

* 1 0 5 2 5 7 4 3 2 7 *

## IN THE DISTRICT COURT FOR CANADIAN COUNTY

## STATE OF OKLAHOMA

| | | |
|---|---|---|
| **1. MELISSA MCCLAIN**<br>**2. ERIN BARTON**<br>**3. CASSIE GOODFELLOW**<br>**4. DONNA WEHMULLER**<br>**5. PAUL HARDAWAY**<br><br><br>PLAINTIFFS<br><br>VS<br><br>**1. CANADIAN COUNTY EX REL THE**<br>**BOARD OF COUNTY COMMISSIONERS,**<br><br>**2. JUDGE BOBBY HUGHEY,** individually<br>and in his official capacity as the Associate<br>District Judge and Director of the Canadian<br>County Children's Justice Center and Juvenile<br>Bureau<br>**3. NACOLE MAJORS,** individually and in her<br>official capacity as the Human Resources<br>Director for Canadian County<br>**4. MELANIE JOHNSON,** individually and in<br>her official capacity as the Director of the<br>Canadian County Children's Justice Center<br>**5. CEDRIC MILLS,** individually and in his<br>official capacity as the Assistant Director of the<br>Canadian County Children's Justice Center<br>DEFENDANTS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **FILED**<br>MARIE HIRST COURT CLERK<br>CANADIAN COUNTY, OKLAHOMA<br><br>JUN 20 2022<br><br>BY _____<br>DEPUTY<br><br>CASE NO: CJ-2022-324<br><br>JURY TRIAL DEMANDED<br>ATTORNEY'S LIEN<br>CLAIMED |

## INITIAL PETITION

CASE ASSIGNED TO:
**JACK D. MCCURDY II**

JUDGE: _____

EXHIBIT 2

Respectfully Submitted,

/s/ Ashley Weyland
Bussett Legal Group, PLLC
2201 N. Classen Blvd
Oklahoma City, OK 73106
Telephone: (405) 605-8073
FAX:  (405) 212-9112
Email: Ashley@BussettLegal.com
*Counsel for the Plaintiffs*

# TABLE OF CONTENTS

INITIAL PETITION ........................................................................................................... 1

TABLE OF AUTHORITIES ........................................................................................... iii

EXHIBITS ......................................................................................................................... v

   I.    EEOC CHARGES APPLICABLE TO THIS CASE: ..................................... v

   II.   TORT CLAIMS APPLICABLE TO THIS CASE ......................................... v

   III.  OTHER EXHIBITS ....................................................................................... v

THIRD AMENDED COMPLAINT ............................................................................... 1

INTRODUCTION .............................................................................................................. 2

   IV.   JURISDICTIONAL ALLEGATIONS .......................................................... 2

     A.   Residency and Venue ........................................................................................ 2

     A.   PRE-SUIT ADMINISTRATIVE REQUIREMENTS AS TO EACH PLAINTIFF: ..... 8

       a.   MELISSA MCCLAIN ................................................................. 8

       b.   ERIN BARTON ............................................................................ 9

       c.   DONNA WEHMULLER ........................................................... 10

       d.   CASSIE GOODFELLOW ......................................................... 10

       e.   PAUL HARDAWAY .................................................................. 11

   V.   STATEMENT OF FACTS ............................................................................. 12

     A.   ADMINISTRATIVE ACTS OF JUDGES. ................................................. 12

     B.   LAW APPLICABLE TO THE ADMINISTRATION OF THE JUVENILE COURTS. 13

     C.   FACTS ABOUT THE CCCJC AND THE HIRING OF KERN RELEVANT TO ALL CLAIMS. ................................................................................................. 15

       a.   Timeline of key events at the CCCJC. ................................................. 15

       b.   About the CCCJC. ................................................................................. 25

       c.   About Judge Hughey .............................................................................. 27

       d.   About Dan Kern. .................................................................................... 35

     B.   HISTORY OF OTHER SEXUAL HARASSMENT COMPLAINTS ......................... 48

     C.   FACTS ABOUT THESE PARTIES ............................................................ 52

     D.   FACTS ABOUT JOHNSON ........................................................................ 61

     E.   FACTS ABOUT MILLS ............................................................................... 62

     F.   FACTS ABOUT MAJORS ........................................................................... 63

     G.   FACTS SPECIFIC TO EACH PLAINTIFF: .............................................. 64

i

a.    MELISSA MCCLAIN ................................................................ 66

i.    Facts regarding McCain's interactions with Kern and reporting.................... 66

ii.   Facts regarding McCain's position transfer...................................... 68

iii.  Facts regarding McCain's Disability, FMLA and ADA Leave....................... 69

b.    ERIN BARTON ......................................................................... 70

c.    DONNA WEHMULLER................................................................. 73

i.    Facts regarding Wehmuller and Kern........................................... 73

ii. Facts regarding additional retaliation ................................................. 75

d.    CASSIE GOODFELLOW ............................................................ 77

e.    PAUL HARDAWAY ................................................................... 78

CAUSES OF ACTION ......................................................................... 80

VI.    FIRST CAUSE OF ACTION – DISABILITY DISCRIMINATION PLAINTIFF
BARTON AGAINST DEFENDANTS CANADIAN COUNTY, JOHNSON, MILLS,
MAJORS, AND HUGHEY IN THEIR OFFICIAL CAPACITIES VIOLATION OF THE
OADA DISABILITY DISCRIMINATION AND ADAA INJUNCTIVE RELIEF ............... 80

VII.    SECOND CAUSE OF ACTION – DISABILITY DISCRIMINATION UNDER THE
OADA PLAINTIFF MCCLAIN AGAINST DEFENDANTS CANADIAN COUNTY,
JOHNSON, MILLS, MAJORS, AND HUGHEY IN THEIR OFFICIAL CAPACITIES ....... 83

VIII.    THIRD CAUSE OF ACTION – EEOC RETALIATION FOR FILING EEOC
CLAIMS, OPPOSING DISCRIMINATIN AND RETAILATION AND FOR
PARTICIPATION IN THE EEOC PROCESS AND ONGOING HOSTILE WORK
ENVIRONMENT ALL PLAINTIFFS AGAINST DEFENDANTS CANADIAN COUNTY
AND ALL INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY .................. 85

IX.    FOURTH CAUSE OF ACTION – NEGLIGENCE AND/OR NEGLIGENCE PER SE
ALL PLAINTIFFS AGAINST ALL INDIVIDUAL DEFENDANTS IN THEIR
INDIVIDUAL CAPACITY........................................................................ 89

X.   FIFTH CAUSE OF ACTION – NEGLIGENCE, NEGLIGENCE PER SE, AND
NEGLIGENT TRAINING, HIRING, AND SUPERVISION PLAINTIFFS MCCLAIN AND
BARTON AGAINST DEFENDANT CANADIAN COUNTY AND JUDGE HUGHEY IN
HIS OFFICIAL CAPACITY ..................................................................... 90

XI.    SEVENTH CAUSE OF ACTION – CONSPIRACY ALL PLAINTIFFS AGAINST
DEFENDANT HUGHEY, MILLS, JOHNSON, AND MAJORS IN THEIR INDIVIDUAL
CAPACITY........................................................................................ 92

# TABLE OF AUTHORITIES

**Cases**

Edwards v. Canadian County, District Court of Canadian County, CV-2014-265 .......... 17
*See Edwards v. Canadian County*, 2015 OK 58, 378 P3d. 54 ......................................... 17

**Statutes**

10A O.S. § 2-4-102 ...................................................................... 14, 15, 37, 40
10A O.S. § 2-4-109 ..................................................................................... 15
10A O.S. §2-4-101 ............................................................................ 14, 16, 25
10A O.S. §2-4-109 ........................................................................................ 6
10A O.S. 2-7-902 ....................................................................................... 14
10A OS §1-1-101 ........................................................................................ 27
10A OS §2-1-101 ........................................................................................ 27
12 O.S. § 2010 ......................................................................................... 3, 4
19 O.S. §1500 ............................................................................................. 4
19 O.S. §452.1 .......................................................................................... 50

**Other Authorities**

*CB by and thorough Charleston DePreist et al v. Walnut Grove Correctional Authority,
et al, 3:10-cv-663, United States District Court for the S. Dist. Of Mississippi, Jackson
Division* .......................................................................................................... 36
*CB by and thorough Charleston DePreist et al v. Walnut Grove Correctional Authority,
et al, 3:10-cv-663, United States District Court for the S. Dist. Of Mississippi, Jackson
Division, Doc 75, Order Approving Settlement Filed 3/26/2012* ................................... 37
http://archives.etypeservices.com/Yukon1/Magazine173160/Publication/Magazine17316
0.pdf .............................................................................................................. 50
https://www.facebook.com/canadiancountychildrensjusticecenter/photos/associate-
district-judge-bob-hughey-is-pleased-to-announce-that-daniel-kern-has-
/2069085303140694/ ...................................................................................... 35
https://www.justice.gov/opa/pr/department-justice-releases-investigative-findings-
walnut-grove-youth-correctional-facility ......................................................... 37
https://www.news9.com/story/5e346dc2527dcf49dad6dc81/2-women-claim-they-were-
fired-for-reporting-sexual-harassment-against-canadian-co-juvenile-center-director . 21,
55
https://www.news9.com/story/5e346e68527dcf49dad6e11b/harassment-inappropriate-
behavior-alleged-at-el-reno-detention-center ...................................................... 21, 54
https://www.newson6.com/story/5e346de2527dcf49dad6dd76/canadian-co-officials-
respond-to-allegations-of-misconduct-at-juvenile-center ............................................ 54

https://www.okcommerce.gov/wp-content/uploads/Population-Projections-Report-
2012.pdf ............................................................................................................................. 16
https://www.okgazette.com/oklahoma/canadian-countys-juvenile-center-is-more-than-a-
jail/Content?oid=2962260 ................................................................................................. 16
https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/case/cb_v_walnu
t_grove_complaint.pdf ....................................................................................................... 39

# EXHIBITS

**I.**    **EEOC CHARGES APPLICABLE TO THIS CASE:**

1. Ronda Moss

2. Melissa McClain

3. Erin Barton

4. Donna Wehmuller

5. Cassie Goodfellow

6. Paul Hardaway

7. Robert Fletcher

**II.**    **TORT CLAIMS APPLICABLE TO THIS CASE**

8. Ronda Moss

9. Melissa McClain

10. Erin Barton

11. Donna Wehmuller

12. Cassie Goodfellow

13. Paul Hardaway

14. Robert Fletcher

**III.**    **OTHER EXHIBITS**

15. List of Individuals Identified in Petition

IN THE DISTRICT COURT FOR CANADIAN COUNTY

STATE OF OKLAHOMA

| | |
|---|---|
| **1. RONDA MOSS** | ) |
| **2. MELISSA MCCLAIN** | ) |
| **3. ERIN BARTON** | ) |
| **4. CASSIE GOODFELLOW** | ) |
| **5. DONNA WEHMULLER** | ) |
| **6. PAUL HARDAWAY** | ) |
| **7. ROBERT FLETCHER** | ) |
| PLAINTIFFS | ) |
| | ) |
| VS | )   CASE NO: CJ-2020-617 |
| | ) |
| **1. CANADIAN COUNTY EX REL THE** | )   JURY TRIAL DEMANDED |
| **BOARD OF COUNTY COMMISSIONERS**, | )   ATTORNEY'S LIEN |
| | CLAIMED |
| **2. JUDGE BOBBY HUGHEY**, individually | ) |
| and in his official capacity as the Associate | ) |
| District Judge and Director of the Canadian | ) |
| County Children's Justice Center and Juvenile | ) |
| Bureau | |
| **3. DANIEL KERN**, individually and in his | ) |
| official capacity as the Facility Director of the | ) |
| Canadian County Children's Justice Center. | ) |
| **4. NACOLE MAJORS**, individually and in her | ) |
| official capacity as the Human Resources | ) |
| Director for Canadian County | ) |
| **5. MELANIE JOHNSON**, individually and in | ) |
| her official capacity as the Director of the | ) |
| Canadian County Children's Justice Center | ) |
| **6. CEDRIC MILLS**, individually and in his | ) |
| official capacity as the Assistant Director of the | ) |
| Canadian County Children's Justice Center | ) |
| DEFENDANTS | ) |

**THIRD AMENDED COMPLAINT**

**COME NOW**, the Plaintiffs, Melissa McClain, Erin Barton, Cassie Goodfellow, Paul Hardaway, and Donna Wehmuller, individually, and for their claims against Canadian County *ex rel* the Board of County Commissioners, Judge Bobby Hughey, individually and in his official capacity, NaCole Majors, individually and in her official capacity, Cedric

1

Mills, individually and in his official capacity, and Melanie Johnson in her individual and official capacity allege and state as follows:

## INTRODUCTION

This is an employment related discrimination case arising out of the employment of five (5) former employees in Canadian County Oklahoma. The employees worked at the Gary E. Miller Canadian County Children's Justice Center ("CCCJC") in El Reno, Oklahoma. Canadian County has two courthouses – the main courthouse in downtown El Reno where all court proceedings involving adults occur that houses two elected District Judges and 3 Special Judges. The management of the main courthouse falls under the purview of the elected District Judges with each of the two judges alternating acting as the "Chief Judge" or "Administrator" of the Courthouse and the court dockets. The second courthouse is the CCCJC which is located several miles away from the main courthouse on Route 66 also in El Reno. All proceedings involving children take place at the CCCJC and this includes deprived, delinquent, adoptions, minor guardianships, and minor victim's protective orders. To understand the dynamics of the circumstances that gives rise to this lawsuit one must understand the structure of the juvenile court system in Oklahoma generally and Canadian County in particular.

## IV.   JURISDICTIONAL ALLEGATIONS

### A.   Residency and Venue

1. Melissa McClain ("McClain") is a citizen of the state of Oklahoma and a resident of Canadian County.

2. Erin Barton ("Barton") is a citizen of the state of Oklahoma and a resident of Canadian County.

3. Cassie Goodfellow ("Goodfellow") is a citizen of the state of Oklahoma and a resident of Canadian County.

4. Donna Wehmuller ("Wehmuller") is a citizen of the state of Oklahoma and a resident of Canadian County.

5. Paul Hardaway ("Hardaway") is a citizen of the state of Oklahoma and a resident of Canadian County.

6. Each Plaintiff was employed by Canadian County and worked at the CCCJC.

7. Plaintiffs allege that the evidence will show that there is a pattern and practice of violating the rights of employees at the CCCJC not only during the time period relative

2

to this suit but dating back a period of years shortly after the appointment of Judge Hughey and continuing to occur thereafter.[1]

8.  The Management Team at the CCCJC changed over periods of time relevant to this proceeding.[2]

9.  This matter is related to case Moss et al v. Canadian County, 22-cv-127, pending before the Honorable Judge Palk in the Western District of Oklahoma. This matter is filed relating to the claims that were not ripe at the time that the case was filed and the Court denied Plaintiffs the ability to amend and include the same.

10. EEOC charges have been filed by McClain (Exhibit 3), Barton (Exhibit 4), Wehmuller (Exhibit 5), Goodfellow (Exhibit 6), and Hardaway (Exhibit 7). All Exhibits are incorporated hereto by reference in accordance with 12 O.S. § 2010 (c).

11. Tort Claims have been filed by Plaintiffs McClain (Exhibit 8), Barton (Exhibit 9), All Exhibits with their allegations and information are incorporated hereto by reference as per 12 O.S. § 2010 (c).

12. The Oklahoma Employment Security Commission (OESC) documents relevant to this proceeding are attached hereto also. McClain's Application for OESC benefits is attached as Exhibit 10. The OESC findings on appeal of McClain's OESC benefits is attached as Exhibit 11. Barton application for benefits is attached as Exhibit 12. The Barton OESC Appeal Determination is Exhibit 13. All Exhibits are incorporated hereto by reference in accordance with 12 O.S. § 2010 (c) .

13. Exhibit 14 – Barton's Resignation Letter for constructive discharge is attached as Exhibit 14, McClain's Resignation Letter for constructive discharge is attached as Exhibit 15. The posting of McClain and Barton's jobs while they are on FMLA is attached as Exhibit 16. All Exhibits are incorporated hereto by reference in accordance with 12 O.S. § 2010 (c).

14. Canadian County is a political subdivision of the State of Oklahoma managed by and through the Board of County Commissioners who are duly elected by the people of Canadian County.

15. Venue is proper in the District Courts in Oklahoma County or Canadian County or the Western District of Oklahoma.

---

[1] To assist the Court in easily identifying and tracking all the individuals involved in this suit, Plaintiffs have attached as Exhibit 1, a List of Individuals Identified in the Petition with a brief biography of each.  Exhibit 2 is a chart of Management Team over the years. All Exhibits with their allegations and information are incorporated hereto by reference as per 12 O.S. §2010(c) .

[2] All Exhibits with their allegations and information are incorporated hereto by reference as per 12 O.S. §2010(c).

16. The CCCJC is a department under the fiscal umbrella of Canadian County. *See* Exhibit 17. All Exhibits with their allegations and information are incorporated hereto by reference as per 12 O.S. §2010(c).

17. All personnel at the CCCJC are employees of Canadian County. *See* Exhibit 17.

18. The CCCJC fiscal matters fall under the County Purchasing Act, 19 O.S. §1500 *et seq.* *See* Exhibit 17.

19. Canadian County has three County Commissioners who are responsible for the operations of the CCCJC. *See* Exhibit 17.

20. Marc Hader ("Hader") is the Canadian County Commissioner for District 1 and is a resident of Canadian County. *See* Exhibit 17.

21. Dave Anderson ("Anderson") is the Canadian County Commissioner for District 2 and is a resident of Canadian County. *See* Exhibit 17.

22. Jack Stewart ("Stewart") is the Canadian County Commissioner for District 3 and is a resident of Canadian County. *See* Exhibit 17.

23. The 3 County Commissioners are the administrative and decision-making arm of the county against whom suit is filed. *See* Exhibit 17.

24. Program and statutory responsibility for the CCCJC falls under the purview of the Associate District Judge Bobby Hughey who handles all Juvenile Dockets. *See* Exhibit 17.

25. Judge Bobby Hughey a/k/a Bob Hughey ("Judge Hughey") is a citizen of the state of Oklahoma and a resident of Canadian County.

26. Judge Hughey is the duly elected Associate District Judge of Canadian County, 26th Judicial District for the State of Oklahoma, having last been elected in November 2018.

27. Judge Hughey was appointed to the bench in 2008 by Governor Brad Henry.

28. Judge Hughey is an employee of the Oklahoma District Courts for the State of Oklahoma.

29. District Court Judges which includes Associate District Court Judges have supervisory control over all District Court personnel.

30. The employees herein are County employees but also function as District Court Personnel as the CCCJC is both a courthouse and a juvenile bureau.

31. Judge Hughey is head of the Juvenile Division of the Canadian County District Court and acts in an administrative capacity over the Gary E. Miller Canadian County Children's Justice Center ("CCCJC") and the Canadian County Education Center ("CCEC"). *See* Exhibit 17.

32. The Juvenile Division includes the Juvenile Bureau which addresses children in the criminal justice system, children and families in the deprived system, private and DHS adoptions, and guardianship proceedings.

33. The "Juvenile Bureau" is a part of the CCCJC operations, however the entirety of the CCCJC is not the juvenile bureau as it also houses court personnel, the District Attorney's Office, Cardinal Point, DHS and other court related services and entities.

34. At all times relevant hereto, Hughey acted as an agent of both the state of Oklahoma and Canadian County.

35. Judge Hughey is sued in his Official Capacity as an employee of the State of Oklahoma and a representative of the Canadian County.

36. Judge Hughey is not sued for his acts in a judicial capacity deciding cases but for actions taken in his official administrative capacity on behalf of the State of Oklahoma and Canadian County relating to the administration of the of the CCCJC and for violations of the US Constitution under color of state law.

37. When Judge Hughey acts in an administrative capacity he is acting both as an agent of the State of Oklahoma and Canadian County. Judicial immunity does not apply when judges perform acts in an administrative capacity. *Forrester v. White*, 484 U.S. 219, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988).

38. The CCCJC is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants. *See* Exhibit 17.

39. The sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center. *See* Exhibit 17.

40. The Resolutions passed for the construction, funding and maintenance of the CCCJC were known as County Resolutions 96-20 and 96-21. See Exhibit 18.

41. Resolution called for the providing of funds for the Construction, Financing, and Equipping of a Juvenile Delinquents Detention Facility and Juvenile Justice Facilities in Canadian County including design, construction, expenses, operations, equipment and furnishings. See Exhibit 19, pg. 1.

42. The facilities created (the CCCJC) was to be owned by the Canadian County Public Facilities Authority subject to the direction of the Canadian County Commissioners to the Trustees of the Canadian County Public Facilities Authority. See Exhibit 19, pg 2.

43. Judge Bobby Hughey and the Facility Director designate managerial and administrative staff to participate in the Management Team of the center. *See* Exhibit 17.

44. The management team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs and to discuss other issues as needed. *See* Exhibit 17.

45. Management team members then communicate this information to the staff within their program of responsibility. *See* Exhibit 17.

46. The Management Team consists of the Facility Director, the Assistant Facility Director, the Executive Assistant, The Director of Operations, the Accountant, The Juvenile Probation Director, the Detention Direction, the Assistant Detention Directors, the Director of Behavioral Health Services, The Group Home Director, the Comprehensive Home Based Services Supervisor, The Director of Student Services, The Community Education and Resource Coordinator, The Supervised Visitation and Exchange Program Director, The Human Resource Manager, the Drug Screen Program Supervisor and Quality Assurance Supervisor.[3] *See* Exhibits 2 and 17.

47. The Citizen's Advisory Committee serves to add in the effective administration of the statutes relating to juveniles and for the purpose of counsel and advice to the center. Committee members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. *See* Exhibit 17 and 10A O.S. §2-4-109.

48. The CCEC is an alternative school that contracts with ten school districts in Canadian County to provide educational services to students who have not been successful in a regular school settings. Referrals are made by the school district where the student resides. Placement at the CCEC is a voluntary decision by the parents of the child who believe the CCEC is the proper placement for the child. *See* Exhibit 17.

49. El Reno Public Schools serves as the Lead Educational Agency for the CCEC. *See* Exhibit 17.

50. The CCEC faculty consists of an administrative principal/director, a dean of students, and five teachers specializing in English, math, science, social studies and reading. *See* Exhibit 17

---

[3] See Exhibit 2, a list of individuals serving on the Management Team as per the Annual Reports filed by the Center and/or per the knowledge and experience of the Plaintiffs in this case.

51. The CCEC is a Department under the fiscal umbrella of Canadian County and pays the salary of the individuals who teach at the center. *See* Exhibit 17.

52. CCCJC's fiscal matters fall under the County Purchasing Act in the Oklahoma Statutes. Canadian County has three elected County Commissioners who are responsible for these operations. *See* Exhibit 17.

53. The CCCJC and El Reno Public Schools are joint employers of the teachers at the school.

54. No allegations of wrongdoing are made against El Reno Public Schools.

55. Daniel Kern ("Kern") was the Facility Director for the Canadian County Children's Justice Center from March 2019 until his termination on or about November 2019.

56. At the time of the acts complained of Kern was a citizen of the state of Oklahoma and a resident of Oklahoma County.

57. At the present time, Kern is believed to be a citizen of the state of Pennsylvania.

58. NaCole Majors ("Majors") is the Human Resources Director for Canadian County and, on information and belief, is a resident of Canadian County.

59. Majors was the Human Resources Director at all times relevant to the claims herein.

60. Melanie Johnson ("Johnson") is the current Facility Director for the CCCJC and is a resident of Oklahoma County.

61. Johnson has been an employee of Canadian County from approximately August of 2020 through present. Exhibit. 19, Affidavit of Schweitzer, ¶28e.

62. Cedric Mills is the Assistant Facility Director and for the CCCJC and on information and belief is a resident of Oklahoma County.

63. Mills has been an employee of Canadian County from 2018 through present.

64. All of the acts complained of occurred in Canadian County, Oklahoma in and around the District Court for Canadian County, the CCCJC, and the Canadian County Building.

65. This action includes complaints of civil rights violations brought pursuant to Title VII of the Civil Rights Act of 1964 for discrimination on the basis of gender and religion, the creation of a hostile work environment, violation of the Oklahoma Anti-Discrimination Act for age and disability, the Rehabilitation Act of 1973, the Family and Medical Leave Act, the Americans with Disabilities Act, violations of the right to free speech under the U.S. and Oklahoma Constitutions, due process violations under the U.S. and Oklahoma Constitutions, violation of the Plaintiffs' rights to enjoy the

gains of their own industry, tortious interference with the employment relationship, and a Burk tort for retaliatory termination in violation of Oklahoma's clearly established public policy including, but not limited to, Okla. Const. Art. II, § 2, 7, 11, 22; and 21 O.S. § 580, 42 USC § 1983, and the laws of the State of Oklahoma and the US Constitution.

## A.   PRE-SUIT ADMINISTRATIVE REQUIREMENTS AS TO EACH PLAINTIFF:

66. All administrative requirements have now been exhausted as of the time of the filing of this Amended Complaint. Plaintiffs have filed all applicable tort claims and EEOC claims and their investigatory periods have run.

### a. MELISSA MCCLAIN

67. McClain is a Caucasian female over the age of forty (40) and was at the time the acts complained of occurred.

68. McClain is also an individual with a disability and is entitled to protections with the Americans with Disabilities Act ("ADA"), the Federal Rehabilitation Act ("Rehab Act"), the Family and Medical Leave Act ("FMLA") and the OADA.

69. McClain has 2 EEOC charges which are part of the related case currently pending in the US District Court for the Western District of Oklahoma.

70. In September 2021, McClain filed a third charge of discrimination with the EEOC (564-2022-1739).

71. Facts related to the third charge were included in the related case but the matters were not ripe at the time the case was filed so they must be brought herein as the Defendants did not waive their ripeness and they were thus not included in the other case. Additionally all facts were not plead.

72. The Notice of Rights was issued by the Department of Justice on March 22, 2022.

73. McClain was discharged from her employment in July 2021. Contemporaneously with the filing of this Amended Petition, is filing a subsequent Tort Claim and EEOC Charge of Discrimination as the Defendants have continued to discriminate against her and retaliate in her employment resulting in her constructive discharge.

74. McClain and Barton both had their jobs posted as "open for hiring" while on FMLA leave.

75. McClain was awarded unemployment by the Oklahoma Employment Security Commission ("OESC") in August 2021 after her employment ended with the Defendant County which the County appealed.

76. In March 2022, the OESC found that McClain's employment was terminated from the center when they posted her job for hire when she was on FMLA leave.

77. McClain filed a second claim pursuant to the OGTCA on January 25, 2022 with Canadian County. The same thereafter was served via certified mail on the State of Oklahoma.

78. The tort claim expired by operation of law for Canadian County on April 26, 2002.

79. The State of Oklahoma denied the tort claim on May 17, 2022 and the Plaintiff received notice of the same on May 20, 2022 by letter served via USPS.

80. McClain complained of Title VII and OADA discrimination based on sex, age, hostile work environment, disability, religion, and retaliation.

81. This matter is timely filed on the tort claim and the EEOC charge.

### b. ERIN BARTON

82. Barton is a Caucasian female over the age of forty (40) and was at the time the acts complained of occurred.

83. Barton is also an individual with a disability and is entitled to protections with the Americans with Disabilities Act ("ADA"), the Federal Rehabilitation Act ("Rehab Act"), the Family and Medical Leave Act ("FMLA") and the OADA.

84. Barton was discharged from her employment in June or July 2021.

85. Barton filed a Second EEOC Charge related to her employment with the Defendants in September 2021 (564-2022-1741).

86. The EEOC issued the right to sue on the second charge of discrimination on March 22, 2022.

87. The tort claim expired by operation of law for Canadian County on April 26, 2002.

88. Barton applied for unemployment benefits with the OESC in August 2021 related to the termination of her employment with the County.

89. The OESC awarded benefits finding that she left employment due to a hostile work environment.

9

90. The State of Oklahoma denied the tort claim on May 17, 2022 and the Plaintiff received notice of the same on May 20, 2022 by letter served via USPS.

91. Barton complained of discrimination Title VII and OADA based on sex, age, hostile work environment, disability, and retaliation.

### c. DONNA WEHMULLER

92. Wehmuller filed an intake with the EEOC alleging discrimination in her employment with Canadian County by and through Judge Hughey, Kern, and the Board of County Commissioners.

93. Wehmuller is a Caucasian female over the age of forty (40).

94. Wehmuller resigned in May 2021 due to ongoing discrimination and retaliation as a result of her allegations against the Defendants.

95. Wehmuller reported the conduct of the individuals at the CCCJC to the media, specifically Channel 9 and it resulted in an expose of the conduct occurring at the center.

96. Wehmuller filed a Second EEOC Charge (564-2022-132) on or about September 2021.

97. The EEOC issued the right to sue letter on March 23, 2022.

98. Wehmuller complained of Title VII and OADA discrimination based on sex, age, hostile work environment, and retaliation.

### d. CASSIE GOODFELLOW

99. Goodfellow was employed as a bookkeeper with the CCCJC until January 8, 2021, when she was terminated.

100.  Goodfellow was known to be an associate and acquaintance of the Plaintiffs herein and was a witness to the hostile work environment created by Kern and Judge Hughey. Ex. 19, Affidavit of Schweitzer, ¶70-71

101.  Goodfellow engaged in protected activity by acting as a witness on behalf of the other Plaintiffs and maintaining contact and relationships with Moss after her termination from the center.

102.  Goodfellow engaged in protected activity by opposing the discriminatory behavior of Dan Kern and complaining about the same to Human Resources. See Ex. 19, Affidavit of Schweitzer.

103. Goodfellow experienced retaliation as a result of reporting the harassment and sexist behavior of Dan Kern and from acting as a witness for and supporting the other plaintiffs herein. See Ex. 19, Affidavit of Schweitzer.

104. In March of 2020 the United States and the State of Oklahoma began shutting down many operations due to the worldwide pandemic caused by the corona virus which caused the disease known as COVID 19.

105. The Families First Coronavirus Response Act was passed on March 18, 2020, and provided certain benefits to employees to allow paid time off for those who suffered with COVID 19, for time for employees to care for family members with COVID 19, and for employees to care for their children who were no longer in school.

106. Goodfellow made complaints about the CCCJC failing to comply with other state and federal laws including the Families First Corona Virus Relief Act and the Occupational Health and Safety Commission.

107. Goodfellow reported deficiencies in the compliance with the Oklahoma Occupational Health and Safety Standards Act (OOHSSA), 40 O.S. §§ 401-435 which regulates the Occupational Health and Safety of Public Employees.

108. In September 2021, Goodfellow filed a charge of discrimination with the EEOC (564-2022-116).

109. The EEOC issued the right to sue letter on March 23, 2022.

110. Goodfellow complained of Title VII and OADA discrimination based on sex, age, hostile work environment, retaliation and violations of public policy.

### e. PAUL HARDAWAY

111. Hardaway filed an intake and charge of discrimination with the EEOC alleging discrimination in his employment with Canadian County by and through Judge Hughey, Kern, and the Board of County Commissioners on September 21, 2021 (564-2022-1740).

112. The EEOC issued the right to sue letter on March 21, 2022.

113. Hardaway is a white male and over the age of 40.

114. Hardaway engaged in protected activity by acting as a witness on behalf of the other Plaintiffs and maintaining contact and relationships with Moss after her termination from the center. See Ex. 19, Affidavit of Schweitzer.

11

115.  Hardaway engaged in protected activity by opposing the discriminatory behavior of Dan Kern and complaining about the same to Human Resources. See Ex. 19, Affidavit of Schweitzer.

116.  Hardaway reported to Human Resources, and in particular Ronda Moss and Melissa McClain that Defendant Dan Kern was creating a sexually hostile work environment in September 2019.

117.  Hardaway wrote a statement about the conduct of Kern that was given to Defendant Hughey.

118.  Included in the statement made by Hardaway was that Kern made sexual comments about a 13-year child who was a student at the CCEC.

119.  Hardaway also reported that Kern offered to engage in illegal acts by taking the student off premises to see her father "if she was good."

120.  Hardaway reported the failure of Judge Hughey and Canadian County to act to protect fellow employees and students to the media in October 2019

121.  Subsequent to his reports to include his report to the media in October 2019, Hardaway was demoted from his employment in May 2021 and constructively discharged. Hardaway was also denied the opportunity to interview or be hired for a position that he had been actively training for and had been tapped for on the retirement of his predecessor.

122.  Suit is timely filed on Hardaway's behalf within 180 days of the expiration of his tort claim.

123.  The right to sue letter was issued on March 21, 2022.

124.  Hardaway complained of Title VII and OADA discrimination based on sex, age, hostile work environment, and retaliation.

## V.    STATEMENT OF FACTS

### A.    ADMINISTRATIVE ACTS OF JUDGES.

125.  A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice. *In re Okla. Code of Judicial Conduct* (Title 5, Ch. 1 App. 4), 2010 OK 90, 285 P.3d 1080, 1088.

126.  Judge Hughey regularly told all employees of the CCCJC that no one at the center was hired or fired without his approval. See Ex. 19, Affidavit of Misty Schweitzer, ¶124.

127.    Rule 2.12 of the Rules of Judicial Conduct addresses the supervisory role of Judges in Oklahoma. This rule provides that "A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code."

128.    The comment to the Rule provides "A judge is responsible for his or her own conduct and for the conduct of others, such as staff, when those persons are acting at the judge's direction or control. A judge may not direct court personnel to engage in conduct on the judge's behalf or as the judge's representative when such conduct would violate the Code if undertaken by the judge.

129.    Judge Hughey acts in an administrative capacity on behalf of the state and Canadian County when supervising court personal like those who have filed suit herein and in acting in a supervisory and managerial capacity over the CCCJC. Judge Hughey's acts are on behalf of the state of Oklahoma and Canadian County.

### B.    LAW APPLICABLE TO THE ADMINISTRATION OF THE JUVENILE COURTS.

130.    When acting in his administrational capacity as the head of the Juvenile Bureau, Judge Hughey is performing a county function. See 2008 OK AG 30 which provides as follows:

a.    Juvenile bureaus were created in 1968 to serve those counties with populations of eighty thousand (80,000) or more. The predecessor of these juvenile bureaus was the office of County Juvenile Officer, which was created in 1947 to serve individual counties.

b.    Counties in which the bureaus are located are responsible for all expenses of the juvenile bureau.

c.    Juvenile court judges are responsible for supervision of the director of the juvenile bureau and for supervising, appointing and removing the director. The director is responsible for appointing and removing other employees.

d.    Although juvenile court judges are state officers, they are not acting in a judicial capacity when supervising juvenile bureau employees. As juvenile bureaus are created to serve the county, juvenile court judges are generally acting in an administrative capacity on behalf of the county. Thus, as a general rule, juvenile bureaus and their employees are considered to be employees of the county.

e.    The district attorney of the county in which the juvenile bureau is located is statutorily required to represent the juvenile bureau and any employee who is acting

13

in his or her official capacity at the time of the act or omission complained of in any lawsuit.

131. The Public Schools which serve children in the juvenile justice system are part of the agencies in the system. 10A O.S. 2-7-902. This means that the CCEC is part of the Juvenile Justice System and subject to the supervision of the District Judge and the Director of the Juvenile Bureau.

132. The Juvenile Bureau is responsible for providing juvenile justice services to children, youth and family located within the county; it is subject to the jurisdiction of the Juvenile Division of the county district court. 10A O.S. §2-4-101.

133. Oklahoma statutory law sets forth the hierarchy of the management of the Juvenile Bureau and how the same should be overseen and managed in 10A O.S. § 2-4-102:

   a. The chief administrative officer of the juvenile bureau shall be a director, who shall be subject to the direction and supervision of the judge of the Juvenile Division, subject to the general administrative authority of the Presiding Judge of the Judicial Administrative District within budgetary limitations. There shall be sufficient counselors, clerks, and assistant clerks to properly conduct the work of the bureau. **The director shall be a person over the age of thirty (30) years, of good character, qualified in social work, and familiar with the problems of juvenile delinquency and dependency**. The director shall be appointed by the judge of the Juvenile Division, subject to the general administrative authority of the Presiding Judge of the Judicial Administrative District, from a list of eligible persons established by the citizens' advisory committee at the request of the Presiding Judge of the Judicial Administrative District. Counselors and other persons may be employed by the director with the approval of the judge of the Juvenile Division, subject to the general administrative authority of the Presiding Judge of the Judicial Administrative District. **The director may be removed by the judge of the Juvenile Division, subject to the general administrative authority of the Presiding Judge of the Judicial Administrative District at any time. The counselors and other employees may be removed by the director**.

134. The Juvenile Bureau and the Center itself are not the same. The Juvenile Bureau is a part of the Center but not all of the Center.

135. In 2015-2016 Fiscal Year the Director of the Juvenile Bureau was Michael Ellison. The Facility Director/Co-Director was not considered the Director of the Juvenile Bureau. See Exhibit 17, page 11.

136. In 2016-2017, Michael Ellison's title was renamed as the Probation Supervisor. See Exhibit 17, page 15. No one was given the title of Director of the Juvenile Bureau.

137. The title of "Director of Juvenile Bureau" never appears on the Annual Reports after the 2015-2016 fiscal year. On information and belief this is due to the ongoing dispute between the County Commissioners and Judge Hughey over the funds received to operate the CCCJC. Judge Hughey unilaterally attempted to classify the entire CCCJC as a "Juvenile Bureau" to keep the County Commissioners from accessing the funds appropriated under County Resolution 96-21 which provided for the operation of the center.

138. Judge Hughey, pursuant to 10A O.S. § 2-4-102, is responsible for overseeing the work done by this director and any subsequent director of the Juvenile Bureau and/or the CCCJC in his role as the administrator of the center.

139. Judge Hughey, pursuant to 10A O.S. § 2-4-102, has general administrative authority over the Director and the CCCJC employees.

140. While the Director of the Juvenile Bureau may remove the employees without the approval of the Judge, the policy and procedure in Canadian County, as set forth by Judge Hughey is that no employee is hired or fired without his approval. See Ex. 19, Affidavit of Misty Schweitzer, ¶124.

141. Hughey has made the statement about no one is hired or fired without his approval to these Plaintiffs as well. See Ex. 19, Affidavit of Schweitzer. ¶124.

142. As the head judge of the Juvenile Division, Hughey has the administrative authority to make such a rule and has the power vested in him as a state judge to act in such a capacity. 10A O.S. § 2-4-102

143. 10A O.S. § 2-4-102 sets out the morality, work, and educational requirements for the Director of the Juvenile Bureau which Hughey properly or improperly determined was the director of the CCCJC and the chain of command for the hiring, firing, promotion, or discipline of employees.

144. Additionally, a Citizen's Advisory Committee is established to aid in the effective administration of the juvenile bureau. See 10A O.S. § 2-4-109.

## C.   FACTS ABOUT THE CCCJC AND THE HIRING OF KERN RELEVANT TO ALL CLAIMS.

### a.   Timeline of key events at the CCCJC.

145.    In 1995 the population of Canadian County exceed 80,000.[4] By law any county having in excess of 80,000 people there is a created a juvenile bureau and a citizens advisory committee to oversee the bureau. 10A O.S. §2-4-101.

146.    In 1996 the citizens of Canadian County passed a .35% sales tax for the construction, maintenance, and providing of juvenile justice services in Canadian County.  See Exhibit 18, Resolution 96-21.

147.    The facility opened its doors in 1999 and is the only juvenile facility in Oklahoma to offer "every conceivable resource the justice system has in helping children struggling with behavior issues and crime."[5] See Exhibit 20, Gazette Article. The CCCJC also serves families involved in the deprived system in Oklahoma.

148.    Bill Alexander worked for the CCCJC until 2007 as the Detention Director when he left to manage another facility.

149.    Judge Hughey was appointed to the bench in 2008. See Exhibit, 17.

150.    Prior to appointment to the bench Judge Hughey routinely practiced before the previous judge and on information and belief was a contract attorney for the CCCJC.

151.    On information and belief, Hughey was recommended for the job based on his knowledge and experience working with the center and its staff.

152.    At the time Hughey was appointed the Facility Director of the CCCJC was Joan South.

153.    On April 5, 2011, Canadian County voters were asked to allocate .10% of the .35% sales tax for the CCCJC for the purpose of acquiring, constructing, renovating, equipping, furnishing and operating county jail facilities. This vote did not pass.

154.    This attempt to reallocate funds led to a rift between the County Commissioners and the CCCJC.

155.    Bill Alexander was rehired in 2011 as the Assistant Facility Director. On information and belief, there had never been an Assistant Facility Director before Alexander was hired for this position.

156.    Bill Alexander was rehired amid a dispute between the County Commissioners and the CCCJC over the use of the tax funds from the 1996 election for continued operations for the center without the involvement of the Commissioners.

---

[4] https://www.okcommerce.gov/wp-content/uploads/Population-Projections-Report-2012.pdf
[5] https://www.okgazette.com/oklahoma/canadian-countys-juvenile-center-is-more-than-a-jail/Content?oid=2962260

157.   The County Commissioners ordinarily make the decisions about the usage and spending of county funds.   The Commissioners attempted to reallocate funds appropriated to the operation of the CCCJC to the operation of other facilities in Canadian County, in particular the operation of the County Jail.

158.   This dispute resulted in a lawsuit which was filed in 2014. *See Edwards v. Canadian County*, District Court of Canadian County, CV-2014-265.   The suit was ultimately resolved on appeal in favor of the CCCJC holding that the funds were allocated by a vote of the people for the operation of the CCCJC and the Commissioners could not unilaterally reappropriate the funds for other county usage. *See Edwards v. Canadian County*, 2015 OK 58, 378 P3d. 54.

159.   To this day there remains discord between the County Commissioners and the Management at the CCCJC over the attempted reallocation of funds and the elections in 2011, 2014, and 2015.

160.   Joan South retired upon the rehiring of Alexander.[6] On information and belief South retired because she did not want to work with Alexander again because of how he treated women.

161.   In 2011, Dr. Bill Sharp was the Director of Behavioral Health. Sharp was appointed Interim Facility Director upon South's retirement.

162.   Instead of appointing Sharp as the permanent Facility Director, Judge Hughey elected to make Sharp a Co-Director and also promoted Alexander to the position of Co-Director.  Prior to 2012, there had never been two facility directors. See Ex 2, Chart.

163.   On information and belief, Alexander was promoted to continue the fight against the County Commissioners over the use of the sales tax which went to the vote of the people in 2015 because the Rules of Judicial Conduct prohibit Hughey as the judge from acting in such a role.

164.   Such a hiring would be an inappropriate use of judicial power and authority. The Rules of Judicial Conduct prohibit a judge from acting in a way to influence an election and/or comment or suggest how they would rule on matters.

165.   Mark Hader was first elected as a County Commissioner in 2014 during the height of the dispute over the use of the sales tax funds. Hader replaced Phil Carson as a Commissioner who retired. Hader and Commissioner Anderson in particular wanted to reallocate the CCCJC funds.  The plan for the reallocation of funds was colloquially referred to as the "Anderson Plan."

---

[6] See Section V(C) below for further discussion on the relevance of the rehiring of Alexander on the operations of the facility.

166.    On information and belief there is specific discord between Judge Hughey and Mark Hader over Hader's 2014 election, the attempt to reallocate CCCJC sales tax funds, and the posting of signs in front of or near the CCCJC referring to Hader in a derogatory manner.

167.    Signs were posted in front of the center which read "For Sale 474-9558 Call Marc Hader." See Exhibit 21, For Sale Signs. The purpose of the signs was to imply the Marc Hader was selling the CCCJC to the highest bidder.

168.    On information and belief, said signs were posted by County employees acting at the direction of Judge Hughey based on Hader's agreement with the other County Commissioners. Specifically, Hughey told Plaintiff Fletcher to make such signs and put them out.

169.    Hughey's involvement with or promotion of said political activities is a violation of the Code of Judicial Conduct.

170.    The expenditure of county funds and materials to create and post such signs is a violation of the County Purchasing Act.

171.    Bill Alexander was terminated in the fall of 2017 and Bill Sharp retired in 2018.

172.    Bill Alexander was terminated after 2 employees made allegations of sexual harassment against him.  Alexander allegedly solicited 2 female employees to engage in sexual behavior.

173.    Alexander was placed on paid leave after the County Commissioners received notice that a charge of discrimination was filed against him. An independent investigation was done into Alexander's conduct. See Exhibit 22, Announcement of Alexander Suspension.

174.    Alexander was fired at the conclusion of the investigation which cost the county in excess of $30,000 to conduct. Moss facilitated the investigation by working with the law firm that investigated Alexander and knows the proper process for such an investigation.

175.    Ronda Moss was appointed Interim Facility Director in the spring of 2018 after Sharp's retirement.

176.    Cedric Mills was hired as a Co-Assistant Facility Director in April 2018. This was the first time there was a Co-Assistant Facility Director. See Exhibit 2.

177.    After Mills was hired, and around the time of the spring 2018 CAB board meeting Hughey told Moss that she and Mills would have to "audition" for the Director position.

178.   Hughey also told Moss he was concerned about promoting her to Director because she had filed a EEOC Charge of Discrimination against a previous employer. Moss told Hughey that was illegal. This was the first time he made such a statement.

179.   In November of 2018, after Hughey won reelection, he told Moss to post the Director Position and she inquired about being promoted.  Hughey advised her she would have to interview again. Moss asked why she would have to interview again. Hughey stated "because of your previous EEOC complaint." Moss again told him that it was illegal to hold her prior complaint against her.

180.   In December 2018, an incident occurred between Moss and Mills wherein Mills cornered Moss in her office, refused to leave when asked, violated employee privacy, and engaged in behavior which potentially exposed the center to a complaint for discrimination and violations of the ADA, OADA, and FMLA. See Exhibit 23, Moss Email to Hughey.

181.   Moss verbally told Hughey that she felt threatened by Mills and reminded Hughey of her experiences with domestic violence and that Mills behavior triggered her anxiety which is a protected disability.

182.   On December 21, 2018, Moss submitted a written complaint about Mills treatment of her, Mills interference with the performance of her job, and Mills discriminatory conduct towards an employee. See Exhibit 23, Moss Email to Hughey.

183.   Mills is an employee favored and shown preference by Hughey because Hughey believes Mills will help him to be reelected based on his alleged political connections and because he is an African American male. Hughey has made statements to individuals in this regard.

184.   Hughey never took any action against Mills for his treatment of Moss or the employee referenced in Moss's email.

185.   Favored employees are treated better than disfavored employees. See Exhibit 19, Affidavit of Schweitzer, ¶13, ¶27.

186.   Dan Kern was hired as the Facility Director in March 2019.

187.   Complaints were made to Moss and McClain about Dan Kern creating a hostile work environment beginning in August 2019 and continuing through his termination.

188.   Moss and McClain formally reported the complaints of sexual harassment to Judge Hughey on September 24, 2019 and the Judge was provided a list of handwritten notes from McClain. See Exhibit 24, McClain Notes to Hughey.

189. These notes were typed and given back to the Judge on September 26, 2019. See Exhibit 24, McClain Notes to Hughey.

190. Hughey never talked with McClain or Moss about the notes or complaints.

191. Moss reached out to Commissioner Dave Anderson on October 10, 2019 because Hughey had taken no action to investigate the discrimination and sexual harassment perpetuated by Kern.

192. Moss told Anderson she was afraid of retaliation for reporting this conduct. Anderson told her that was prohibited.

193. Moss was concerned that the behavior exhibit by Kern could be considered predatory sexual grooming and expressed this concern to Hughey with no action.

194. Wehmuller reached out to Commissioner Hader on October 9, 2019. They met at his office to discuss the complaints. See Exhibit 25, Wehmuller Texts with Hader.

195. Hader told Wehmuller that he reported her concerns to Nacole Majors. See Exhibit 25, Wehmuller Texts with Hader.

196. Moss and McClain filed complaints with the EEOC on October 15, 2019 when no action had been taken by Anderson, Hughey, Majors, or Hader to suspend or investigate Kern.

197. Kern was never placed on suspension like Alexander was after an employee complained and EEOC charges filed.

198. Kern was not placed on suspension after letters from counsel were sent to the County.

199. Moss was fired on October 17, 2019 and McClain was demoted.

200. An assembly was held on October 17, 2019 where all employees were told that Moss had been terminated. Employees were told they could not associate with Moss and that she was forbidden from entering county premises at the CCCJC.

201. Kern also admitted at the that he was no longer allowed "to tell his funny stories" per the Judge's instructions.

202. It was a violation of CCCJC policy and procedure for Kern to tell the employees of the center the personal information he did about Moss and his conduct constituted defamation and damage to Moss's reputation.

203. No action was taken against Kern for his disgusting sexual comments and behavior and/or his violations related to discussing Moss's termination publicly.

204.   When it was clear nothing was being done by the Commissioners, the County Human Resources or the Judge to address the sexual harassment by Kern at the CCCJC employees Wehmuller and Hardaway went to the media and disclosed what was happening at the center.

205.   The first media story aired on October 28, 2019 on News 9. In the story Hader is quoted as saying "he was unaware of any specific allegations but did know about recent firings at the center." See Exhibit 26, 10/28/19 News 9 story.[7]

206.   Kern told employees to block news reporters from entering a public building. See Exhibit 26. This is another example of illegal behavior by Kern.

207.   Hader's statements to the news media are directly contradicted by his texts with Wehmuller. Hader lied to the media. See Exhibits 25 and 26.

208.   On November 6, 2019, Moss was interviewed by News 9 about her termination and the action taken against McClain. See Exhibit 27.[8]

209.   Both Moss and McClain reported to News 9 they had notified Hughey of the allegations and that he makes all the hiring and firing decisions. See Exhibit 27.

210.   On November 15, 2019, Judge Hughey defended Kern to the news media. Hughey told the media "There was no reason for this lawsuit to raise any red flags related to the employment of Dan Kern. Kern was recognized as an expert with the knowledge and experience to correct the problems of Walnut Grove." See Exhibit 28.[9]

211.   The conduct and commentary reported to Judge Hughey in September plus the history of Walnut Grove should have raised a red flag to Hughey but Hughey failed to act.

212.   McClain, Hardaway, and Wehmuller continued to provide anonymous information to the press in the November 15th article. Kern also remained on the job while these complaints were allegedly investigated even though Alexander was suspended during his investigation.

213.   The article reported the retaliation that was occurring at the center still nothing was done.

---

[7] See video at https://www.news9.com/story/5e346e68527dcf49dad6e11b/harassment-inappropriate-behavior-alleged-at-el-reno-detention-center. The text is attached hereto as Exhibit 26.

[8] See video at https://www.news9.com/story/5e346dc2527dcf49dad6dc81/2-women-claim-they-were-fired-for-reporting-sexual-harassment-against-canadian-co-juvenile-center-director which is incorporated by reference as Exhibit 27.

[9] See video at https://www.news9.com/story/5e346d3a527dcf49dad6d8c5/canadian-co-judge-defends-detention-center-dir-at-heart-of-controversy which text is incorporated as Exhibit 28.

214.    Kern was shown favored employee status like that described by Misty Schweitzer in her affidavit.

215.    However, Kern was sued for his behavior in management and there is no evidence in the public documents that Kern was dismissed for any reason other than to streamline the Walnut Grove litigation.  Walnut Grove was shut down for behavior like that complained of by CCCJC staff in addition to significantly worse behavior.

216.    In an undated internal document Kern wrote "In regards to inappropriate remarks I have made since the onset of my employment with the Canadian County Children's Justice Center, I can honestly say, without hesitation, that I had absolutely no intention of ever making anyone feel uncomfortable, but nonetheless, those comments were unbecoming of my position and not appropriate for the workplace."  Kern further admitted "I wrongfully errored in sharing stories and making comments that are not workplace appropriate." See Exhibit 29, Kern Statement.

217.    On information and belief, the statement was made on or around October 17, 2019, based upon Kern's admission that he could no longer tell his "funny stories" at work and that he had been admonished by leadership and Judge Hughey to be better.

218.    It does not matter whether Kern intended to make anyone uncomfortable the fact is he DID MAKE PEOPLE UNCOMFORTABLE and this was reported and no action was take to discipline Kern.

219.    Kern took no responsibility for his actions and instead blamed other people for his conduct including jealousy and rumors.  Kern shifted responsibility.

220.    Instead of disciplining Kern for his conduct, Hughey told Kern about the complaints and Kern took retaliatory action against the employees that worked under him at the center including Ronda Moss, Melissa McClain, Erin Barton, Donna Wehmuller, Robert Fletcher, Cassie Goodfellow, and Paul Hardaway.

221.    Kern's retaliatory behavior is demonstrated by his actions taken against the employees including faking a drug allegation against Moss and Duggan.

222.    Thus Judge Hughey and the County Commissioners misrepresented to the public what they knew about Kern and his behavior and expressly allowed the Director of a Facility to remain employed after making sexual comments about a child and knowingly offending multiple employees while firing and demoting two employees who complained about the unlawful conduct. This is further evidence of the culture of "favored" and "preferential employment practices" at the center. See Exhibit 19, Affidavit of Schweitzer.

223.    On November 12, 2019, a letter was delivered to Canadian County instructing the County to preserve evidence relating to Wehmuller, Barton, and Fletcher.

224.  The next day Kern cornered Barton and yelled at her about the preservation letter and suing him. Then perhaps realizing what he did was wrong, came back and yelled at Barton that he was not harassing her.

225.  Barton's maiden name is "Hamm" and she is related to an oil and gas billionaire who is the 63rd richest person in the world that the Judge attempted to solicit to donate to his 2018 campaign.

226.  This is a violation of the rules of Judicial conduct.

227.  Hughey repeatedly acted in his own self interest in regard to managing the facility instead of protecting the employees and families he was charged with supervising.

228.  In the companion case Hughey claims he has no supervisory roll over the center but that claim is an outright and blatant misrepresentation of the law.

229.  Barton asked for the tape of Kern's harassment to be preserved through Angel Colley.   Only after being notified of these events did Hughey or the commissioners take action against Kern.

230.  Kern was placed on leave without pay on November 18, 2019 and fired on November 22, 2019. See Exhibit 30, Kern Discipline.

231.  Kern was only disciplined after being caught on tape harassing an employee related to millionaire who might be inclined to donate to Hughey's campaign.

232.  Up until Kern was caught harassing Barton on tape, Hughey defended Kern's conduct and behavior within the CCCJC and to the media. See Exhibit 31, November 25, 2019 News 9 Story.[10]

233.  Cedric Mills was the Interim Facility Director after Kern was terminated. Kern never appears on the Annual Reports as being employed. See Exhibits 2 and 17.

234.  Melanie Johnson was hired as the Facility Director in August 2020 and remains the Director. See Exhibit 19, Affidavit of Schweitzer, ¶28e.

235.  Melissa McClain moved to Supervised Visitation from Human Resources taking a pay cut in December 2020.

236.  Cassie Goodfellow complains of inappropriate spending and violations of COVID protocol in December 2020 and January 2021.

---

[10] https://www.news9.com/story/5e346cbb527dcf49dad6d527/director-of-canadian-co-center-fired-amid-misconduct-investigation

237.   Two employees who have complained of spending act violations have been fired. See Ex 19, Affidavit of Schweitzer ¶125

238.   Cassie Goodfellow is terminated within 10 days of filing a complaint against the CCCJC with the Public Employees Occupational Health and Safety Commission about violations of COVID 19 protocols. Goodfellow previously complained about Kern.

239.   McClain and Barton take FMLA leave for care of another and self care respectively in March 2021. They are due to return to work in late June.

240.   Donna Wehmuller resigns due to harassment in May 2021.

241.   Just prior to when McClain and Barton are due to return to work. Johnson tells Schweitzer to post McClain and Barton's jobs while they are on leave in violation of Center policy. See Exhibit 19, Affidavit of Schweitzer, ¶78.

242.   Melanie Johnson did not want  McClain and Barton to return to their employment with the center. See Exhibit 19, Affidavit of Schweitzer, ¶78.

243.   Schweitzer was instructed to fill Barton and McClain's jobs while they were out. Schweitzer told Johnson this was improper and she was told by Johnson to do it anyway. See Exhibit 19, Affidavit of Schweitzer, ¶78.

244.   McClain and Barton request short term leave under the ADA at the end of June 2021 to obtain a doctors letter of accommodations upon their return from FMLA leave. See Exhibit 19, Affidavit of Schweitzer, ¶80.

245.   Johnson told Schweitzer to deny McClain and Barton's request for ADA leave and to place them on unprotected leave in an effort to get them to quit their jobs. See Exhibit 19, Affidavit of Schweitzer, ¶83.

246.   Johnson intentionally interfered with Schweitzer soliciting donated leave for McClain and Barton so they would be on protected leave. See Exhibit 19, Affidavit of Schweitzer, ¶84.

247.   Schweitzer was not allowed to engage in the interactive process with McClain and Barton regarding their request for ADA leave and accommodations. See Exhibit 19, Affidavit of Schweitzer, ¶85.

248.   Simultaneously with this conduct Hardaway was applying for the position of Principal with the CCEC.

249.   Hardaway was not allowed to interview for the Principal position. He was demoted from his position as Dean of Students and was only offered a job as a teacher.

250.   Hardaway's employment ended in July 2021 when his contract was over.

251.   The Oklahoma Employment Security Commission ("OESC") found that McClain was discharged while on medical leave and Barton was discharged due to a hostile work environment. See Exhibits 10-13.

252.   The CCCJC tried to allege that McClain was fired for misconduct and appealed the OESC decision on that basis. The hearing was held March 30, 2022 wherein Johnson admitted that McClain did not commit misconduct and instead tried to claim she quit. The award of benefits for discharge for hostile work environment was upheld and the Commission found that the act of posting McClain's job while she was on FMLA was a termination by the Center. See Exhibit 11.

253.   Schweitzer was also instructed to appeal Barton's award of benefits.

254.   Barton's benefit hearing was set on June 8, 2022.  The CCCJC failed to timely register for the hearing thus Barton's award of benefits was upheld on appeal. See Exhibit 13.

255.   On information and belief, the CCCJC did not want to risk another finding that Barton was fired like McClain was while she was on protected leave.

256.   Regardless of the OESC determination difference between Barton and McClain, both women's jobs ended under the same circumstances and they submitted nearly identical resignation letters due to the harassment.

257.   The intent to fire or force out Barton and McClain is substantiated by Schweitzer.

### b.  About the CCCJC.

258.   As of the April 1, 2010, census Canadian County had a population of 115,541. By 2020, the population had reached 154,405. [11] Canadian County is Oklahoma's fastest growing county.

259.   The CCCJC provides all court services for the juvenile law division of Canadian County specifically including the deprived division, the delinquent division, and guardianship matters.

260.   Items involving juvenile crime and detention fall under the purview of the Juvenile Bureau which is housed/operated at the CCCJC.

261.   The services of a Juvenile Bureau are focused on the administration of the juvenile justice services to children, youth, and families in the county.  10A O.S. §2-4-101.

---

[11] https://www.census.gov/quickfacts/fact/table/canadiancountyoklahoma,US/POP010210

262. The Juvenile Bureau generally does not include adoptions and guardianships which are also done at the CCCJC.

263. The services provided at the CCCJC include services other than those of the Juvenile Bureau.

264. Per Exhibit 17 - The Mission Statement of the CCCJC is:

> The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families. In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.

265. Program and Statutory Responsibility for management of the CCCJC in total and not just the Juvenile Bureau, falls under the purview of the Associate District Judge who handles all Juvenile Dockets in Canadian County.

266. The CCCJC is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants. This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

267. Programs and Services provided by the CCCJC include:

| | |
|---|---|
| Juvenile Court for Deprived, Delinquent, and In Need of Supervision | Outpatient Behavioral Health Services |
| 28 Bed Juvenile Detention/Sanctions Center | 12 Bed Ft. Reno Adolescent Center |
| | Juvenile Probation Office |
| Supervised Visitation and Exchange Program | Drug Screening Program |
| | Truancy Program |
| Comprehensive Home-Based Services | |
| Canadian County Education Center | |

268. The Citizens Advisory Board ("CAB Board") was created in 2004. This board serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice" to the Associate District Judge. Board members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed.

269. Title 10A of the Oklahoma Statutes is the Children and Juvenile Code.

270. Article 1, 10A OS §1-1-101 is known as the Oklahoma Children's Code. This regulates abuse and neglect cases.

271. Article 2, 10A OS §2-1-101 et seq is the Oklahoma Juvenile Code. This regulates juvenile delinquent, truancy, and mental health proceedings and the creation of the juvenile bureau.

### c. About Judge Hughey

272. Multiple staffing controversaries have occurred under Judge Hughey and the complaints are consistent that the Judge fails to take appropriate action.

273. Hughey failed to take proper action in regard to Will Bradley, Mark Hixson, Cedric Mills, Dan Kern and Melanie Johnson when complaints were made about them. Others have had to step in and force him to take action.

274. Judge Hughey has a reputation for engaging in willful blindness with regard to illegal and inappropriate behavior at the facility and only takes action when forced to because another elected official becomes involved. See Ex 19, Affidavit of Schweitzer.

275. All hiring and firing practices at the CCCJC are sanctioned and approved by Hughey, Johnson, Mills and Majors. See Ex 19, Affidavit of Schweitzer.

276. Hughey is actively involved in the process of determining who is hired at the center. Id.

277. Hughey has also sanctioned and improved the improper expenditures of county funds. Mills, Johnson, and Majors were also involved with this process. Id.

278. The CCCJC provides services to children and parents in deprived proceedings through the use of contract attorneys.

279. In 2014, an attorney hired by Judge Hughey to provide services to parents was suspended for a period of 18 months for failing to diligently represent clients. See OBA v. Bradley, 2014 OK 78.

280. While Bradley was specifically disciplined related to his private practice clients and not court contract clients, the complaints against him were not limited to his private practice clients.

281. Plaintiffs counsel took over the representation of two parents who had their children taken away and who were set for termination of parental rights. Counsel requested the file from Bradley and Bradley never produced the same. When counsel advised the Judge Hughey that they needed access to the court file because Bradley did not produce

27

a file, Judge Hughey admitted that Bradley was known not to maintain actual files for his clients.

282. These parents had one of their children die while in the custody of DHS in a placement which Judge Hughey approved.

283. The parents filed a complaint against Hughey and he refused to recuse from the same and continued to hear the case for over 6 months after knowing a complaint had been lodged against him. This violates the rules of judicial conduct.

284. In 2016, another contract attorney was disciplined by the Oklahoma Bar Association after he solicited a client for sex in lieu of payment. *State ex rel OBA vs. Hixson*, 2017 OK 56.

285. The attorney was suspended from the practice of law for six months and the Professional Responsibility Tribunal noted that he solicited the client for sex at a time when she was particularly vulnerable as her child had just been taken into DHS custody in Canadian County and was not happy that the attorney attempted to blame the client instead of accepting responsibility for his conduct.

286. Hughey testified on behalf of Hixson as to his good character to mitigate his discipline.

287. This violates the rules of judicial conduct.

288. Hixson remains employed as a contract attorney representing children at the CCCJC to this day.

289. In 2017 multiple employees complained of Facility Director Bill Alexander sexually harassing them and filed EEOC complaints about the same.

290. Judge Hughey failed to take action in regard to Bill Alexander.

291. The County Commissioners made the decision to place Alexander on suspension while he was investigated. See Ex. 32, Yukon Progress Article Dated 6/17/2017 and Ex. 22, Email from Bill Sharp.

292. The email from Sharp noted "the Board takes allegations of this nature very seriously. .....in light of the Board's concerns related to the workplace environment at the juvenile center, the Board has temporarily suspended the job duties of the Justice Center Co-Facility Director, Bill Alexander, while an independent investigation into this matter is conducted." See Ex. 22.

293.   As per the Yukon Progress article which is consistent with state law, it was Hughey's job and not the Commissioner's to take action against Alexander. Hughey failed again.

294.   Unlike what was done for Alexander, the Board of County Commissioners took no action against Kern despite knowing of the same.

295.   In the Spring of 2018, Hughey told Moss that she would have to "audition" for the Director position. When she asked "why" Hughey replied that the Board concerns about promoting both her and Mills. There was one concern for each of them. Hughey then told Moss they were concerned about promoting her because "You have filed an EEOC complaint against a previous employer."   Moss explained the circumstances of the previous complaint.

296.   Moss learned that the Board's concern about Mills was "he is lazy and he never finished anything."

297.   After this incident another employee at the center also told Hughey that Moss was justified in filing her prior EEOC complaint against another employer because she was subjected to a hostile work environment.

298.   In November of 2018, shortly after his reelection, Hughey told Moss to post the Director position both internally and externally. Moss asked if he was not just going to hire someone who had previously interviewed or promote from within. Hughey said no.

299.   Hughey told Moss she would have to apply and interview for the position a second time. When she asked "why" he told her "Because you have filed an EEOC complaint against a prior employer."

300.   Moss again explained the details of her complaint and told Hughey "its illegal for you to use my complaint against me." Hughey told her to post the job anyway.

301.   In December 2018, Moss made a complaint to Hughey about Mills. Moss complained that Mills had verbally attacked her, interfered with her performing her job and attempted to use his body to obstruct her leaving an office and to physically intimidate her by blocking the exit to the office.

302.   Moss also told Hughey that Mills had obstructed the interactive process with an employee who was seeking an ADA accommodation and that could expose the center to liability.

303.   Hughey took no action on the complaints against Mills by Moss or on Mills interference with HR responsibilities. This is another failure of Hughey's duties.

304. When she made the complaint about Mills, Hughey knew Moss was a domestic violence survivor.

305. Hughey later told Moss she should go to counseling over her domestic violence experience. She told Hughey that she had been to counseling.

306. Judge Hughey made the decision to hire Dan Kern in the spring of 2019.

307. After Hughey told Moss he hired Kern she asked why she wasn't chosen and Hughey told her "because you filed an EEOC complaint against a previous employer." Moss again told him that it was illegal not to hire her for that reason.

308. Hughey then replied that it was for Moss yelling at Mills. Moss reminded him that she only yelled at Mills because he had verbally assaulted her, obstructed the performance of her job, and attempted to physically intimidate her. Moss also reminded Hughey that she was a domestic violence survivor, that Hughey knew her history, and that Mills' behavior triggered her anxiety due to her past domestic violence history.

309. It was well known at the CCCJC that due to Ms. Moss' history with domestic violence that she panicked if put in situations where a man tried to physically intimidate her and/or block exists like Mills did.

310. At meetings Moss would sit next to doors and/or exits because of her anxiety and this was well known to her co-workers.

311. Hughey gave her a deer in the headlights look, nodded his head, and left the room.

312. Judge Hughey knew or should have known about the allegations against Dan Kern in his employment at Walnut Grove Correctional Institute.

313. Judge Hughey failed to perform an appropriate background check to ensure that Dan Kern prior to hiring him as the Director.

314. Hughey tells employees of the CCCJC that he is the final decision maker in all hiring and firing decisions at the CCCJC, not just the hiring of the Director of the CCCJC.

315. Judge Hughey, pursuant to statute in his role as the head of the Juvenile Bureau, had the final decision-making authority for the hiring of the Director of the CCCJC.

316. Judge Hughey pursuant to his role as an Associate District Judge for the State of Oklahoma and the Judge assigned to manage the juvenile justice center in its entirety is also a decision maker with regard to the employment of court personnel and individuals who do not fall under the division of the juvenile bureau.

317.   Judge Hughey must still act in conjunction with the statute and the County Commissioners and CAB Board.

318.   Employees at the CCCJC are considered Court Personnel and all aid in the administration of justice at the CCCJC.

319.   Judge Hughey has the authority to make administrative decisions about hiring and firing of any employee without approval by the Director.

320.   While acting in an administrative capacity as the judicial administrator of the CCCJC Judge Hughey engaged in the following conduct which violates Rule 2.12 of the Rules of Judicial Conduct:

a. Judge Hughey failed to take action against Will Bradley who placed individuals whom he represented in proceedings before the Judge in jeopardy when he did not maintain files and diligently represent clients.

b. Judge Hughey testified on behalf of the of Mark Hixson and allowed him to continue to represent children in vulnerable situations after he had been disciplined by the bar for taking advantage of a vulnerable client who's child was taken by DHS and would have appeared before Judge Hughey.

c. Judge Hughey failed to take action on the sexual harassment allegations against Bill Alexander while acting as the Director of the Facility.

d. Judge Hughey told Ronda Moss on multiple occasions that he was not hiring her as the Director of the CCCJC because she had filed a EEOC claim against a previous employer.

e. Judge Hughey failed to take any action on the complaints filed by Ronda Moss, Melissa McClain, Erin Barton, Donna Wehmuller, Cassie Goodfellow, Paul Hardaway, Robert Fletcher, Doni Duggan, and others.

f. Judge Hughey knowingly and intentionally failed to advise Canadian County HR about the allegations against Dan Kern prior to hiring him.

g. Judge Hughey knowingly and intentionally failed to advise the presiding judge of the judicial district about the conduct of Dan Kern.

h. Judge Hughey knew or should have known that Daniel Kern had a history of acting in an inappropriate and sexually suggestive manner prior to hiring him and hired him anyway.

i. Judge Hughey admitted that Dan Kern acted inappropriately towards employees and stated he was not going to fire him.

j.  Judge Hughey made inappropriate comments about a female employee's breasts to Melissa McClain.

k.  Judge Hughey approved the decision to tell Melissa McClain that neither she nor Robert Fletcher could assemble during their lunch hour and engage in bible study.

l.  Judge Hughey failed to take protective action on behalf of Ronda Moss when she reported that Cedric Mills harassed and intimidated her.

m.  Judge Hughey allowed Ronda Moss to be harassed, intimidated, and verbally abused on more than one occasion and engaged in retaliatory behavior against her when she reported it.

n.  Judge Hughey retaliated against Ronda Moss for reporting the conduct of Cedric Mills which violates Title VII gender discrimination, assault and battery and for participating in other protected conduct under Title VII in her prior employment.

o.  Judge Hughey condoned the use of the drug testing procedures as a manner of retaliating against Moss, Barton, Wehmuller and others after reporting the conduct of Kern.

p.  Judge Hughey approved the decision not to allow Hardaway to interview for the Principal Position of the CEC after he engaged in protected conduct in reporting the unlawful conduct of Dan Kern.

q.  Judge Hughey approved the decision to not rehire Hardaway as the Dean of Students after he engaged in protected conduct in reporting the unlawful conduct of Dan Kern.

r.  Judge Hughey condoned the retaliation against McClain and Fletcher and actively or passively permitted Mills, Majors, and others to deny them the right to assemble to praise god on their lunch hour.

s.  Judge Hughey retaliated against Moss and refused to hire her for a position she was other wise qualified to hold because she had previously asserted a lawful claim for gender discrimination against another employee.

321.  On December 21, 2018, Moss sent Hughey an email following up on her complaint about Mills assaulting her. Moss advised that Mills interfered with her job performance, refused to leave her office when asked so that she could meet with an employee and HR Generalist McClain to engage in the interactive process for an ADA accommodation. Moss advised that she was also concerned that the employee felt forced to return to work for fear of losing her job despite needing accommodations. Moss further advised Hughey that she was concerned that the employee may try to

complain about failure to accommodate and obstruction of the interactive process and that Mills had violated HR policy and obstructed the process.

322.    On or around October 9, 2019 Moss had an in person conversation with Hughey about Kern. In the course of the conversation, she told Hughey that she had reached out to Detective Sidell about Kern's comments. Moss told Sidell she wanted an impartial opinion about the conduct she observed because she was concerned, she could be biased.

323.    Moss told Sidell that an individual had offered to take a juvenile off premises to see her father if she behaved. Moss also advised that the individual made comments about the girls butt.  Sidell expressed concern and that the behavior was consistent with grooming behavior. Sidell suggested that Moss speak with Adam Flowers about it further.

324.    Adam Flowers is a Captain in the Canadian County Sheriff's Office who's specialty is tracking cyber predators who prey on children.

325.    Moss told Hughey of her conversation with Sidell and Sidell's confirmation that Kern's behavior constituted grooming.

326.    Grooming is the process during which a child sex offender draws a child in by gaining their trust in order to sexually abuse the child and maintain secrecy.

327.    Moss expressed concern that Kern had access to the young girls personal information and may try to contact her away from campus.

328.    When Moss told Hughey about her conversation with Sidell, Hughey gave her an astonished look but did nothing.

329.    On October 9, 2019, at 9:19 am Ronda Moss emailed Judge Hughey and advised the judge that Kern had never asked previously for incident reports for Behavioral Health, Detention or the facility nor had he ever asked for a report in a meeting. She further advised that an employee provided an overview of incidents that occurred on a daily basis at the FRAC and Kern never asked for a report. Moss reported that Kern did not ask for a report when a juvenile assault a staff member.  Moss further told the judge **"He has wanted to get younger employees into positions over older staff since shortly after starting to work kere. He has never discussed any of this with us. I strongly feel that this is nothing but retaliation for people participating in complaints against him"**

330.    On the day of Ronda Moss's termination Kern called all employees into the gym where he announced the termination of Moss. He made admissions against interest in the announcement about being talked to regarding his professionalism.

331.  These are admissions against interest and evidence that Judge Hughey, Dan Kern, Nacole Majors and others at Canadian County lied on multiple occasions.

332.  This is evidence that Ronda Moss and others reported the conduct of Kern and that Kern was talked to about his unprofessional behavior his so called "funny stories."

333.  Never in the history of the CCCJC before or since November 17, 2019 has an assembly been called to announce the termination of an employee. Such an assembly violates privacy laws.

334.  Throughout the assembly Kern called the allegations "gossip and rumors" in an effort to discredit the reports made by Moss, McClain, Hardaway, Colly, Barton, Fletcher, Wehmuller, Goodfellow, and others.

335.  The retaliatory behavior under Kern, Mills, and Hughey continued with the addition of Johnson to the staff. See Ex 19, Affidavit of Schweitzer.

336.  Management did not want to accommodate individuals with disabilities and engaged in discriminatory practices towards employees they did not like and actively engaged in behavior designed to make them quit. See Ex 19, Affidavit of Schweitzer.

337.  When employees would not quit and/or asserted their rights, Hughey, Mills, Johnson and Majors would trump up allegations to have a pretext for termination.

338.  Misty Schweitzer personally observed the behavior targeted at Barton, McClain, Hardaway, Wehmuller and Goodfellow. She also saw it targeted to friends of the parties Jerry Koester, Angel Colley and others. See Ex 19, Affidavit of Schweitzer.

339.  Rachel Theron was fired in March 2021 after filing an EEOC charge in January 2022 complaining about retaliation by D'Shea Brothers and Johnson. See Ex 19, Affidavit of Schweitzer.

340.  Schweitzer was fired after she refused to engage in discriminatory and retaliation toward employees, and after asking for accommodations related to her own disability. Id.

341.  Complaints alleged against Schweitzer are similar in nature to complaints against Moss in HR that she forged a document.  Schweitzer denies forging any document.

342.  Schweitzer refused to send out an email telling employees they could not practice their religion at the CCCJC.  Schweitzer also told employees their rights to challenge their write ups and challenged the preferential treatment shown to Brothers when Johnson was finally forced to write Brothers up due to the amount of complaints lodged against her. Brothers write up was soften to take out potential termination language which is included in all other CCCJC formal writeups. Id.

343. Brothers actively interfered with the ability of employees to do their job and engaged in sabotage type behavior to create a pretext for termination and to move their responsibilities to her.

344. Goodfellow was terminated because Hughey, Johnson, Kern, Mills and Majors believed she was gathering intelligence for Moss, McClain, Barton, Wehmuller, Fletcher and others. Id.

345. Mills admitted that they wanted to fire Goodfellow because of her relationship with the lawsuit against the center. See Ex 19, Affidavit of Schweitzer at ¶74.

### d. About Dan Kern.

346. On information and belief Kern was hired without input or full information being provided to the CAB Board and/or County Commissioners about Kern's experience and work history.

347. On March 12, 2019 the CCCJC and Judge Hughey placed an announcement about the hiring of Kern on Facebook. The announcement said[12]:

> Associate District Judge Bob Hughey is pleased to announce that Daniel Kern has been selected as the new director of the Canadian County Children's Justice Center. Mr. Kern started in his new position on March 11.

> Mr. Kern received a Bachelor of Science from Kutztown University, and he also has two master degrees from Shippensburg University. **But it is his professional experience that set him apart.** Most recently he was the Chief Executive Officer 112-bed psychiatric residential treatment program in North Carolina. In that capacity he was responsible for the daily operations of that facility.

> Mr. Kern's background also includes being the Director of Operations of an adolescent assessment and treatment center in New Mexico, as well as being the Director of an adolescent shelter and assessment center in Pennsylvania. He also has leadership experience in other treatment facilities and programs.

> Judge Hughey stated that he was very pleased with the number of applicants, and with the quality of those who applied. Hughey stated that he received applications from Texas, New Mexico, Nevada, Arkansas, and Ohio, along with several strong candidates from Oklahoma.

---

[12] https://www.facebook.com/canadiancountychildrensjusticecenter/photos/associate-district-judge-bob-hughey-is-pleased-to-announce-that-daniel-kern-has-/2069085303140694/ (emphasis added)

Mr. Kern has a reputation of having an excellent work ethic and for being a team builder. His professional references spoke very highly of him, indicating that any organization would be pleased with his leadership abilities.

The top leadership team at the Children's Justice Center will continue to include Ronda Moss and Cedric Mills as Assistant Directors. All three of these individuals have their unique skills sets and experience, which should benefit the Children's Justice Center.

348.   There was no mention of Kern's prior employment with Walnut Grove Correctional Facility or how his employment with Walnut Grove would have qualified him to hold this job.

349.   Kern's employment with Walnut Grove should have been listed on his resume and would have been easily discoverable on a background check that should have been done in conjunction with his hiring.

350.   On information and belief Judge Hughey and Canadian County knew of Kern's association with Walnut Grove and the allegations against him and knowingly and intentionally hid Kern's history upon his hiring.

351.   When Judge Hughey, in his role as the head of the Juvenile Bureau, hired Kern he either knew or should have known that there were questions regarding Kern's fitness for this job based on the requirement of "good moral character" under the statute.

352.   Prior to working for Canadian County Kern was the Deputy Warden of Walnut Grove Correctional Facility in Mississippi.

353.   Kern was named as a defendant in a lawsuit against Walnut Grove for the mistreatment of juveniles. *See CB by and thorough Charleston DePreist et al v. Walnut Grove Correctional Authority, et al, 3:10-cv-663, United States District Court for the S. Dist. Of Mississippi, Jackson Division.*

354.   Walnut Grove was a private for-profit juvenile prison that was ultimately closed due to the lawsuit in which Kern was named as a defendant. See Exhibit 33, NY Times Article about Walnut Grove.

355.   The article notes that "the sexual misconduct we found was among the worst that we have seen in any facility anywhere in the nation." *Id.*

356.   Interestingly the Plaintiffs in this case and the related case have said that the conduct and commentary of Kern was of the most vulgar that they had ever heard.

357.   Both the judge in the lawsuit and the US Department of Justice (DOJ) made substantial findings about the horrific treatment of juveniles at this facility.   Such

findings included that there was "systemic, egregious and dangerous practices exacerbated by a lack of accountability and controls" in management at the facility.[13]

358.    The Court found that the children at Walnut Grove were "at risk every minute, every hour, every day." *CB by and thorough Charleston DePreist et al v. Walnut Grove Correctional Authority, et al, 3:10-cv-663, United States District Court for the S. Dist. Of Mississippi, Jackson Division, Doc 75, Order Approving Settlement Filed 3/26/2012.*

359.    After reviewing the evidence, the Court stated it understood how the DOJ concluded that "the sexual misconduct occurring at [Walnut Grove], including "brazen" staff sexual misconduct and brutal youth-on-youth rapes, was "among the worst that we have seen in any facility anywhere in the nation." *Id.*

360.    The judge overseeing the case stated in regard to Walnut Grove that "The misconduct is widespread and frequent, and [Walnut Grove] is deliberately indifferent to the serious and substantial risk of harm to which these youth are subjected. And to add one final insult to these injuries, State officials repeatedly failed to monitor the contracts with GEO and simply rewarded the company by either extending or offering new contracts, or by not revoking the existing contract despite "systemic, egregious, and dangerous practices exacerbated by a lack of accountability and controls." *Id.*

361.    While Kern was later dismissed from the lawsuit, the dismissal was not one clearing Kern of allegations, but rather it was for purposes of streamlining that litigation. Even though Kern was dismissed it is known and cannot be discounted that the systemic, egregious, and a dangerous practices occurred during Kern's tenure at the facility.

362.    Canadian County and/or Judge Hughey knew of Kern's employment with Walnut Grove at the time he was hired and knew or should have known of the allegations against Kern prior to employing him.

363.    Canadian County and Judge Hughey hired Kern as the Director of the CCCJC despite the sickening allegations against him relative to Walnut Grove.

364.    Canadian County, Nacole Majors, and Judge Hughey took efforts to actively hide Kern's past employment with Walnut Grove from CCCJC employees.

365.    Dan Kern did not meet the statutory requirements of 10A O.S. § 2-4-102 at the time he was hired.

---

[13] https://www.justice.gov/opa/pr/department-justice-releases-investigative-findings-walnut-grove-youth-correctional-facility

366. CCCJC personnel files are normally kept at the CCCJC in the Human Resources Office. Kern's file in the office was incomplete despite efforts made by Moss to ensure a complete copy of the file.

367. Prior to receiving reports against Kern, Moss and McClain discovered that Kern's HR file was missing information, specifically his resume which should have been kept in his file with his application.

368. Moss instructed McClain to contact Majors to obtain the missing information.

369. Majors actively avoided giving Moss and McClain the information and engaged in evasive email tactics to avoid producing the file.

370. McClain told Majors that the information was also necessary to maintain in their HR files due to the audits performed by agencies that certify the CCCJC. Instead of producing the information as had been done on every other employee file and for any other director, Majors told McClain she would produce the document only when or if needed for an audit.

371. It was apparent that Majors was actively trying not to produce Kern's employment file documents.

372. Shortly after McClain exchanged emails with Majors about the missing file information Judge Hughey went to the CCCJC HR office visibly upset and demanded to know why Moss and McClain were asking about Kern's file.

373. Hughey was advised that the information was needed for agency audits.

374. On information and belief, Majors contacted Hughey and told him that CCCJC HR was attempting to obtain Kern's application information and resume because shortly.

375. On information and belief this was done to prevent Moss as the CCCJC HR Director from finding information about Kern's past employment and the allegations against him.

376. The odd and abnormal behavior by both Majors and Hughey over the production of information ordinarily needed and maintained by the CCCJC office prompted suspicion about Kern's background.

377. About this time Moss recalled seeing a pen on Kern's desk bearing the mark "Walnut Grove."

378. Shortly thereafter, multiple employees began making reports about the behaviors and conduct of Kern. This prompted Moss and McClain to investigate Kern and they discovered Kern's association with Walnut Grove and its past history.

379.   The allegations against Kern were a matter of public record and based upon the statutory requirement that the individual serving as the Director of the CCCJC be of good moral character should have been fully vetted and investigated prior to his employment with Canadian County. Further, any information good and/or bad regarding the individual should have been fully disclosed to the county, the CAB Board and/or Human Resources at the County and CCCJC level.

380.   Further, the allegations against Kern are easily discoverable with a google search. The Complaint against him is also publicly available on the Southern Poverty Law Center website.[14]

381.   On information and belief, his employment history with Walnut Grove was also listed on the resume which was kept in the main county HR file maintained by Nacole Majors. The resume was not included in the HR filed maintained at the CCCJC.

382.   Had anyone taken the time to google Walnut Grove to even compare that juvenile facility to the CCCJC facility to understand his experience they would have uncovered the horrors at Walnut Grove.

383.   Instead Judge Hughey and the County either negligently failed to check his references and experience or knowingly brought a potential predator into the midst of the CCCJC.

384.   On information and belief, Kern's employment history and experience with Walnut Grove was intentionally omitted from Judge Hughey's announcement on March 12, 2019.

385.   On information and belief, Kern had a history of inappropriate behavior in the workplace that preceded his employment with even Walnut Grove, and he moved from juvenile center to juvenile center with his inappropriate conduct being overlooked and swept under the rug by multiple employers.

386.   Based on the allegations against Kern in the Walnut Grove suit, he did not meet the statutory requirements for employment at the CCCJC and should have been disqualified from consideration.

387.   Had a proper background check been done on Kern, the information and allegations against him would have been discovered and Judge Hughey and the hiring committee should have known that Kern was not qualified for the job.

---

[14] https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/case/cb_v_walnut_grove_complaint.pdf

39

388.    Hughey and the County Hiring Committee either failed to diligently conduct a background investigation into Kern or knowingly and intentionally disregarded the information they found.

389.    Instead of disqualifying Kern, Judge Hughey decided to hire him.

390.    Hughey never disclosed Kern's history with Walnut Grove and the allegations against him to the CAB Board who advises the judge on running the CCCJC and who participated in the hiring of Johnson to replace Kern.

391.    Shortly after Kern was hired, he began engaging in a pattern of behavior that was inappropriate for the workplace, not within the requirements of 10A O.S. § 2-4-102 *et seq,* and created a hostile work environment for those with whom he worked.

392.    During his employment with the CCCJC Kern made sexually charged comments about youth at the facility—specifically about a 13-year-old female—and such comments were overlooked, ignored, and swept under the rug by Kern's superiors, including Judge Hughey.

393.    Kern solicited subordinates to help him convince another subordinate to engage in a dating and/or sexual relationship with him.

394.    In nearly every conversation Kern had with an employee or employees of the center he peppered it with sexual innuendo, double entendres, and inappropriate remarks.

395.    Kern routinely talked about sexually charged and inappropriate topics that were not relevant or appropriate to conducting the business of the CCCJC including such things as:

   a.  his wife's pubic hair when giving birth to their children and nicknaming her "sasquatch".

   b.  The placement of his genitals when he used a toilet and particularly when he was defecating. Barton complained about this to HR.

   c.  The abnormally large size of his genitals particularly as compared to other Oklahoma men.

   d.  Describing his history of humor by paging "Vulva Hymen" over the intercom. Angel Colly submitted a complaint to Moss and McClain about this.

   e.  Discussing his discovery of a used tampon and how it impacted him.

   f.  Graphic description of his daughter's inability to use a tampon or engage in sexual activity due to inadequacies of her anatomy.

40

g.  Making sexual comments about a 13-year-old female in his charge having a "nice butt" and offering to drive her to see her father in jail when such comments and/or offers of transportation are inappropriate and violate CCCJC rules. Hardaway made a complaint about this in writing to HR.

h.  On 9/4/19 Kern talked about the smell of teenage girls underwear to Colly after she spoke to him about the smell in the gym. Dan said "yea teenage boys do smell bad but you know what smells worse teenaged girls" Colly mentioned the smell of her daughter's basketball shoes and Kern replied "Oh I'm not talking about shoes. I'm talking about their underwear. Teenage girls underwear smells really bad! I told my daughters they had to start doing their own laundry." Colly told HR she was disgusted by the comment.

396.  These are the funny stories Kern was told he could no longer tell to employees. These are the funny stories he talked about in the October 17, 2019 assembly about Moss's termination.

397.  Kern admitted that the two weeks before the termination of Moss were among the hardest for him both personally and professionally.

398.  Kern asked Colly whether her sister in law was having an affair with Bill Sharp the former Director who was terminated for sexual harassment. Kern then went on to tell Colly "Well you know it was perceived by a few people that you were too." Colly reported this conduct to HR as well.

399.  Kern routinely targeted female employees as the subject of "jokes" and his offensive humor by saying such things as:

a.  Telling a female employee "Glad your puss is here" when she arrived at a meeting.

b.  Referring to Plaintiff Moss as the "Gestapo;"

c.  Referring to a female employee, who is an immigrant, as a "mail order bride;"

d.  Soliciting Plaintiff Barton to help him convince another female employee to leave her husband for him.

e.  When speaking with one subordinate female employee he referred to her shoes as "hooker heels."

f.  Making fun of female employees' appearance, glasses, and patterns of speech.

g.  Making fun of children in his charge with special needs by calling them such things as "dick slinger" "jackasses" "window lickers," "little shitheads," and "the ones who wear the helmets."

41

h. Making fun of children by making gestures with his hands, face, and pattern of speech to imitate a disabled child in a mocking manner.

i. Publicly discussed a child exposing himself to individuals who should not have received such information while saying that the child was "swinging his meat around."

j. Asking a group of students if "they were keeping it in their pants today?"

k. Targeting and making fun of an employee for displaying a nervous tic when speaking.

l. Specifically commenting on and/or asking the age of female job applicants.

m. Diminished the work quality, work abilities or general competency of any employee who was over the age of 40 and/or who did not meet his standards of beauty, sexuality, femininity, or sensuality based upon their physical appearance, disability or age.

400. Kern also regular made remarks about female employees age, physical appearance and standards of beauty, the shoes they wore, the tightness of their outfits, their marital or dating status and their sexuality in general and their sexual prowess.

401. From the time he arrived in March of 2019 until he was fired in November 2019, Dan Kern never missed an opportunity to make a sexually charged remark, flirt with a pretty girl or insert sexual inuendo into his otherwise ordinary and routine work conversations.

402. Kern made his preference for young pretty girls, especially those who wore high heels and tight clothes well known.

403. He openly favored and showed preference to any female working at the facility under the age of 40.

404. Kern even told one male contractor of the facility that he had fantasized about having sex with each of the female employees and rated them on their sexual prowess based on their appearance and how he believed they would perform in bed. The reporting individual relayed what was said in the most professional way possible, but the gist of the conversation was that Kern had rated the "fuckability" of every female employee of the center.

405. Multiple male employees and individuals who worked with the CCCJC and around the facility reported that Dan Kern was the most vulgar individual they ever met.

406. Nearly every female employee complained about his conduct in some form or fashion.

407. A majority of the male employees complained about the vulgar nature of his conduct and communication.

408. Judge Hughey made admissions about Kern's improprieties on multiple occasions but never took action to stop his behavior. Hughey mentioned on one occasion that Kern's "brain falls out of his mouth" after employees commented on Kern's inappropriate behavior.

409. Hughey also affirmatively and clearly stated "I'm not firing Dan."

410. All the current and former employees named as Plaintiffs herein made complaints to CCCJC Human Resources, Judge Hughey, Canadian County Human Resources, and/or the Canadian County Commissioners which were ignored and not investigated.

411. On September 24, 2019, McClain delivered handwritten notes to Judge Hughey from Moss which reflected complaints about Kern's conduct by Moss, McClain, Barton, Paul Hardaway, Angel Colley, Robert Fletcher, Donni Duggan, and others at the center.

412. On October 2, 2019, Paul Hardaway wrote a statement about conduct he observed with Kern. Hardaway also noted the time of the meeting 1:30 p.m. Hardaway approached Kern to discuss the CEC suspension policy. During the conversation with Hardaway Kern referred to the student body as "jackasses" and "little shitheads." Kern said the kids have "fucking problems." Hardaway also mentioned that Kern had previously approached him in front of students during breakfast asking "is everyone keeping in their pants today" and "where is that swinging dick."

413. On October 2, 2019, Hardaway wrote the report about the girl that Kern said had a cute butt.

414. The next day, before Hardaway reported anything to Moss or McClain about Kern's comments, Kern was overheard trying to discredit Hardaway presumably because Kern knew he had messed up.

415. Donni Duggan was the Assistant Director of Behavioral Health during Kern's employment.

416. On October 16, 2019, Donni Duggan resigned her employment at the center because of discrimination by Kern and the Judge's failure to address the hostile work environment.

417.   In her resignation letter Duggan stated "I feel I must leave at this time due to the lack of support I have received from facility leadership as well as being targeted for failure due to my age. I have always been very proud to be a part of this facility but due to the current leadership's practice of making inappropriate comments, belittling employees as wells as clients, inappropriate focus on younger female staff members as well as purposefully splitting staff and causing confusion, I no longer feel this is the place I want to be. I do want to thank you and many others for the support you have provided me. There are many great people working there who are dedicated to the betterment of the lives of the children and families of this county. I hope something will be done to get the facility back on track. The people of Canadian County deserve so much better."

418.   Judge Hughey took no action on these complaints; he did request more formal complaints but took no action on the formal complaints either.

419.   On September 26, 2019, McClain delivered Moss's typed summary of complaints from these individuals and other information proving that the Judge, in his role as the head of the Juvenile Bureau, should investigate Kern's conduct at the CCCJC.

420.   Hughey never did anything to investigate the complaints with the exception of advising Moss he was in receipt of the complaints and would speak with County Human Resources about the same.

421.   On information and belief, Hughey did tell Kern about the assertions against him and took no action to prohibit Kern from retaliating against the reporting employees.

422.   Kern has the statutory authority to act against all those employees who complained about him without the approval of Hughey or the Commissioners.

423.   Kern immediately began retaliating against the reporting employees.

424.   On October 9, 2019, Moss spoke with Commissioner David Anderson about her concerns, and he had no information about them being made. This was thirteen (13) days after the summary of complaints were delivered to Judge Hughey in his role as the head of the Juvenile Bureau.

425.   Moss told Commissioner Anderson she was afraid she would be retaliated against for coming to him.

426.   Commissioner Anderson stated that Kern's conduct was vulgar and that he would look into the allegations. Anderson further stated that the County had a policy against retaliation and thanked her for following County policy about reporting.

427.   On information and belief Commissioner Anderson took no further action to investigate the complaints.

44

428.   On October 9, Plaintiff Wehmuller spoke with Commissioner Marc Hader about Kern's behavior at the center and advised that it needed to be investigated.

429.   Commissioner Hader commented that this was the second time that he had heard about Kern's inappropriate conduct that day.

430.   Commissioner Hader said he would look into the allegations but was not concerned with the way Kern was handling things because "people didn't always like change."

431.   Plaintiff Wehmuller felt that Commissioner Hader's comments indicated that he did not take the allegations seriously.

432.   On information and belief Commissioner Hader took no further action to investigate the complaints.

433.   Prior to Moss's termination Kern began telling employees of the center that Moss and another employee Doni Duggan were responsible for drugs coming into the group home.

434.   On October 1, 2019, Miriam Reynold approached Moss and Duggan during a meeting in Moss's office. Reynolds told them that she thought there was a possibility that a group home resident had brought drugs into the group home. During this meeting Reynolds was noticeably ill.

435.   The resident had been allowed out on a church pass and was not supposed to go home. Reynolds expressed concern that the child had been taken home by his mother.

436.   Duggan and Reynolds decided to do room searches and to bring in a drug dog. No further discussion was had in Moss's presence about the concern.

437.   On October 8, 2019, McClain went to Judge Hughey's office where she saw Hughey speaking with Kern and Reynolds. McClain observed Kern tell Hughey that he would leave so Hughey and Reynolds could talk.

438.   Moss asked Duggan if something further had happened and Duggan indicated nothing had happened to her knowledge.

439.   Approximately 2 hours later, Kern emailed Duggan and Moss asking for an update on 2 residents who went AWOL. They would not have been updated unless the students had been located and brought to detention which had not occurred at the time Kern asked for an update. Further, one employee provides daily updates of occurrences.

440.   Kern sent an email stating that he had requested to be provided incident reports on several occasions. Reynolds replied via email that she was bringing reports.

441.  No one in the Behavioral Health unit knew what Kern and Reynolds were talking about.

442.  None of the therapists reported unusual or concerning behavior with the students.

443.  On October 9, 2019, Kern emailed Moss, Reynolds, and Duggan that effective that day the Group Home would be under his leadership. By doing this Kern curr off all communication between Reynolds and Duggan.

444.  Moss immediately sent an email to Judge Hughey about the suspicious nature of Kern's conduct stating that she believed it was retaliation.

445.  Reynolds is a female under the age of 40 whom Kern showed preferential treatment to on multiple occasions.

446.  On October 11, 2019, there was a meeting attended to by Kern, Duggan, Kim White, Mills, Krystal, Latanya Freeman, Neil Womack, and Reynolds.

447.  These were not normally accusatory meetings and usually focused on implementing behavioral health for the children.

448.  Upon entering the room Kern was seated in front of a whiteboard. The meeting quickly turned accusatory. Kern began asking Reynolds deliberate and what sounded like rehearsed questions.

449.  Freeman was also asked questions. Freeman exhibited nervous behavior, wore a ball cap pulled down over her face and looked down throughout the meeting. Freeman is known for having an expressive face in meetings and has previously had to be counseled about how expressive she was.

450.  Reynolds exhibited nervous behavior, her hands were shaking and her voice was shaking as she answered Kern's questions.

451.  Moss quickly deduced that the meeting had been scripted and rehearsed and the purpose of the meeting appeared to be to embarrass Moss, Duggan and Kim as retaliation for complaining about Kern.

452.  That the meeting had been rehearsed and scripted was obvious by their manor of speaking. When Reynolds did not answer the way he wanted her to, Kern would lead her to say what he wanted her to say.  Kern also used an interesting turn of phrase when he said "and he basically said, he listen there's some funky things going down in Chinatown?"

Reynolds responded "yes he has written statements and submitted them as well."

Reynolds response is not a natural response to the statement made by Kern.

453.   Kern wanted to know why Duggan had not called in the group home drug incident to DHS.

454.   There was no basis to call DHS because there was no evidence that anything had happened.

455.   The suspicion of drugs being in the facility was based on a teenager who had been out on a pass being sleepy after waking up.

456.   Teens, as are adults, are often sleepy after waking up. It's a normal human behavior. Its especially normal for humans who are detoxing from drugs.

457.   A drug dog was brought into the group home and made no hits.

458.   No drugs were ever found in the facility.

459.   No parent of the children reported missing medications or drugs.

460.   No kids were found to be positive for drugs.

461.   There were no incident reports made which suggested that drug behavior was happening in the facility.[15]

462.   The allegations that Kern made about Moss were suspiciously similar to the allegations made involving the Walnut Grove facility and involving Kern.

463.   Kern also made an announcement to a group of employees at the center that Moss was terminated and she was involved with drugs being brought into the facility.

464.   After Doni Duggan resigned Kern created a fake timeline of events to place in Duggan's file to trump up support to take action against Moss and to counteract the resignation letter written by Duggan accusing him of discrimination.

465.   Prior to Kern arriving under the supervision of Duggan the group home received a letter of commendation from the Oklahoma Department of Mental Health and Substance Abuse Services (ODMHSAS).

---

[15] This made up incident is strikingly different from an incident in April 2018 when drugs were found in the Detention Center. At that time the Judge required all Detention Officers to be tested. Four probation officers were found positive for drugs. The Judge decided he could not terminate all the detention officers even though they were in direct violation of county policy. The Judge had Moss contact all the Officers and tell them they would be drug tested again in 30 days and they better be clean. No detention officers were suspended and all were allowed to return to work. No one contacted the Office of Juvenile Affairs as is required by law on the positive drug test. Latanya Freeman the individual who supervised the Detention Center should have contacted OJA. There was no meeting over Freeman's failure and nothing documented in her file.

466.   It was a "Notice of Certification with Special Distinction." Further ODMHSAS congratulated the center for receiving "100% compliance with all Core Organizational, Core Operational, and Quality Clinical Standards" during its renewal. The special distinction was valid through May 31, 2021.

467.   Kern told Barton in November "The stuff with Ronda was legit and needed to happen. There were kids not getting medical attention and drugs in the facility that no one was handling. Parents weren't being notified. I didn't see the reports I was asked a series of questions and put it together."

468.   Kern "put it together' because he and Reynolds concocted the story to get rid of Moss.

469.   In Schweitzer's affidavit she details that during her employment drugs were brought into the group home – specifically fentanyl. The fentanyl was never reported to the appropriate authorities or investigated. See Ex. 19, Affidavit of Schweitzer.

470.   No one was ever disciplined or terminated over the drugs being brought into the group home or the failure to investigate or report.

## B.   HISTORY OF OTHER SEXUAL HARASSMENT COMPLAINTS

471.   This is the second instance in which Judge Hughey has authorized an individual of questionable moral character to serve in the role of the Director of the CCCJC; the previous director of the CCCJC, Bill Alexander was terminated for sexually harassing employees he supervised at the Center.

472.   Bill Alexander was employed by the CCCJC in multiple rolls over the years.

473.   Prior to 2011, Alexander was employed as the Detention Director. He left in approximately 2007. During his employment then there were allegations made against him for sexual harassment.

474.   In 2011, Alexander was rehired as the Assistant Facility Director by Judge Hughey, who knew or should have known about the previous allegations against Alexander as they should have been documented in his employee file that should still have been on file and/or accessible for review.

475.   Additionally, multiple employees at the CCCJC quit upon Alexander's rehire because of his history of inappropriate conduct. This should have triggered Judge Hughey to investigate the propriety of hiring Alexander. Hughey did not investigate.

476.   During his employment in the Detention Center, from 2011 through 2017, Alexander allegedly engaged in inappropriate behavior by sending lewd text messages

and coming on to employees he worked with and/or supervised. Alexander's conduct was well known among those who worked at the CCCJC which would have included Hughey.

477.   On October 1, 2012, Alexander was promoted to Co-Facility Director by Judge Hughey. Hughey did not follow the county hiring practice and procedure of posting the position and interviewing for the same.

478.   At the time of Alexander's promotion Hughey knew or should have known of the complaints against Alexander because multiple employees quit upon Alexander's rehire due to his prior inappropriate sexual conduct.

479.   In the spring of 2017, CCCJC employee Joy Merryfield was terminated and filed an EEOC complaint on behalf of herself and another employee against Alexander. The allegations were that Alexander sent text messages to an employee asking if she was a swinger and what sexual positions she preferred. The employee did not make a complaint for fear of losing her job.

480.   A second employee also filed an EEOC complaint alleging sexual harassment by Alexander.

481.   The text messages were sent to the First Assistant District Attorney and he did not have the authority to initiate an investigation.

482.   Similar conduct allegedly occurred with other employees and on information and belief there were at least two EEOC Charges filed over these incidents involving Alexander.

483.   Hughey was the supervisor of Alexander and responsible for initiating an investigation into his conduct and failed to do so. Hughey did not suspend Alexander or discipline Alexander over the alleged conduct.

484.   This is not the only known conduct involving Alexander. Hughey knew or should have known of the allegations and took no action to investigate or stop Alexander's behavior.

485.   On June 13, 2017, at 5:37 pm Bill Sharp sent an email to all CCCJC employees advising that the Commissioners had received an EEOC complaint about Bill Alexander and that the Commissioners took the allegations very seriously. In light of their concerns **the Board of County Commissioners, not Judge Hughey**, temporarily **suspended Bill Alexander while an independent investigation was performed**.

486.  On June 17, 2017, Alexander's suspension was reported in the local newspaper the Yukon Progress.[16]

487.  The County Commissioners hired an independent investigator and law firm, Fuller Tubb,[17] to investigate the allegations against Bill Alexander.

488.  In her role as the Human Resources Director Moss assisted and worked alongside Fuller Tubb with the investigation into allegations that former center Director Bill Alexander sexually harassed other employees. Ms. Moss is specifically trained on how to identify sexual harassment in the workplace.

489.  Moss was taught specifically how and what to look for in sexual harassment and the proper reporting procedures.

490.  Because Judge Hughey failed to take any action to investigate the conduct of Bill Alexander and the allegations of sexual harassment, the County Commissioners voted to suspend Alexander with pay.

491.  Judge Hughey did not want to fire Alexander and only did so because of instruction by counsel by and through Fuller Tubb.

492.  While the law provides that the Judge of the Juvenile Center is the individual in charge of the hiring and firing decisions of the center, in regard to the suspension of Bill Alexander, the Commissioners stated that they believe they had the authority to act to suspend Alexander.[18]

493.  The Commissioners relied on 19 O.S. §452.1 which provides that "With the approval of the board of county commissioners, the judge responsible for the juvenile docket of any county may employ a director of county juvenile facilities and services and deputies to the director as the judge may deem appropriate. The director shall perform the duty or duties of directions and implementations of county juvenile facilities and services as prescribed and directed by the board of county commissioners. Such directors and their deputies shall serve at the will and discretion of the judge responsible for the juvenile docket."

494.  Moss interviewed for Alexander's job, Co-Facility Director in after he was terminated in the fall of 2017. She was not hired but given no reason for not being hired. Presumably no hire was made because in January of 2018, Hughey drew an opponent for his seat.

---

[16] http://archives.etypeservices.com/Yukon1/Magazine173160/Publication/Magazine173160.pdf The facts and allegations herein are incorporated by reference hereto.
[17] Fuller Tubb focuses its practice on defense of employment litigation.
[18][18] Id.

50

495.   The other Co-Facility Director Bill Sharp retired in April 2018. At the time of his retirement Sharp told Hughey that Ronda Moss was the most qualified candidate and was the only individual who knew how to run the center.

496.   Moss was the Acting Director of the Facility beginning April 2018 and she served in this roll until March 2019 when Kern was hired. However, her official title remained Co-Assistant Facility Director.

497.   In May 2018, Hughey told Moss he was not giving her the job of the Facility Director because she had made an EEOC complaint against a prior employer.

498.   Mills was hired in April 2018 and began working in May 2018.

499.   Mills and Moss were Co-Assistant Facility Directors while Moss did the Facility Director job duties.

500.   In November 2018, immediately after the election, Hughey had Moss post an opening for the Facility Director Position. Moss asked if she had to interview for the position again. Hughey told her yes because of her prior EEOC complaint.

501.   Moss interviewed for the Facility Director position in the November of 2018 and was not selected.

502.   In March 2019, Hughey again told Moss he was not giving her the job of the Facility Director because she had made an EEOC complaint against a prior employer.

503.   There was a well-qualified pool of applicants for the position in 2017 and 2018 and on information and belief, had Hughey followed proper protocol there would have been a well-qualified pool of applicants in 2012.

504.   Kern was hired to replace Alexander in March 2019.

505.   Kern is the second Facility Director to be accused of sexual harassment and inappropriate sexual conduct in the workplace, while Hughey has been the head of the facility.

506.   The allegations against Mr. Kern were more sordid than the allegations against Mr. Alexander but swifter action was taken against Alexander.

507.   No outside investigator was hired to investigate the allegations against Kern and no law firm was hired to oversee the investigation into Kern.

508.   Any investigation into Kern was cursory at best and did not occur until months after the conduct was reported and well after the media became involved.

509.   Kern was not suspended. Kern was informed and allowed to look into the allegations against him.

510.   Moss, McClain, Wehmuller, Hardaway, Goodfellow, Robert Fletcher and Barton were all employees of the CCCJC when Bill Alexander the previous Director was investigated and subsequently terminated for sexual harassment.

### C.   FACTS ABOUT THESE PARTIES

511.   The actions primarily relevant to this action occurred between March 2019 and August 2021.

512.   All Plaintiffs were at will employees except Paul Hardaway who had an annual contract for employment.

513.   All Plaintiffs were public employees of Canadian County when they were terminated or constructively discharged.

514.   Moss put the Defendants on notice of her retention of counsel and their duty to protect evidence in November 2019.

515.   McClain, Barton, Wehmuller, and Fletcher each put the Defendants on notice of their retention of counsel and their duty to protect evidence relative to their complaints prior to their actual or constructive discharge in November of 2019.

516.   Goodfellow put the Defendants on notice of her retention of counsel and their duty to protect evidence relative to their complaints prior to their actual or constructive discharge in June of 2020.

517.   Robert Fletcher was a Maintenance Technician at the CCCJC who put the County on notice of representation by counsel due to retaliatory conduct which occurred after he reported Kern and supported other employees at the center in the fall of 2019.

518.   Fletcher filed a charge with the EEOC and brought claims against the center related to Kern and served as a witness on behalf of the Plaintiffs herein.

519.   Fletcher was terminated from the center in after retaining counsel, filing suit, and acting as a witness on behalf of the Plaintiffs in this case.

520.   Plaintiffs Hardaway and Goodfellow were wrongfully terminated from their employment.

521.   Plaintiffs McClain, Barton, and Wehmuller were constructively discharged from their employment after complaining about the conduct of Kern and other officials.

522. The OESC found that McClain was terminated from her employment when her job was posted. See Exhibit 11.

523. Barton's employment ended under similar circumstances. See Exhibits 8-15.

524. The CCCJC failed to appear for Barton's OESC appeal. On information and belief if the hearing had been held, the OESC likely would have found that Barton was also fired when her job was posted.

525. Barton and McClain were both in Supervised Visitation and both went on FMLA in March 2021. See Ex 19, Affidavit of Schweitzer ¶77.

526. Both Barton and McClain requested a leave under the ADA to bridge their FMLA leave to get return to work accommodations. See Ex 19, Affidavit of Schweitzer, ¶83-86.

527. Johnson and Majors instructed Schweitzer to deny McClain and Barton's request for ADA leave, offer them jobs which were not substantially similar to their previous jobs and to maintain that they were employed by the CCCJC when their jobs had been posted and they submitted resignation letters.

528. Hardaway was terminated from his employment with the CCEC in that his contract for the Dean of Students position was not renewed and he was only offered a teaching position. Hardaway was denied the opportunity to interview for and advance to the Principal of the CCEC position, even though he submitted an application, for pretextual reasons based on his complaints about the conduct of Kern and other officials.

529. Prior to Moss's termination and McClain's demotion neither the County Commissioners, Judge Hughey, nor the County Human Resources Representative took any action to speak with Moss, McClain, or others about the conduct of Kern.

530. Moss and McClain both filed intakes with the EEOC on October 15, 2019.

531. Moss was terminated on October 17, 2019.

532. McClain was demoted on October 17, 2019.

533. On information and belief, Canadian County by and through Nacole Majors knew or should have known that Moss and McClain had both filed EEOC complaints.

534. On information and belief, Canadian County intended to fire McClain on the same day as it fired Moss, and only did not because Canadian County, by and through Majors learned that Moss and McClain had filed EEOC intakes.

535.   On October 28, 2019, News 9 ran a story about the inappropriate behavior of Kern at the CCCJC.[19]

536.   Wehmuller and Hardaway were the Canadian County employees who cooperated with the media.

537.   The story quoted the individuals as saying "any alleged retaliation was something political and we don't even realize how high."

538.   The report quoted Hardaway's report that Kern promised a 13 year old student he'd take her to see her father in prison asking about her relationship with her father. After the student was dismissed Kern told an official "She's a cute girl and she's got a cute butt."

539.   According to documents obtained by News 9, multiple employees at the Canadian County Children's Justice Center have complained about Director Dan Kern's behavior. In one alleged instance, Kern was heard calling the students at the center "jack***" and little s***-heads." In another alleged incident, after a student had exposed himself at the school, Kern said in front of students and a school official "Where is that swinging d***?"

540.   Hardaway's complaint about Kern was provided to the media and his cooperation with the media is detailed in his EEOC charge.

541.   On November 5, 2019, an evidence preservation letter was served on the County on behalf of McClain and Moss from the Bussett Legal Group.[20]

542.   The Bussett Legal Group and its employees write a weekly column for several newspaper publications in Canadian County and are considered a part of the local media.

543.   Counsel has also been routinely featured in news articles on other high profile cases involving employment discrimination, DHS failures, and is a regular contributor to the media on legal matters that are relevant in current events.

544.   On November 5, 2019, News 9 made a report wherein the Canadian County officials responded to the allegations of misconduct via a Facebook post claiming that they were "not notified" of the allegations and an investigation into Kern had been "delayed by the withholding of information." See Exhibit 34 11/5/19 news article.[21]

---

[19] https://www.news9.com/story/5e346e68527dcf49dad6e11b/harassment-inappropriate-behavior-alleged-at-el-reno-detention-center which is incorporated by reference.

[20] Rachel Bussett of Bussett Legal Group was Hughey's opponent in the 2018 judicial election.

[21] https://www.newson6.com/story/5e346de2527dcf49dad6dd76/canadian-co-officials-respond-to-allegations-of-misconduct-at-juvenile-center which is incorporated by reference.

545.   The Facebook post by a representative for the County and/or the CCCJC was inaccurate and an attempt to deceive the public about actions at the CCCJC in that Judge Hughey and two out of the three County Commissioners were specifically advised of Kern's conduct prior to the news story of October 28, 2019; and the post is evidence of the intent of the County to conceal Kern's conduct.

546.   However, Kern has made admissions against interest prior to the running of the story which prove that the Center knew of the allegations and dismissed them. On the day Moss was terminated, Kern called everyone into the center gymnasium. Kern gave a big speech about Moss no longer being employed by Canadian County. Kern told everyone present that Moss was not allowed on center property and that they were prohibited from communicating with her.

547.   Kern further told the employees **"The last few weeks have been challenging for me on a personal and professional level and it gave me the opportunity to evaluate something that I needed to do to improve for a higher level of professionalism, I had dialed in conversations. I can't tell my funny stoies anymore. But that's the expectations that the judge placed on me to raise the bar."**

548.   This is also substantiated by the statement against interest made by Kern attached as Exhibit 29. The County Commissioners and Hughey knew about Kern's conduct and they actively hid it.

549.   On November 6, 2019, Plaintiff Moss gave an interview with News 9 detailing Kern's misconduct and the County's failure to act on the information reported by her and McClain. See Ex. 27, 11/6/2019 News 9 story[22]

550.   The CCCJC was contacted about Moss's interview prior to it airing and given the opportunity to respond to her statements.

551.   Commissioner Anderson told News 9 that they were taking the allegations seriously and were conducting an internal investigation into the facilities director.

552.   Anderson was the Commissioner that Moss specifically told about what was happening at the center prior to her termination and that she feared retaliation.

553.   When Moss was fired by Majors she claimed no knowledge about the previous allegations against Kern.

---

[22] https://www.news9.com/story/5e346dc2527dcf49dad6dc81/2-women-claim-they-were-fired-for-reporting-sexual-harassment-against-canadian-co-juvenile-center-director which is incorporated by reference.

554.   Harsh treatment of McClain by Judge Hughey and Kern escalated after Moss's interview which confirmed that Judge Hughey had in fact been notified almost two months prior about the conduct of Kern.

555.   However, this interview still did not spark a real investigation.

556.   On November 12, 2019, an evidence preservation letter was served on the County on behalf of Barton, Fletcher, and Wehmuller again by the Bussett Legal Group.

557.   On information and belief, Canadian County and Judge Hughey believed that Bussett had spoken with Barton, Fletcher, and Wehmuller prior to the interview and that Barton, Fletcher, Wehmuller, and McClain may have given information to the media at the time of Moss's interview.

558.   Still no action was taken at this time to investigate Kern or to protect the employees of the CCCJC.

559.   On November 13, 2019, at approximately 9 a.m. Kern entered the office of Barton and started screaming at her about suing him. This incident was caught on video.

560.   Barton immediately requested that the video of Kern harassing her be saved as evidence.

561.   On November 13, 2019, a letter was sent by the Bussett Legal Group to Canadian County about the harassment and it being caught on video.

562.   Still no action was taken against Kern.

563.   While Barton was in the process of reporting Kern's conduct to management, he confronted her again by stating he "didn't confront her" thereby making admissions against interest about the nature of his conduct.

564.   It wasn't until November 18, 2019, some five (5) days after being caught on tape harassing an employee that Kern was placed on administrative leave without pay.

565.   On about November 21, 2019, Kern was fired.

566.   On information and belief, Canadian County only took action against Kern because he was caught on video harassing Barton, and because Barton is related to an oil tycoon whom the Judge wanted to support his campaign. The Judge had previously solicitated Barton and Moss to ask oil tycoon to support his campaign in 2018.

567.   Prior to being caught on video Canadian County had taken no action to investigate the complaints made by Plaintiffs and others about Kern.

568. Further, the County openly lied about being advised of the Kern's conduct by way of the Facebook post disclaiming notice of Kern's misconduct.

569. Plaintiffs believe that no action would have been taken against Kern if he had not harassed Barton specifically due to her political connections and the harassment had not been caught on tape.

570. On January 29, 2020, a letter was hand delivered to Canadian County and Majors advising them that they were under an obligation to preserve evidence, that they had failed to do so, and instructing her to protect information stored on McClain's computer.

571. McClain's computer was not properly connected to the server system and suffered a failure causing evidence related to this case to be lost or damaged.

572. When the letter was delivered to Majors, she refused to accept the same and scratched out her name on the letter.

573. Thereafter Majors immediately contacted McClain and accused her of intentionally and deliberately causing computer problems. Thus, continuing to harass and intimidate McClain instead of taking action to ensure that the computer was protected.

574. Thereafter Majors attempted to contact a coworker, Angel Colley, and intimidate her into stating that McClain had administrative rights to a computer that she did not have.

575. The following day a second letter was delivered to Canadian County detailing Majors' behavior the day prior.

576. Subsequently, counsel for the CCCJC sent a letter to Plaintiffs' counsel about the same. Instead of advising that they would investigate the allegations, counsel attempted to justify the behavior by claiming that being rude or engaging in strict application of the rules in write ups does not rise to the level of retaliation. Once again, the County missed the point of the complaints and their failure to protect the employees from discriminatory behavior.

577. The CCCJC's counsel ignored that the CCCJC failed to preserve evidence, continued to engage in harassing behavior by telling individuals that they could not speak to former employees, limiting the ability of employees to assemble in their lunch period and the like.

578. Since reporting the conduct of Daniel Kern to Judge Hughey, the County Commissioners and Human Resources, the Plaintiffs have been confined to offices, repeatedly subjected to drug test, told they were not allowed to worship during their lunch periods, had their right of assembly interfered with in being told whom they could eat lunch with, threatened over assembling with former employees after hours, told that

they could not speak out about certain happenings at the center including talking to the media, told what they could and could not post in social media on their off time and their personal bus, and other harassing behaviors.

579.   Counsel for the CCCJC likewise ignored the ongoing conduct of the CCCJC that had been complained of by Moss, McClain, Barton, Wehmuller and others – the targeting of employees who complained about being subjected to a hostile work environment and being the victims of gender/sex and age discrimination.

580.   The CCCJC and its representatives engaged in a pattern of victim blaming and negligently failing to investigate the harassment happening right under their nose. Further, the CCCJC had a reputation for allowing this to happen as the Director that Alexander was removed for sexually harassing other employees.

581.   The CCCJC never properly interviewed the individuals who complained about Kern to determine the validity of the allegations against him nor did they ever contact counsel to request to interview the individuals.

582.   The pattern of harassment did not stop with the termination of Kern.  Instead, the harassment went on and got worse until all the employees who complained were gone.

583.   After the termination of Kern and before the hiring of Johnson, Mills was the acting Facility Director.

584.   Mills allowed, permitted, condoned and encouraged the ongoing harassment and targeting of the Plaintiffs.

585.   After Johnson was hired she continued the pattern of harassing behaviors.

586.   Hughey, Kern, Mills, and Johnson all had the power to fire the Plaintiffs at any point during the relevant time periods without consultation with Hughey.

587.   Hughey Kern, Mills, and Johnson all individually and at the relevant times acting in concert knowingly and intentionally went out to harass and intimidate the Plaintiffs to make them either quit or stop pursuing their claims against the center and the county.

588.   Moss was terminated in October 2019. McClain was demoted in October 2019. Fletcher was terminated at the beginning of 2021. Goodfellow was terminated in January 2021. Wehmuller was constructively discharged in May 2021. Hardaway was terminated from his Dean of Students job in May 2021, demoted to teacher, and not allowed to interview for Principal of the CCEC.   Barton and McClain were constructively discharged in July 2021.

589.   At all times relevant herein the County Commissioners, Hughey, Majors, Kern, Johnson or Mills had authority to initiate an investigation and to take action to protect the Plaintiffs from the illegal conduct complained of herein and failed to do so.

590.   Hughey failed to initiate an investigation and to protect the employees and engaged in retaliatory conduct and approved the termination of Moss, Fletcher, and Goodfellow and approved the conduct which led to the constructive discharge of Barton, McClain, Wehmuller, and Hardaway.

591.   The County Commissioners failed to initiate an investigation and to protect the employees and engaged in retaliatory conduct and approved the termination of Moss, Fletcher, and Goodfellow and approved the conduct which led to the constructive discharge of Barton, McClain, Wehmuller, and Hardaway.

592.   Mills failed to investigate and/or report the conduct of Kern and failed to initiate an investigation and to protect the employees and engaged in retaliatory conduct and approved the termination of Moss, Fletcher and Goodfellow and approved the conduct which led to the constructive discharge of Barton, McClain, Wehmuller, and Hardaway.

593.   Majors failed to investigate and/or report the conduct of Kern and failed to initiate an investigation and to protect the employees and engaged in retaliatory conduct and approved the termination of Moss, Fletcher, and Goodfellow and approved the conduct which led to the constructive discharge of Barton, McClain, Wehmuller, and Hardaway.

594.   Johnson failed to initiate an investigation and to protect the employees and engaged in retaliatory conduct and approved the termination of Goodfellow and approved the conduct which led to the constructive discharge of Barton, McClain, Wehmuller, and Hardaway.

595.   Hughey, Majors, and Mills all facilitated, participated in, suborned the discrimination against all Plaintiffs throughout the relevant time periods.

596.   Johnson perpetuated the retaliatory conduct against all Plaintiffs except Moss from the summer of 2020 forward when she was hired. The discriminatory conduct began under Kern and continued throughout the remainder of their employment with the center.

597.   When Johnson was hired, she should have undertaken an administrative review of the center to resolve the environment which led to conduct which allowed both Alexander and Kern to be employed but Johnson failed to take any action to correct or repair the discriminatory environment.

598.   The Associate District Judge and the Facility Director, and Assistant Facility Director, designate managerial and administrative staff to participate in the Management Team for the CCCJC. This team meets at least once per month to plan

programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility.

599. On information and belief, there was never a meeting of the Management Team to discuss the behavior of Dan Kern or its impact on facility morale and the providing of services to the community.

600. On information and belief, the evidence will show that the Judge has consistently failed to manage the center and properly oversee the operations of the center on a day-to-day basis and is effectively retired on the job.

601. If the Commissioners had the authority to act to suspend Alexander, then the Commissioners also had the authority to act to suspend Kern.

602. Commissioners Hader and Anderson failed to take actions on the conduct reported to them regarding Kern.

603. An independent investigator and law firm were hired to determine whether or not Alexander engaged in sexual harassment. The investigation determined that Mr. Alexander had engaged in improper conduct and that he should be fired.

604. Moss made reports about the sexual harassment of Kern that Judge Hughey and the Commissioners failed to act on.

605. Yet despite the history, knowledge and training involved with Moss and McClain's positions, Judge Hughey blatantly ignored what he was told about Kern harassing not only his employees but making sexual innuendo about a 13-year-old girl at the school the CCCJC oversaw.

606. Judge Hughey also failed to investigate the other inappropriate comments made by Kern about the children in the center and Kern's attempts to engage in a dating or sexual relationship with individuals employed by the center.

607. On information and belief, instead of taking action to initiate an investigation into Kern's conduct, Hughey told Kern about all of the complaints made against him and identified the complaining parties.

608. Solicitation of subordinate employees to engage in a sexual relationship was a basis for the termination of Alexander but not investigated in relation to Kern.

609. During his employment, Kern was actively recruiting employees he supervised to help him entice another employee he supervised into engaging in a dating and/or sexual relationship with him.

60

### D.    FACTS ABOUT JOHNSON

610.    Johnson is the sister of an attorney who is under contract to represent indigent families in the deprived system at the CCCJC.

611.    Johnson's brother was also previously investigated and disciplined by the bar for an inappropriate sexual relationship.

612.    Johnson's brother was contracted with the CCCJC by Judge Hughey after being suspended by the bar association for his inappropriate sexual relationship with a client.

613.    Hughey testified for Johnson's brother in bar disciplinary proceedings.

614.    Johnson was not going to take action inconsistent with Hughey because of Hughey's support of her brother.

615.    Statutorily Johnson has all decision making authority over all employees at the CCCJC.

616.    Johnson specifically targeted Hardaway over the performance of his job.

617.    Johnson demoted Hardaway from the Dean of Students position to a teacher position for the 2021-2022 school year.

618.    Johnson reluctantly re-interviewed Hardaway for the Dean of Students position.

619.    Johnson told Hardaway he would not be allowed to interview for the Principal of the CCEC position.

620.    Johnson fired Hardaway and refused to hire/promote him.

621.    Johnson specifically targeted Hardaway, Wehmuller, Barton and McClain during her employment. See Ex. 19 Affidavit of Schweitzer.

622.    Johnson along with Hughey, Majors, and Mills all wanted the Plaintiffs gone and anyone who associated with them.

623.    Johnson terminated Fletcher over inflated misstatements.

624.    Johnson approved the termination of Goodfellow in January 2021 after Goodfellow reported the violations of the FFCRA and the (OOHSSA), 40 O.S. §§ 401-435, theft of county time, false timesheets, and acted as a witness on behalf of the parties herein.

625.    Johnson targeted Goodfellow and wanted to terminate her for taking time off.

626.   Johnson wanted to terminate or force out anyone associated with the Plaintiffs in this suit and the Moss suit.

627.   Johnson condoned, participated and approved the misconduct which occurred relating to the constructive discharge of Barton, Wehmuller and McClain including refusing to put them back in their positions after returning from FMLA leave, refusing to grant ADA leave, reducing pay, and other matters complained of herein.

628.   Johnson interfered with and prohibited Hardaway's employment with the center from continuing.

629.   The previous conduct that occurred under Kern and Judge Hughey continued under Johnson and Judge Hughey with regard to the mistreatment of McClain, Barton, Wehmuller, Hardaway, and Goodfellow.

630.   Fletcher was terminated in September 2020. Goodfellow was terminated in January 2021.   Wehmuller was constructively discharged in May 2021. Hardaway was terminated from his Dean of Students job in May 2021, demoted to teacher, and not allowed to interview for Principal of the CCEC.   Barton and McClain were constructively discharged in July 2021.

### E.   FACTS ABOUT MILLS

631.   Cedric Mills was hired, from outside the facility, as the second Assistant Facility Director.

632.   Mills was less qualified for the position of Facility Director or Assistant Facility Director than Moss having less education and experience.

633.   Mills was hired at the same rate of pay as Moss.

634.   Mills only had the title of Co-Assistant Facility Director and his responsibilities as Assistant Facility Director were equal to or less than the responsibilities of Moss in this position plus Moss had the responsibilities of 2 other positions with no increased pay or benefits.

635.   Mills had an Executive Assistant D'Shea Brothers help him perform his duties as Assistant Facility Director.

636.   Mills took away duties from McClain and assigned them to Brothers who was younger and less qualified than McClain.

637.   Moss did not have an Executive Assistant to help her perform her job duties as Assistant Facility Director.

638.   Mills would have been acting Facility Director between November 2019 and June 2020 when Johnson began.

639.   Mills specifically targeted all Plaintiffs during his employment.

640.   Mills was trained to do his job by Moss.

641.   Hughey was advised on multiple occasions that Mills lied about his work time on his time cards.

642.   No action was ever taken against Mills.

643.   On information and belief, Mills was hired because Judge Hughey believed that Mills had political connections which could assist him with reelection as he was subject to a contested judicial election for the first time ever in 2018.

644.   Mills knew that Moss had an issue with having her exists blocked based on a previous experience where Moss had a claustrophobia attack when Mills stood between her and the exit in a meeting with Commissioner Anderson at the CCCJC's accounting office. Mills specially commented on Moss's panic attack in that instance.

645.   Mills acted to physically intimidate and verbally assault Moss on or about December 18, 2018 while Moss tried to perform her job as a Human Resources Director.

646.   Mills interfered with the interactive process in providing employee accommodations with his behavior. Mills behavior was reported to Hughey via a formal complaint.

647.   When Barton, McClain, Wehmuller, and Hardaway's employment with the CCCJC was ending Mills told people "the trash takes itself out." See Ex 19, Affidavit of Schweitzer, ¶90.

## F.    FACTS ABOUT MAJORS

648.   Majors actively participated and facilitated the discrimination against the Plaintiffs.

649.   Majors subjected McClain to humiliating conduct going so far to attack her grooming and appearance when she reviewed McClain.

650.   Majors condoned, supported, and facilitated the conduct of Mills, Johnson, Hughey and Kern.

651.   Majors participated in the denial of ADA leave requests to Barton and McClain.

652.   Majors knew about the misuse of county funds and took no action to stop it.

## G.   FACTS SPECIFIC TO EACH PLAINTIFF:

653.   In late February/early March 2019, Judge Hughey announced that he had chosen Kern for the Facility Director position.

654.   When Moss inquired why she had not been chosen for the position, Judge Hughey again informed her that it was because she had previously filed an EEOC complaint against a former employer.

655.   Within weeks of Kern beginning to work at the CCCJC he began making sexual remarks, offensive gestures, telling sexual jokes and talking very inappropriately to females in the facility, including Moss and McClain.

656.   In September 2019, other employees began reporting to either Moss or to McClain, as Human Resources staff, and made complaints about Kern's disturbing and escalating behavior.

657.   Following the County's policy manual, on September 24, 2019, and again on September 26, 2019, McClain submitted documentation about Kern's inappropriate language and vulgar behavior on her and Moss's behalf as well as on behalf of other employees to Judge Hughey.

658.   Individuals who complained about Kern include but aren't limited to Donni Duggan, Robert Fletcher, Ronda Moss, Melissa McClain, Paul Hardaway, Donna Wehmuller, Erin Barton, Angel Cooley and others.

659.   On September 30, 2019, after reports had been made about Kerns conduct, Majors sent an email to Hughey about Moss' alleged "eye rolling" in a meeting. The email alleged Moss rolled her eyes when Kern spoke. Kern did not speak at the meeting in question. Majors alleged that Moss eye rolling was passive aggressive.

660.   The CCCJC used the alleged eye rolling event as a justification for her termination. However, no action was taken against Mills after Moss reported him to Hughey on multiple occasions for engaging in physically intimidating and physically harassing behavior.

661.   On October 3, 2019, the Dean of Students of the alternative school at the CCCJC, Paul Hardaway, reported to Moss and McClain that the day prior Kern had appeared at the school and spoke with a 13-year-old female student.

662.   During the encounter with the child, Hardaway observed Kern tell the student that if she improved her behavior, he would take her to see her father whom she had never seen and who was incarcerated.

663.   When this student left Hardaway's office Kern tapped Hardaway on the shoulder

64

and stated, "cute kid," and "she has a cute butt."

664. Moss expressed her concerns about Kern's behavior to Judge Hughey, but no action was taken, and Kern continued to have access to youth in the facility.

665. On October 9, 2019, Moss called County Commissioner David Anderson and spoke with him about the Kern complaints.

666. Commissioner Anderson advised Moss that he was not aware of the complaints. Commissioner Anderson took no action on the complaints.

667. On October 17, 2019, Moss was to meet with County Human Resources Director, Majors in Major's office. During the meeting Majors notified Moss that she was being terminated.

668. No reason was given to Moss for her termination during the meeting with Majors.

669. Immediately after Moss was terminated, Kern called an impromptu meeting at the CCCJC for all of the employees who were in the building.

670. Kern announced to the CCCJC staff that Moss had been fired and the complaints about him "were just gossip and rumors."

671. Kern also instructed employees not to have contact with Moss and attempted to ban her from the property.

672. Kern's behavior is a violation of Moss's constitutional rights.

673. As a citizen of Canadian County Moss has a right to use the facilities that the CCCJC has to offer.

674. Moss also has a constitutional right to speak with, associate with and assemble with her friends and former co-workers.

675. Upon information and belief, Judge Hughey shared the complaints with Kern which motivated Kern to retaliate against Moss and the other individuals who reported.

676. The day after Moss was terminated, October 18, 2019, Kern had a discussion with Barton. Kern knew that Barton was one of the individuals who made a complaint against him.

677. Kern advised Barton that "the gossip and rumors are gone" indicating he was referring to Moss's being terminated.

678. Kern, with an extremely cocky attitude, stated to Barton that he "would be just fine" apparently insinuating that no adverse action would be taken against him as a result of

the complaints.

679.   Hughey condoned and ratified the illegal behavior of Kern.

680.   The County failed to take any action in regard to Kern after being advised of the same.

681.   Ironically it was Kern's continued acts of intimidation against Barton that led to his ultimate demise.

### a. MELISSA MCCLAIN

#### i. Facts regarding McCain's interactions with Kern and reporting.

682.   McClain adopts and incorporates her EEOC Charge and Tort Claim which are attached hereto as Exhibits 3 and 8.

683.   McClain was hired as a detention officer for the CCCJC in 2004 and then moved to the administrative assistant for detention position.

684.   In May 2018, McClain transferred to the Human Resources Department as a General Office Assistant under the supervision of Moss.

685.   McClain began working with Kern while still being supervised by and working closely with Moss.

686.   In the Summer of 2019 Kern recommended McClain be given the title of Human Resource Generalist since she was responsible for many job duties.  McClain also received a small raise.

687.   During that same period, Kern also created a position for a younger female and awarded her a $10,000.00 annual raise.  This female was Krystal Rose, and she was a member of the Management Team after Kern promoted her.

688.   McClain's raise was considerably less than Rose's that Kern was attracted to.

689.   This "new" position was not posted, and McClain was not given an opportunity to interview for it.

690.   In the fall of 2019, Kern again created another "new" position for another younger employee with a higher salary than McClain's for which she was not given an opportunity to interview because it was not posted.

691.   On information and belief, Kern considered McClain to be less attractive or desirable than the younger female employees and as a result of his lack of sexual

attraction to her, Kern failed to hire, promote or pay McClain the same as he did young and "sexy" female employees.

692.   McClain also made written complaints pursuant to County policy about Kern's escalating inappropriate behavior. Said complaints were submitted September 24, 2019 and again September 26, 2019.

693.   These complaints were submitted by McClain in her personal capacity and in her capacity as the Human Resource Generalist on behalf of other employees, including but not limited to her supervisor Moss.

694.   On or about October 15, 2019 McClain made contact with the EEOC regarding filing a charge against Canadian County, Judge Hughey, Kern and others.

695.   Majors was made aware of McClain's contact with the EEOC on October 17, 2019. On information and belief, but for Moss telling Majors that McClain had contacted the EEOC, McClain would have also been fired.

696.   The following day, October 18, 2019, Kern stated to McClain that she had "violated confidentiality" so she would no longer be allowed to have access to some employees' information even though her job duties include employee documentation in personnel files.

697.   Since that time, McClain has had numerous other Human Resource job duties taken away from her and was instructed by Kern to isolate in her office until they figure out what to do with her.

698.   Mr. Kern told McClain that she would be able to keep her job "if I didn't do like what I had done before" (turn in employee's complaints.)

699.   Mr. Kern also attempted to make McClain sign a document stating that she would not contact Ms. Moss, which she refused to do.

700.   On occasion, McClain and co-worker Fletcher would utilize lunch breaks for bible study either in a vacant office or off-campus. Their lunch hour was unpaid.

701.   Kern and Majors informed McClain that her bible study was not permitted.

702.   Kern's behavior constitutes retaliation for reporting illegal activity.

703.   After the notice of preservation was delivered on Moss and McClain's behalf, McClain's work environment became even more uncomfortable, and she was further targeted by Judge Hughey and by Kern.

704.   McClain submitted an Amendment to her EEOC Charge in the Summer of 2020.

### ii.   Facts regarding McCain's position transfer.

705.   The retaliatory treatment of McClain continued after Kern left under Mills and Johnson.

706.   Kern hired D'Shea Brothers as a Executive Assistant to Mills. Brothers' first day of work was Kern's last day of work in 2019.

707.   D'Shea Brothers developed a friendship with Melanie Johnson.

708.   D'Shea Brothers was used to take duties away from McClain and other people that Kern, Hughey, Johnson and Majors did not like without arousing suspicion.

709.   Brothers has only a GED while all other Plaintiffs

710.   McClain eventually could no longer handle the way she was treated as a Human Resource Generalist and transferred to a position in supervised visitation under Barton in August of 2020.

711.   McClain made the switch because of the ongoing harassment and retaliation following her reporting of Kern's behavior and bringing these claims.

712.   McClain had some relief while working in supervised visitation but that was only because Barton was her supervisor and protected her.

713.   Upon her transfer, McClain's salary was reduced and raises she had previously received were taken away from her when she changed position.

714.   McClain was treated differently than other employees who had not reported wrongdoing in the center when they transferred to a job with a different paygrade.

715.   McClain's pay was reduced because of her report of harassment.

716.   McClain reported to Majors that the recalculation of pay was inappropriate and not consistent with past Center policy and procedure.

717.   The reduction in pay formula applied to McClain was not the usual reduction in pay formula applied when an employee changes positions to a lower paying job.

718.   McClain was treated differently than other employees who had not reported wrongdoing in the center when they transferred to a job with a different paygrade.

719.   On information and belief these raises were taken away and McClain's pay reduced because she reported on wrongdoing at the center.

720.   Majors took the action against McClain anyway.

68

721. Majors made inappropriate comments to McClain about her dress.

722. Majors picked on McClain for her appearance and told her she had grooming problems.

723. Majors set out to embarrass and dehumanize McClain after McClain reported her.

724. Majors treatment of McClain violated County policy.

725. Hughey and/or Johnson could have and should have stopped the reduction in McClain's salary and failed to do so.

### iii.   Facts regarding McCain's Disability, FMLA and ADA Leave.

726. McClain has a diagnosis of anxiety which the center knew or should have known of during her employment.

727. McClain's diagnosis was known to Moss when Moss was in HR so Moss's knowledge constitutes knowledge to the center.

728. The conduct and treatment of McClain impacted her anxiety and caused her to have to increase medications and undergo additional treatment.

729. The defendants engaged in a pattern of conduct designed to harass and intimidate McClain to make her quit.

730. McClain had some relief while working in supervised visitation but that was only because Barton was her supervisor and protected her.

731. In the spring of 2021 McClain's anxiety was exacerbated by the conduct and treatment she was receiving since reporting the conduct of Kern, Johnson, Hughey, Mills, and Majors.

732. At the same time McClain's daughter began to have significant medical complications due to her seizure disorder.

733. McClain was not offered leave under FMLA, the ADA, or the OADA to care for herself or her daughter.

734. McClain elected to exercise FMLA leave to take time to care for her daughter and herself in approximately March 2021.

735. While on leave McClain became pregnant. McClain's pregnancy is high risk because of her age and medical conditions which the CCCJC knew of due to McClain's prior pregnancy.

736.   This was also occurring at the height of the COVID 19 pandemic. McClain's anxiety is heightened related to the COVID 19 pandemic, and her co-morbidities placed her at even higher risk related to her pregnancy should she contract COVID 19.

737.   The County failed to offer accommodations to McClain related to her employment, her anxiety, and/or her high-risk pregnancy.

738.   When McClain was scheduled to return from FMLA leave she sought accommodations allowed to her under the OADA, the ADA, and the Rehab Act.

739.   The CCCJC failed to engage in the interactive process with her over needed accommodations to return to work.

740.   The CCCJC posted McClain's job as being opened when McClain was attempting to return to work from FMLA with accommodations.

741.   Members of the County Human Resources admitted to McClain that her job was wrongfully posted.

742.   McClain was not offered to return to a substantially similar position.

743.   McClain was offered a job in the CCCJC kitchens upon her return from FMLA leave.

744.   McClain's job was open at the time she was to return from her leave.

745.   McClain was constructively discharged on July 9, 2021

746.   The Oklahoma Employment Security Commission found that McClain had a reasonable basis to quit her job following the ongoing harassment she had been subject to in her employment.

747.   McClain filed a EEOC complaint in September 2021 which is incorporated hereto which further describes the facts associated with her discrimination and retaliation. See Exhibit 4. All Exhibits with their allegations and information are incorporated hereto by reference as per Fed.R.Civ.Pro 10(c).

748.   The right to sue letter has been issued on this charge but the OGTCA claim has not yet expired.

### b. ERIN BARTON

749.   Barton adopts and incorporates her EEOC Charge and Tort Claim which are attached hereto as Exhibits 4 and 9.

750. Barton has been employed by the CCCJC since 2013, initially serving as a Supervised Visitation Monitor and presently as a Supervised Visitation Supervisor.

751. Soon after Kern began working at the CCCJC Barton was exposed to Kern's inappropriate and offensive conduct.

752. On several occasions, Kern visited Barton's office unannounced to discuss his patently vulgar and inappropriate thoughts.

753. During one of these visits Kern informed Barton that he was "excited" because he was getting a "big boy toilet installed" in his house and further stated "I don't know what's wrong with Oklahoma boys, but I guess they don't put their balls in the toilet to poop...does your husband put his balls in the toilet to poop?"

754. During a Summer 2019 incident, Kern visited Barton's office and initiated another uninvited conversation asking her whether one of her employees "looks hot."

755. Barton was aware that Kern was referring to an employee of Columbian nationality.

756. Kern then asked Barton to disclose further details regarding this employee's Columbian nationality and information about this employee's husband.

757. Following these comments, Kern next obscenely speculated that the employee was most likely "a-mail-order-bride."

758. Last, Kern informed Barton that he wanted Barton to help get this employee "away from her husband."

759. In September of 2019, Barton drafted a formal complaint against Kern concerning his inappropriate comments, discriminatory conduct, and creation of a hostile work environment which was delivered to Human Resource Generalist McClain.

760. In October of 2019, Kern and Barton attended a meeting in which Kern made it clear that he knew she had filed a formal complaint against him. Kern told Barton all complaints about him would have to go through him.

761. Kern then commented to Barton, about her formal complaint, that "I will be just fine," as it concerned his employment security.

762. Kern knew Hughey would take no action against him.

763. In November of 2019, Barton retained legal counsel and on November 12, 2019, a Letter of Preservation and Open Records Act Request were hand-delivered to Canadian County, placing the County on notice of Barton's claims.

764.   Barton believes her choice to hire counsel influenced how Judge Hughey treated her and resulted in his failure to investigate and to address the issues with Kern.

765.   The very next day, on November 13, 2019, Kern further harassed Barton by abruptly entering her office, stating that he heard Barton] was suing him.

766.   This disruptive act caused Barton to cry while stating to Kern that: "I only want to do my job."

767.   Barton notified her legal counsel of Kern's conduct and counsel reported the same to the CCCJC by written letter.

768.   On information and belief no action was taken against Kern until an additional incident between Barton and Kern was caught on tape. Barton believes action was only taken then because Hughey wanted political favor with her oil tycoon uncle.

769.   Although Kern was fired on or about November 21, 2019, Barton has continued to be subjected to a hostile work environment, retaliation, and differential treatment than her non-reporting co-workers by Judge Hughey, Cedric Mills, Nacole Majors, and Melanie Johnson.

770.   Throughout Barton's employment following the report of illegal behavior by the County, Kern and others there has been an ongoing pattern of retaliation and hostility from the CCCJC, Judge Hughey, Dan Kern, Cedric Mills, and Melanie Johnson.

771.   In the spring of 2021, Barton went on leave under the Family and Medical Leave Act due to stress related to her employment with the CCCJC arising out of targeting and retaliatory behavior by Judge Hughey, Cedric Mills, Nacole Majors, and Melanie Johnson.

772.   Barton was targeted and told that she could not associate with former employees of the center and what she could and could not discuss on social media.

773.   Barton was treated differently than non-reporting employees.

774.   While Barton was on leave and scheduled to return the CCCJC at the direction of Johnson and Majors posted Barton's job.

775.   When Barton was due to return, she requested an additional short period of leave under the Americans with Disabilities Act to provide information for needed accommodations.

776.   The leave was not approved.

777.   The center failed to enter into the interactive process regarding her return to work.

778. The center did not offer Barton her job back despite not having filled it while out. They did not offer a substantially similar position either. Barton was offered employment in the kitchen.

779. Barton was constructively discharged on July 9, 2021

780. The Oklahoma Employment Security Commission found that Barton had a reasonable basis to quit her job following the ongoing harassment she had been subject to in her employment.

781. Barton filed a EEOC complaint in September 2021 which is incorporated hereto which further describes the facts associated with her discrimination and retaliation. See Exhibit 5. All Exhibits with their allegations and information are incorporated hereto by reference as per Fed.R.Civ.Pro 10(c).

782. The 180 days allowed to the EEOC to investigate the September charge have not expired. Though facts related to the same are set forth herein, Plaintiff will need to amend to add those causes of action upon issuance of the right to sue or the passage of the 180 days. A tort claim is also filed related to these claims and the administrative period has not yet expired and/or the County Commissioners have not rejected the claim.

### c. DONNA WEHMULLER

783. Wehmuller adopts and incorporates her EEOC Charge which is attached hereto as Exhibit 5.

784. Since 2013 Wehmuller has been employed as an Administrative Assistant for the CCCJC's alternative school, an office of the CCCJC.

785. 463. Wehmuller resigned her position with the CCJC in May 2021 due to the ongoing hostile work environment, discrimination and retaliation which occurred after she reported, spoke to the media, filed a tort claim and filed and EEOC charge of discrimination.

### i. Facts regarding Wehmuller and Kern

786. In March 2019, Wehmuller observed Kern refer to the CCJC students as "shit heads" during on office meeting.

787. During the summer of 2019, Kern created a "new" position for hire with the title, "Quality Assurance Coordinator."

788. However, no hiring process was administered for this position, and no postings regarding its opening for applications were published.

789.   Consequently, Wehmuller, among other CCCJC employees, was not permitted to interview for this position or even provided an opportunity to apply for it although Wehmuller would have been qualified and could have been a potential hiring consideration.

790.   Instead, Kern internally promoted a young female employee under the age of 40 as the "Quality Assurance Coordinator," awarding her a $10,000.00 annual raise.

791.   In the fall of 2019, Kern created a second "new" position, this time titled "Executive Assistant" while again foregoing any administered hiring process or postings.

792.   Instead, Kern once more internally hired another younger female employee under the age of 40 and likewise provided her with a raise denying Wehmuller an opportunity to interview for this "new" position for which she was qualified.

793.   Throughout the summer and into the fall of 2019, Wehmuller observed Kern engage in conversation, rhetorical commenting, and asides, all of which were inappropriate and offensive in numerous facets, including speaking offensively about matters concerning CCCJC enrolled children and students.

794.   Wehmuller experienced Kern talking to and about her co-workers in a vulgar manner and observed Kern often sexually discriminate against female CCCJC employees when speaking to or about them.

795.   Wehmuller suffered emotional distress as Kern intimately describing his penis and testicles.

796.   During the period spanning from September 24, 2019 to October 7, 2019, numerous CCCJC employees attempted to bring an end to the hostile work environment Kern had created for the CCCJC employees.

797.   To halt Kern's offensive conduct Wehmuller joined Moss and McClain in drafting complaints to be submitted to Judge Hughey.

798.   Wehmuller's brother, Paul Hardaway is an employee of the County and El Reno Public Schools and was the individual to whom Kern made the sexual comments about the 13 year old girl.

799.   Hardaway is one of the individuals who made a statement to Moss and McClain that was provided to Hughey.

800.   All Defendants knew or should have known that Wehmuller was working cooperatively with her brother about reporting Kern's conduct.

74

801.   Five other CCCJC employees also joined the women in submitting formal complaints.

802.   Wehmuller spoke with Canadian County Commissioner Marc Hader regarding Kern's behavior and acts of promulgating a hostile work environment at CCCJC on October 9, 2019.

803.   Wehmuller has contemporaneous text messages that prove she met with Commissioner Hader on this date.

804.   Moss spoke to Canadian County Commissioner Dave Anderson and Judge Hughey, about Kern's behavior and the hostile work environment at CCCJC.

805.   No action was undertaken with respect to Kern's offensive and unlawful conduct.

806.   When the Commissioners and Judge Hughey failed to act Wehmuller contacted the media in October 2019 about what was happening at the CCCJC.

807.   Because the media reports included information about Wehmuller' s brother the Defendants knew or should have known that Wehmuller was one of the individuals disclosing what was happening at the center to the media.

808.   Wehmuller continues to suffer harassment and retaliation since coming forward about Kern.

809.   Wehmuller believes she has been targeted because she too hired counsel and she spoke to the media.

810.   The Defendants took action to suppress free speech and assembly with Moss and others after her termination and the media reports were made.

### ii. Facts regarding additional retaliation

811.   In January 2021, the Canadian County Commissioners elected to give a three percent (3%) raise to the CCCJC in their budget to provide raises to employees.

812.   Wehmuller received only a 1.7% raise.  Her direct supervisor was never asked to provide input into the amount of raise Wehmuller should receive as was customary.

813.   On February 4, 2021, Wehmuller submitted an email grievance to Judge Hughey regarding KRONOS (the new timekeeping software.) The grievance contained her requests for clarity on how the KRONOS system is available for other employees to access from their desktops. However, Wehmuller was informed that she had to use the KRONOS box located in the main facility lobby. There has never been training

75

provided for KRONOS and this box is located a substantial distance from her work area.

814.   Wehmuller needs to be at her work area before students and staff arrive. Wehmuller was treated differently from other staff who did not report on Kern and Judge Hughey and she was retaliated against.

815.   On February 26, 2021, the Director of Student Services at the CCCJC alternative school, Mr. Neil Womack, who is Wehmuller's supervisor, needed a blank copy of a job description that is used for tutors of the alternative school. Wehmuller asked Human Resources Manager, Misty Schweitzer, via email for a copy of this form but Ms. Schweitzer denied access to the form stating that it would be "an HR violation." Providing a blank job description is not an Human Resource violation; Wehmuller has been provided this form for many years prior to this. Human Resources by and through Majors was obstructing Wehmuller in the performance of her job.

816.   On March 22, 2021, Wehmuller placed an order for ballpoint pens for a teacher who had requested them. The alternative school has its own budget, and she has been able to order supplies for the school for years; however, the request was ignored. Wehmuller was advised that the executive assistant had denied the order. The purchase order request for the pens had been signed by Wehmuller's supervisor and by his supervisor, an Assistant Facility Director.

817.   On December 11, 2020, Wehmuller received an email from Facility Director, Melanie Johnson, stating that she would no longer be allowed to run errands for the alternative school even with the approval and request of her supervisor.

818.   On December 18, 2020, Wehmuller was notified by Misty Schweitzer that running errands is not part of her job description, although she has done this for the past eight (8) years. Wehmuller picks up needed items for her department as other employees do to facilitate the purchase of items that the school and students need.

819.   None of these changes occurred until after Wehmuller hired counsel and spoke out about the problems within the CCCJC by filing an EEOC complaint.

820.   While the acts Wehmuller may seem small or incidental they are examples of the insidious passive aggressive conduct that has occurred against the individuals who reported and acted as witnesses.

821.   There is an ongoing pattern of retaliation and hostility from the CCCJC, Judge Hughey, Cedric Mills, and Melanie Johnson.

822.   Wehmuller filed a EEOC complaint in September 2021 which is incorporated hereto which further describes the facts associated with her discrimination and retaliation. See

Exhibit 6. All Exhibits with their allegations and information are incorporated hereto by reference as per Fed.R.Civ.Pro 10(c).

823.  The 180 days allowed to the EEOC to investigate the September charge have not expired. Though facts related to the same are set forth herein, Plaintiff will need to amend to add those causes of action upon issuance of the right to sue or the passage of the 180 days. A tort claim is also filed related to these claims and the administrative period has not yet expired and/or the County Commissioners have not rejected the claim.

### d. CASSIE GOODFELLOW

824.  Goodfellow adopts and incorporates her EEOC Charge and Tort Claim which are attached hereto.

825.  Goodfellow became employed by the CCCJC in 2012, first as a Youth Guidance Specialist working in the Fort Reno Group Home which is located within the CCCJC center; an administrative assistant for the behavioral health program; Quality Assurance for Behavioral Health; and most recently as a bookkeeper since 2019.

826.  Goodfellow was a witness to the discriminatory conduct and hostile work environment created by Kern at the CCCJC.

827.  Goodfellow was also a witness to the hostile work environment that McClain, Barton and Wehmuller were subjected to after Moss and Kern were terminated and the different treatment they received.

828.  In March 2020, Oklahoma began shutting down as a result of the Corona Virus COVID 19 pandemic.

829.  Goodfellow was advised by Assistant Facility Director, Cedric Mills, not to process leave requests under the Families First Coronavirus Response Act (FFCRA).

830.  Mills advised Goodfellow that the forms could be filled out but that she was to treat all employees as working from home--the FFCRA form would just be kept in an envelope.

831.  This resulted in a chaotic handling of employees' leave and violations of employees' rights under the FFCRA.

832.  Some employees were allowed to work from home while some were denied time off even with a doctor's certification stating they should be in quarantine.

833.  Some employees who were already out on FMLA leave for health reasons or were in the hospital and/or receiving medical treatments were now considered "working from home" and as a result were given extra time off or extended FMLA time that they were not entitled to have.

834.   Goodfellow complained to her supervisor, Pamela Owens, that she was not comfortable initialing payroll claims because they were not accurate and truthful.

835.   No action was taken to correct the mishandling of leave.

836.   Goodfellow also reported that she was concerned that employees were falsifying timesheets to Mills.

837.   Goodfellow spoke with numerous people about the concerns that timesheets were being falsified.

838.   Goodfellow subsequently reported her concerns to the Oklahoma Public Employees Occupational Safety and Health Agency (PEOSHA) on December 29, 2020.

839.   Goodfellow was required to sign her complaint with PEOSHA so the CCCJC officials knew who made the complaint.

840.   Goodfellow was terminated from employment on January 8, 2021.

841.   Goodfellow filed a EEOC complaint in September 2021 which is incorporated hereto which further describes the facts associated with her discrimination and retaliation.  See Exhibit 7. All Exhibits with their allegations and information are incorporated hereto by reference as per Fed.R.Civ.Pro 10(c).

842.   The 180 days allowed to the EEOC to investigate the September charge have not expired. Though facts related to the same are set forth herein, Plaintiff will need to amend to add those causes of action upon issuance of the right to sue or the passage of the 180 days.

### e. PAUL HARDAWAY

843.   Hardaway adopts and incorporates his EEOC Charge and Tort Claim which are attached hereto.

844.   Hardaway became employed by the CCCJC in 2012 first as a teacher and then as the Dean of Students.

845.   Hardaway was the Dean of Students for 7 years.

846.   Hardaway was a witness to the discriminatory conduct and hostile work environment created by Kern at the CCCJC.

847.   Hardaway filed a written report on the hostile work environment and sexual harassment by Dan Kern. Hardaway's report was given to Judge Hughey in October 2019.

848. At the time his report was made, there had been several other complaints lodged against Kern.

849. Kern entered Hardaway's office where Hardaway was meeting with a female student who had been acting out in class. Kern intervened in the meeting and told the student that if she behaved he would take her to visit her father in prison. The young lady had never met her father. The prison was over an hour and a half from the school facility.

850. It is a violation of CCEC and CCCJC for a staff member to take a child to the prison like Kern proposed.

851. After the young lady left the room Kern turned to Hardaway and said, "cute girl" and "she's got a cute butt." The young lady was 13 years old.

852. Hardaway was immediately offended and outraged by Kern's conduct and was familiar with Kern's other inappropriate statements about children at the CCCJC.

853. Hardaway contacted Moss and McClain in HR to report Kern's conduct and prepared a written statement.

854. Hardaway also contacted the CCEC school Principal Neil Womack about what happened.

855. After Moss and McClain reported the incident Judge Hughey came to Hardaway's office and asked him what happened. Hardaway reasserted what was put in his report. Hughey asked Hardaway if anyone else heard what Mr. Kern said and Hardaway told him "I didn't think so." Hughey also asked Hardaway "are you making this up?" which suggests that Hughey did not believe what Hardaway reported.

856. Hughey took no further action. Hughey's meeting with Hardaway was prior to this being reported in the media.

857. Prior to reporting Dan Kern's conduct, Hardaway had no problems with his employment and had not been disciplined.

858. In October 2019, Hardaway disclosed to the media what was happening at the CCCJC and News 9 ran a series of articles over his allegations against Kern.

859. Kern, Hughey, Mills, Majors, Johnson and the Commissioners knew or should have known that Hardaway was the anonymous media source.

860. From October 2019 until his employment with the CCCJC ended Hardaway was subject to active and passive retaliation from Kern, Hughey, Mills, Majors, Johnson

and the Commissioners for reporting the violations, acting as a witness, and speaking to the media.

861.    Hardaway was being groomed to take over as the Principal of the CCEC upon the retirement of Womack which occurred at the end of the 2021 school year.

862.    At the end of the 2021 school year, Hardaway was demoted from the Dean of Students to a teacher.

863.    Hardaway submitted an application for the Principal position due to the retirement of Womack but his application was rejected and Johnson would not allow him to interview for the position.

864.    Womack recommended Hardaway for the position and told Hardaway that so long as Johnson is in charge of the facility he will not be promoted.

865.    Hardaway was allowed to interview for the Dean of Students position which he had held for 7 years.  Hardaway was not allowed to continue in his position and an individual with less qualifications and experience was placed in the position instead.

866.    Hardaway filed a EEOC complaint in September 2021 which is incorporated hereto which further describes the facts associated with his discrimination and retaliation.  See Exhibit 8. All Exhibits with their allegations and information are incorporated hereto by reference as per Fed.R.Civ.Pro 10(c).

867.    The  County by and through Hughey, Mills, Johnson and Majors failed to hire Hardaway for the Principal position for which he was qualified for, refused to allow him to interview of the same and hired someone less qualified than him who was also rumored to have had complaints of sexual harassment lodged against him at former schools.

868.    The County by and through Hughey, Mills, Johnson and Majors refused to renew Hardaways Dean of Students job and terminated him from the same after he participated in the EEOC process by serving as a witness for others and opposed the conduct of Kern. Also after he exercised his rights of free speech to go to the media on matters of public concern when the county refused to take action.

## CAUSES OF ACTION

**VI.**      **FIRST CAUSE OF ACTION – DISABILITY DISCRIMINATION PLAINTIFF BARTON AGAINST DEFENDANTS CANADIAN COUNTY, JOHNSON, MILLS, MAJORS, AND HUGHEY IN THEIR OFFICIAL CAPACITIES VIOLATION OF THE OADA DISABILITY DISCRIMINATION AND ADAA INJUNCTIVE RELIEF**

869. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

870. Defendant Canadian County receives financial assistance from various federal and state agencies. As such, Defendant Canadian County is subject to the restrictions set forth in the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq.

871. As a recipient of federal funding, Defendant Canadian County is subject to the requirement of § 504, including the requirement that it not subject otherwise qualified individuals with disabilities to discrimination on the basis of disability.

872. At all times relevant, Plaintiff Barton is qualified individuals with a disability as defined by § 504 of the Rehabilitation Act and the Oklahoma Anti-Discrimination Act (OADA) because she was able to perform the essential function of their position with or without accommodations.

873. Plaintiff Barton has an actual disability and has been regard has having a disability as defined in the ADAAA at 42 U.S.C. § 12102(1) and (3) and incorporated into the Rehabilitation Act in that she has an actual or perceived physical impairment as a result of her high blood pressure and depression which impact, among others, the major life activity of working and major bodily function of the circulatory system.

874. Alternatively, Plaintiff Barton has a § 504 disability as defined in the ADAAA at 42 U.S.C. § 12102(1)(A) in that she has an impairment that limits her in one or more major life activities or bodily functions in regard to the impairment due his high blood pressure and depression.

875. Plaintiff has a disability protected by the Rehabilitation Act as defined at 42 U.S.C. § 12102(B) and the ADAAA and the OADA.

876. Defendants were aware of Plaintiff's disability as it was aggravated in relation to her employment with Defendant due to on-the-job stress and working in a hostile work environment.

877. Plaintiff was subject to ongoing need for medical intervention and monitoring to ensure that his blood pressure and/or depression did not escalate as a result of the circumstances of his employment.

878. Plaintiff Barton sought FMLA leave for her high blood pressure in March 2021.

879. Defendant did not engage in the interactive process required for accommodations with Barton under the ADA, OADA, or the Rehabilitation Act when she began seeking leave and instead harassed and threatened her over her FMLA and alleged it to be improper.

81

880. When Barton's FMLA leave was ending she sought additional unpaid time off for time to get to her doctor before returning to work to determine if accommodations were necessary upon her return to work.

881. Canadian County again failed to engage in the interactive process to allow her time off. Instead, Canadian County told her that her job was no longer protected.

882. Instead of bringing Barton back into employment in her existing position they offered to put her in the Kitchen. Employment in the Kitchen is not nearly identical to employment as a visitation supervisor.

883. Defendant Canadian County's allowance of the hostile work environment created by Kern, Judge Hughey, Majors, and Johnson and subsequent ongoing harassment, retaliation and constructive discharge of Plaintiff violated § 504 of the Rehabilitation Act as amended by the ADAAA at 42 USC§ 12102(1)(C) and (3) which prohibits discrimination against qualified individuals because of an actual or perceived physical impairment.

884. Defendants Kern, Johnson, Mills, Judge Hughey and Majors intentionally, with reckless indifference to Plaintiff's rights violated § 504 of the Rehabilitation Act, the OADA and the ADA by suspending and subsequently discriminating against her and constructively discharging Plaintiff despite the clear prohibition of taking adverse action against an otherwise qualified individual based on a perceived or actual impairment.

885. Plaintiff suffered adverse employment consequences as a result of asserting her rights and protections due under the OADA.

886. Regardless of whether Plaintiff has an actual disability as defined under the Rehabilitation Act, the OADA and/or the ADA, she was regarded as having a disability and treated more harshly as a result.

887. As a result of the conduct of Defendants Canadian County and Kern, Johnson, Mills, Hughey and Majors, Plaintiff was forced to endure a hostile work environment, has lost wages and benefits, and sustained damage to her reputation and career.

888. Plaintiff has suffered, and continues to suffer, the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of her peace of mind as a result of Defendants' unlawful conduct, a reaction that any reasonable person have under like circumstances.

889. Plaintiff is entitled to recover judgments against each Defendant for an amount in excess of $75,000.00 together with interest, attorneys' fees and costs for their violation of the OADA.

890.   Plaintiff is also entitled to injunctive relief against the individual Defendants in their official capacity including Judge Hughey, Melanie Johnson, Cedric Mills, and Nacole Majors under ex parte young and the County ordering them to comply with the requirements of the ADAA and not discriminate against the Plaintiffs and others.

**VII.    SECOND CAUSE OF ACTION – DISABILITY DISCRIMINATION UNDER THE OADA PLAINTIFF MCCLAIN AGAINST DEFENDANTS CANADIAN COUNTY, JOHNSON, MILLS, MAJORS, AND HUGHEY IN THEIR OFFICIAL CAPACITIES**

891.   Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

892.   Defendant Canadian County receives financial assistance from various federal and state agencies. As such, Defendant Canadian County is subject to the restrictions set forth in the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq and the OADA.

893.   As a recipient of federal funding, Defendant Canadian County is subject to the requirement of § 504, including the requirement that it not subject otherwise qualified individuals with disabilities to discrimination on the basis of disability.

894.   At all times relevant, Plaintiff McClain is qualified individuals with a disability as defined by § 504 of the Rehabilitation Act and the OADA because they were able to perform the essential function of their position with or without accommodations.

895.   Plaintiff McClain has an actual disability and has been regard has having a disability as defined in the ADAAA at 42 U.S.C. § 12102(1) and (3) and incorporated into the Rehabilitation Act in that she has an actual or perceived physical impairment as a result of her anxiety, depression, and high-risk pregnancy which impact, among others, the major life activity of working and major bodily function of the circulatory system, endocrine and reproductive systems.

896.   Alternatively, Plaintiff McClain has a § 504 disability as defined in the ADAAA at 42 U.S.C. § 12102(1)(A) in that she has an impairment that limits her in one or more major life activities or bodily functions in regard to the impairment due anxiety, depression and high-risk pregnancy.

897.   Plaintiff has a disability protected by the Rehabilitation Act as defined at 42 U.S.C. § 12102(B), under the ADAAA and the OADA.

898.   Defendants were aware of Plaintiff's disability as it was aggravated in relation to her employment with Defendant due to on-the-job stress and working in a hostile work environment.

899.   Plaintiff was subject to ongoing need for medical intervention and monitoring to ensure that her blood pressure, anxiety, and/or depression did not escalate as a result of the circumstances of her employment.

900.   Plaintiff McClain requested to be transferred out of her position as a Human Resource Generalist to work in Supervised Visitation in the late summer/early fall of 2020 due to the hostile work environment and retaliation she experienced.

901.   All Defendants working at the CCCJC at that time knew that McClain was on increasing doses of medication and that her anxiety was increasing. Rather than taking steps to see things from Plaintiffs side of things the Defendants simply moved her and decreased her pay which was further retaliation against her.

902.   In February/March 2021, Plaintiff sought FMLA on behalf of herself and for her daughter who has serious seizures which were escalating. Plaintiff's daughter's seizure also escalates her anxiety and depression.

903.   Defendants harassed Plaintiff in regard to her attempt to take protected FMLA leave for herself and her daughter.

904.   Defendants did not engage in the interactive process to determine whether leave was appropriate under the OADA, ADAAA or Rehab act.

905.   While Plaintiff was on FMLA leave she learned she was pregnant.  Plaintiff's pregnancies are high risk and Defendant Canadian County is aware of this from Plaintiffs prior pregnancy.

906.   Plaintiff requested an extension of her time off for medical purposes for time to visit her physician to discuss her pregnancy.

907.   Defendant did not offer leave under the OADA, ADAAA or the Rehab Act and did not engage in the interactive process to determine whether leave was appropriate.

908.   Instead, Defendant told Plaintiff that her job was no longer protected, they advertised her position as open and offered her a return job in the kitchen.

909.   Employment in the kitchen is not nearly identical to being a visitation supervisor.

910.   Defendant's demotion and subsequent constructive discharge of Plaintiff violated the OADA, § 504 of the Rehabilitation Act as amended by the ADAAA at 42 USC§ 12102(1)(C) and (3) which prohibits discrimination against qualified individuals because of an actual or perceived physical impairment.

911.   Defendants Johnson, Mills, Judge Hughey and Majors intentionally, with reckless indifference to Plaintiff's rights violated § 504 of the Rehabilitation Act by demoting

and subsequently constructively discharging Plaintiff despite the Rehabilitation Act's clear prohibition of taking adverse action against an otherwise qualified individual based on a perceived or actual impairment.

912. Plaintiff suffered adverse employment consequences as a result of asserting her rights and protections due under the Rehabilitation Act and under the ADAAA and the OADA.

913. Regardless of whether Plaintiff has an actual disability as defined under the Rehabilitation Act, the ADAA, or the OADA Defendants Johnson, Mills, Hughey and Majors regarded her as having a disability and treated her more harshly as a result.

914. As a result of the conduct of Defendants Canadian County and Johnson, Mills, Hughey and Majors, Plaintiff was forced to endure a hostile work environment, has lost wages and benefits, and sustained damage to her reputation and career.

915. Plaintiff has suffered, and continues to suffer, the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of her peace of mind as a result of Defendants' unlawful conduct, a reaction that any reasonable person have under like circumstances.

916. Plaintiff is entitled to recover judgments against each Defendant for an amount in excess of $75,000.00 together with interest, attorneys' fees and costs.

917. Plaintiff is also entitled to injunctive relief against the individual Defendants in their official capacity including Judge Hughey, Melanie Johnson, Cedric Mills, and Nacole Majors under ex parte young and the County ordering them to comply with the requirements of the ADAA and not discriminate against the Plaintiffs and others.

VIII. **THIRD CAUSE OF ACTION – EEOC RETALIATION FOR FILING EEOC CLAIMS, OPPOSING DISCRIMINATIN AND RETAILATION AND FOR PARTICIPATION IN THE EEOC PROCESS, ONGOING HOSTILE WORK ENVIRONMENT, AND FAILURE TO HIRE, PROMOTE AND RETAIN ALL PLAINTIFFS AGAINST DEFENDANTS CANADIAN COUNTY AND ALL INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY**

918. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

919. Plaintiffs Hardaway, McClain, Barton, Goodfellow, and Wehmuller were retaliated against for asserting their rights under the Equal Employment Opportunity Commission (EEOC) and for making formal complaints about the discrimination and hostile work environment to which each was being subjected.

920.   Plaintiffs Hardaway, McClain, Barton, Goodfellow, Fletcher and Wehmuller openly complained about the hostile work environment to human resources, Judge Hughey, Majors, Johnson, and/or the Canadian County Commissioners.

921.   Employees Moss and Fletcher were also retaliated against by Defendants for filing an EEOC charge against their former employer.

922.   Defendants were aware of Moss's charge against a former employer and Judge Hughey cited the same as the rationale for failing to award her the Facility Director position for which she applied; for awarding her the lower position of Assistant Facility Director; and for making her interview twice for the Facility Director position when no other candidate had to do so.

923.   Moss was retaliated against for filing a complaint against Kern on her own behalf as well as for doing her job in bringing forth complaints of others.

924.   Moss filed a complaint with the EEOC on October 15, 2019.

925.   Moss was terminated on October 17, 2019.

926.   McClain filed a complaint with the EEOC on October 15, 2019.

927.   Majors became aware of the complaint on October 17, 2019.

928.   Immediately thereafter, McClain was instructed by Kern to stay in her office during work hours until they could "decide what to do" with her.

929.   The Defendants intended to fire McClain on the same day as Moss and only did not because they found out about her EEOC charge. Thereafter they set out on a campaign to force her to quit.

930.   Since that time McClain's job duties have been reduced and/or given away to other employees and she has been passed up for promotions for which she is qualified.

931.   McClain has had to move departments to be allowed to do her job.

932.   McClain had to go out on medical leave to care for her daughter in the spring of 2021. While out on leave she was targeted and retaliated against.

933.   The CCCJC refused to engage in the interactive process for disability leave and accommodations when she requested the same while out on FMLA leave to care for her daughter.

934.   The CCCJC failed to offer McClain her job back upon her return from FMLA leave even though said job was still available. They further failed to offer her a nearly identical job upon her proposed return.

86

935.    At the time of her FMLA leave McClain was a visitation supervisor.  Upon her proposed return, while asking for accommodations under the ADA or the Rehabilitation Act the CCCJC told McClain they might have a job in the kitchen for her.

936.    The CCCJC also knew McClain was returning to work with a high-risk pregnancy.

937.    In September 2019 Barton filed a formal complaint against Kern relative to his outrageous conduct at the Justice Center.

938.    Immediately thereafter Barton was called into a meeting with Kern in which he was openly derogatory and hostile. No action was taken to deter this behavior or to protect Barton.

939.    Shortly thereafter, Kern was permitted to enter into Barton's office alone at which time he confronted and verbally harassed her to such an extent that she broke down in tears. No action was taken to prevent this event or to protect Barton.

940.    In November 2019, Canadian County received notice of Bussett's representation of Fletcher, Barton and Wehmuller on the same matters as Moss and McClain.

941.    In October and November of 2019 Hardaway's complaints were played out in the media.

942.    In June 2020, Canadian County received notice of Bussett's representation of Goodfellow.

943.    Goodfellow and Hardaway were targeted for being a witness and supporting their co-workers.

944.    Hughey, Johnson, Majors, and Mills set out to terminate all employees who were associated with the Moss lawsuit and anyone who was a witness in support of them.

945.    Since that time McClain, Barton, Hardaway and Goodfellow and Wehmuller continued to suffer retaliation, hostile work environment and a change in their employment.

946.    Since forcing the CCCJC to take action against Kern, Barton has suffered an increasingly hostile work environment.  She is the lowest paid supervisor and they have tried to force her to take on more duties with less pay.  The CCCJC will not allow Barton to discipline an employee who is not following policy and procedure.

947.    The CCCJC is interfering with her ability to provide proper visitation supervisor services by refusing to provide adequate and appropriate audio visual equipment which endangers Barton and her staff but also the children and families she supervises.

948.   Barton is suffering medical complications as a result of the high levels of stress she is under.  When Barton sought to go off on FMLA leave, the center interfered with and threatened her job over her request to take leave.  When it was time for Barton to return from leave the center refused to engage in the interactive process with her allowing accommodations under the ADA and/or the Rehabilitation Act to give her additional time necessary to go to the doctor to be cleared to return to duty.

949.   The CCCJC failed to offer Barton her job back in visitation upon the return from FMLA leave even though said job was still available and failed to offer her a nearly identical job upon her proposed return.  At the time of her FMLA leave Barton was the Supervisor of the Supervised Visitation department.  Upon her proposed return, and while asking for accommodations under the ADA or the Rehabilitation Act the CCCJC told Barton they might have a job in the kitchen for her.

950.   Wehmuller has continued to suffer targeted harassment and discrimination since reporting the conduct in the fall of 2019 and supporting her brother.

951.   The CCCJC blamed Wehmuller for being the media leak and participating as a witness for the other parties and for sharing information with individuals who were no longer employed at the center.

952.   The CCCJC interfered with Wehmuller's ability to do her job and subjected her to restrictions not imposed on any other employee.

953.   Moss, McClain, Barton and Wehmuller all filed complaints during their employment.

954.   Hardaway was the brother of Wehmuller and was one of the original parties who filed complaints that were given to Hughey in September 2019 that set off the chain of events.

955.   Hardaway's complaint was given to the media.

956.   Hardaway supported his sister and was vocal about the failure of the county to do the right thing in regard to Kern.

957.   Hardaway continued to be vocal about the failings of the center throughout his employment and object to the policies and procedures of Mills and Johnson.

958.   Hardaway was denied the opportunity to interview for a higher position as Principal that he had been training for and groomed for by the previous principal and was well qualified to interview for and hold.

959. Johnson specifically targeted Hardaway and did not want to promote him because he would not fall in line and be quiet and spoke out about the problems and because he was a witness for his sister and others.

960. Johnson failed to hire Hardaway for the principal position and instead hired someone less qualified and on information and belief had a history of sexual harassment complaints made against him at other employers.

961. Johnson failed to rehire Hardaway as the Dean of Students and demoted him to a teacher.

962. Hardaway left the CCCJC to find employment elsewhere as a result of the retaliation he experienced for reporting Kern and Johnson, serving as a witness for the other plaintiffs and speaking to the media.

963. Goodfellow was a witness on behalf of all Plaintiffs and reported conduct of Kern to Moss and McClain. In her position of Bookkeeper Goodfellow also saw further abuses of payroll and the system by the Defendants and reported the same.

964. McClain, Wehmuller, Hardaway, Goodfellow, and Barton have all been targeted for acting as witnesses on behalf of others regarding the conduct of Kern, Judge Hughey, Johnson and Majors and for filing their own complaints.

965. As a result of the conduct by Defendant Canadian County, Plaintiffs McClain, Barton, Hardaway, Goodfellow, and Wehmuller were forced to endure a hostile work environment, were overlooked for overtime, positions, and promotions for which each was otherwise qualified for and were eventually terminated.

966. As a result of the terminations, Plaintiffs Hardaway, McClain, Barton, Goodfellow, and Wehmuller have lost wages and benefits, suffered emotional distress and mental anguish, and have sustained damage to their reputations and careers.

967. Plaintiffs are entitled to recover judgments against each Defendant for an amount in excess of $75,000.00 together with interest, attorneys' fees and costs.

IX. **FOURTH CAUSE OF ACTION – NEGLIGENCE AND/OR NEGLIGENCE PER SE ALL PLAINTIFFS AGAINST ALL INDIVIDUAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITY.**

968. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

969. The actions taken by Defendants Hughey, Kern, Majors, Johnson, and Mills, as described in detail above, constitutes williful and wanton negligence and/or recklessness, which places the individual Defendants outside the scope of their employment.

970.   The actions taken by Defendants Hughey, Kern, Majors, Johnson, and Mills, as described in detail above, constitutes a violation of one or more statutes codified in the state of Oklahoma.

971.   As a result of these actions, Plaintiffs have suffered, and continue to suffer, the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of their peace of mind as a result of the unlawful conduct of the Defendants, a reaction that any reasonable person would have under like circumstances.

972.   Plaintiffs have been injured in an amount in excess of $75,000 and are entitled to judgment against all Defendants for their illegal and wrongful conduct.

## X.   FIFTH CAUSE OF ACTION – NEGLIGENCE, NEGLIGENCE PER SE, AND NEGLIGENT TRAINING, HIRING, AND SUPERVISION PLAINTIFFS MCCLAIN AND BARTON AGAINST DEFENDANT CANADIAN COUNTY AND JUDGE HUGHEY IN HIS OFFICIAL CAPACITY

973.   Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

974.   Defendant Canadian County and Judge Hughey negligently hired Dan Kern.

975.   There are specific statutory requirements for the individual hired to serve as the Director of the CCCJC.

976.   It is clear that Kern did not satisfy the statutory requirement for being hired with his history of inappropriate behavior.  Failure to hire in compliance with the statute constitutes negligence per se.

977.   Additionally, the County and Judge Hughey negligently failed to investigate the background of Kern before hiring to work at a facility with children and other individuals.

978.   Kern had a reputation, pattern and practice of engaging in inappropriate sexual activity in the workplace that would have or should have been uncovered with proper due diligence. Kern was hired anyway.

979.   Judge Hughey as the head of the CCCJC for the County has a pattern and practice of negligently hiring directors who engage in sexual harassment and inappropriate work place behaviors.

980.   The CCCJC has failed to implement a proper hiring, training, and supervision protocols to ensure this behavior does not happen.

981.   Defendant has a duty to ensure that the Director is appropriate to work with and be around children.

982.   Kern refers to the children that are served by the facility as "shit head" "meat slingers" "retards" "helmet heads" and "window lickers" to name a few derogatory terms.

983.   Hughey failed to take action to prevent this kind of environment.

984.   Defendant did none of the things it was supposed to do to protect its employees from this kind of conduct.

985.   As a result of the conduct of Defendants Canadian County, Plaintiff has suffered damages for lost wages and benefits due to the unequal treatment of pay.

986.   Plaintiffs have suffered, and continues to suffer, the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of her peace of mind as a result of Defendants' unlawful conduct, a reaction that any reasonable person have under like circumstances.

987.   Plaintiffs have been injured in an amount in excess of $75,000 and is entitled to judgment against Defendants for their wrongful conduct.

**SIXTH CAUSE OF ACTION – TORTIOUS INTERFERENCE PLAINTIFFS MCCLAIN AND BARTON AGAINST DEFENDANT CANADIAN COUNTY**

988.   Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

989.   The adverse employment actions taken by Defendants, as described above, interfered with an existing right of Plaintiffs, including, but not limited to, the right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry. Okla. Const. Art. II, § 2.

990.   The actions taken by Canadian County, through its officers and employees, was malicious in that it targeted individuals similarly situated to and in the same protected group as Plaintiffs.

991.   This interference was not justified by any actions of Plaintiffs, but, instead, resulted from the ongoing behavior of individual Defendants and the culture of behavior perpetuated by Canadian County.

992.   As a result of the conduct of Defendants Canadian County, Plaintiff has suffered damages for lost wages and benefits due to the unequal treatment of pay.

993.   Plaintiffs have suffered, and continues to suffer, the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of her peace of mind as a result of Defendants' unlawful conduct, a reaction that any reasonable person have under like circumstances.

994.   Plaintiffs have been injured in an amount in excess of $75,000 and is entitled to judgment against Defendants for their wrongful conduct.

XI.   **SEVENTH CAUSE OF ACTION – CONSPIRACY ALL PLAINTIFFS AGAINST DEFENDANT HUGHEY, MILLS, JOHNSON, AND MAJORS IN THEIR INDIVIDUAL CAPACITY**

995.   Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

996.   Each of the individual Defendants engaged in a civil conspiracy which operated to deprive Plaintiffs of certain rights and liberties.

997.   The individual Defendants intentionally conspired together to deprive the minor children on whose behalf Plaintiffs bring this case and Light of their safety, of access to medical care, of a suitable and safe living environment, and to a life free from abuse.

998.   Each of the individual Defendants conspired to commit these unlawful acts by and through their choice and refusal to properly investigate allegations of abuse and neglect with respect to each Plaintiff (as described in this Complaint) and to protect and/or remove the children from an unfit and dangerous environment even after being on actual and/or constructive notice that the children were in unsafe and inappropriate living situations.

999.   The civil conspiracy engaged in by the Defendants was the actual and proximate cause of the Plaintiffs' damages.

1000.   Each Plaintiff is entitled to recover judgments against each Defendant for an amount in excess of $75,000.00 together with interest, attorneys' fees and costs.

**WHEREFORE**, Plaintiffs, demand judgment in his favor and against Defendants in an amount in excess of $75,000.00 for their wrongful, improper, and illegal conduct. Plaintiffs request that each of them be awarded lost wages, damages for lost benefits, damage to reputation, damages for emotional distress and mental suffering, and punitive damages. Plaintiffs further request that the Court award each of them the costs and attorney's fees associated with this suit, and any and all other relief that the Court deems just and equitable.

Respectfully Submitted,

_Ashley Weyland_

Ashley Weyland, OBA#32141
Bussett Legal Group, PLLC
2201 N. Classen Blvd
Oklahoma City, OK 73106
Telephone: (405) 605-8073
FAX:  (405) 212-9112
Email: Ashley@BussettLegal.com


Christopher Stombaugh (*pro hac vice pending*)
Laura E. Reasons (*pro hac vice pending*)
DiCello Levitt Gutzler LLC
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
Facsimile: (312) 253-1443
Email  lreasons@dicellolevitt.com
*Counsel for the Plaintiffs*

**JURY TRIAL DEMANDED**
**ATTORNEY'S LIEN CLAIMED**

93

## LIST OF EXHIBITS

1. Exhibit 1 is a list of all individuals who may be identified in this complaint or may be relevant to this matter.

2. Exhibit 2, is a summary of the individuals who fulfilled management roles on the Management Team over the respective years regardless of what is stated in the Annual Report.

3. Exhibit 3 McClain EEOC.

4. Exhibit 4 Barton EEOC

5. Exhibit 5 Wehmuller EEOC

6. Exhibit 6 Goodfellow EEOC

7. Exhibit 7 Hardaway EEOC

8. Exhibit 8 McClain OGCTA Jan. 2022.

9. Exhibit 9 Barton OGCTA Jan 2022.

10. Exhibit 10 McClain's OESC file

11. Exhibit 11 McClain OESC Appeal Finding.

12. Exhibit 12 -  Barton OESC File.

13. Exhibit 13 – Barton OESC Appeal Determination.

14. Exhibit 14 – Barton Resignation Letter

15. Exhibit 15 – McClain Resignation Letter

16. Exhibit 16 – Posting of McClain and Barton Jobs

17. Exhibit 17, are excerpts from the Annual Reports for the CCCJC for the Fiscal Years 2012 – 2021.

18. Exhibit 18, County Tax Resolution 96-20 and 96-21.

19. Exhibit 19, Affidavit of Misty Schweitzer, former Human Resources Manager.

20. Exhibit 20, Oklahoma Gazette Article.

21. Exhibit 21, For Sale Signs.

22. Exhibit 22, Announcement of Alexander Suspension.

23. Exhibit 23, Moss Email to Hughey.

24. Exhibit 24, McClain Notes to Hughey.

25. Exhibit 25, Wehmuller Texts to Hader.

26. Exhibit       26,       10/28/2019       News       9       Story.
    https://www.news9.com/story/5e346e68527dcf49dad6e11b/harassment-inappropriate-
    behavior-alleged-at-el-reno-detention-center

27. Exhibit   27,   11/6/2019   News   9   Story   on   Moss   and   McClain
    Hader.https://www.news9.com/story/5e346dc2527dcf49dad6dc81/2-women-claim-they-
    were-fired-for-reporting-sexual-harassment-against-canadian-co-juvenile-center-director

28. Exhibit 28, 11/15/2019 News 9 Story
    https://www.news9.com/story/5e346d3a527dcf49dad6d8c5/canadian-co-judge-defends-
    detention-center-dir-at-heart-of-controversy

29. Exhibit 29, Kern Statement and Admissions.

30. Exhibit 30, Kern Discipline.

31. Exhibit 31, November 25, 2019 News 9 Story.
    https://www.news9.com/story/5e346cbb527dcf49dad6d527/director-of-canadian-co-center-
    fired-amid-misconduct-investigation

32. Exhibit 32 - Yukon Progress Article Dated 6/17/2017

33. Exhibit 33- NY Times Article about Walnut Grove

34.  Exhibit 34 November 5, 2019 News 9 story,
    https://www.newson6.com/story/5e346de2527dcf49dad6dd76/canadian-co-officials-respond-
    to-allegations-of-misconduct-at-juvenile-center

## LIST OF INDIVIDUALS IDENTIFIED IN PETITION

1. Rhonda Moss is a white female who was 57 years old at the time of her termination. Ms. Moss was the Co-Assistant Facility Director and Director of Human Resources for the CCJC.

2. Erin Barton is a white female approximately 40 years of age at the time of discharge. She was the Supervised Visitation Program Supervisor with approximately 6 or 7 years of service with the CCJC

3. Paul Hardaway is a white male approximately 49 years of age. Mr. Hardaway was the Dean of Students of CCEC (CCJC's alternative school), White Male. He was employed for approximately about 8 years in the position. Mr. Hardaway is the brother of Plaintiff Wehmuller.

4. Donna Wehmuller us a white female in her mid-50's. Ms. Wehmuller was the Alternative School (CCEC) Administrative Assistant. is the sister of Plaintiff Hardaway.

5. Cassie Goodfellow is a white female, approximately 34 years old. At the time of her discharge she was a bookkeeper with 8 1/2 years of service with CCCJC

6. Melissa McClain is a white female approximately 43 years of age. At the time of her constructive discharge Ms. McClain was a Human Resources Generalist.

7. Robert Fletcher is a white male. Mr. Fletcher was a maintenance technician for the CCJC and reported to Mr. Colley. Mr. Fletcher is over the age of 40.

8. The Honorable Bob Hughey is white male, approximately 60 years old. Judge Hughey is an Associate District Judge for Canadian County and is the presiding Juvenile Judge. Judge Hughey is also employed as the Administrator of the Gary E. Miller Canadian County Children's Justice Center ("CCCJC") and the Canadian County Education Center ("CCEC"). Judge Hughey was appointed to his position in 2008.

9. Dan Kern is a white male who at the time of employment was approximately 50 years of age. Mr. Kern was the Facility Director for the CCJC from March 2019 until his termination on or about November 2019, approximately seven (7) months.

10. Cedric Mills is a black male approximately 60 years of age. He is the Assistant Facility Director. He was hired in late 2018 or early 2019.

11. NaCole Majors is a white female in her 30's. Ms. Majors is the Human Resources Director for Canadian County.

12. Melanie Johnson is a white female. She is the current Facility Director for the CCCJC having been hired in July 2020.

13. Marc Hader, Defendant. Mr. Hader is the is the Canadian County Commissioner for District 1.

14. Dave Anderson, Defendant. is the Canadian County Commissioner for District 2.

15. Jack Stewart, Defendant. is the Canadian County Commissioner for District 3.

16. Retired Judge Gary E. Miller. Judge Miller was the Canadian County Associate District Judge from 1993 to 2008. Judge Miller was the driving force behind the creation of the CCCJC and the center is named after him. Judge Miller retired in 2008 and was replaced by Judge Hughey. Judge Miller was District Judge from 2010 through 2017.

17. Bill Alexander is white male who was in his 50's at the time of his termination. He is the former CCJC Facility Director. Alexander was investigated terminated in 2017 for sexual harassment of employees.

18. Joy Merryfield. Ms. Merryfield was a Bookkeeper for the CCJC who filed an EEOC complaint against former Director of the CCJC Bill Alexander which eventually led to his suspension and final termination.

19. Angel Colley. Ms. Colley is a white female in her mid 40's. She is Director of Operations. She is related to Joy Merryfield, the supervisor of Robert Fletcher, she made complaints about Dan Kern and is suspected of "feeding information" to Plaintiffs.   Colley did not file an EEOC complaint.

20. Doni Duggan is white female approximately 62 years of age. She was the Assistant Director of Behavioral Health. She has/had approximately 15 years of service with the CCCJC. She resigned in October 2019 due to the hostile work environment created by Dan Kern.

21. Dr. Bill Sharp is a white male. He was a Co-Facility Director of the CCJC. He was also the Director of Behavioral Health.

22. LaTanya Freeman is a black female approximately 40 years of age. She is the Detention Director.

23. Chris Etheredge is a white female approximately 57 years of age. She was the Community Education and Resources Coordinator.

24. Kim White is/was the Assistant Director of Behavioral Health. She is a white female in her mid-40's. She has 15+ years with CCJC. She is a former group home director and a therapist.

25. Kaitlyn Nixon is/was a Case Manager for the CCJC. She is a white female in her 20's. She had about 1 ½ years with CCJC.

26. Krystal Rose is a white female approximately 34 years of age. Defendant Kern promoted Rose to Quality Assurance Administrator in 2019 and gave her a $10,000.00 bonus that other employees did not receive. She had approximately 7 years with the CCJC.

27. Dani Stewart was the Justice Center's Court Clerk staff. She is white female in her 60's. Ms. Stewart complained that Mr. Kern made fun of children with special needs, made inappropriate sexual comments, and he made derogatory gestures toward her about her age and appearance. Ms. Stewart also reported that Paige White, an employee in the Court Clerk's Office was scared of Mr. Kern.

28. Michelle Wilson was/is the Community Home Based Program Supervisor. She is a white female in her 30's. She has/had approximately 8 years' service with CCJC

29. Monica Hofer was Supervised Visitation Staff. She is a white female in her 40's.

30. Josh Rutherford was/is a Maintenance Technician. He is a white male in his 30's. Mr. Rutherford made complaints about the way Kern treated Moss, the sexual comments made by Kern and the hostile work environment.

31. Jackie Richards is/was the Assistant Group Home Director. He is a black male in his 50's.

32. Mariam Reynolds is/was the Group Home Director. Ms. Reynolds is of Persian descent and is in her 30's.

33. Donnie Dunkin is/was a Detention Officer with the CCJC. He is a white male in his 60's.

34. Pam Owens is an Accountant for the CCJC. She is a white female approximately 60 years of age.

35. Derika Leon is a white female under age 40. She is a case manager. Ms. Leon told Ms. McClain that Mr. Kern always makes offensive comments about sex.

36. Rachel Hardin, Administrative Assistant for Court Related Services is a white female under the age 40. Ms. Hardin complained to Ms. McClain that Kern was always talking dirty at work.

EXHIBIT 1, PAGE 3

37. Gary Medley was contractor with the facility.  Mr. Medley was a white male over the age of 40 who made complaints to Moss about the sexual comments made by Kern, Kern's discriminatory treatment of Moss, and the hostile work environment.

38. Misty Schweitzer, the Human Resource Manager who replaced Ronda Moss. Schweitzer was hired in October 2020 and terminated on March 25, 2022.  Misty Schweitzer has filed an EEOC complaint against the CCCJC. Ms. Schweitzer was terminated after asking for accommodations and after refusing to engage in discriminatory conduct in violation of state and federal law.

39. Rachel Theron was the accountant hired to replace Pam Owens. She is a white female over the age of 40. Ms. Theron was hired in the fall of 2021 after Pam Owens retired and was fired on March 24, 2022, after complaining about discriminatory treatment by Melanie Johnson and D'Shea Brothers. No investigation into her complaints was made. Ms. Theron discovered that Brothers and Johnson were not complying with the County Purchasing Act and falsifying purchase orders.  She demanded documentation for their spending and was fired the same day.  Ms. Theron also filed an EEOC claim against the center regarding the discriminatory treatment by Melanie Johnson and D'Shea Brothers. The Center received notice of the filing several weeks prior to her termination. Ms. Theron has retained counsel.

40. Ebelin Spencer is a Secretary for the District Attorney's Office.  She is a white female over the age of 40. Ms. Spencer complained about Kern engaging in discriminatory conduct toward the children of the facility and making fun of children with disabilities.

41. D'Shea Brothers was an Executive Assistant hired in November 2019 who resigned on or about May 12, 2022.  Ms. Brothers was shown preferential treatment by Management of the CCCJC and was assigned the job duties of Melissa McClain as they were progressively taken away from her. Numerous complaints were made about Ms. Brothers by multiple employees without any action being taken by the center. Other County Officials complained about Ms. Brothers. Ms. Brothers has violated the County Purchasing Act. Ms. Brothers received preferential treatment when she was not written up until after multiple complaints were made against her. When she was written up Ms. Schweitzer was told to remove standard language from her write up that she may be subject to termination.

42. Jerry Koester is a white male over the age of 40.  Koester is a former Chief of Police in Piedmont Oklahoma and a friend of Judge Hughey. Koester was written up for allegedly selling a weapon to Robert Fletcher. Koester denied the write up. Koester was pressured into signing off on the write up by Judge Hughey at the direction of Melanie Johnson. Koester retired in January 2022. The CCCJC threw him a retirement party and violated the County Purchasing Act by using county funds to subsidize the party.

43. Mark Hixson is a contract attorney at the CCCJC. Judge Hughey hires the contract attorneys. Mr. Hixson is contracted with the CCCJC/Canadian County to represent children in deprived proceedings. Mr. Hixon has been disciplined by the Oklahoma Bar Association and the Oklahoma Supreme Court for soliciting sex from a 25-year-old client identified as "S.R." whom he had represented on multiple occasions since she was approximately 19-20 years old. S.R. had an infant and DHS took her infant into custody. Hixson offered to represent S.R. in her criminal matters in exchange for sex. Judge Hughey testified on Hixson's behalf before the Professional Responsibility Tribunal. See OBA v. Hixson, SCBD-6453, 2017 OK 56. Hixson was suspended from the practice of law for 6 months as a result of his actions. Hixson continues to represent vulnerable children at the CCCJC.

44. Paige White is a white female under age 40. Ms. White works in the Court Clerk's Office at the CCCJC. Ms. White has a pronounced stutter which is a recognized disability. Mr. Kern actively made fun of Ms. White to other employees. This was reported to Judge Hughey.

45. Will Bradley was a contract attorney with the CCCJC who was suspended from the practice of law in 2014 due to neglect of his files and failure to respond to bar grievances. Judge Hughey knew that Bradley did not keep files on individuals Bradley was to represent before the CCCJC and took no action to enforce compliance with bar duties.

| Position | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|
| Associate District Judge | Bobby Hughey | Bobby Hughey | Bobby Hughey | Bobby Hughey |
| Facility Director | Joan South; | Bill Alexander; Bill Sharp | Bill Alexander; Bill Sharp | Bill Alexander; Bill Sharp |
| Interim Facility Director | Not on Management Team | Not on Management Team | Not on Management Team | Not on Management Team |
| Assistant Facility Co-Director | Not on Management Team | Not on Management Team | Not on Management Team | Not on Management Team |
| Executive Assistant | Not on Management Team | Not on Management Team | Not on Management Team | Not on Management Team |
| Director of Operations | Jamie Girard | Jamie Girard | Jamie Girard | Jamie Girard |
| Accountant |  | Kim Rhodes | Kim Rhodes | Kim Rhodes |
| Juvenile Bureau Director | Michael Ellison | Michael Ellison | Michael Ellison | Michael Ellison |
| Juvenile Probation Director |  |  |  |  |
| Detention Director | Charles Hunt | LaTanya Freeman | LaTanya Freeman | LaTanya Freeman |
| Assistant Detention Director | Janario Thomas | Robert Cole; Ronnie Warrior | Robert Cole; Ronnie Warrior | Abby Wright; Ronnie Warrior |
| Director of Behavioral Health | Dr. Bill Sharp | Dr. Bill Sharp | Dr. Bill Sharp | Dr. Bill Sharp |
| Office Manager (Bookkeeper) | Jahree Edwards | Jahree Edwards | Jahree Edwards | Angel Colley |
| Assistant Director of Behavioral Health | Doni Duggan | Doni Duggan | Doni Duggan | Doni Duggan |
| Group Home Director | Kim White | Kim White | Kim White | Kim White |
| Assistant Group Home Director | Jackie Richards | Jackie Richards; Jessica Arkeketa | Jackie Richards | Jackie Richards |
| Comprehensive Home Based Services Supervisor | Jennifer Norton | Michelle Wilson | Michelle Wilson | Michelle Wilson |
| Director of Student Services | Johnny Walters | Karen Carter | Karen Carter | Karen Carter |
| Community Education and Resource Coordinator | Megan Stringer | Megan Stringer | Megan Stringer | Chris Ethredge |
| Supervised Visitation & Exhchange Program Director | Joanne Bush | Joanne Bush | Joanne Bush | Joanne Bush |
| Human Resource Manager | Tarae McDonald | Tarae McDonald | Tarae McDonald | Tarae McDonald; Ronda Moss |

| Position | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|
| Associate District Judge | Bobby Hughey | Bobby Hughey | Bobby Hughey | Bobby Hughey |
| Facility Director | Bill Alexander; Bill Sharp | Bill Alexander; Bill Sharp | Dan Kern; | Dan Kern; |
| Interim Facility Director | Not on Management Team | Ronda Moss | Ronda Moss; Cedric Mills | Cedric Mills |
| Assistant Facility Co-Director | Not on Management Team | Ronda Moss Cedric Mills | Ronda Moss; Cedric Mills; Vacant | Cedric Mills |
| Executive Assistant | Not on Management Team | Not on Management Team | Not on Management Team | Not on Management Team |
| Director of Operations | Angel Colley | Angel Colley | Angel Colley | Angel Colley |
| Accountant | | Cynthia Rice | Pam Owens | Pam Owens |
| Juvenile Bureau Director | Michael Ellison | Not on Management Team | Not on Management Team | Not on Management Team |
| Juvenile Probation Director | | Eliza Botone | Eliza Botone | Eliza Botone |
| Detention Director | LaTanya Freeman | LaTanya Freeman | LaTanya Freeman | LaTanya Freeman |
| Assistant Detention Director | Abby Wright Cash Overton | Ronnie Warrior; Abby Wright | Ronnie Warrior; Abby Wright | Ronnie Warrior; Abby Wright |
| Director of Behavioral Health | Dr. Bill Sharp | Dr. Bill Sharp Ronda Moss | Ronda Moss | |
| Office Manager (Bookkeeper) | Joy Merryfield Pam Owens | Pam Owens | Doni Duggan | Doni Duggan; |
| Assistant Director of Behavioral Health | | | Cassie Goodfellow (Not on Management Team) | Cassie Goodfellow (Not on Management Team) |
| Group Home Director | Kim White | Kim White | Kim White | Kim White |
| | Doni Duggan | Doni Duggan | Mariam Reynolds | Mariam Reynolds |
| Assistant Group Home Director | Jackie Richards | Jackie Richards | Jackie Richards | Jackie Richards |
| Comprehensive Home Based Services Supervisor | Michelle Wilson | Michelle Wilson | Michelle Wilson | Michelle Wilson |
| Director of Student Services | Karen Carter | Neil Womack | Neil Womack | Neil Womack |
| Community Education and Resource Coordinator | Chris Ethredge | Chris Ethredge | Chris Ethredge | Chris Ethredge |
| Supervised Visitation & Exchange Program Director | Joanne Bush | Joanne Bush | Erin Barton | Erin Barton |
| Human Resource Manager | Ronda Moss | Ronda Moss | Ronda Moss | Ronda Moss |

| Position | 2020-2021 | 2021-2022 |
|---|---|---|
| Associate District Judge | Bobby Hughey | Bobby Hughey |
| Facility Director | Melanie Johnson | Melanie Johnson |
| Interim Facility Director | | |
| Assistant Facility Co-Director | Cedric Mills | Cedric Mills |
| Executive Assistant | D'Shea Brothers | D'Shea Brothers |
| Director of Operations | Angel Colley | |
| Accountant | Pam Owens | Pam Owens; Rachel Theron |
| Juvenile Bureau Director | Not on Management Team | Not on Management Team |
| Juvenile Probation Director | Eliza Botone | Eliza Botone |
| Detention Director | LaTanya Freeman | LaTanya Freeman |
| Assistant Detention Director | Ronnie Warrior; Abby Wright | Ronnie Warrior; Abby Wright |
| Director of Behavioral Health | Kim White | Kim White |
| Office Manager (Bookkeeper) | Cassie Goodfellow (Not on Management Team) | Cassie Goodfellow (Not on Management Team) |
| Assitant Director of Behavioral Health | Kim White | Kim White |
| Group Home Director | Michael Dunn | Michael Dunn |
| Assistant Group Home Director Comprehensive Home Based Services Supervisor | Jackie Richards Michelle Wilson | Jackie Richards Michelle Wilson |
| Director of Student Services | Neil Womack | Neil Womack |
| Community Education and Resource Coordinator | Chris Ethredge | Chris Ethredge and ??? |
| Supervised Visitation & Exhchange Program Director | Erin Barton | Erin Barton |
| Human Resource Manager | Misty Schweitzer | Misty Schweitzer |

| Position | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 |
|---|---|---|---|---|
| Human Resource Generalist | | | | |
| Drug Screen Program Supervisor | Brandi Smith | Brandi Smith | Brandi Smith | Brandi Smith |
| Quality Assurance | Rebecca Hall (Not on Management Team) | Angel Johnson (Not on Management Team) | Angel Johnson (Not on Management Team) | |
| Kitchen Supervisor | | | | Judi Putman |

| Position | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|
| Human Resource Generalist | | Not on Management Team | Melissa McClain | Melissa McClain |
| Drug Screen Program Supervisor | Brandi Smith | Not on Management Team | Not on Management Team | Not on Management Team |
| Quality Assurance | | Not on Management Team | Not on Management Team | Not on Management Team |
| Kitchen Supervisor | Judi Putman | Judi Putman | Judi Putman | Judi Putman |

| Position | 2020-2021 | 2021-2022 |
|---|---|---|
| Human Resource Generalist | Not on Management Team | Not on Management Team |
| Drug Screen Program Supervisor | Brandi Smith | Brandi Smith |
| Quality Assurance | Krystal Rose | Krystal Rose |
| Kitchen Supervisor | Judi Putman | Judi Putman |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (Indicate Mr., Ms., Mrs.)<br>**Melissa McClain** | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**Canadian County at the Children's Justice Center** | No. Employees, Members<br>**100 or More** | Phone No. (Include Area Code)<br>**405-262-0202** |
|---|---|---|

| Street Address<br>**7905 E. US Highway 66 El Reno OK 73036** | City, State and ZIP Code | |
|---|---|---|

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☒ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **Spring 2019**   Latest **current**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.   I have worked at the Canadian County Children's Justice Center (CCCJC) since 2004, first as a detention officer, then as an administrative assistant for the detention department and I am still currently employed in my current position as HR Generalist.

II.   The CCCJC is run by the elected Associate District Judge Bob Hughey who has the ultimate hiring and firing over all positions with the assistance of a Facility Director.  Judge Hughey came to the bench by appointment in 2008. At that time there was a female Facility Director who was hired by the previous judge who retired in 2008. The female Facility Director retired in late 2010 or early 2011. In 2011, Bill Sharp was appointed Interim Facility Director. Thereafter Mr. Sharp was appointed Co-Facility Director along with Bill Alexander was unilaterally hired by Judge Hughey without following CCCJC policy and procedure regarding the posting of positions.  Bill Alexander had previously worked at CCCJC as the Director or Detention before leaving to be the administration of a group home.

III.   A female CCCJC employee was terminated in the spring of 2017.  After her termination she filed a sexual harassment complaint with the EEOC against Facility Director, Bill Alexander. In the summer of 2017, an external investigator was hired to interview employees of CCCJC about Mr. Alexander's behavior.  Since I had worked at the facility for so long and in the detention area, I was one of the employees who was called to be interviewed by the investigator.  Mr. Alexander was eventually terminated for his actions.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 3·26·2020 *(Date)*   *Melissa McClain (Charging Party Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| *State or local Agency, if any* | |

IV.  In April 2018, I interviewed and received a transfer out of the detention area into the position of General Office Assistant, helping the HR Director who had recently accepted a position as an Assistant Facility Director along with her HR job duties.

V.  In March 2019, Judge Hughey appointed Mr. Kern Kern as the new Facility Director.  Soon after his hire, I was meeting with Mr. Kern and he told me that a co-worker, Chris Etheredge, (and who is a very close friend of Bill Alexander's) told Mr. Kern that she did not like me because I did not support Mr. Alexander in the investigation and that I had thrown him (Mr. Alexander) under the bus.  The results of the investigation and what each employee said was kept confidential, so I have no knowledge as to the information she was giving.  However, she has treated me as such ever since.

VI.  In the Summer of 2019, Mr. Kern changed my job title to HR General to match with the job duties that I had been doing for the past year.  I also, received a 2,500.00-annual raise.  However, Mr. Kern created a position for a younger female without following procedures to post the position to give other employees a change to apply.  Mr. Kern also gave this younger employee a 10,000.00-annual raise

VII.  On July 25, 2019 Mr. Kern came into my office were me and my supervisor, Assistant Facility Director and HR Director, Ronda Moss, was discussing an employee's leave when Mr. Kern entered my office and shut the door.  Mr. Kern then proceeded to talk about when his wife was in childbirth, that she had "let that area go" and that he gave her the nickname of "Sasquatch" after that.  He also stated that he "helped her take care of that area for each pregnancy afterwards."  During this conversation, Mr. Kern also started discussing that his daughter has problems using tampons because they don't fit well, and that the first time he saw a used tampon in the toilet as a kid, he thought that one of his sisters was dying."  We told him that we didn't want to hear what he was talking about.

VIII.  In August 2019, I had learned that Mr. Kern was reported to be unsupportive of some female employees of the behavioral health department and I discussed this and the fact that he could be offensive, with him on 2 occasions.  Mr. Kern took no responsibility for his actions, denied them and stated to "drive on."

IX .In September, my supervisor, Ronda Moss, had come to me with information that some employees had come to her with complaints about Mr. Kern's inappropriate language and his behavior seemed to be escalating, and that he was being inappropriate in several departments throughout the facility.  Ms. Moss stated that we needed to inform Judge Hughey, who is Mr. Kern's supervisor.  I met with the employees that Ms. Moss had told me about and a few other employees who had come to me directly.  Some of the employees wanted to make a formal complaint, and some just wanted Judge Hughey to be informed.  I met

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 3-26-2020          *Melissa McClain*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | |
| | ☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| *State or local Agency, if any* | |

with employees and validated the information.  Maintenance Technician, Robert Fletcher verbally expressed a complaint against Mr. Kern about Mr. Kern's inappropriate language, actions and removing him from job duties with no explanations despite having received good evaluations from his supervisor.  Ein Barton reported that Mr. Kern had discussed his "balls not fitting in his toilet" and that he "thinks Monica is a mail order bride."  Angel Colley reported that Mr. Kern told her that "teenaged girls underwear smells bad," and that she had heard Mr. Kern telling a joke about "vulva hymen" and Paul Hardway expressed concerns over a discussion that Mr. Kern had with a 13-year old female student and then telling Paul that the student "has a cute butt."  Between September 24, 2019 and October 7, 2019, I hand delivered to Judge Hughey, the written complaints and information from employees Erin Barton, Angel Colley, Ronda Moss and myself.


X. Approximately 2 weeks went by and nobody had contacted me or Ms. Moss, Angel Colley or Erin Barton about the complaints.  I assumed that Judge Hughey would have turned the complaints over to the County HR Director, NaCole Majors and that Ms. Majors would contact me to discuss the information.  October 17, 2019, Ms. Moss was told to meet with the county HR Director, NaCole Majors, and when she did, she was terminated.  The same day, I was demoted by Mr. Kern (in spite of consistently having good performance evaluations)  Mr. Kern also attempted to make me sign a document stating that I would not contact Ms. Moss, which I refused to do.  Since October 17, 2019, I have had numerous job duties taken from me, I have asked for a job description so that I would know what my duties are, which Ms. Majors (now my HR supervisor) and Mr. Cedric Mills, Assistant Facility Director who is my direct supervisor, will not provide to me.  There has been an internal email from Mr. Kern stating that I am now helping payroll and they will have an opening for a HR Generalist (which is my position.)  I have been "confined" to my office by Mr. Kern when one day he told me to "stay in my office until they figure out what to do with me."  I had previously eaten lunch with Robert Fletcher and at times done bible study with him at lunchtime off the clock in my office or his office or gone off campus to eat.  I was told by Mr. Kern and Ms. Majors that it is not appropriate for me to go to lunch with anyone


XI. October 21, 19, I received an email from NaCole Majors asking me to use standard black ink in my emails despite having sent emails with color for years.  Other employees used colored font with no problem.  I also received a call from NaCole Majors stating that the font in my typed documents/emails needs to be changed so that as Mr. Kern told me, "so everybody gets in line and has to be on the same page."  Other employees are allowed to use different font with no problem.


October 24, 2019 Mr. Kern told me that I would be able to keep my job but he "expects me to not do/act as if I did in the past (alerting Judge Hughey to Mr. Kern's statements and behavior; atmosphere of sexual harassment and retaliation.)

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 3-26-2020    *Melissa McClain* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| *Date*          *Charging Party Signature* | |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

XII. Mr. Kern was terminated when he was caught on video harassing Erin Barton about her suing him. Prior to his termination, Mr. Kern let Erin know that he had seen the documents that I had given to Judge Hughey and knew what employees had written about him. Apparently, Judge Hughey had given the documents to Mr. Kern and this allowed Mr. Kern to retaliate against employees for making the complaints against him.

XIII. I continue to suffer retaliation have continued to ask for a job description, and have not been provided with one, I have asked for a meeting with Ms. Majors and Judge Hughey for which I was denied, I have not been allowed for employees to come to me when they have an issue when they want to talk to Human Resources, I have had the job duty of ordering and making employee badges taken from me and given to the Executive Assistant, I am no longer given employee documentation to keep in employee human resources files that I had before, in Dec 2019, my supervisor, Cedric Mills opened an envelope that was in my mailbox from an employee that was intended for me and he has never given it to me and I am excluded from important meetings that involve personnel matters and employees. Important information is withheld from me that intentionally makes my job more difficult or impossible to do.

XIV. I believe that I have been discriminated against because I am a female, I have been sexually harassed by Mr. Kern and retaliated against by Judge Hughey, Mr. Kern and Cedric Mills, by having my job duties taken away from me, and by Chris Etheredge and LaTanya Freeman for my participation in the EEOC investigation of Bill Alexander, and in retaliation for my participation in that EEOC complaint and investigation in 2017 when a female employee made a sexual harassment complaints against him, and for recently turning in complaints against Mr. Kern in 2019 for sexual harassment. I have been retaliated against by Mr. Kern by being confined to my office after making complaints of sexual harassment "until they know what to do with me." I believe that I have been discriminated against by not having an opportunity to apply for a position that I am qualified for and that was given to a younger female and I was given a $2500.00 annual raise compared to a 10,000.00 annual raise for this female employee who is younger, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 3-26-2020   *Melissa McClain*<br><br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 564-2021-00529 |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Melissa McClain** | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Canadian County at the Children's Justice Center** | **100 or More** | **405-262-0202** |

| Street Address | City, State and ZIP Code |
|---|---|
| **7905 E. US Highway 66 El Reno OK 73036** | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

| ☐ RACE | ☐ COLOR | ☐ SEX | ☐ RELIGION | ☐ NATIONAL ORIGIN |
|---|---|---|---|---|
| ☒ RETALIATION | ☐ AGE | ☐ DISABILITY | ☐ GENETIC INFORMATION | |
| ☐ OTHER (Specify) | | | | |

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **March 2020**   Latest **current**

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. I previously filed an amended EEOC charge (564-2020-00088) against my employer, Canadian County Children's Justice Center, on 06/12/2020. Since that time, I have continued to be retaliated against by Canadian County Human Resources Director, NaCole Majors. I was assigned under Ms. Majors as my supervisor relating to matters concerning human resources in October 2020, in addition to my regular supervisor, Cedric Mills, Assistant Facility Director.

II. Employee performance evaluations are completed annually for all current CCCJC employees and evaluate each employee for their job performance for the previous fiscal year. The target timeline for having them completed and turned in by department supervisors is July-August. I had not received my performance evaluation for several months when other employee evaluations had already been turned in. I mentioned this to Ms. Johnson, Mr. Mills and Ms. Majors on several occasions. I finally received my evaluation on November 20, 2020, well after other employees had received theirs. My evaluation was conducted by Ms. Majors, who still did not have a complete understanding of how systems work at the CCCJC and who has never supervised me on a daily basis.

III. I believe the content of my evaluation by Ms. Majors (who is also named in my original EEOC complaint) is yet another example of the retaliation I continue to receive from her. Ms. Majors gave

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *1-25-21*    *Melissa McClain*<br>Date           Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EEOC Form 5 (11/09)

| | |
|---|---|
| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act<br>Statement and other information before completing this form. | Charge Presented To:    Agency(ies) Charge No(s):<br><br>☐ FEPA<br>☒ EEOC |

| | |
|---|---|
| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
| *State or local Agency, if any* | |

me low ratings in almost every area of the evaluation. Ms. Majors also listed goals and objectives that were not met as: #2 "the employee was provided projects and assignments that were never completed." In addition, Ms. Majors attached a typed document (Attachment 1 of 2) to the evaluation and listed my "shortcomings." Ms. Majors states that I "had reasons that these projects were not completed instead of finding methods to complete what was asked." Ms. Majors also listed "some improvements" in her document; only giving very minimal reference. One of the "improvements" that Ms. Majors listed in her typewritten document was "professional appearance is also improved with business dress and proper grooming and <u>cleanliness.</u>" I feel this is derogatory and retaliatory. I have always dressed professionally for the position in which I work in. I feel that Ms. Majors used this term to humiliate me and as an underhanded way to retaliate against me for including her in my previous EEOC complaint. I have worked for CCCJC for 16 years; I have had numerous performance evaluations and have never had "grooming and cleanliness" as a problem in any of those evaluations. In fact, I have received good evaluations and nothing less than acceptable – commendable marks. Ms. Majors is judging my attire based on my economic status as well as my over-all physical appearance. (I am older than Ms. Majors and I am not as thin as Ms. Majors.)

Ms. Majors' list of "projects and assignments" she reports that were never completed, and my responses (in bold type) are listed below.

- Completion of Org Chart– **MR. MILLS ASKED ME TO HOLD OFF ON THIS UNTIL WE GOT A NEW DIRECTOR DUE TO A POTENTIAL CHANGE.**
- Completion of facility-wide Badge photos –**UPDATING BADGE PHOTOS WAS IN THE PROCESS. I EVEN COMPLETED SOME AND PLACED THEM ON A SHARED ZIP DRIVE AND THEN EMAILED IT TO MS. MAJORS. HOWEVER, COVID-19 HIT AND I WAS TOLD TO HOLD OFF DUE TO EVERYONE BEING REQUIRED TO STAY IN THEIR AREA UNLESS WE HAD TO LEAVE IT. IN ADDITION, MR. MILLS TOOK THE PHONE BACK FROM ME THAT IS USED TO TAKE THESE BADGE PICTURES.**
- Missed Kronos Discovery Deadlines – **I NEVER MISSED ANY DEADLINES. PAM OWENS (CCCJC BOOKKEEPER AND THE OTHER PERSON ASSIGNED TO WORK ON KRONOS WITH ME) EVEN SENT AN EMAIL STATING THAT WE HAD WORKED VERY HARD TO COMPLETE THEST TASKS.**
- Completion of storing resumes/applications on electronic drive – **I COMPLETED ALL OF THEM AND UPLOADED THEM TO MS. MAJORS. I THEN PLACED THE DRIVE ON MR. MILLS' COMPUTER AND SHOWED HIM HOW TO USE IT. IF AN INTERNAL APPLICATION WAS RECEIVED, I SCANNED IT AND PLACED IT IN THE**

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *1-25-21*          *Melissa McClain*<br>Date                Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| State or local Agency, if any | |

APPLICANT/EMPLOYEE'S FILE.  WHEN EXTERNAL APPLICATIONS WERE RECEIVED, I SCANNED THEM AND PUT THE FILE ON THE COMPUTER.

IV.   After receiving my evaluation, I spoke with Facility Director, Melanie Johnson, about Ms. Majors' comments.  Ms. Johnson stated to me that she "has no doubt that my next evaluation will be different."  If my next evaluation (from a different supervisor) will be different than the one that Ms. Majors gave me, that would indicate that Ms. Majors used my performance evaluation as a way to retaliate against me.

V.    On or around January 12, 2021, my supervisor, Erin Barton, spoke to CCCJC Human Resource Director Misty Schweitzer about raises for Ms. Barton's employees (for which I am one.)  Ms. Schweitzer told Ms. Barton that she had been told by Ms. Majors that I would not receive a raise for the next two years.  The reason that Ms. Majors gave was that I "had given myself a raise" when I moved to my current department.  This is not true; in fact, I took a $3,100.00 pay cut when I changed positions.

VI.   I believe I have continued to be retaliated against by Ms. Majors because of my participation in a previous EEOC complaint in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 1-25-21        *Melissa McClain*<br>Date               Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.   **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.   **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.   **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under work-sharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

DocuSign Envelope ID: 413EF55D-0D23-492D-8585-CB737D703516

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Melissa McClain** | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Canadian County at the Children's Justice Center** | **100 or More** | **405-262-0202** |

| Street Address | City, State and ZIP Code |
|---|---|
| **7905 E. US Highway 66 El Reno OK 73036** | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

| | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | Earliest: **Fall 2020**   Latest: **current** |
| ☒ RETALIATION  ☒ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION | |
| ☐ OTHER (Specify) | ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I previously filed an amended EEOC charge (564-2020-00088) against my employer, Canadian County Children's Justice Center (CCCJC), for which I received a right to sue letter. I have filed suit on that charge and have continued to be subject to discrimination. My first contact with the EEOC was in October 2019. Since then I have filed a subsequent charge (564-2021-00529). I am also listed as a witness on behalf of Ronda Moss, Donna Wehmuller, Erin Barton, Robert Fletcher and Cassie Goodfellow who have asserted allegations against the CCCJC and these individuals. Since filing the original charge and being named as a witness, I have continued to be retaliated against by Canadian County by and through NaCole Majors, Judge Bob Hughey, Melanie Johnson, and Cedric Mills.

I have worked at the Canadian County Children's Justice Center (CCCJC) since 2004, first as a detention officer, then as an administrative assistant for the detention department, as HR Generalist and currently as a Supervised Visitation Monitor. I was constructively discharged from my employment in July 2021.

In August 2020, after working in a hostile atmosphere as the Children's Justice Center HR Generalist, and reporting directly to Canadian County Human Resources Director, NaCole Majors, I requested a transfer to the Supervised Visitation department. I requested the transfer because I was being continuously harassed and retaliated against (564-2021-00529). in my position after reporting sexual harassment in the work place (564-2020-00088) and acting as a witness on behalf of my co-workers in EEOC proceedings.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/20/2021 _____   DocuSigned by: *Melissa McClain* 7E1A1089F2E44B5 Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date | |

DocuSign Envelope ID: 413EF55D-0D23-492D-8585-CB737D703516

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

The salary for the position in the Supervised Visitation department was less than what my current salary was for my HR Generalist position. Upon filling out the paperwork for my transfer, as I have done many times for employees, I figured the amount of my salary. I used the formula of calculating salaries when an employee moves to a position with a lower salary.

This formula was taught to me by former Canadian County Children's Justice Center, HR Director, Ronda Moss (in 2016 when I began working in the Human Resources Department) who was taught this formula in 2015, by former Facility Directors, Bill Alexander and Dr. Bill Sharp. The formula has been used for several years and has been used for several employees who have taken lesser paying positions. When I transferred to the lesser paying position the CCCJC did not apply the formula to my salary. I was treated differently than other employees engaging in similar transfers who did not file EEOC claims against the CCCJC and who did not act as witnesses on behalf of individuals who filed claims against CCCJC.

During September 2020, when my supervisor, Ms. Barton, discussed raises for her employees, she was advised by CCCJC HR Manager, Misty Schweitzer, whose supervisor is Ms. Majors, that I "would not be eligible for a raise for another couple of years because I had given myself a raise."

I did not give myself a raise when I moved to my current position as I had informed Ms. Majors. I followed the CCCJC formula that had been in place, and I had told this to Ms. Majors. Ms. Majors who wasn't providing HR services at the CCCJC until November 2019, doesn't know and has not learned the requirements and practices of the CCCJC, but instead, is using this as another way to retaliate against me.

Throughout this time period the CCCJC knew that I suffered from anxiety, and they never offered me leave or accommodations for my anxiety. Instead, the CCCJC and its managers would knowingly and intentionally place me in situations designed to harass and intimidate me in an effort to exacerbate my anxiety to create a hostile work environment and force me to quit my job. This happened continuously from the time I filed my first EEOC claim until my employment ended.

In March of 2021, I requested leave to care for another under the Family and Medical Leave Act. I was also eligible for leave at this time for self-care due to my high risk pregnancy. I went on leave to care for my daughter who has seizures. The CCCJC has been aware of my child's health condition and my periodic need to care for her for a long time.

My allowed FMLA leave expired in June 2021. At that time, I requested leave under the Americans with Disabilities Act due to my pregnancy. I requested the leave for time to see my doctor to determine if accommodations were needed upon my return to work. My pregnancy interferes with major life activities. I

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/20/2021     DocuSigned by:<br>        *Melissa McClain*<br>        721A1C68F22444D...<br>*Date*       *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

DocuSign Envelope ID: 413EF55D-0D23-492D-8585-CB737D703516

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

have been previously pregnant while working for the CCCJC and required accommodations during that pregnancy as well.

The CCCJC refused to enter into the interactive process with me about leave under the ADA and/or the Oklahoma Anti Discrimination Act. As I was scheduled to come back from the FMLA leave the CCCJC posted my position for hiring.  Instead of offering me my position back the CCCJC offered me a position in the kitchen instead of my position in supervised visitation.  The kitchen position was not substantially similar to my position in supervised visitation.

I attempted to engage in the interactive process with the CCCJC for approximately one month for accommodations upon my return. The CCCJC was uncommunicative and uncooperative and refused to discuss proper accommodations with me or offer me appropriate leave under the ADA.

The CCCJC also refused to communicate with me and provide me information about my employment status and other information needed to assist me with my application for social security benefits for my daughter.

I believe I have continued to be retaliated against because I have previously filed an EEOC complaint  against the CCCJC  in violation of Title VII of the Civil Rights Act of 1964, as amended, I have been subjected to a hostile work environment for acting as a witness on behalf of others in violation of  Title VII, for taking leave under the Family and Medical Leave Act for self-care and care of others, and requiring and for requesting accommodations and leave under the American's with Disabilities Act of 1990 as amended and the Age Discrimination in Employment Act.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/20/2021      *DocuSigned by:* Melissa McClain <br> ────────── *Date*     F2 7A1C68F224540... *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

DocuSign Envelope ID: 413EF55D-0D23-492D-8585-CB737D703516

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.**  EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Erin Barton** | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Canadian County at the Children's Justice Center** | **100 or More** | **405-262-0202** |

| Street Address | City, State and ZIP Code |
|---|---|
| **7905 E. US Highway 66 El Reno OK 73036** | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN

☒ RETALIATION ☒ AGE ☐ DISABILITY ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **March 2019**   Latest: **Fall 2019**

☐ CONTINUING ACTION

THE PARTICULARS ARE (if additional paper is needed, attach extra sheet(s)):

I.   I have been an employee of the Canadian County Children's Justice Center (CCCJC) from 2013 and I am still current employed there as a Coordinator of the Supervised Visitation Program.

II.   The CCCJC is run by the elected Associate District Judge Bob Hughey who has the ultimate hiring and firing over all positions with the assistance of a Facility Director. Judge Hughey came to the bench by appointment in 2008.

III.   In March, Judge Hughey hired a new Facility Director, Daniel Kern. Soon after being hired, Mr. Kern would come back to my department and talk. He discussed the fact that since he had just moved to Oklahoma and bought a house he was "excited because he gets a big boy toilet installed in his house." He went on to say "I don't know what's wrong with Oklahoma boys, but I guess they don't put their balls in the toilet to poop. Does your husband put his balls in the toilet to poop?"

IV.   Mr. Kern also stated to me that one of my staff, Monica Hofer, (who is of Columbian nationality "like his ex-wife") that "she looks hot." He started asking me questions about Monica to include "Is she married.?" "Is her husband nice?" and "I bet he ordered her off the internet, like a mail-order bride." Mr. Kern also told me that I needed to "help him get Monica away from her husband." Mr. Kern began meeting with Monica, unbeknownst to me and tell her that she can have specific days off without talking to me about it and talking to her about creating a different position for her.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *3/26/20* _____ *[signature] Erin Barton*<br>Date         Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

V. In September 2019, I wrote out a formal complaint against Mr. Kern for his inappropriate comments and gave them to HR staff, Melissa McClain. In October 2019, I had to meet with Mr. Kern and discuss a work situation when he brought up that I (along with some other employees) had made a complaint against him. Mr. Kern stated back to me what my complaint said which indicated that his supervisor, Judge Bob Hughey, had given the complaints to Mr. Kern, which allowed him to retaliate. Mr. Kern then told me that I should have come to him and that in the future any and all complaints would have to go through him.

VI. In late October 2019, due to no appropriate action being taking against Mr. Kern for his inappropriate actions and his continuation of harassment, I consulted legal advice. In November 2019, while in my work area, Mr. Kern came to me and stated loudly that he had "heard that I was suing him." At this time, I began to cry and stated that I only wanted to do my job. This area is video and audio recorded and it was only due to the fact that it was caught on video that Mr. Kern was fired.

However, since then, Cedric Mills, Assistant Facility Director, who is now my direct supervisor, has continued to make my work practically impossible to do. I have been stating for several months that I need more employees to handle the caseload that my department has, and this has fallen on deaf ears, forcing me to work 10 hour days, 6 days a week. I was finally able to get approval to allow applications to be taken for more employees, however, instead the usual way of doing it where I would get the applications, and interview employees who I believe would be a good fit for my program Mr. Mills has kept the applications to himself and has not taken any of the necessary steps to hire more employees.

I believe that I have been sexually harassed by Mr. Kern and retaliated against by Mr. Kern for making a complaint against him and for seeking legal advice and making a complaint of the harassment and retaliated against by Mr. Mills who continues to make my work environment difficult in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 3/26/20  _Erin Barton_ <br> Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

DocuSign Envelope ID: 9B6FEB39-545D-4F89-829B-AC46CDD82F52

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Erin Barton** | | |

Street Address                                    City, State and ZIP Code

| Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.) |
|---|

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Canadian County at the Children's Justice Center** | **100 or More** | **405-262-0202** |

| Street Address | City, State and ZIP Code |
|---|---|
| **7905 E. US Highway 66 El Reno OK 73036** | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|

| | | | | | Earliest | Latest |
|---|---|---|---|---|---|---|
| ☐ RACE | ☐ COLOR | ☐ SEX | ☐ RELIGION | ☐ NATIONAL ORIGIN | **Spring 2021** | **current** |
| ☒ RETALIATION | ☐ AGE | ☒ DISABILITY | ☐ GENETIC INFORMATION | | | |
| ☒ OTHER (Specify)  **OADA** | | | | ☒ CONTINUING ACTION | | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.   I recently filed an EEOC charge #564-2020-00275 against my employer, Canadian County Children's Justice Center, for which I received a right to sue letter.

II.  I have worked at the Canadian County Children's Justice Center (CCCJC) since 2013, first as a Supervised Visitation Monitor and most currently as the Coordinator/Supervisor of the Supervised Visitation Program.  I am no longer employed by the CCCJC.

III. After Daniel Kern was caught on tape harassing me he was fired in November of 2019.

IV.  I continued to pursue my charges against the center after he was terminated.

V.   I have been harassed, intimidated, and retaliated against for pursuing my charges against the CCCJC.

VI.  The CCCJC is run by the elected Associate District Judge Bob Hughey who has the ultimate hiring, firing and disciplinary actions over all positions with the assistance of a Facility Director.  Judge Hughey came to the bench by appointment in 2008.

VII. I have been harassed, intimidated, and retaliated against for acting as a witness on behalf of other individuals who are pursuing charges against the CCCJC in particular for supporting Melissa McClain who transferred to work under me as a result of the harassment, intimidation and bullying she was subjected to in Human Resources after filing her EEOC compliant.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/20/2021 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |
| Date                    Charging Party Signature | |

DocuSign Envelope ID: 9B6FEB39-545D-4F89-829B-AC46CDD82F52

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

VIII. On April 6, 2021, I submitted the required documentation requesting to take FMLA time off for my own serious health condition. I provided the medical certification that my doctor filled out stating that I was under his care and that I needed the time away from work for self-care.

IX. On April 14, 2021, I received a letter from my employer stating that I was currently being denied FMLA leave due to the content of my request being vague and I was given 7 days to provide additional information from my health care provider. This letter was dated April 9, 2021; however, I did not receive this letter until 2 days before the 7-day deadline as the letter was not post marked until April 12th. The 2-day time limit I was provided, especially during a global pandemic, is an impossible deadline to meet.

X. Since March 2020, the US has been in a global pandemic. The CCCJC has not been uniformly following the COVID leave procedures and has been treating employees differently. I have complained about their failure to treat everyone the same and have been retaliated against for doing so.

XI. Due to my health conditions I am at high risk of contracting COVID 19 and suffering complications.

XII. I am supporting Cassie Longfellow who reported the CCCJC's failures to POSHA.

XIII. In addition, my FMLA request stated that I suffer from high-blood pressure and I am currently unable to drive. Human Resources staff are allowed to contact a medical provider if clarity is needed in order to make a decision, however, this was not done. The information that I provided on my FMLA application along with the documentation from my medical provider should be sufficient in determining my FMLA leave request and I feel that this is yet another ploy to harass me.

XIV. When my FMLA leave expired I requested short term leave under the American's with Disabilities Act to allow me additional time to see my physician and determine if accommodations were necessary upon my return to work.

XV. The CCCJC knew that I was off work for personal health complications including high blood pressure and they never offered me any accommodations upon my return to work. Additionally, when I requested accommodations, they failed to enter into the interactive process about my need for accommodations.

XVI. The week of July 12, 2021, my attorney advised the CCCJC that I considered myself constructively discharged due to their failure to engage in the interactive process. I have advised the CCCJC that I consider my constructive discharged date to be July 9, 2021.

XVII. I have applied for but not received unemployment compensation related to my constructive discharge. As of 8/23/21 the CCCJC still maintained that I was an employee however the center has refused to

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/20/2021     DocuSigned by: [signature] B6F4C3B707A746E... | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| *Date*     *Charging Party Signature* | |

DocuSign Envelope ID: 9B6FEB39-545D-4F89-829B-AC46CDD82F52

EEOC Form 5 (11/09)

| | |
|---|---|
| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act<br>Statement and other information before completing this form. | Charge Presented To:      Agency(ies) Charge No(s):<br>☐ FEPA<br>☒ EEOC |

**Oklahoma Attorney General's Office, Office of CR Enforcement**     and EEOC

*State or local Agency, if any*

communicate with me and/or offer me my previous job or a substantially similar job back.

XVIII.  The CCCJC has been advised by my attorney that they are failing to engage in the interactive process, but they still remain uncooperative and will not discuss necessary accommodations with me.

XIX.  Upon the time for me to return to work the Center posted my job as being open for hiring. I was not offered to return to my former position despite it not being filled.

XX.  I was not offered a substantially similar job upon my return to work either. The CCCJC offered to put me in the kitchen instead of returning me to my former position.

XXI.  The CCCJC has failed to offer me accommodations when they knew or should have know I needed accommodations due to my need to take self care FMLA.

XXII.  The CCCJC failed to properly communicate with me and engage in the interactive process upon the expiration of my FMLA leave.

XXIII.  When interviewing others for my job, the CCCJC has spoken about me in a negative and derogatory manner and disclosed inappropriate personal information to individuals considered for my replacement. The CCCJC has also told applicants not to speak to me or communicate with me about the fact that they are interviewing for my job.

I believe I have continued to be retaliated against because I have previously filed an EEOC complaint against the CCCJC in violation of Title VII of the Civil Rights Act of 1964, as amended, I have been subjected to a hostile work environment for acting as a witness on behalf of others in violation of Title VII, for taking leave under the Family and Medical Leave Act for self-care and care of others, and requiring and for requesting accommodations and leave under the American's with Disabilities Act of 1990 as amended and the Age Discrimination in Employment Act.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/20/2021<br>*Date*    DocuSigned by: _____ B8F4C3B707A746E *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

DocuSign Envelope ID: 9B6FEB39-545D-4F89-829B-AC46CDD82F52

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Donna Wehmuller | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Canadian County at the Children's Justice Center | 100 or More | 405-262-0202 |

| Street Address | City, State and ZIP Code |
|---|---|
| 7905 E. US Highway 66 El Reno OK 73036 | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **Spring 2019**   Latest: **Fall 2019**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. I have been an employee of the Canadian County Children's Justice Center (CCCJC) from 2013 as the alternative school administrative assistant. I am still currently employed.

II. The CCCJC is run by the elected Associate District Judge Bob Hughey who has the ultimate hiring and firing over all positions with the assistance of a Facility Director. Judge Hughey came to the bench by appointment in 2008. In March 2019, Judge Hughey hired a new Facility Director, Dan Kern.

III. In March 2019, Judge Hughey hired a new Facility Director, Dan Kern. When Dan Kern came to the alternative school for a staff meeting and to discuss how some students aren't allowed to have access to a computer. His reply was that "we can get around that" and he referred to the students as "shitheads."

IV. Summer 2019, Dan Kern made a position for a younger female employee and never notified other employees of an opportunity to apply for the position. I feel that I am qualified for this position. He also gave a significant raise to this employee. I was not given the opportunity to apply for this position since it was not posted.

V. I believe that I have been discriminated against because of my age by not being allowed to apply for a position for which I feel I am qualified when Mr. Kern made the position for an employee who is younger, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 3/24/2020   *Donna Wehmuller* Date       Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to *or disclosed* to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

DocuSign Envelope ID: 4D5B51C2-8A4F-4CD5-AE73-04FE726CA119

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

**Oklahoma Attorney General's Office, Office of CR Enforcement** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Donna Wehmuller** | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Canadian County at the Children's Justice Center** | **100 or More** | **405-262-0202** |

| Street Address | City, State and ZIP Code |
|---|---|
| **7905 E. US Highway 66 El Reno OK 73036** | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **January 2021**  Latest: **current**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.   I recently filed an EEOC charge #564-2020-01136 against my employer, Canadian County Children's Justice Center, for which I received a right to sue letter.

II.   I have worked at the Canadian County Children's Justice Center (CCCJC) since 2013 as the alternative school administrative assistant.  I am still currently employed.

III.   The CCCJC is run by the elected Associate District Judge Bob Hughey who has the ultimate hiring, firing and disciplinary actions over all positions with the assistance of a Facility Director.  Judge Hughey came to the bench by appointment in 2008.

IV.   In January 2021, the Canadian County Commissioners elected to give a 3% raise to the Children's Justice Center in their budget to provide raises to the Center's employees.  I only received a 1.7% raise.  My direct supervisor was never asked to provide input into the amount of raise I should receive as has always been the case in the past, and the raise was not based on my job performance.

V.   On February 4, 2021, I submitted an email grievance to Judge Hughey regarding KRONOS (the new timekeeping software.)  The grievance contained my attempts for clarity on how the KRONOS system is available for other employees to access from their desktops, however, I was informed that I have to use the KRONOS box located in the main facility lobby.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/20/2021     *DocuSigned by:* Donna Wehr [B9BE1C19DB454A1...] | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date     *Charging Party Signature* | |

DocuSign Envelope ID: 4D5B51C2-8A4F-4CD5-AE73-04FE726CA119

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

    In addition, there has never been training provided for KRONOS and this box is located a substantial distance from my work area. I am needed to be at my work area before students and staff arrive.

VI.    On February 26, 2021, the Director of Student Services at the CCCJC alternative school, Mr. Neil Womack, who is my supervisor, needed a blank copy of a job description that is used for tutors of the alternative school. I asked HR Manager, Misty Schweitzer via email for a copy of this form, Ms. Schweitzer denied me access to the form stating that it would be "an HR violation." Providing me a blank job description is not an HR violation. In addition, I have been provided this form for many years prior to this.

VII.    March 22, 2021, I placed an order for ballpoint pens for a teacher who had requested them. The alternative school has its own budget and I have been able to order supplies for the school for years, however, my request was ignored. I was advised that the executive assistant had denied the order. The purchase order request for the pens had been signed by my supervisor and by his supervisor, an Assistant Facility Director.

VIII.    On December 11, 2020, I received an email from Facility Director, Melanie Johnson, stating that I would no longer be allowed to run errands for the alternative school even with the approval and request of my supervisor. In addition, on December 18, 2020, I was notified by HR Manager Misty Schweitzer that running errands is not part of my job description, although I have done this for the past 8 years. I pick up needed items for my department as other employees do so as to shorten the waiting time to obtain the items that the school and students need.

IX.    I feel that I am being targeted and am having duties taken away from me to intentionally make my job more difficult.

X.    I resigned in May 2021 due to the ongoing hostile work environment I was subjected to on a daily basis after I reported what was happening at the center and I continued to support former employees in their claims against the center.

XI.    I believe that I have been retaliated against because I previously filed an EEOC complaint against my employer in violation of Title VII of the Civil Rights Act of 1964, as amended and because I've acted as a witness on behalf of other individuals who have also filed complaints.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/20/2021     *DocuSigned by:* Anne Wlr B9SE1C1908454A1... | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| *Date*     *Charging Party Signature* | |

DocuSign Envelope ID: 4D5B51C2-8A4F-4CD5-AE73-04FE726CA119

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

DocuSign Envelope ID: 1337AB3E-3994-4EE1-BABC-DC62414DF800

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) **Cassie Goodfellow** | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name **Canadian County at the Children's Justice Center** | No. Employees, Members **100 or More** | Phone No. (Include Area Code) **405-262-0202** |
|---|---|---|

| Street Address **7905 E. US Highway 66 El Reno OK 73036** | City, State and ZIP Code | |
|---|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☒ OTHER (Specify)  **FFCRA**

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **March 2020**   Latest **current**

☒ CONTINUING ACTION

I. I became employed by the Canadian County Children's Justice Center in 2012, first as a Youth Guidance Specialist working in the Fort Reno Group Home which is located within the CCCJC center, an administrative assistant for the behavioral health program, Quality Assurance for Behavioral Health and most recently as a bookkeeper since 2019.

II. The CCCJC is run by the elected Associate District Judge Bob Hughey who has the ultimate hiring, firing and disciplinary actions over all positions with the assistance of a Facility Director. Judge Hughey came to the bench by appointment in 2008.

III. In my position as bookkeeper, I was advised by Assistant Facility Director, Cedric Mills, that if employees turn in Families First Coronavirus Response Act (FFCRA) documentation, those employees would instead be considered "working from home" and that the FFCRA forms could be filled out by employees, but they "weren't going to be processed." Instead, the FFCRA form would just be kept in an envelope. This resulted in a chaotic handling of employees' leave and of their rights under the FFCRA. Some employees were allowed to work from home while some were denied time off even with a doctor's certification stating they should be in quarantine. Some employees who were already out on FMLA leave for health reasons or were in the

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/20/2021 _____ Date | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| DocuSigned by: [signature] 9BEFF442F87D466... Charging Party Signature | |

DocuSign Envelope ID: 1337AB3E-3994-4EE1-BABC-DC62414DF800

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

hospital and/or receiving medical treatments were now considered "working from home." I expressed my concerns to my supervisor Ms. Owens, that I no longer felt comfortable initialing the Payroll claims due to the fact that they were not accurate nor truthful. After expressing my concerns to management and the continuation of how my employer was mishandling issues of Covid exposure, I contacted the Public Employees Occupational Safety and Health (PEOSH) and made a complaint on 12/29/2020. Within a week of my complaint, which required my signature, I was terminated on 01/08/2021, without being provided a reason.

IV. In my position as bookkeeper I am aware of the treatment of Melissa McClain, Donna Wehmuller, Erin Barton, Ronda Moss, and Paul Hardaway following their complaints about Daniel Kern. I have agreed to act as a witness on their behalf and have openly supported them while I was employed with the CCCJC. I also experienced the hostile work environment created by Daniel Kern during my employment with the CCCJC and the ongoing retaliatory actions taken by management after it was reported. .

V. I believe I have been retaliated against by Canadian County Children's Justice Center administration and Judge Bob Hughey because of expressing my concerns over mishandling of the FFCRA leave of employees on disability leave, by making a complaint with the Public Employees Occupational Safety and Health and by acting as a witness on behalf of employees complaining of a hostile work environment under Title VII.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/20/2021     DocuSigned by: [signature]<br>9BEFF442F87D466...<br>*Date*     *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

DocuSign Envelope ID: 1337AB3E-3994-4EE1-BABC-DC62414DF800

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.  **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.  **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.  **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.  **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.  **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

DocuSign Envelope ID: 489F19FD-FBEF-4665-90EF-C516E5A86450

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (Indicate Mr., Ms., Mrs.) **Paul Hardaway** | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Street Address | City, State and ZIP Code | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name **Canadian County at the Children's Justice Center** | No. Employees, Members **100 or More** | Phone No. (Include Area Code) **405-262-0202** |
|---|---|---|
| Street Address **7905 E. US Highway 66 El Reno OK 73036** | City, State and ZIP Code | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☒ OTHER (Specify)  **OADA,**

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **Oct 2019**   Latest **June 2021**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.    I have worked at the Canadian County Children's Justice Center (CCCJC) alternative school known as CCEC, since 2012, first as an educator for two years and as Dean of Students for the last seven years. Dean of Students was my most recent position.  I am no longer employed.

II.   The CCCJC is run by the elected Associate District Judge Bob Hughey who has the ultimate hiring, firing and disciplinary actions over all positions with the assistance of a Facility Director.  Judge Hughey came to the bench by appointment in 2008.

III.  I am employed by El Reno Public Schools and in addition I am provided a stipend from the CCCJC funds.  El Reno Public Schools acts as the Lead Education Agency of the CCEC alternative School.

IV.   Dan Kern was hired as the Facility Director for the CCCJC in March 2019.

V.    In late September and early October of 2019, there had been several sexual harassment complaints made against Mr. Kern that had been given to Judge Hughey.

VI.   On September 24, 2019, Melissa McClain, HR Generalist turned in my reports to Judge Hughey about Dan Kern engaging in sexual harassment by making inappropriate remarks of a sexual nature about

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/20/2021 _____ Date | DocuSigned by: *[signature]* F9C34E3D7E7D46E... Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

DocuSign Envelope ID: 489F19FD-FBEF-4665-90EF-C516E5A86450

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| *State or local Agency, if any* | |

children that made me uncomfortable. For example, in regards to a male student exposing himself in class, Mr. Kern came by the office and asked if "everybody was keeping it in their pants" and calls the students names such as "shit heads."

VII.    In late September or early October 2019, Mr. Kern came to my office where I was speaking with a female student who had been acting out that day. Mr. Kern proceeded to speak with this female student, and he told her that if her behavior improved, he would take her to see her father, who is in prison and whom she has never met. The drive is approximately one and a half hours away. This is a violation of the CCCJC policies.

VIII.    After the discussion with the student and as she walked out of my office, Mr. Kern tapped me on the shoulder and stated "cute girl, and she's got a cute butt." This female student is 13 years old. The following day I requested to speak with someone from the CCCJC Human Resources department. I contacted HR Generalist, Melissa McClain who in turn notified her supervisor, HR Director, Ronda Moss. Both Ms. McClain and Ms. Moss came to my office where I informed them of the conversation Mr. Kern had with the female student. I expressed my concern for the student and how much it had bothered me since the conversation happened. Ms. McClain and Ms. Moss stated that they would forward the information to Judge Hughey which Ms. Moss did. I then informed my supervisor, Principal (Director of Student Services,) Neil Womack. I also provided Ms. McClain and Ms. Moss with information regarding Mr. Kern's behavior as the comments he makes about students

IX.    I reported this conduct with the young lady to Ronda Moss and Melissa McClain on October 4, 2019. Prior to me reporting this conduct to anyone Mr. Kern announced at a meeting that I was blowing the incident with the young lady out of proportion. Given that I had not said anything to anyone at that time, his statements indicate a guilty conscience.

X.    On approximately October 8, 2019, Ms. Moss and Ms. McClain presented my complaints to Judge Hughey a second time.

XI.    Following this incident, Mr. Kern continued to have contact with students and staff throughout the facility and it was only when Mr. Kern was harassing one of the female employees who had made a complaint against him was caught on camera that Mr. Kern was terminated.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/20/2021     *DocuSigned by:*     F6C34E307E7D46E... <br> *Date*        *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

DocuSign Envelope ID: 489F19FD-FBEF-4665-90EF-C516E5A86450

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Oklahoma Attorney General's Office, Office of CR Enforcement** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

XII.   After reporting the incident with the female student, Judge Hughey came to my office several days later and asked me about the situation. I explained to him what happened and he asked me if anyone else heard what Mr. Kern said and I told him that I didn't think so. His tone suggested he thought I was making it up. Judge Hughey said "okay thank you" and walked out.

XIII.   In October 2019, Ronda Moss the HR Director and Assistant Co-Facility Director was fired. Melissa McClain the HR Generalist was demoted. Both were retaliated against for reporting conduct involving Kern. Both filed EEOC complaints prior to this action due to their treatment after reporting the sexual harassment with Kern including reporting on my complaints. I am a supporting witness for their complaints about Dan Kern and the resulting treatment at the CCCJC.

XIV.   Donna Wehmuller, Erin Barton, and Robert Fletcher also filed EEOC Complaints arising out of this conduct, and I am a supporting witness for them as well. Donna Wehmuller is also my sister and this is well known at the CCCJC.

XV.   In October and November 2019, both my sister and I had contact with Channel 9 reporting what was happening at the CCCJC because Judge Hughey and others in leadership in Canadian County were not taking action to investigate the complaints against Kern.

XVI.   No one took any action to investigate besides Ronda Moss and Melissa McClain until after the reports were made to Channel 9.

XVII.   On October 31, 2019 with Mr. Neil Womack present, I was interviewed in the CCCJC Conference Room about my complaints against Daniel Kern. The conversation was recorded by Ms. Majors and after the interview was over I never heard back from her or anyone else again investigating the claims.

XVIII.   Dan Kern was finally terminated after being caught on video harassing Erin Barton after she retained counsel regarding her complaints.

XIX.   The CCCJC did not investigate Dan Kern the same way they investigated the prior Facility Director Bill Alexander who was also accused of sexual harassment.

XX.   After all this occurred, I felt like I had a target on my back. I watched as Ronda Moss was terminated, Melissa McClain was demoted, harassed, and retaliated against and then Erin Barton, Donna Wehmuller and Robert Fletcher were harassed and retaliated against.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/20/2021<br>_____<br>Date          *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

DocuSign Envelope ID: 489F19FD-FBEF-4665-90EF-C516E5A86450

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [ ] FEPA [X] EEOC | |

| Oklahoma Attorney General's Office, Office of CR Enforcement | and EEOC |
|---|---|
| *State or local Agency, if any* | |

XXI.     I was retaliated against for filing a claim and being a witness for other claimants with a variety of bullying behavior by Assistant Facility Director Cedric Mills and the replacement Facility Director Melanie Johnson.

XXII.    Mr. Mills would put me in a position and try to make me make decisions that I did not have the authority to make when my boss the CCEC Principal was unavailable.

XXIII.   They tried to make me disregard COVID protocols in the building. They interfered with my ability to discipline students which was within the purview of my job and tried to make me get approval from them and/or Judge Hughey before I could suspend students. None of these things were an issue before I spoke out and reported what was happening.

XXIV.   In July 2020, Judge Hughey hired another Facility Director named Ms. Melanie Johnson. Ms. Johnson wanted to make changes to the programs at CCEC that takes away the style and structure of the program, making it more difficult to manage the students. I had a conversation with Ms. Johnson about the philosophy of the center that has been in place since its inception.

XXV.    The CCCJC has been in existence for 20 years, with the philosophy of Judge Gary E. Miller who was instrumental in its creation. The philosophy of the center and of the alternative school (CCEC) is accountability and providing the youth who come into the facility, due to legal charges, school difficulties or parental reporting, so they can have a structured and positive environment to make changes. The CCEC operates on a scaled down version of military directions, which has been proven time and again to work.

XXVI.   In April 2021, Ms. Johnson and Assistant Facility Director, Cedric Mills came to my office and informed me that I was no longer going to be the Dean of Students. When I asked why, they said they "felt they needed a change since they felt I wasn't on board with the philosophy they wanted," even though I have followed the philosophy of the CCCJC and CCEC. I met with Ms. Johnson at a later time and told her that I could work with her philosophy.

XXVII.      I believe the "philosophy" issue is a pretext to retaliate against me for reporting the sexual harassment, and supporting the other individuals who filed EEOC charges against the county and the center

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/20/2021 *Date* | DocuSigned by: *Charging Party Signature* F6C34E3D7E7D46E... | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

DocuSign Envelope ID: 489F19FD-FBEF-4665-90EF-C516E5A86450

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

**Oklahoma Attorney General's Office, Office of CR Enforcement** _____ and EEOC

*State or local Agency, if any*

XXVIII.     The next week, I received an email from Ms. Johnson asking me if I had time to come interview at 2:00 pm on Thursday. I responded that I did. When I went to Ms. Johnson's office for the interview, she and Mr. Mills started asking me questions. After about the 5th question, I asked if this interview was for the principal's position that I had expressed interest in because the questions being asked didn't seem like questions that would be asked for the principal's position, I was told that I was interviewing for the Dean of Students position (which has been my current position for the past seven years and for which I currently held.) They told me that it wouldn't seem right to have someone in the principal position who was taken out of the Dean's spot, put into a classroom and then made the Principal. However, the person who they ended up choosing for the position is a teacher with no administrative experience and was taken right out of the classroom. I also learned that another teacher at the CCEC was looking to change jobs and was going to possibly leave, however, they gave this teacher more money to stay. I spoke with Ms. Johnson about the fact that I was going to be given more responsibilities, work under a new Principal and help train a new secretary, if a raise may be in order for me. Ms. Johnson's response was "absolutely not." Ms. Johnson told me that I would have to work under a new Principal for a year before a raise would be considered.

XXIX.  Since previously reporting all of the incidents concerning Mr. Kern's behavior towards the students to Judge Hughey, I have been denied the ability to even interview for the vacant Principal's position that became vacant upon Mr. Womack's recent retirement. When I informed Ms. Johnson of my interest in applying for the position, she advised me that I could not even be a candidate for the position because something didn't seem right "downtown." I asked what that meant and then she asked me if my relationship with my ex-wife was okay. I said yes, but what does that have to do with interviewing for the principal's job. She kept referring to my personnel file and that there may be something in there and also that Mr. McVay (El Reno Public School Superintendent) didn't give me a good recommendation.

XXX.  I later spoke with Mr. McVay and learned that Ms. Johnson lied about the recommendation Mr. McVay progided. Mr. McVay stated that he gave an excellent recommendation but that in his opinion as long as the current administration was in charge of the CCCJC I would never be hired as principal.

XXXI.  I was advised by Ms. Johnson that I would have to work under a new Principal for a year before a raise would even be considered, even though a teacher was given a raise just to stay at the facility.

I believe that I have been retaliated against because I reported behaviors of a sexual nature involving Mr. Kern and because I acted as witness on behalf of Ronda Moss, Melissa McClain, Donna Wehmuller, and Erin Barton all of whom who have also filed EEOC claims against the center related to the hostile work

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/20/2021 _____<br>*Date*     ⎯DocuSigned by:⎯<br>F6C34E3D7E7D46E...<br>*Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

DocuSign Envelope ID: 489F19FD-FBEF-4665-90EF-C516E5A86450

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

**Oklahoma Attorney General's Office, Office of CR Enforcement**   and EEOC
*State or local Agency, if any*

environment created by Daniel Kern and Judge Hughey's actions, in violation of Title VII of the Civil Rights Act of 1964, as amended. 9/20/2021

---

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/20/2021<br>*Date*   ―DocuSigned by:<br>*Charging Party Signature*<br>―F0C34E3D7E7D46E... | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

DocuSign Envelope ID: 489F19FD-FBEF-4665-90EF-C516E5A86450

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.    FORM NUMBER/TITLE/DATE.**  EEOC Form 5, Charge of Discrimination (11/09).

**2.    AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.    PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.    ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.    WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

**NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW**

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

**NOTICE OF NON-RETALIATION REQUIREMENTS**

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.



**Rachel L. Bussett-Simco**
**Patricia A. Podolec**
**Kindra Dotson-Avila**
**Ashley C. Weyland**

2201 N. Classen Blvd.
Oklahoma City, OK 73106
Telephone: 405-605-8073
Fax: 405-212-9112

**BUSSETT**
LEGAL GROUP, PLLC
www.BussettLegal.com

*OMES/Central Purchasing*

2020 OCT 15  A 10: 37

October 14, 2020

HAND DELIVERED
Canadian County Commissioners
201 N Choctaw
PO Box 458
El Reno, OK 73036

Hand Delivered
Office of the Attorney General
State of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105

HAND DELIVERED
Canadian County Clerk
201 N Choctaw
PO Box 458
El Reno, OK 73036

Hand Delivered
Office of Risk Management
Will Rogers Office, Ste. 202
2401 N. Lincoln Blvd.
Oklahoma City, OK 73105

SHERRY MURRAY
CANADIAN COUNTY CLERK

2020 OCT 15  A 8: 31

STATE OF OKLAHOMA
CANADIAN COUNTY
FILED OR RECORDED

**RE:   Notice of Tort Claim Against Canadian County and the Canadian County Children's Justice Center**

Our Client:  Melissa McClain
Entities:   The County of Canadian County and the Canadian County Children's Justice Center
Date of Incident:  Various

To Whom it May Concern:

Please be advised that Melissa McClain has retained my office to represent her in an action against Canadian County, the County Commissioners of Canadian County, the Canadian County Children's Justice Center, Judge Bob Hughey, Daniel Kern and NaCole Majors for damages sustained as a result of discrimination, she incurred while employed as Human Resources Generalist. This claim arises within the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151.  Please contact the undersigned attorney at the Bussett Legal Group, P.L.L.C. to resolve this claim.

Tort information: Violations of state and federal law including the United States and Oklahoma Constitutions for violation of rights to free speech, right to redress, right to assemble, right to access the courts, due process, equal protection, privacy, property

OCT 1 5 2020

ATTORNEY GENERAL

1

interest in employment and other such violations as may be discovered, whistleblowing, defamation, slander, conspiracy, tortious interference with business and employment, violation of public policy (Burk Tort), negligence, negligent hiring, training and supervision, intentional infliction of emotional distress, violations of the Oklahoma Statutes including but not limited to the Oklahoma Anti-Discrimination Act, violations of the Civil Rights Act of 1964, violations of 42 USC § 1983, violation of Title VII, retaliation resulting in a hostile work environment, and other matters that may be discovered.

**Description of the Incident:**

Ms. McClain was hired as a detention officer for the Canadian County Children's Justice Center in 2004 and then moved to the administrative assistant for detention position. In May 2018, she transferred to the Human Resources Department as a General Office Assistant. Ms. McClain is still employed with the CCCJC and continues to experience discrimination and retaliation in her employment.

In April 2018, Ms. McClain interviewed and was chosen for the position of General Office Assistant under the supervision of Ms. Moss in the Human Resources department. However, Ms. McClain went on maternity leave for 3 months before returning to work.

In late February/early March 2019, Judge Hughey announced that he had chosen Daniel Kern for the vacant Facility Director position that had been open for the past several months.

Ms. McClain began working along with Mr. Kern while still being supervised by Ms. Moss and still working closely with her. Mr. Kern praised Ms. McClain for the growth in her position and in the Summer of 2019, he recommended her to change to the title of HR Generalist since she was now doing many of the job duties. Ms. McClain also received a small raise. However, Mr. Kern also created a position for a younger female and gave her a $10,000.00 annual raise. This "new" position was not posted, and Ms. McClain was not given an opportunity to interview for it. In the fall of 2019, Mr. Kern again, created another "new" position for another younger employee with a higher salary than Ms. McClain's. Ms. McClain was not given an opportunity to interview for this position either as it was not posted.

Throughout his employment with the CCCJC, Mr. Kern made sexual and offensive remarks to and about the employees at the center. He told sexual jokes and talked very inappropriately to females in the facility, including Ms. Moss and Ms. McClain. In September, multiple employees began seeking out Ms. Moss and/or Ms. McClain, since they were HR staff, to make complaints about the offensive behavior and hostile work environment. Ms. McClain and Ms. Moss also made complaints of their own about Mr.

2

Kern's escalating inappropriate behavior. Some employees wrote out complaints, some only wanted Judge Hughey to be aware of Mr. Kern's conduct, all were offended by the vulgar nature and conduct of the facility director.

In accordance with the County's policy manual, on September 24, 2019 and again on September 26, 2019, Ms. McClain turned in handwritten and typed documentation about Mr. Kern's inappropriate language and inappropriate behavior. These complaints were submitted by Ms. McClain in her personal capacity and in her capacity as the HR Generalist on behalf of other employees including but not limited to her supervisor Ronda Moss.

On October 3, 2019, the Dean of Students of the alternative school at the Justice Center, Paul Hardaway, wanted to talk to Ms. Moss and Ms. McClain. Upon meeting with Mr. Hardaway, he told Ms. McClain and Ms. Moss that the day before, Mr. Kern had come to the school and talked to a 13-year-old female student. Mr. Kern told her that if she improved her behavior, he would take her to see her father, whom she had never seen, and who is incarcerated in Lawton, OK. When this student left Mr. Hardaway's office, Mr. Kern tapped Mr. Hardaway on the shoulder and stated, "cute kid, and "she has a cute butt." Mr. Hardaway was distraught about this comment and Mr. Kern's actions. Mr. Hardaway wrote a statement about the matter and it was given to Judge Hughey. Ms. Moss also talked to Judge Hughey and expressed her concerns about it. However, Judge Hughey took no action to address the hostile work environment created by Dan Kern and continued to allow him full access to the children at the center and to continue to harass his subordinate employees.

On October 17, 2019, Ms. Moss was to meet with County HR Director, NaCole Majors, in Ms. Major's office. When the meeting occurred, Ms. Majors notified Ms. Moss that she was being terminated. Ms. Moss advised Ms. Majors that she had filed and EEOC complaint and later that Melissa McClain had filed one also. Ms. McClain believes that she was not fired that day only because Ms. Moss told Ms. Majors that EEOC action had been taken by Ms. McClian

Soon after Ms. Moss's meeting with Ms. Majors, Mr. Kern approached Ms. McClain and told her that she could keep her job if she 'didn't do what she had done before." (Turning in complaints.) Mr. Kern also notified employees that going forward, Ms. McClain was going to be "sliding over to help with payroll." He also notified the security company that makes employees badges that Ms. McClain was no longer going to be doing the badge orders and he would let them know when an "HR Generalist" was named.

The following day, October 18, 2019, Mr. Kern had a discussion with one of the employees

3

who had made one of the complaints against him.  Mr. Kern told this employee, Erin Barton, that he had seen the complaints and knew what was said and who said what. Apparently, Judge Hughey had given the complaints to him which in turn allowed Mr. Kern to retaliate against those who made complaints against him.  Mr. Kern also stated to Ms. McClain that she had "violated confidentiality" so she would no longer be allowed to have access to some employees' information even though it is HR's job to keep employee documentation in personnel files.  However, Mr. Kern, nor anybody else has ever been able to state what this means or provide any valid proof.

On or about October 15, 2019 Ms. McClain made contact with EEOC regarding filing a charge against Canadian County, Judge Hughey, Daniel Kern and others.  Since this time, Ms. McClain has had numerous HR job duties taken away from her and was told by Mr. Kern to stay in her office until they figure out what to do with her. Ms. Majors was made aware of Ms. McClain's contact with the EEOC on October 17, 2019.

Ms. McClain has been told by Mr. Kern and County HR Director, NaCole Majors, that she could not go to lunch with co-workers.  Ms. McClain has asked Ms. Majors and Assistant Facility Director, Cedric Mills, for a job description but has not been provided with one. Ms. McCain only finds out that she is no longer responsible for something when she learns that somebody else has done it.  Mr. Mills has taken confidential correspondence out of Ms. McClain's mailbox that is addressed to her from employees and he has told employees to come to him with HR matters and not to Ms. McClain.

Ms. McClain is one of several other individuals who have come forward about the conduct of Daniel Kern and Judge Hughey, the hostile work environment and the ongoing discrimination against women.

In November 2019, Ms. McClain officially retained legal services regarding sexual harassment, and discrimination she had been experiencing as a result of speaking out.

**Location (Address), Date and Time of the Incident:**  various dates as per attached documents.

**Claimant's Names, Address, Phone Numbers:**

Melissa McClain

3635 S. Airport Rd

El Reno, OK 73036

405-684-5316

**Estimate of the Damages**:  In excess of $175,000.00

4

**Parties/Agencies Involved**: Canadian County Commissioners, Judge Bob Hughey, Daniel Kern, NaCole Majors and Melissa McClain

**Name, Address, Telephone Number of Authorized Agent to Settle Claim**: Bussett Legal Group, LLC, 2201 N. Classen Blvd.; Oklahoma City, Oklahoma, 73106 (405) 605-8073, fax (405)22-9112

If you have any questions or need any additional information, please do not hesitate to contact me.   I can be reached at the number listed above or via email at Rachel@Bussettlegal.com.   Please   always   include   my   assistant,   Crystal   at Crystal@Bussettlegal.com in all correspondence.

Sincerely,

Rachel Bussett

Cc: Melissa McClain

5



# BUSSETT
## LEGAL GROUP, PLLC
www.BussettLegal.com

2201 N. Classen Blvd.
Oklahoma City, OK 73106
Telephone: 405-605-8073
Fax: 405-212-9112

January 26, 2022

| HAND DELIVERED | HAND DELIVERED |
|---|---|
| Canadian County Commissioners | Canadian County Clerk |
| 201 N Choctaw | 201 N Choctaw |
| PO Box 458 | PO Box 458 |
| El Reno, OK 73036 | El Reno, OK 73036 |

**RE:   Notice of Tort Claim Against Canadian County and the Canadian County Children's Justice Center**

Our Client:  Melissa McClain
Entities:    The County of Canadian County and the Canadian County Children's Justice Center
Date of Incident:  Various

To Whom it May Concern:

Please be advised that Melissa McClain has retained my office to represent her in an action against Canadian County, the County Commissioners of Canadian County, the Canadian County Children's Justice Center, Cedric Mills, Melanie Johnson, NaCole Majors, and Judge Bob Hughey for damages sustained as a result of discrimination, she incurred while employed as Human Resources Generalist. This claim arises within the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151. Please contact the undersigned attorney at the Bussett Legal Group, P.L.L.C. to resolve this claim.

**Tort information:**

Violations of state and federal law including the United States and Oklahoma Constitutions for violation of rights to free speech, right to redress, right to assemble, right to access the courts, due process, equal protection, privacy, property interest in employment and other such violations as may be discovered, whistleblowing, defamation, slander, tortious interference with business and employment, violation of public policy (Burk Tort), negligence, negligent hiring, training and supervision, intentional infliction of emotional distress, violations of the Oklahoma Statutes including but not limited to the Oklahoma

1

Anti-Discrimination Act, violations of the Civil Rights Act of 1964, violations of 42 USC § 1983, violation of Title VII, retaliation resulting in a hostile work environment, and other matters that may be discovered.

**Description of the Incident:**

Ms. McClain was hired as a detention officer for the Canadian County Children's Justice Center (CCCJC) in 2004 and then moved to the administrative assistant for detention position. In May 2018, she transferred to the Human Resources Department as a General Office Assistant. Ms. McClain who was constructively discharges as of July 12, 2021 experienced discrimination and retaliation during her employment.

Beginning in October 2019, Ms. McClain has filed several EEOC claims against the CCJC, Judge Hughey and others due to the continued discrimination and retaliation she has suffered. Her latest EEOC claim was filed in September 2021. Ms. McClain is also a Plaintiff in a lawsuit against the center.

Ms. McClain continued to suffer retaliation and discrimination from the county, Judge Hughey, Melanie Johnson, NaCole Majors and Cedric Mills through August 2021 as well as violation of the State and Federal Family Medical Leave Act and the Americans with Disabilities Act.

In March 2021, Ms. McClain requested leave under FMLA to care for daughter. In June 2021, Ms. McClain's FMLA expired and she requested leave under the ADA due to her high risk pregnancy. This was not her first pregnancy while employed by the CCCJC and she had required leave and accommodations during that pregnancy as well, which the CCCJC had no issues allowing.

The CCCJC refused to enter into the interactive process regarding her leave under the ADA and Oklahoma Anti Discrimination Act. In fact, the CCCJC posted Ms. McClain's position and began to do interviews. The CCCJC offered Ms. McClain a position within the kitchen, which was not substantially similar to the position she held prior to her FMLA leave in supervised visitation. Representatives of the county admitted to acting inappropriately and in violation of policy.

Additionally, the CCCJC refused to communicate with Ms. McClain and provide requested employment status and information needed so that she could file for social security benefits for her daughter. The OESC found that Ms. McClain's resignation of her employment was appropriate due to ongoing retaliation and awarded her unemployment benefits.

2

**Location (Address), Date and Time of the Incident:**

various dates through August 2021

**Claimant's Names, Address, Phone Numbers:**

Melissa McClain
3635 S. Airport Rd
El Reno, OK 73036
405-684-5316

**Estimate of the Damages:**

In excess of $75,000.00

**Parties/Agencies Involved:**

Canadian County Commissioners, Judge Bob Hughey, and Melissa McClain, Erin Barton, Cedric Mills, NaCole Majors, and Melanie Johnson

**Name, Address, Telephone Number of Authorized Agent to Settle Claim:**

Bussett Legal Group, LLC, 2201 N. Classen Blvd.; Oklahoma City, Oklahoma, 73106 (405) 605-8073, fax (405)22-9112

If you have any questions or need any additional information, please do not hesitate to contact me. I can be reached at the number listed above or via email at Rachel@Bussettlegal.com. Please always include my assistant, Crystal at Crystal@Bussettlegal.com in all correspondence.

Sincerely,

Rachel Bussett

3



**BUSSETT**
LEGAL GROUP, PLLC
www.BussettLegal.com

Rachel L. Bussett-Simco
Patricia A. Podolec
Kindra Dotson-Avila
Ashley C. Weyland

2201 N. Classen Blvd.
Oklahoma City, OK 73106
Telephone: 405-605-8073
Fax: 405-212-9112

STATE OF OKLAHOMA
CANADIAN COUNTY
FILED OR RECORDED

2020 NOV 12 P 4: 22

SHERRY MURRAY

RECEIVED

NOV 12 2020

NOV 12 2020 DCAM RISK MANAGEMENT,

DCAM RISK MANAGEMENT

**November 12, 2020**

HAND DELIVERED
Canadian County Commissioners
201 N Choctaw
PO Box 458
El Reno, OK 73036

NOV 12 2020

HAND DELIVERED
Office of the Attorney General
State of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105

BY:

HAND DELIVERED
Canadian County Clerk
201 N Choctaw
PO Box 458
El Reno, OK 73036

HAND DELIVERED
Office of Risk Management
Will Rogers Office, Ste. 202
2401 N. Lincoln Blvd
Oklahoma City, OK 73105

RECEIVED
RECEPTIONIST

NOV 12 2020

ATTORNEY GENERAL

**Re:    Notice of Tort Claim Against Canadian County and The Canadian County Children's Justice Center**

| | |
|---|---|
| Claimant: | Ms. Erin Barton |
| Entities: | Canadian County and the Canadian County Children's Justice Center |
| Date of Incident: | Various |

**To Whom it May Concern:**

Please be advised that Ms. Erin Barton ("Ms. Barton") has retained my office to represent her in an action against Canadian County, the County Commissioners of Canadian County ("Commissioners"), the Canadian County Children's Justice Center of the Twenty-Sixth Oklahoma Judicial District ("CCCJC"), Associate District Judge Mr. Bob Hughey of the Twenty-Sixth Oklahoma Judicial District ("Judge Hughey"), and Mr. Daniel Kern ("Mr. Kern") for damages sustained as a result of discrimination incurred by Ms. Barton while employed at CCCJC where she began in 2013 as a Supervised Visitation Monitor, and works presently as the Supervised Visitation Supervisor. Ms. Barton brings this claim under the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151. Please contact the undersigned attorney at the Bussett Legal Group, P.L.L.C. to resolve this claim.

1

**TORT INFORMATION:**

Violations of the United States Constitution, violations of the State of Oklahoma Constitution, violations of United States federal law, and violations of the State of Oklahoma Statutes, which collectively include violations of rights to free speech, privacy rights, property interest and rights in employment, and other such violations as may be discovered which concern whistleblowing, defamation, slander, conspiracy, retaliation resulting in a hostile work environment, tortious interference with business and employment rights, negligence, negligent hiring, negligent training and supervision, intentional infliction of emotional distress, violations of the Oklahoma Anti-Discrimination Act, violations of Title VII of the Civil Rights Act of 1964 as amended, violations of 42 U.S.C.S. § 1983, and any and all other matters that may be discovered.

**DESCRIPTION OF THE INCIDENT:**

Ms. Barton has been employed by the CCCJC since 2013, initially serving as a Supervised Visitation Monitor, and presently as a Supervised Visitation Supervisor. Ms. Barton currently remains employed with the CCCJC and continues to experience a hostile work environment, including discrimination and retaliation in her employment.

In March of 2019, Judge Hughey announced his decision to hire Mr. Kern for the vacant CCCJC Facility Director position. Within mere weeks of starting as Facility Director, Mr. Kern commenced his creating a discriminatory and hostile work environment for the employees of CCCJC, including discrimination, harassment, retaliation, and making sexually offensive comments and gestures leveled toward female employees. Ms. Barton's personal experiences with Mr. Kern's discrimination and hostile work environment are as follows:

Soon after Mr. Kern began working at the CCCJC, Ms. Barton was exposed to Mr. Kern's inappropriate and offensive conduct. On several occasions, Ms. Barton recalls Mr. Kern visiting her office, unannounced to discuss his patently vulgar and inappropriate thoughts. For example, Mr. Kern, during one of his visits, informed Ms. Barton that he was "excited because he gets a big boy toilet installed in his house" and further stating "I don't know what's wrong with Oklahoma boys, but I guess they don't put their balls in the toilet to poop...does your [Ms. Barton's] husband put his balls in the toilet to poop?" Here, Mr. Kern's inappropriate dialogue directed at Ms. Barton was vulgar, entirely inappropriate, and an obvious example of his creating a hostile work environment at CCCJC for Ms. Barton and all its employees.

2

During another summer 2019 incident, Mr. Kern visited Ms. Barton's office and initiated another uninvited conversation. Mr. Kern asked Ms. Barton whether one of her employees "looks hot." Ms. Barton was aware that Mr. Kern was referring to a CCCJC employee of Columbian nationality. Mr. Kern then asked Ms. Barton for further details regarding this CCCJC employee's Columbian nationality and other information about this employee's husband. Following these comments, Mr. Kern next obscenely speculated that the employee was most likely "a-mail-order-bride." Lastly, Mr. Kern informed Ms. Barton that he wanted her to "help get this employee away from her husband." These comments made by Mr. Kern were inappropriate, discriminatory, sexually offensive, vulgar, and entirely inappropriate. In this manner, Mr. Kern's conduct created the hostile work environment endured by Ms. Barton and her fellow CCCJC employees.

In September of 2019, Ms. Barton drafted a formal complaint against Mr. Kern concerning his inappropriate comments, discriminatory conduct, and creation of a hostile work environment. Ms. Barton provided the CCCJC Human Resource Generalist, Ms. Melissa McClain ("Ms. McClain"), with the formal complaint.

Then in October of 2019, Mr. Kern and Ms. Barton attended a meeting with other CCCJC employees. At this meeting, Mr. Kern went out of his way with the obvious motive to inform Ms. Barton that he knew she had filed a formal complaint against him. Mr. Kern did not disclose how he was made aware of this information. Mr. Kern then, during this same meeting, told Ms. Barton that "she was only to provide him with her complaints and no one else." He then commented to Ms. Barton, about her formal complaint, that "he [Mr. Kern] would be just fine," as it concerned his employment security.

In November of 2019, Ms. Barton recognized that her hostile work environment was not improving and consulted with legal counsel. Ms. Barton retained Attorney Rachel Bussett ("Ms. Bussett"), of the Bussett Legal Group, PLLC. On November 12, 2019, a Letter of Preservation and Open Records Act Request were hand-delivered to Canadian County, placing the County on notice of the Bussett Legal Group's representation of Ms. Barton, Mr. Robert Fletcher, and Ms. Donna Wehmuller. **On November 13, 2019**, after Mr. Kern learned that Ms. Barton had retained counsel, he reacted by further harassing Ms. Barton. This harassment involved Mr. Kern abruptly entering Ms. Barton's office, stating that he had "heard I [Ms. Barton] was suing him."

3

Because Ms. Barton's work area at CCCJC is both video and audio recorded, Mr. Kern can be heard and seen performing this disruptive act, which caused Ms. Barton to inevitably start crying while stating to Mr. Kern that: "I [Ms. Barton] only want to do my job." Ms. Barton immediately informed her attorney, Ms. Bussett, of Mr. Kern's outcry directed at her. Ms. Barton also told Ms. Bussett that the entirety of these events was video, and audio recorded. Ms. Bussett then contacted the CCCJC, informed them of Ms. Barton's most recent experience with Mr. Kern's while also making sure the CCCJC understood that Mr. Kern's actions were recorded. Mr. Kern was then fired just subsequent to Ms. Bussett's letter to the CCCJC, Mr. Kern was fired. It is only because Ms. Barton's attorney contacted the CCCJC and Canadian County that Mr. Kern was fired. Otherwise, his tenure would have likely endured. This is just a brief description of the conduct experienced by Ms. Barton and others at the CCCJC at the hands of Mr. Kern.

Since Mr. Kern was fired on or about November 21, 2019, Ms. Barton has continued to be subjected to a hostile work environment, retaliation, and different treatment than her non-reporting co-workers. Ms. Barton and her other co-workers who spoke out about the County's failure to remedy the situation have been the target of ongoing discrimination and constitutional violations. Ms. Barton has also been targeted and reprimanded for speaking out in a public forum about her desire to pursue a different career. The actions taken by the County in reprimanding her resulted in this office sending correspondence about the violation of her rights. The County must take action to protect its workers who do the right thing and speak out about wrongdoing. Thus far it has not only failed to remedy the wrongdoing it has engaged in further suppression of employee rights. This is illegal.

**LOCATION (ADDRESS), DATE AND TIME OF THE INCIDENT:**
Various and numerous dates.

**CLAIMANT'S NAMES, ADDRESS, PHONE NUMBERS:**
Ms. Erin Barton
18725 SW 59th Street
El Reno, OK 73036
405-410-6216

**ESTIMATE OF THE DAMAGES:**
In excess of $175,000.00.

**PARTIES/AGENCIES INVOLVED:**

4

The Canadian County Children's Justice Center of the Twenty-Sixth Oklahoma Judicial District, the Canadian County Commissioners, Associate District Judge Mr. Bob Hughey of the Twenty-Sixth Oklahoma Judicial District, Mr. Daniel Kern, and Ms. Erin Barton.

**NAME, ADDRESS, TELEPHONE NUMBER OF AUTHORIZED AGENT TO SETTLE CLAIM:**
Bussett Legal Group, LLC, 2201 N. Classen Blvd.; Oklahoma City, Oklahoma, 73106 (405) 605-8073, fax (405) 212-9112

---

If you have any questions or need any additional information, please do not hesitate to contact me. I can be reached at the number listed above or via email at Rachel@Bussettlegal.com. Please always include my assistant, Crystal at Crystal@Bussettlegal.com in all correspondence.

Sincerely,

Rachel Bussett

cc: Erin Barton

5



# BUSSETT
## LEGAL GROUP, PLLC
### www.BussettLegal.com

2201 N. Classen Blvd.
Oklahoma City, OK 73106
Telephone: 405-605-8073
Fax: 405-212-9112

**January 26, 2022**

HAND DELIVERED
Canadian County Commissioners
201 N Choctaw
PO Box 458
El Reno, OK 73036

HAND DELIVERED
Canadian County Clerk
201 N Choctaw
PO Box 458
El Reno, OK 73036

HAND DELIVERED
Office of the Attorney General
State of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105

HAND DELIVERED
Office of Risk Management
Will Rogers Office, Ste. 202
2401 N. Lincoln Blvd
Oklahoma City, OK 73105

**Re:    Notice of Tort Claim Against Canadian County and The Canadian County Children's Justice Center**

| | |
|---|---|
| Claimant: | Ms. Erin Barton |
| Entities: | Canadian County and the Canadian County Children's Justice Center |
| Date of Incident: | Various |

**To Whom it May Concern:**

Please be advised that Ms. Erin Barton ("Ms. Barton") has retained my office to represent her in an action against Canadian County, the County Commissioners of Canadian County ("Commissioners"), the Canadian County Children's Justice Center of the Twenty-Sixth Oklahoma Judicial District ("CCCJC") and Associate District Judge Mr. Bob Hughey of the Twenty-Sixth Oklahoma Judicial District ("Judge Hughey"), Cedric Mills, Melanie Johnson and NaCole Majors for damages sustained as a result of discrimination incurred by Ms. Barton while employed at CCCJC where she began in 2013 as a Supervised Visitation Monitor, and as the Supervised Visitation Supervisor. Ms. Barton brings this claim under the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151. Please contact the undersigned attorney at the Bussett Legal Group, P.L.L.C. to resolve this claim.

1

**TORT INFORMATION:**

Violations of the United States Constitution, violations of the State of Oklahoma Constitution, violations of United States federal law, and violations of the State of Oklahoma Statutes, which collectively include violations of rights to free speech, privacy rights, property interest and rights in employment, and other such violations as may be discovered which concern whistleblowing, defamation, slander, conspiracy, retaliation resulting in a hostile work environment, tortious interference with business and employment rights, negligence, negligent hiring, negligent training and supervision, intentional infliction of emotional distress, violations of the Oklahoma Anti-Discrimination Act, violations of Title VII of the Civil Rights Act of 1964 as amended, violations of 42 U.S.C.S. § 1983, and any and all other matters that may be discovered.

**DESCRIPTION OF THE INCIDENT:**

Ms. Barton has been employed by the CCCJC since 2013, initially serving as a Supervised Visitation Monitor, and then as a Supervised Visitation Supervisor. Ms. Barton who was previously employed with the CCCJC until she was constructively discharge in July 2021 experienced a hostile work environment, including ongoing discrimination and retaliation, to include violation of the Family and Medical Leave Act for self-care and care of others and the American's with Disability Act during her employment.

Ms. Barton filed an EEOC claim against the Canadian County Children's Justice Center (CCCJC) for harassment in or around March 2020, EEOC Charge No. 564-2020-00275. A lawsuit was initiated in December of 2020. Since the date of filing, Ms. Barton has been discriminated against, harassed, intimidated and retaliated against due to her claims and lawsuit against the CCCJC, Judge Hughey and others.

Ms. Barton filed for FMLA on or around April 6, 2021. She received a letter on April 14, 2021 that was dated for April 9, 2021, denying her request for FMLA as the content was considered vague despite her original request including a medical certification completed by her doctor as required. Due to the date mailed as per the postmark (April 12, 2021) and the date received, Ms. Barton only had two days to provide the additional information from her health care provider or the request for FMLA was to be denied. Human Resources had the ability to contact Ms. Barton's medical provider directly to request any clarification or additional information needed but chose to send her a letter instead and to not send the letter for three days after it was drafted, extremely limiting her time to provide the required information.

2

Once Ms. Barton's FMLA leave expired, she requested short term leave under the American's with Disabilities Act to determine if accommodations were necessary upon her return to work.   Ms. Barton discussed with her doctor and determined a list of accommodations needed.  However, while she requested the same, the CCCJC failed to enter into interactive process which lead to my constructive discharge on or around July 9, 2021.

While the CCCJC still maintain that Ms. Barton is an employee as of 8/21/2021, they refuse to communicate with her and/or offer Ms. Barton her previous job or a substantially similar job back.  In fact the CCCJC listed Ms. Barton's position as being open and began conducting interviews for the same while offering to place Ms. Barton in the kitchen.  A position that was not a substantially similar job as the one she previously held before taking FMLA.  Employees of the county admitted they should not have posted the job and doing so was a violation of policy.

Additionally, the CCCJC made negative and derogatory comments about Ms. Barton to several candidates interviewed for her previously position.  They also instructed the candidates not to communicate to Ms. Barton that they were in fact interviewing for her job.  The OESC found that Ms. Barton's resignation of employment was appropriated due to ongoing retaliation and was awarded he unemployment benefits.

## LOCATION (ADDRESS), DATE AND TIME OF THE INCIDENT:
Various and numerous dates through August 2021.

## CLAIMANT'S NAMES, ADDRESS, PHONE NUMBERS:
Ms. Erin Barton
18725 SW 59th Street
El Reno, OK 73036
405-410-6216

## ESTIMATE OF THE DAMAGES:
In excess of $175,000.00.

## PARTIES/AGENCIES INVOLVED:
The Canadian County Children's Justice Center of the Twenty-Sixth Oklahoma Judicial District, the Canadian County Commissioners, Associate District Judge Mr. Bob Hughey of the Twenty-Sixth Oklahoma Judicial District, and Ms. Erin Barton. NaCole Majors, Cedric Mills, Melanie Johnson and Melissa McClain.

3

**NAME, ADDRESS, TELEPHONE NUMBER OF AUTHORIZED AGENT TO SETTLE CLAIM:**

Bussett Legal Group, LLC, 2201 N. Classen Blvd.; Oklahoma City, Oklahoma, 73106 (405) 605-8073, fax (405) 212-9112

---

If you have any questions or need any additional information, please do not hesitate to contact me. I can be reached at the number listed above or via email at Rachel@Bussettlegal.com. Please always include my assistant, Crystal at Crystal@Bussettlegal.com in all correspondence.

Sincerely,

Rachel Bussett

cc: Erin Barton

4

# Oklahoma Employment Security Commission

## Fact Finding

### 409 QUESTIONS EMPLOYER

SSN:                                CLAIM ID: 17475387

EFFECTIVE DATE: 08/01/2021

RECORDED ON DATE: 08/24/2021    4:38:00PM

Issue:

10 Day Call:

The information received previously from you will be considered in issuing a determination. However, additional detailed information is needed regarding the enclosed statement and/or above-mentioned Unemployment Insurance Claim. This information must be received by 5:00 pm on or before the date listed below:
RESPOND BY DATE:

Failure to respond may affect the outcome of the claim. In your response, please address all the questions on this form. You should include any documentary evidence pertaining to the issue. You may mail, telephone or FAX your response to this office.
Failure to address all questions may affect the decision. Was the claimant's original position available upon return?

For Agency Use Only =====> Contact Saved - 8/24/2021 4:38:00 PM

Phone: (405) 262-0202
Party Contacted: Employer
Name: Misty Schweitzer
Title: Canadian County
Results: Left Message
Date: 8/24/2021 4:37 PM
Advised to provide information by: 8/16/2021
Advised party that failure to respond could affect the outcome of the claim: True
Interviewer Name: B. Sizemore 918-295-3333 Ext 19804083

End of Contact Info                      LAST CONTACT DATE: 08/24/2021

## Oklahoma Employment Security Commission

### Fact Finding
### OTHER - GENERAL

SSN:                                    CLAIM ID: 17475387

EFFECTIVE DATE: 08/01/2021

RECORDED ON DATE: 08/17/2021  11:00:42AM

Issues: Issue code 1217 Per Employer Protest,
   C states that on 7/11/2021 she constructively discharged from Canadian County Juvenile Center.
She states she was on medical leave and when she was not released to return to work at the
expected time, her employer posted her job as an open position, and told her that when she returned
they would find her something do do. There is currently a law suit regarding the matter.

Additional questions:

Do you need to add an issue?
No

OKLAHOMA EMPLOYMENT SECURITY COMMISSION    NOTICE OF DETERMINATION

SS#        LOFP 55-44  EFFECTIVE  08/01/2021  PROGRAM  UI

APPEAL TRIBUNAL, P.O. BOX 53345, OKLAHOMA CITY, OK 73152-3345
FAX #(405)208-4552 E-MAIL ADDRESS: UI.APPEALS@OESC.STATE.OK.US

THIS DETERMINATION WAS MAILED ON 08/30/2021 TO THE CLAIMANT AND/OR THE
EMPLOYER AT THEIR RESPECTIVE ADDRESSES SHOWN ON THIS DETERMINATION

CLAIMANT                  EMPLOYER
                   CANADIAN COUNTY
MELISSA A MCCLAIN         CANADIAN COUNTY CLERK
                   PO BOX 458
                   EL RENO  OK        73036-0458

THE APPLICABLE SECTION OF THE OKLAHOMA SECURITY ACT IS SECTION 2-406 ;
THE FULL TEXT OF THIS LAW CAN BE FOUND BY ACCESSING THE OKLAHOMA
EMPLOYMENT SECURITY COMMISSION WEBSITE AT WWW.OK.GOV/OESC. CLICK
ON THE LINK FOR OESC ACT WHICH IS FOUND UNDER "ADDITIONAL RESOURCES."
THE SECTIONS ARE LISTED IN NUMERICAL ORDER. INTERNET ACCESS IS
AVAILABLE AT YOUR LOCAL OKLAHOMA WORKS CENTER.

YOU ARE ALLOWED BENEFITS EFFECTIVE 08/01/2021.  BASIS FOR DETERMINATION-

THE CLAIMANT IS CONSIDERED TO HAVE BEEN DISCHARGED WHILE ON MEDICAL LEAVE.
THE EMPLOYER DID NOT RETAIN THE SAME POSITION OR SUITABLE EMPLOYMENT
FOR THE RETURN OF THE CLAIMANT. THOUGH THIS MAY HAVE BEEN IN THE BEST
INTERESTS OF THE EMPLOYER, THIS IS CONSIDERED A DISCHARGE AND NO MISCONDUCT
HAS BEEN FOUND.

IF YOU DISAGREE WITH THIS DETERMINATION YOU MAY FILE AN APPEAL WITHIN TEN
(10)DAYS OF THE MAILING DATE OF THIS DETERMINATION. YOU MAY FILE AN APPEAL
BY MAIL, FAX, E-MAIL, OR TELEPHONE. IF YOU LIVE WITHIN THE OKLAHOMA CITY
METROPOLITAN AREA, PLEASE CALL 525-1500. IF YOU LIVE OUTSIDE THE OKLAHOMA
CITY METROPOLITAN AREA, PLEASE CALL 1-800-555-1554. AS A CONVENIENCE
IN FILING AN APPEAL, AN APPEAL TRIBUNAL ADDRESS, FAX NUMBER, AND
E-MAIL ADDRESS HAVE BEEN LISTED AT THE TOP OF THIS DOCUMENT.  IF YOU HAVE
ANY QUESTIONS OR NEED ADDITIONAL INSTRUCTIONS, PLEASE REFER TO YOUR
"REEMPLOYMENT ASSISTANCE FOR THE UNEMPLOYED" OR "EMPLOYERS GUIDE TO
UNEMPLOYMENT INSURANCE" BOOKLET OR CONTACT THE UNEMPLOYMENT SERVICE
CENTER.

CLAIMANT COPY  PREPARED  08/27/2021  BY  BSE5          UIB262 2-406

1

OES-461

# APPEAL TRIBUNAL
## OKLAHOMA EMPLOYMENT SECURITY COMMISSION
### P.O. BOX 53345
### OKLAHOMA CITY, OK 73152

Docket No. 22-005711

In re: Claim of: SSA# XXX-X:

CANADIAN COUNTY                          MELISSA A MCCLAIN
CANADIAN COUNTY CLERK
PO BOX 458
EL RENO OK  73036-0458

ORDER OF DECISION

Now on APRIL 8, 2022, this cause comes on for consideration pursuant to regular assignment and hearing on MARCH 30, 2022, before JERRI POWELL, HEARING OFFICER, at 2:01 P.M. by telephone at which time the claimant appeared represented by Rachel Bussett, Attorney. Appearing for the claimant was Rhonda Moss, Former Human Resources. The employer appeared represented by Melanie Johnson, Director.  Testifying for the employer was Cedric Mills, Assistant Facilities Director.  The Commission was not represented.  **The issue to be resolved is whether the claimant was discharged for a reason amounting to misconduct connected with the work.**

The Appeal Tribunal having considered the evidence and records on file, FINDS AND ORDERS AS FOLLOWS:

-1-

That on SEPTEMBER 3, 2021, the employer appealed the Commission's determination awarding claimant unemployment benefits under Section 2-406 of the Oklahoma Employment Security Act by finding claimant was discharged from employment for reasons which do not constitute misconduct connected to the work.

-2-

The claimant was employed from November 4, 2004, until June 23, 2021. She was a Supervisor Visitation Monitor at the time of her separation.

-3-

Around April 1, 2021, the claimant filed for leave under the Family Medical Leave Act ("FMLA") due to her child's medical condition. The employer approved the claimants' request for FMLA leave. She remained on leave for twelve weeks. The employer held the claimant's job for her to return while she was on FMLA leave On June 23, 2021, the employer mailed a letter to the claimant stating that her FMLA leave had exhausted. (Appeal Tribunal Exhibit 4) Around that time, the Human Resources Manager verbally notified the claimant that her position would be filled, and that she could apply for another position after she returned from non-FMLA leave. The claimant's last day worked was April 1, 2021.

-4-

The Appeal Tribunal offered and entered without objection, for jurisdictional purposes, the Notice of Determination (Appeal Tribunal Exhibit 1), the claimant's appeal (Appeal Tribunal Exhibit 2), and the Notice of Hearing (Appeal Tribunal Exhibit 3). The Appeal Tribunal offered and entered without objection page 5 of the Commission file (Appeal Tribunal Exhibit 4). The Appeal Tribunal offered and entered without objection page 23 of the Commission file (Appeal Tribunal Exhibit 5).

JP/SD

Continued on Page 2

-5-

**Section 2-406. Discharge for misconduct:** A. An individual shall be disqualified for benefits if he or she has been discharged for misconduct connected with his or her last work. If discharged for misconduct, the employer shall have the burden to prove that the employee engaged in misconduct as defined by this section. Such burden of proof is satisfied by the employer, or its designated representative, providing a signed affidavit, or presenting such other evidence which properly demonstrates the misconduct which resulted in the discharge. Once this burden is met, the burden then shifts to the discharged employee to prove that the facts are inaccurate or that the facts as stated do not constitute misconduct as defined by this section. Disqualification under this section shall continue for the full period of unemployment next ensuing after he or she has been discharged for misconduct connected with his or her work and until such individual has become reemployed and has earned wages equal to or in excess of ten (10) times the weekly benefit amount. B. Acts which constitute misconduct under this section shall be limited to the following: 1. Any intentional act or omission by an employee which constitutes a material or substantial breach of the employee's job duties or responsibilities or obligations pursuant to his or her employment or contract of employment; 2. Unapproved or excessive absenteeism or tardiness; 3. Indifference to, breach of, or neglect of the duties required which result in a material or substantial breach of the employee's job duties or responsibilities; 4. Actions or omissions that place in jeopardy the health, life, or property of self or others; 5. Dishonesty; 6. Wrongdoing; 7. Violation of a law; or 8. A violation of a policy or rule enacted to ensure orderly and proper job performance or for the safety of self or others. C. Any misconduct violation as defined in subsection B of this section shall not require a prior warning from the employer. As long as the employee knew, or should have reasonably known, that a rule or policy of the employer was violated, the employee shall not be eligible for benefits. D. Any finding by a state or federal agency of any failure by the employee to meet the applicable civil, criminal or professional standards of the employee's profession shall create a rebuttable presumption of such misconduct, and benefits shall be denied, unless the employee can show, with clear and convincing evidence, that such misconduct did not occur, or the Commission determines that such failure did not constitute misconduct as defined herein. **[AMENDED BY HB 2505, Eff. 11-1-14]**

-6-

At the hearing, both parties acknowledged that the claimant submitted a resignation letter to the employer. However, the evidence demonstrated that the employer notified the claimant that her position was being filled prior to the claimant submitting the resignation letter. When the employer notified the claimant that her position was being filled, it initiated the separation for unemployment purposes. Therefore, Section 2-406 applies.

-7-

When an employee is discharged, the employer bears the burden to prove the discharge was for misconduct connected with the work. Here, the burden has not been met. The evidence demonstrated that the separation occurred because the employer chose to fill the claimant's position while she was on leave. The employer may have good business reasons to discharge the claimant. However, misconduct connected with the work has not been shown. Therefore, benefits are allowed.

-8-

The Commission's determination is AFFIRMED. The claimant is qualified for benefits effective AUGUST 1, 2021, provided the claimant meets all other requirements of the Act.

BY ORDER OF

JERRI POWELL, HEARING OFFICER

Copy to: APPELLANT
          APPELLEE

4/8/22
22-005711/JP/SD

Page 2 of 3 Pages

OKLAHOMA EMPLOYMENT SECURITY COMMISSION     NOTICE OF DETERMINATION

SS#          LOFP 55-44 EFFECTIVE 08/01/2021 PROGRAM UI

APPEAL TRIBUNAL, P.O. BOX 53345, OKLAHOMA CITY, OK 73152-3345
FAX #(405)208-4552 E-MAIL ADDRESS: UI.APPEALS@OESC.STATE.OK.US

THIS DETERMINATION WAS MAILED ON 10/12/2021 TO THE CLAIMANT AND/OR THE
EMPLOYER AT THEIR RESPECTIVE ADDRESSES SHOWN ON THIS DETERMINATION

CLAIMANT                 EMPLOYER
                  CANADIAN COUNTY
ERIN M BARTON         CANADIAN COUNTY CLERK
                  PO BOX 458
                  EL RENO  OK      73036-0458
THE APPLICABLE SECTION OF THE OKLAHOMA SECURITY ACT IS SECTION 2-404 ;
THE FULL TEXT OF THIS LAW CAN BE FOUND BY ACCESSING THE OKLAHOMA
EMPLOYMENT SECURITY COMMISSION WEBSITE AT WWW.OK.GOV/OESC. CLICK
ON THE LINK FOR OESC ACT WHICH IS FOUND UNDER "ADDITIONAL RESOURCES."
THE SECTIONS ARE LISTED IN NUMERICAL ORDER. INTERNET ACCESS IS
AVAILABLE AT YOUR LOCAL OKLAHOMA WORKS CENTER.

YOU ARE ALLOWED BENEFITS EFFECTIVE 08/01/2021.  BASIS FOR DETERMINATION-

THE CLAIMANT BECAME SEPARATED FROM EMPLOYMENT DUE TO A HOSTILE WORKING
ENVIRONMENT. THE CLAIMANT REPORTED INAPPROPRIATE CONDUCT REGARDING PERSONAL
ATTACKS AGAINST HER. NO CHANGES WERE MADE AFTER REPORTING THE INCIDENTS.
THE CLAIMANT HAS SHOWN GOOD CAUSE FOR QUITTING.

IF YOU DISAGREE WITH THIS DETERMINATION YOU MAY FILE AN APPEAL WITHIN TEN
(10)DAYS OF THE MAILING DATE OF THIS DETERMINATION.  YOU MAY FILE AN APPEAL
BY MAIL, FAX, E-MAIL, OR TELEPHONE.  IF YOU LIVE WITHIN THE OKLAHOMA CITY
METROPOLITAN AREA, PLEASE CALL 525-1500.  IF YOU LIVE OUTSIDE THE OKLAHOMA
CITY METROPOLITAN AREA, PLEASE CALL 1-800-555-1554.  AS A CONVENIENCE
IN FILING AN APPEAL, AN APPEAL TRIBUNAL ADDRESS, FAX NUMBER, AND
E-MAIL ADDRESS HAVE BEEN LISTED AT THE TOP OF THIS DOCUMENT.  IF YOU HAVE
ANY QUESTIONS OR NEED ADDITIONAL INSTRUCTIONS, PLEASE REFER TO YOUR
"REEMPLOYMENT ASSISTANCE FOR THE UNEMPLOYED" OR "EMPLOYERS GUIDE TO
UNEMPLOYMENT INSURANCE" BOOKLET OR CONTACT THE UNEMPLOYMENT SERVICE
CENTER.

CLAIMANT COPY  PREPARED  10/11/2021  BY  CH27         UIB282 2-404

Ex. 10 Barton OESC.pdf
Page 1 of 4

OKLAHOMA EMPLOYMENT SECURITY COMMISSION      NOTICE OF DETERMINATION

SS#              LOFP  55-44  EFFECTIVE  08/01/2021  PROGRAM  UI

APPEAL TRIBUNAL, P.O. BOX 53345, OKLAHOMA CITY, OK  73152-3345
FAX #(405)208-4552 E-MAIL ADDRESS:  UI.APPEALS@OESC.STATE.OK.US

THIS DETERMINATION WAS MAILED ON 10/12/2021 TO THE CLAIMANT AND/OR THE
EMPLOYER AT THEIR RESPECTIVE ADDRESSES SHOWN ON THIS DETERMINATION

          EMPLOYER                              CLAIMANT
CANADIAN COUNTY
CANADIAN COUNTY CLERK                     ERIN M BARTON
PO BOX 458
EL RENO  OK              73036-0458


THE APPLICABLE SECTION OF THE OKLAHOMA SECURITY ACT IS SECTION 2-404 ;
THE FULL TEXT OF THIS LAW CAN BE FOUND BY ACCESSING THE OKLAHOMA
EMPLOYMENT SECURITY COMMISSION WEBSITE AT WWW.OK.GOV/OESC. CLICK
ON THE LINK FOR OESC ACT WHICH IS FOUND UNDER "ADDITIONAL RESOURCES."
THE SECTIONS ARE LISTED IN NUMERICAL ORDER. INTERNET ACCESS IS
AVAILABLE AT YOUR LOCAL OKLAHOMA WORKS CENTER.



RECEIVED
OCT 19 2021

APPEAL TRIBUNAL

YOU ARE ALLOWED BENEFITS EFFECTIVE 08/01/2021.  BASIS FOR DETERMINATION-

THE CLAIMANT BECAME SEPARATED FROM EMPLOYMENT DUE TO A HOSTILE WORKING
ENVIRONMENT. THE CLAIMANT REPORTED INAPPROPRIATE CONDUCT REGARDING PERSONAL
ATTACKS AGAINST HER. NO CHANGES WERE MADE AFTER REPORTING THE INCIDENTS.
THE CLAIMANT HAS SHOWN GOOD CAUSE FOR QUITTING.


IF YOU DISAGREE WITH THIS DETERMINATION YOU MAY FILE AN APPEAL WITHIN TEN
(10)DAYS OF THE MAILING DATE OF THIS DETERMINATION.  YOU MAY FILE AN APPEAL
BY MAIL, FAX, E-MAIL, OR TELEPHONE.  IF YOU LIVE WITHIN THE OKLAHOMA CITY
METROPOLITAN AREA, PLEASE CALL 525-1500.  IF YOU LIVE OUTSIDE THE OKLAHOMA
CITY METROPOLITAN AREA, PLEASE CALL 1-800-555-1554.  AS A CONVENIENCE
IN FILING AN APPEAL, AN APPEAL TRIBUNAL ADDRESS, FAX NUMBER, AND
E-MAIL ADDRESS HAVE BEEN LISTED AT THE TOP OF THIS DOCUMENT.  IF YOU HAVE
ANY QUESTIONS OR NEED ADDITIONAL INSTRUCTIONS, PLEASE REFER TO YOUR
"REEMPLOYMENT ASSISTANCE FOR THE UNEMPLOYED" OR "EMPLOYERS GUIDE TO
UNEMPLOYMENT INSURANCE" BOOKLET OR CONTACT THE UNEMPLOYMENT SERVICE
CENTER.

EMPLOYER COPY  PREPARED  10/11/2021     BY  CH27          UIB282 2-404

# Oklahoma Employment Security Commission

## Fact Finding

### DISCHARGE - GENERAL

SSN:                              CLAIM ID: 796768025

EFFECTIVE DATE: 08/01/2021

RECORDED ON DATE: 09/01/2021  11:14:56AM

Employer Name: CANADIAN COUNTY CHILDRENS JUSTICE C

Employer Telephone number: (405) 262-0202

What was your actual last day of work? 3/30/2021

On what date were you discharged? 3/30/2021

What is the name of the person who discharged you? mISTY

What is the title of the person who discharged you? h.r.

What exactly were you told when you were discharged? i WENT OUT OF fmla AND WHILE i WAS ON MEDICAL LEAVE AND WHY i WAS OUT THEY pOSTED MY JOB

Give specific details regarding the reason for separation. Include dates, individuals present, and what occurred that resulted in discharge. aLL MY PERSONAL BELONGING WERE BOXED UP AND MY HUSBAND HAD TO COME PICK UP .  wHEN i CONTACTED hr TO SEE WHAT WAS GOING ON THEY OFFERED ME A KITCHEN POSTION , WHICH IS NOT WHAT i WAS DOING

Have you been warned about your actions?
No

Is there any other information you would like to add? i THINK ITS ALL BECAUSE iM INVOLVED WITH A LAWSUIT AGAINST THE COMPANY

SEPARATING EMPLOYER
SSN:
NAME: ERIN     M BARTON
DATE INIT CLAIM FILED: 08/05/21    EFFECTIVE DATE: 08/01/21
CLAIM TYPE:  REGULAR     TRANS:  N      FLEX:  N
EMPLOYER ACCOUNT NUMBER: 000000000
EMPLOYER NAME: CANADIAN COUNTY (COUNTY CLERK)
EMPLOYER ADDR: PO BOX 458
          EL RENO          ,OK  73036-0458


DATES WORKED FROM:   10/08/13 TO 07/09/21
REASON FOR SEPARATION: DISCHARGE
AIC DATE EFFECTIVE:   00/00/00      AIC DATE FILED:   00/00/00
REOPEN DATE EFFECTIVE: 00/00/00        REOPEN DATE FILED: 00/00/00


SALARY:      $ 41000.00 PER YEAR
JOB TITLE:   SUPERVISED VISITATIO
WORK LOCATION: 7905 E HIGHWAY 66
WORK PHONE:   405-264-5558


DATE MAILED: 00/00/00    DATE REMAILED: 09/28/21    DATE LO MAILED: 00/00/00
617 NOT REQUIRED:  N

OES-461

# APPEAL TRIBUNAL
## OKLAHOMA EMPLOYMENT SECURITY COMMISSION
### P.O. BOX 53345
### OKLAHOMA CITY, OK 73152

Docket No. 22-005711

In re: Claim of: SSA# XXX-X

CANADIAN COUNTY                                    MELISSA A MCCLAIN
CANADIAN COUNTY CLERK
PO BOX 458
EL RENO OK  73036-0458

### ORDER OF DECISION

Now on APRIL 8, 2022, this cause comes on for consideration pursuant to regular assignment and hearing on MARCH 30, 2022, before JERRI POWELL, HEARING OFFICER, at 2:01 P.M. by telephone at which time the claimant appeared represented by Rachel Bussett, Attorney. Appearing for the claimant was Rhonda Moss, Former Human Resources. The employer appeared represented by Melanie Johnson, Director.  Testifying for the employer was Cedric Mills, Assistant Facilities Director.  The Commission was not represented.  **The issue to be resolved is whether the claimant was discharged for a reason amounting to misconduct connected with the work.**

The Appeal Tribunal having considered the evidence and records on file, FINDS AND ORDERS AS FOLLOWS:

-1-

That on SEPTEMBER 3, 2021, the employer appealed the Commission's determination awarding claimant unemployment benefits under Section 2-406 of the Oklahoma Employment Security Act by finding claimant was discharged from employment for reasons which do not constitute misconduct connected to the work.

-2-

The claimant was employed from November 4, 2004, until June 23, 2021. She was a Supervisor Visitation Monitor at the time of her separation.

-3-

Around April 1, 2021, the claimant filed for leave under the Family Medical Leave Act ("FMLA") due to her child's medical condition. The employer approved the claimants' request for FMLA leave. She remained on leave for twelve weeks. The employer held the claimant's job for her to return while she was on FMLA leave On June 23, 2021, the employer mailed a letter to the claimant stating that her FMLA leave had exhausted. (Appeal Tribunal Exhibit 4) Around that time, the Human Resources Manager verbally notified the claimant that her position would be filled, and that she could apply for another position after she returned from non-FMLA leave. The claimant's last day worked was April 1, 2021.

-4-

The Appeal Tribunal offered and entered without objection, for jurisdictional purposes, the Notice of Determination (Appeal Tribunal Exhibit 1), the claimant's appeal (Appeal Tribunal Exhibit 2), and the Notice of Hearing (Appeal Tribunal Exhibit 3). The Appeal Tribunal offered and entered without objection page 5 of the Commission file (Appeal Tribunal Exhibit 4). The Appeal Tribunal offered and entered without objection page 23 of the Commission file (Appeal Tribunal Exhibit 5).

JP/SD

Continued on Page 2

Ex 11 Mellisa McClain Order on OESC Appeal.pdf
Page 1 of 2

-5-

**Section 2-406. Discharge for misconduct:** A. An individual shall be disqualified for benefits if he or she has been discharged for misconduct connected with his or her last work. If discharged for misconduct, the employer shall have the burden to prove that the employee engaged in misconduct as defined by this section. Such burden of proof is satisfied by the employer, or its designated representative, providing a signed affidavit, or presenting such other evidence which properly demonstrates the misconduct which resulted in the discharge. Once this burden is met, the burden then shifts to the discharged employee to prove that the facts are inaccurate or that the facts as stated do not constitute misconduct as defined by this section. Disqualification under this section shall continue for the full period of unemployment next ensuing after he or she has been discharged for misconduct connected with his or her work and until such individual has become reemployed and has earned wages equal to or in excess of ten (10) times the weekly benefit amount. B. Acts which constitute misconduct under this section shall be limited to the following: 1. Any intentional act or omission by an employee which constitutes a material or substantial breach of the employee's job duties or responsibilities pursuant to his or her employment or contract of employment; 2. Unapproved or excessive absenteeism or tardiness; 3. Indifference to, breach of, or neglect of the duties required which result in a material or substantial breach of the employee's job duties or responsibilities; 4. Actions or omissions that place in jeopardy the health, life, or property of self or others; 5. Dishonesty; 6. Wrongdoing; 7. Violation of a law; or 8. A violation of a policy or rule enacted to ensure orderly and proper job performance or for the safety of self or others. C. Any misconduct violation as defined in subsection B of this section shall not require a prior warning from the employer. As long as the employee knew, or should have reasonably known, that a rule or policy of the employer was violated, the employee shall not be eligible for benefits. D. Any finding by a state or federal agency of any failure by the employee to meet the applicable civil, criminal or professional standards of the employee's profession shall create a rebuttable presumption of such misconduct, and benefits shall be denied, unless the employee can show, with clear and convincing evidence, that such misconduct did not occur, or the Commission determines that such failure did not constitute misconduct as defined herein. **[AMENDED BY HB 2505, Eff. 11-1-14]**

-6-

At the hearing, both parties acknowledged that the claimant submitted a resignation letter to the employer. However, the evidence demonstrated that the employer notified the claimant that her position was being filled prior to the claimant submitting the resignation letter. When the employer notified the claimant that her position was being filled, it initiated the separation for unemployment purposes. Therefore, Section 2-406 applies.

-7-

When an employee is discharged, the employer bears the burden to prove the discharge was for misconduct connected with the work. Here, the burden has not been met. The evidence demonstrated that the separation occurred because the employer chose to fill the claimant's position while she was on leave. The employer may have good business reasons to discharge the claimant. However, misconduct connected with the work has not been shown. Therefore, benefits are allowed.

-8-

The Commission's determination is AFFIRMED. The claimant is qualified for benefits effective AUGUST 1, 2021, provided the claimant meets all other requirements of the Act.

BY ORDER OF:

JERRI POWELL, HEARING OFFICER

Copy to: APPELLANT
          APPELLEE

4/8/22
22-005711/JP/SD

Page 2 of 3 Pages

OKLAHOMA EMPLOYMENT SECURITY COMMISSION     NOTICE OF DETERMINATION

SS#          LOFP 55-44 EFFECTIVE 08/01/2021 PROGRAM UI

APPEAL TRIBUNAL, P.O. BOX 53345, OKLAHOMA CITY, OK 73152-3345
FAX #(405)208-4552 E-MAIL ADDRESS: UI.APPEALS@OESC.STATE.OK.US

THIS DETERMINATION WAS MAILED ON 10/12/2021 TO THE CLAIMANT AND/OR THE
EMPLOYER AT THEIR RESPECTIVE ADDRESSES SHOWN ON THIS DETERMINATION

CLAIMANT                EMPLOYER
                        CANADIAN COUNTY
ERIN M BARTON           CANADIAN COUNTY CLERK
                        PO BOX 458
                        EL RENO OK      73036-0458
THE APPLICABLE SECTION OF THE OKLAHOMA SECURITY ACT IS SECTION 2-404 ;
THE FULL TEXT OF THIS LAW CAN BE FOUND BY ACCESSING THE OKLAHOMA
EMPLOYMENT SECURITY COMMISSION WEBSITE AT WWW.OK.GOV/OESC. CLICK
ON THE LINK FOR OESC ACT WHICH IS FOUND UNDER "ADDITIONAL RESOURCES."
THE SECTIONS ARE LISTED IN NUMERICAL ORDER. INTERNET ACCESS IS
AVAILABLE AT YOUR LOCAL OKLAHOMA WORKS CENTER.

YOU ARE ALLOWED BENEFITS EFFECTIVE 08/01/2021.  BASIS FOR DETERMINATION-

THE CLAIMANT BECAME SEPARATED FROM EMPLOYMENT DUE TO A HOSTILE WORKING
ENVIRONMENT. THE CLAIMANT REPORTED INAPPROPRIATE CONDUCT REGARDING PERSONAL
ATTACKS AGAINST HER. NO CHANGES WERE MADE AFTER REPORTING THE INCIDENTS.
THE CLAIMANT HAS SHOWN GOOD CAUSE FOR QUITTING.

IF YOU DISAGREE WITH THIS DETERMINATION YOU MAY FILE AN APPEAL WITHIN TEN
(10)DAYS OF THE MAILING DATE OF THIS DETERMINATION.  YOU MAY FILE AN APPEAL
BY MAIL, FAX, E-MAIL, OR TELEPHONE.  IF YOU LIVE WITHIN THE OKLAHOMA CITY
METROPOLITAN AREA, PLEASE CALL 525-1500.  IF YOU LIVE OUTSIDE THE OKLAHOMA
CITY METROPOLITAN AREA, PLEASE CALL 1-800-555-1554.  AS A CONVENIENCE
IN FILING AN APPEAL, AN APPEAL TRIBUNAL ADDRESS, FAX NUMBER, AND
E-MAIL ADDRESS HAVE BEEN LISTED AT THE TOP OF THIS DOCUMENT.  IF YOU HAVE
ANY QUESTIONS OR NEED ADDITIONAL INSTRUCTIONS, PLEASE REFER TO YOUR
"REEMPLOYMENT ASSISTANCE FOR THE UNEMPLOYED" OR "EMPLOYERS GUIDE TO
UNEMPLOYMENT INSURANCE" BOOKLET OR CONTACT THE UNEMPLOYMENT SERVICE
CENTER.

CLAIMANT COPY  PREPARED  10/11/2021  BY CH27        UIB282 2-404

Ex. 10 Barton OESC.pdf
Page 1 of 4

1

OKLAHOMA EMPLOYMENT SECURITY COMMISSION      NOTICE OF DETERMINATION

SS#            LOFP  55-44  EFFECTIVE  08/01/2021  PROGRAM  UI

APPEAL TRIBUNAL, P.O. BOX 53345, OKLAHOMA CITY, OK  73152-3345
FAX #(405)208-4552 E-MAIL ADDRESS:  UI.APPEALS@OESC.STATE.OK.US

THIS DETERMINATION WAS MAILED ON 10/12/2021 TO THE CLAIMANT AND/OR THE
EMPLOYER AT THEIR RESPECTIVE ADDRESSES SHOWN ON THIS DETERMINATION

     EMPLOYER                              CLAIMANT
CANADIAN COUNTY
CANADIAN COUNTY CLERK                 ERIN M BARTON
PO BOX 458
EL RENO  OK             73036-0458


THE APPLICABLE SECTION OF THE OKLAHOMA SECURITY ACT IS SECTION 2-404 ;
THE FULL TEXT OF THIS LAW CAN BE FOUND BY ACCESSING THE OKLAHOMA
EMPLOYMENT SECURITY COMMISSION WEBSITE AT WWW.OK.GOV/OESC. CLICK
ON THE LINK FOR OESC ACT WHICH IS FOUND UNDER "ADDITIONAL RESOURCES."
THE SECTIONS ARE LISTED IN NUMERICAL ORDER. INTERNET ACCESS IS
AVAILABLE AT YOUR LOCAL OKLAHOMA WORKS CENTER.

RECEIVED

OCT 1 9 2021

APPEAL TRIBUNAL

YOU ARE ALLOWED BENEFITS EFFECTIVE 08/01/2021.  BASIS FOR DETERMINATION-

THE CLAIMANT BECAME SEPARATED FROM EMPLOYMENT DUE TO A HOSTILE WORKING
ENVIRONMENT. THE CLAIMANT REPORTED INAPPROPRIATE CONDUCT REGARDING PERSONAL
ATTACKS AGAINST HER. NO CHANGES WERE MADE AFTER REPORTING THE INCIDENTS.
THE CLAIMANT HAS SHOWN GOOD CAUSE FOR QUITTING.


IF YOU DISAGREE WITH THIS DETERMINATION YOU MAY FILE AN APPEAL WITHIN TEN
(10)DAYS OF THE MAILING DATE OF THIS DETERMINATION.  YOU MAY FILE AN APPEAL
BY MAIL, FAX, E-MAIL, OR TELEPHONE.  IF YOU LIVE WITHIN THE OKLAHOMA CITY
METROPOLITAN AREA, PLEASE CALL 525-1500.  IF YOU LIVE OUTSIDE THE OKLAHOMA
CITY METROPOLITAN AREA, PLEASE CALL 1-800-555-1554.  AS A CONVENIENCE
IN FILING AN APPEAL, AN APPEAL TRIBUNAL ADDRESS, FAX NUMBER, AND
E-MAIL ADDRESS HAVE BEEN LISTED AT THE TOP OF THIS DOCUMENT.  IF YOU HAVE
ANY QUESTIONS OR NEED ADDITIONAL INSTRUCTIONS, PLEASE REFER TO YOUR
"REEMPLOYMENT ASSISTANCE FOR THE UNEMPLOYED" OR "EMPLOYERS GUIDE TO
UNEMPLOYMENT INSURANCE" BOOKLET OR CONTACT THE UNEMPLOYMENT SERVICE
CENTER.

EMPLOYER COPY  PREPARED  10/11/2021    BY  CH27           UIB282 2-404

# Oklahoma Employment Security Commission

## Fact Finding

### DISCHARGE - GENERAL

SSN:                              CLAIM ID: 796768025

EFFECTIVE DATE: 08/01/2021

RECORDED ON DATE: 09/01/2021  11:14:56AM

Employer Name: CANADIAN COUNTY CHILDRENS JUSTICE C

Employer Telephone number: (405) 262-0202

What was your actual last day of work? 3/30/2021

On what date were you discharged? 3/30/2021

What is the name of the person who discharged you? mISTY

What is the title of the person who discharged you? h.r.

What exactly were you told when you were discharged? I WENT OUT OF fmla AND WHILE i WAS ON MEDICAL LEAVE AND WHY i WAS OUT THEY pOSTED MY JOB

Give specific details regarding the reason for separation. Include dates, individuals present, and what occurred that resulted in discharge. aLL MY PERSONAL BELONGING WERE BOXED UP AND MY HUSBAND HAD TO COME PICK UP . wHEN i CONTACTED hr TO SEE WHAT WAS GOING ON THEY OFFERED ME A KITCHEN POSTION , WHICH IS NOT WHAT i WAS DOING

Have you been warned about your actions?
No

Is there any other Information you would like to add? I THINK ITS ALL BECAUSE iM INVOLVED WITH A LAWSUIT AGAINST THE COMPANY

SEPARATING EMPLOYER
SSN:
NAME: ERIN    M BARTON
DATE INIT CLAIM FILED: 08/05/21    EFFECTIVE DATE: 08/01/21
CLAIM TYPE:  REGULAR     TRANS:  N     FLEX:  N
EMPLOYER ACCOUNT NUMBER: 000000000
EMPLOYER NAME: CANADIAN COUNTY (COUNTY CLERK)
EMPLOYER ADDR: PO BOX 458
        EL RENO        ,OK  73036-0458


DATES WORKED FROM:   10/08/13 TO 07/09/21
REASON FOR SEPARATION: DISCHARGE
AIC DATE EFFECTIVE:   00/00/00      AIC DATE FILED:   00/00/00
REOPEN DATE EFFECTIVE: 00/00/00        REOPEN DATE FILED: 00/00/00


SALARY:      $  41000.00 PER YEAR
JOB TITLE:    SUPERVISED VISITATIO
WORK LOCATION: 7905 E HIGHWAY 66
WORK PHONE:   405-264-5558


DATE MAILED: 00/00/00    DATE REMAILED: 09/28/21    DATE LO MAILED: 00/00/00
617 NOT REQUIRED:  N

OES-461

# APPEAL TRIBUNAL
## OKLAHOMA EMPLOYMENT SECURITY COMMISSION
### P.O. BOX 53345
### OKLAHOMA CITY, OK 73152

In re: Claim of: SSA# XXX-XX-8535                                    Docket No. 22-008217

CANADIAN COUNTY                                    ERIN M BARTON
CANADIAN COUNTY CLERK                              18725 SW 59TH ST
PO BOX 458                                         EL RENO OK  73036
EL RENO OK  73036-0458

### ORDER OF DECISION

Now on JUNE 10, 2022, this cause comes on for consideration pursuant to the appeal filed on OCTOBER 19, 2021, under Section 2-404 of the Oklahoma Employment Security Act.

A hearing was scheduled on JUNE 8, 2022, at 11:00 A.M. before RACHEL SPIVA, HEARING OFFICER.

After due and proper notice, the appellant did not register for the hearing as directed.  The appeal is hereby submitted on the record and the Commission's determination is AFFIRMED.

BY ORDER OF:

RACHEL SPIVA, HEARING OFFICER

Copy to:  APPELLANT
          APPELLEE
          RACHEL BUSSETT
          BUSSETT LEGAL GROUP PLLC
          2201 N CLASSEN BLVE
          OKLAHOMA CITY OK 73106

### APPEAL RIGHTS

This decision becomes final and binding on all parties to the appeal unless, within **10 calendar days** of the certified date of mailing stated below, an appeal is filed with the Board of Review. [OKLA. STAT. Tit. 40, Sec. 2-605]

The appealing party must file a **written appeal** to the Board of Review by any of the following methods: (1) Mailing the appeal to the Board of Review, P.O. Box 53345, Oklahoma City, OK 73152.  An appeal filed by mail must be postmarked no later than **10 calendar days** after the certified mailing date of the Appeal Tribunal Decision.  (2) Faxing the appeal to (405) 962-7540. (3) Emailing the appeal to bor@oesc.state.ok.us.  (4) Delivering the appeal to the 5th floor reception desk at the Will Rogers Building, 2401 North Lincoln Boulevard,  Oklahoma City, Oklahoma. [OAC 240:15-3-3]

### FURTHER INSTRUCTIONS TO THE CLAIMANT

**You must continue to file weekly claims and report to the Commission as directed while your claim is on appeal.**

### CERTIFICATE OF MAILING

I certify that on  10 JUN 22  I personally placed copies of this decision in the United States mail in envelopes addressed to the claimant and/or employer at their respective addresses shown on the decision.  Said envelopes were sealed and bore indicia of proper postage paid.

RS/JPU                                             Ex 13 Barton OESC Appeal Decision.pdf
                                                   Page 1 of 1

10/01/2021   12:15 Administration                                    (FAX)4052620259           P.004/005

## Misty Schweitzer

| | |
|---|---|
| **From:** | Erin Barton <emiller2079@yahoo.com> |
| **Sent:** | Monday, August 23, 2021 11:16 PM |
| **To:** | Misty Schweitzer |
| **Subject:** | Resignation |

Dear Misty

This is to confirm that I have resigned from my position due to the hostile work environment at the CC CJC. After reporting the inappropriate conduct of Dan Kern in September 2019 to Judge Hughey I have been the victim of ongoing retaliation and personal attacks at the center.
I've had my job responsibilities reduced, multiple "random" ua's, pointed out my staff was lying on time sheets, only to be told "Kronos will fix it". I have filed to EEOC complaints and the retaliation continues.

In March of this year I went on FMLA leave due to my health issues dealing with stress and anxiety due to the retaliation. When my FMLA leave ended I asked to be placed on ADA leave while waiting to see my doctor to see what additional accommodations or restrictions I would need to do my job. I requested that the center enter into the interactive process with me regarding my request for accommodations and the center was not cooperative. The center refused to grant my short term request for ADA leave. Additionally you have posted my job and interviewed people for the same. I have been advised That the center is talking with applicants about my employment and instructing individuals not to speak with me. This is completely inappropriate.

Under FMLA standards I should be returned to a substantially similar position to my position and supervised visitation. Via a telephone call Ms Schweitzer talked about offering me a job in the the new barn or at another county facility, and even threw out the idea that I could work in the kitchen. This is not substantially similar under the law. Further when transitioning to ADA leave I should be returned to my former position which I am capable of performing with accommodations. Despite not selling my job you've not offered me this opportunity. Therefore based on the ongoing and continued retaliation and hostile work environment that has existed at the center since I made my claim of sexual-harassment involving Dan Kern I am resigning my employment. My resignation should be considered resignation should be considered effective July 9, 2021. I have attempted to resolve this issue with you on multiple occasions and have not had any cooperation from you, the center, or the centers Counsel.

I am applying for unemployment benefits due to the constructive discharge. If the center denies my application for unemployment benefits I will appeal the same as you have discriminated against me in multiple ways and finally constructively discharged me due to a health condition which allows me to obtain unemployment benefits under Oklahoma law.

Erin Barton

Received by OESC at 12:17:36 2021-10-01

1

Ex 14 Barton Resignation Letter.pdf
Page 1 of 1

-------- Original message --------
From: mcclml <mcclml@aol.com>
Date: 8/23/21 1:09 PM (GMT-06:00)
To: Misty Schweitzer <mschweitzer@ccjcok.org>
Subject: Mcclain

**Dear Misty**

This is to confirm that I have resigned my position due to the hostile work environment add the CC CJC. After reporting the inappropriate conduct of Dan Kern in September 2019 to Judge Hughey I have been the victim of ongoing retaliation and personal attacks at the center. Among other things I've been confined to my office and not allowed to leave. I was told I could not meet with my friends and worship as I had previously done during lunch.
I've had my job responsibilities reduced. I've had individuals interfere with the ability to do my job. I have filed to EEOC complaints and the retaliation continues.

In March of this year I went on FMLA leave to care for my daughter who suffers from epilepsy. While I was out I discovered I was pregnant. I have a high risk pregnancy. When my FMLA leave ended I asked to be placed on ADA leave while waiting to see my doctor to see what additional accommodations or restrictions I would need to do my job. I requested that the center enter into the interactive process with me regarding my request for accommodations and the center was not cooperative.
The center refused to grant my short term request for ADA leave. Additionally you have posted my job and interviewed people for the same. I have been advised That the center is talking with applicants about my employment and instructing individuals not to speak with me. This is completely inappropriate.
Under FMLA standards I should be returned to a substantially similar position to my position and supervise visitation. You have offered me a job in the kitchen. This is not substantially similar under the law. Further when transitioning to ADA leave I should be returned to my former position which I am capable of performing with accommodations. Despite not selling my job you've not offered me this opportunity. Therefore based on the ongoing and continued retaliation and hostile work environment that has existed at the center since I made my claim Of sexual-harassment involving Dan Kern I am resigning my employment. My resignation should be considered resignation should be considered effective July 9, 2021. I have attempted to resolve this issue with you on multiple occasions and have not had any cooperation from you, the center, or the centers Counsel.

I am applying for unemployment benefits due to the constructive discharge. If the center denies my application for unemployment benefits I will appeal the same as you have discriminated against me in multiple ways and finally

1

constructively discharged me due to a health condition which allows me to obtain unemployment benefits under Oklahoma law.

Thank you, Melissa McClain

Sent via the Samsung Galaxy Note9, an AT&T 5G Evolution capable smartphone

2



STATE OF OKLAHOMA
CANADIAN COUNTY
FILED OR RECORDED

FEB 0 3 2014

SHELLEY DICKERSON
COUNTY CLERK
14063

# Gary E. Miller Canadian County Children's Justice Center

## Annual Report

## July 1, 2012 – June 30, 2013

**Gary E. Miller Canadian County Children's Justice Center**
**7905 East Highway 66**
**El Reno, Oklahoma 73036**

Canadian County Clerk's Office

### Mission Statement

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families. In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

1

Canadian County Clerk's Office

## Organization and Leadership

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the County and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

Dave Anderson---Commissioner for District 2
Phil Carson---Commissioner for District 1
Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent County sales tax and revenues generated from program contracts and grants. This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the Center.

## Management Team

The Associate District Judge and the Facility Co-Directors designate managerial and administrative staff to participate in the Management Team. The Management Team meets on at least a monthly basis to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and other issues as needed. The Management Team then communicates issues and information to staff within their specific programs of responsibility. Members of the Management Team are:

Bill Sharp, Ph.D., Facility Co-Director
Bill Alexander, Facility Co-Director
Michael Ellison, Juvenile Bureau Director
Cindy Bacon, Assistant Juvenile Bureau Director
Charles Hunt, Detention Director
Ronnie Warrior, Detention Coordinator
Kendra Lantz, Sanctions Coordinator
Jahree Edwards, Office Manager
Tarae McDonald, Human Resources Director
Bill Sharp, Ph.D., Director of Behavioral Health Services
Doni Duggan, Assistant Director of Behavioral Health Services
Kim White, Group Home Director
Jackie Richards, Assistant Group Home Director II
David Tanner, Assistant Group Home Director I
Michelle Wilson, Comprehensive Home Based Services Supervisor
Karen Carter, Director of Canadian County Education Center
Jamie Girard, Director of Operations
Megan Stringer, Community Education and Resource Coordinator

2

Canadian County Clerk's Office

STATE OF OKLAHOMA
CANADIAN COUNTY
FILED OR RECORDED

APR 1 3 2015

SHELLEY DICKERSON
COUNTY CLERK
15393

**Gary E. Miller Canadian County
Children's Justice Center**

**Annual Report**

**July 1, 2013 – June 30, 2014**

**Gary E. Miller Canadian County Children's Justice Center
7905 East Highway 66
El Reno, Oklahoma 73036**

### *Mission Statement*

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families. In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

### *Organization and Leadership*

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the county and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

> Dave Anderson---Commissioner for District 2
> Phil Carson---Commissioner for District 1
> Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants. This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

2

## *Management Team*

The Associate District Judge and the Facility Co-Directors designate managerial and administrative staff to participate in the Management Team. This team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility. Members include:

Bill Sharp, Ph.D., Facility Co-Director
Bill Alexander, Facility Co-Director
Michael Ellison, Juvenile Bureau Director
LaTanya Freeman, Detention Director
Ronnie Warrior, Assistant Detention Director
Robert Cole, Assistant Detention Director
Jahree Edwards, Office Manager
Kim Rhodes, Accountant
Tarae McDonald, Human Resources Director
Bill Sharp, Ph.D., Director of Behavioral Health Services
Doni Duggan, Assistant Director of Behavioral Health Services
Kim White, Group Home Director
Jackie Richards, Assistant Group Home Director II
Jessica Arkeketa, Assistant Group Home Director I
Michelle Wilson, Comprehensive Home Based Services Supervisor
Karen Carter, Director of Student Services
Jamie Girard, Director of Operations
Megan Stringer, Community Education and Resource Coordinator
Angel Johnson, Kitchen Supervisor
Joanne Bush, Supervised Visitation and Exchange Program

## *Citizens Advisory Board*

The Citizens Advisory Board was created in 2004. This board serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice". Board members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. The Center's Citizen Advisory Board members during FY13-14 are:

| | |
|---|---|
| John Bickerstaff | Sandy Bohannan |
| Leroy Bridges | Phil Carson |
| Mary K. Hollingsworth | Mark House |
| Jennifer King | Tony Kouba |
| Kent Mathers | Gary Miller |
| Sara Myers | Linda Ramey |
| Becky Reuter | Brooke Robertson |
| Donna VonTungeln | Cleve Wheeler |

3

**Gary E. Miller Canadian County
Children's Justice Center**

**Annual Report**

**July 1, 2014 – June 30, 2015**

**Gary E. Miller Canadian County Children's Justice Center
7905 East Highway 66
El Reno, Oklahoma 73036**

## *Mission Statement*

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families.  In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

## *Organization and Leadership*

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the county and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

> Dave Anderson---Commissioner for District 2
> Phil Carson---Commissioner for District 1 -Termed Out on Dec. 31, 2014
> Marc Hader---Commissioner for District 1-Took Office in Jan. of 2015
> Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants.  This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

2

### *Management Team*

The Associate District Judge and the Facility Co-Directors designate managerial and administrative staff to participate in the Management Team. This team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility. Members include:

Bill Sharp, Ph.D., Facility Co-Director
Bill Alexander, Facility Co-Director
Michael Ellison, Juvenile Bureau Director
LaTanya Freeman, Detention Director
Abby Wright, Assistant Detention Director
Angel Colley, Office Manager
Kim Rhodes, Accountant
Tarae McDonald, Human Resources Director (Resigned-February 2015)
Bill Sharp, Ph.D., Director of Behavioral Health Services
Doni Duggan, Assistant Director of Behavioral Health Services
Kim White, Group Home Director
Jackie Richards, Assistant Group Home Director II
Jessica Arkeketa, Assistant Group Home Director I
Michelle Wilson, Comprehensive Home Based Services Supervisor
Karen Carter, Director of Student Services
Jamie Girard, Director of Operations
Chris Etheredge, Community Education and Resource Coordinator
Jamie Girard-Director of Operations
Joanne Bush, Supervised Visitation and Exchange Program

### *Citizens Advisory Board*

The Citizens Advisory Board was created in 2004. This board serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice". Board members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. The Center's Citizen Advisory Board members during FY14-15 are:

| | |
|---|---|
| John Bickerstaff | Sandy Bohannan |
| Leroy Bridges | Phil Carson |
| Mary K. Hollingsworth | Mark House |
| Jennifer King | Tony Kouba |
| Kent Mathers | Gary Miller |
| Sara Myers | Linda Ramey |
| Becky Reuter | Brooke Robertson |
| Donna VonTunglen | Cleve Wheeler |

Jack Stewart-Took Office-Jan. 2015

3

# Gary E. Miller Canadian County
# Children's Justice Center

# Annual Report

# July 1, 2015 – June 30, 2016

# Gary E. Miller Canadian County Children's Justice Center
# 7905 East Highway 66
# El Reno, Oklahoma 73036

## *Mission Statement*

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families. In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

## *Organization and Leadership*

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the county and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

> Dave Anderson---Commissioner for District 2
> Marc Hader---Commissioner for District 1
> Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants. This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

2

### *Management Team*

The Associate District Judge and the Facility Co-Directors designate managerial and administrative staff to participate in the Management Team. This team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility. Members include:

Bill Sharp, Ph.D., Facility Co-Director
Bill Alexander, Facility Co-Director
Michael Ellison, Juvenile Bureau Director
LaTanya Freeman, Detention Director
Ronnie Warrior, Assistant Detention Director
Robert Cole, Assistant Detention Director
Angel Colley, Office Manager
Kim Rhodes, Accountant
Tarae McDonald, Human Resources Director (Resigned-February 2015)
Bill Sharp, Ph.D., Director of Behavioral Health Services
Doni Duggan, Assistant Director of Behavioral Health Services
Kim White, Group Home Director
Jackie Richards, Assistant Group Home Director II
Michelle Wilson, Comprehensive Home Based Services Supervisor
Karen Carter, Director of Student Services
Chris Etheredge, Community Education and Resource Coordinator
Jamie Girard-Director of Operations
Joanne Bush, Supervised Visitation and Exchange Program

### *Citizens Advisory Board*

The Citizens Advisory Board was created in 2004. This board serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice". Board members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. The Center's Citizen Advisory Board members during FY14-15 are:

| | |
|---|---|
| John Bickerstaff | Sandy Bohannan |
| | Phil Carson |
| Mary K. Hollingsworth | Mark House |
| Jennifer King | Tony Kouba |
| Kent Mathers | Gary Miller |
| Sara Myers | Linda Ramey |
| Becky Reuter | Brooke Robertson |
| Donna VonTunglen | Cleve Wheeler |
| Jack Stewart | |

3

**Gary E. Miller Canadian County
Children's Justice Center**

**Annual Report**

**July 1, 2016 – June 30, 2017**

**Gary E. Miller Canadian County Children's Justice Center
7905 East Highway 66
El Reno, Oklahoma 73036**

<u>*Mission Statement*</u>

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families.  In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

<u>*Organization and Leadership*</u>

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the county and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

> Dave Anderson---Commissioner for District 2
> Marc Hader---Commissioner for District 1
> Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants.  This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

2

## *Management Team*

The Associate District Judge and the Facility Co-Directors designate managerial and administrative staff to participate in the Management Team. This team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility. Members include:

Bill Sharp, Ph.D., Facility Co-Director
Bill Alexander, Facility Co-Director
Michael Ellison, Probation Supervisor
LaTanya Freeman, Detention Director
Cash Overton-Assistant Detention Director
Abby Wright-Assistant Detention Director
Robert Cole, Assistant Detention Director
Cynthia Rice, Accountant (DOH-1/30/17)
Ronda Moss, Human Resource Director
Bill Sharp, Ph.D., Director of Behavioral Health Services
Doni Duggan, Assistant Director of Behavioral Health Services
Kim White, Group Home Director
Jackie Richards, Assistant Group Home Director II
Michelle Wilson, Comprehensive Home Based Services Supervisor
Karen Carter, Director of Student Services
Chris Etheredge, Community Education and Resource Coordinator
Angel Colley-Director of Operations
Joanne Bush, Supervised Visitation and Exchange Program

### *Citizens Advisory Board*

The Citizens Advisory Board was created in 2004. This board serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice". Board members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. The Center's Citizen Advisory Board members during FY16-17 are:

| | |
|---|---|
| John Bickerstaff | Sandy Bohannan |
| Phil Carson | Nedra Funk |
| Mary K. Hollingsworth | Mark House |
| Jennifer King | Tony Kouba |
| Kent Mathers | Gary Miller |
| Sara Myers | Linda Ramey |
| Becky Reuter | Brooke Robertson |
| Donna VonTunglen | Cleve Wheeler |
| Jack Stewart | |

3

Gary E. Miller Canadian County
Children's Justice Center

Annual Report

July 1, 2017 – June 30, 2018

Gary E. Miller Canadian County Children's Justice Center
7905 East Highway 66
El Reno, Oklahoma 73036

### Mission Statement

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families.  In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

### Organization and Leadership

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the county and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

> Dave Anderson---Commissioner for District 2
> Marc Hader---Commissioner for District 1
> Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants.  This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

2

### *Management Team*

The Associate District Judge and the Facility Co-Directors designate managerial and administrative staff to participate in the Management Team. This team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility. Members include:

Ronda Moss, Assistant Facility Director
Cedric Mills, Assistant Facility Director
Eliza Botone, Juvenile Probation Director
LaTanya Freeman, Detention Director
Ronnie Warrior-Assistant Detention Director
Abby Wright-Assistant Detention Director
Cynthia Rice, Accountant
Ronda Moss, Human Resource Director
Bill Sharp, Ph.D., Director of Behavioral Health Services
Doni Duggan, Assistant Director of Behavioral Health Services
Kim White, Group Home Director
Jackie Richards, Assistant Group Home Director II
Michelle Wilson, Comprehensive Home-Based Services Supervisor
Neil Womack, Director of Student Services
Chris Etheredge, Community Education and Resource Coordinator
Angel Colley-Director of Operations
Joanne Bush, Supervised Visitation and Exchange Program

### *Citizens Advisory Board*

The Citizens Advisory Board was created in 2004. This board serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice". Board members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. The Center's Citizen Advisory Board members during FY17-18 are:

| | |
|---|---|
| John Bickerstaff | Judge Bob Hughey |
| Phil Carson | Nedra Funk |
| Sandra Bohannon | Brian Grider |
| Jennifer King | Ronda Moss |
| Kent Mathers | Gary Miller |
| Sara Myers | Linda Ramey |
| Charles Schwarz | Brooke Robertson |
| Jack Stewart | Cedric Mills |
| Cleve Wheeler | |

3

**Gary E. Miller Canadian County
Children's Justice Center**

**Annual Report**

**July 1, 2018 – June 30, 2019**

**Gary E. Miller Canadian County Children's Justice Center
7905 East Highway 66
El Reno, Oklahoma 73036**

## *Mission Statement*

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families. In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

## *Organization and Leadership*

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the county and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

> Dave Anderson---Commissioner for District 2
> Marc Hader---Commissioner for District 1
> Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants. This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

2

## *Management Team*

The Associate District Judge and the Facility Director designates managerial and administrative staff to participate in the Management Team. This team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility. Members include:

Cedric Mills, Interim Facility Director
Facility Director Vacant
Assistant Facility Director Vacant
D'Shea Brothers, Executive Assistant
Angel Colley-Director of Operations
Pam Owens, Accountant
Eliza Botone, Juvenile Probation Director
LaTanya Freeman, Detention Director
Ronnie Warrior-Assistant Detention Director
Abby Wright-Assistant Detention Director
Kim White Assistant Director of Behavioral Health Services
Mariam Reynolds, Group Home Director
Jackie Richards, Assistant Group Home Director
Michelle Wilson, Comprehensive Home-Based Services Supervisor
Neil Womack, Director of Student Services
Chris Etheredge, Community Education and Resource Coordinator
Erin Barton, Supervised Visitation and Exchange Program
Melissa McClain, Human Resource Generalist

## *Citizens Advisory Board*

The Citizens Advisory Board was created in 2004. This board serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice". Board members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. The Center's Citizen Advisory Board members during FY18-19 are:

| | |
|---|---|
| John Bickerstaff | Judge Bob Hughey |
| Phil Carson | Nedra Funk |
| Sandra Bohannon | Brian Grider |
| Jennifer King | Gary Miller |
| Sara Myers | Linda Ramey |
| Charles Schwarz | Brooke Robertson |
| Jack Stewart | Cedric Mills |
| Cleve Wheeler | Charles Bradley |
| Jeanne Hobson | Erin Jones-Slavtev |

3

**Gary E. Miller Canadian County
Children's Justice Center**

**Annual Report**

**July 1, 2019 – June 30, 2020**

**Gary E. Miller Canadian County Children's Justice Center
7905 East Highway 66
El Reno, Oklahoma 73036**

# Table of Contents

| | |
|---|---|
| **Mission Statement** | **Page  2** |
| **Organization and Leadership** | **Page  2** |
| **Management Team** | **Page  3** |
| **Citizens Advisory Board** | **Page  3** |
| **Programs and Services** | **Page  4** |
| **Juvenile Probation Office** | **Page  4** |
| **Juvenile Detention Center** | **Page  7** |
| **Drug Screening Program** | **Page  8** |
| **Canadian County Education Center** | **Page  9** |
| **Behavioral Health Services** | **Page 10** |
| **Comprehensive Home-Based Services (CHBS)** | **Page 12** |
| **Supervised Visitation and Exchange Program** | **Page 13** |
| **Performance Improvement:** | **Page 13** |
| **Client Satisfaction Surveys** | **Page 14** |
| **Needs Assessment** | **Page 15** |
| **Collaboration** | **Page 16** |
| **Annual Center Goals** | **Page 17** |
| **Program Outcome Measures and Results** | **Page 18** |
| **Health and Safety Report** | **Page 21** |
| **Grievance System Annual Review** | **Page 22** |
| **Administration:  Human Resources** | **Page 28** |
| **Multicultural Committee** | **Page 28** |
| **Fiscal Management** | **Page 29** |

## *Mission Statement*

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families. In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

## *Organization and Leadership*

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the county and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

> Dave Anderson---Commissioner for District 2
> Marc Hader---Commissioner for District 1
> Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants. This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

2

### *Management Team*

The Associate District Judge and the Facility Director designates managerial and administrative staff to participate in the Management Team. This team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility. Members include:

Cedric Mills, Interim Facility Director
Facility Director Vacant
Assistant Facility Director Vacant
D'Shea Brothers, Executive Assistant
Angel Colley-Director of Operations
Pam Owens, Accountant
Eliza Botone, Juvenile Probation Director
LaTanya Freeman, Detention Director
Ronnie Warrior-Assistant Detention Director
Abby Wright-Assistant Detention Director
Kim White Assistant Director of Behavioral Health Services
Mariam Reynolds, Group Home Director
Jackie Richards, Assistant Group Home Director
Michelle Wilson, Comprehensive Home-Based Services Supervisor
Neil Womack, Director of Student Services
Chris Etheredge, Community Education and Resource Coordinator
Erin Barton, Supervised Visitation and Exchange Program
Melissa McClain, Human Resource Generalist

### *Citizens Advisory Board*

The Citizens Advisory Board was created in 2004. This board serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice". Board members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. The Center's Citizen Advisory Board members during FY19-20 are:

| | |
|---|---|
| John Bickerstaff | Judge Bob Hughey |
| Phil Carson | Nedra Funk |
| Sandra Bohannon | Brian Grider |
| Jennifer King | Gary Miller |
| Sara Myers | Linda Ramey |
| Charles Schwarz | Brooke Robertson |
| Jack Stewart | Cedric Mills |
| Cleve Wheeler | Charles Bradley |
| Jeanne Hobson | Erin Jones-Slavtev |

3

### *Programs and Services*

Canadian County Juvenile Court for Deprived, Delinquent, and In Need of Supervisions

28 Bed Juvenile Detention/Sanctions Center

Outpatient Behavioral Health Services

12 Bed Ft. Reno Adolescent Center

Juvenile Probation Office

Canadian County Education Center

Drug Screening Program

Comprehensive Home-Based Services

Supervised Visitation and Exchange Program

Truancy Program

**For fiscal year 2019-2020, the Children's Justice Center provided the following services:**

### *Juvenile Probation Office*

The Canadian County Juvenile Probation Office was established in July 2004. The Juvenile Probation Office is statutorily responsible for the provision of intake and probation services for delinquent and in need of supervision youth. The Juvenile Probation Office staff consists of administrative personnel and probation officers. The Juvenile Probation Office provides a variety of programs for youth in the county. These programs are offered at no cost to the youth and parents/guardians.

**Court Intake:** Juvenile Probation officers conduct intakes for cases referred by law enforcement, schools or parents. Each intake is an interview with both the juvenile and the legal guardians regarding the allegations within the referral. Following intake, a case is referred for prosecution, diversion services, and referral to other community resources and/or the closing of the case.

**Detention Screening:** Juvenile Probation officers are delegated authority by the court to screen for admission to secure detention. The Juvenile Probation Office has an on-call officer 24 hours a day, 7 days a week. Law Enforcement contacts the on-call probation officer to make a referral to detention. The on-call probation officer obtains a verbal order from the juvenile judge to detain the juvenile in detention. Upon receiving the order to detain the juvenile, the probation officer makes contact with inquiring law enforcement agency and collects information regarding the

4

charge, demographics for the juvenile and parent contact information. This information is relayed to detention control before the juvenile arrives to detention.

**Transport:** The Juvenile Probation Office is responsible for transporting juveniles that are currently in detention to the Emergency Room if an emergency occurs. The probation office also transports juveniles on probation that are either in detention or in sanctions to doctor's appointments including medication management. Probation office transports the detained juveniles to their court hearings. Transport duties also consist of transporting juveniles to the Drug Screening Lab for drug screens or other appointments on a case by case basis.

**Court Probation:** The Juvenile Probation Office provides probation supervision for youth adjudicated by the Juvenile Court as delinquent or in need of supervision. Youth are assessed and an individual service plan is designed to provide the framework for services. Probation officers uphold the court's orders by having regular contact with juvenile, parents, school officials and other service providers. Probation officers refer the juvenile for counseling, wrap around services and drug and alcohol treatment when needed. Probation officers report back to the court on progress or lack thereof.

**Restitution:** This program seeks to provide monetary reimbursement to the victims of juvenile crime while at the same time provides an element of restorative justice to the offender. The probation office collects and distributes restitution and manages amounts owed.

**Beyond Parental Control:** Youth who are beyond parental control may be adjudicated as In Need of Supervision. Parents who feel their child's behaviors are beyond their control may request that their child be placed on probation and monitored by the court. The Juvenile Probation Office provides probation services to assist the youth and the parents/guardians with services as needed.

**Truancy Program:** Each school district in the county may refer juveniles who meet the statutory requirement for truancy (missed 4 days or parts of days in a 4-week period or 10 days or parts of days in a semester) to the Juvenile Probation Office with the aim of getting these students back in school. The Probation Office conducts intakes with the student and legal guardians that have been referred to address the issues of truancy. A variety of interventions, such as deferred filings, graduated sanctions, and court probation are used to help juveniles improve school attendance. The probation office collects attendance on supervised juveniles on a regular basis in order to address any issues that may arise.

**Truancy Officers:** Services provided for our schools from the Truancy Program included the deployment of six deputies from the Canadian County Sheriff's Office within 40 schools across Canadian County. District schools are able to send these deputies out to the homes of children that are not attending school and are either meeting truancy statute or at risk of becoming truant. The deputies meet with the parents and the child and discuss the issues of truancy. Deputies are also deployed to process other action requests by the children's justice center. They have delivered letters and/or summons for Court to parents, and developed and conducted a junior police academy. Further, the deputies have developed and implemented TIP, Truancy Intervention Program. TIP is held twice a month and it covers all areas of truancy including parental educational neglect.

**Graduated Sanctions Program:** This is a diversion program used for youth who are truant or who have been referred to probation by their parents. This program is designed to address truancy

5

and behavior outside of the court system in an effort to keep juveniles off of probation. This program is supervised by a probation officer that meets with the juveniles at least once a month to review their grades and attendance along with any other program requirements such as educational classes, community service or drug screens. If the juvenile completes all requirements of the program, then their case is closed. If the juvenile has violations or does not complete requirements, then the case may be referred to the Assistant District Attorney for a petition to be filed and probation requested.

**Informal Adjustments:**  This is a term used to describe how a delinquent case is filed. It is also a diversion program used to address law enforcement referrals that are often times first offenses. This program is used to keep juveniles out of court and off of probation. An informal adjustment is agreed to by the Assistant District Attorney and implemented by the probation office. An agreement is drafted to address the delinquent act as well as items such as community service, educational classes, drug and alcohol assessments, drug screens and any other identified service. The probation officer meets with the juvenile and family once a month to review their progress in completing the items on their agreement. Once all items have been completed then the case can be dismissed. If the juvenile has any violations or receives additional charges then the case will be referred to the Assistant District Attorney and probation will be requested.

**Orientation to the Juvenile Justice System:**  When receiving services from the Juvenile Probation Office, youth and their parents/guardians are required to attend an orientation presented by Juvenile Probation Office staff. The orientation provides information regarding the legal process of the juvenile system and an overview of services, requirements, and consequences. This class is offered on the first Tuesday of every month.

**Intensive Supervision Program (ISP):**  Youth who have difficulty adhering to the requirements of probation, evidenced by multiple violations of probation rules, may be court-ordered into the Intensive Supervision Program. Probation youth in the ISP are required to attend court on a weekly basis and receive a more intensive level of supervision by the probation officer. Youth in the ISP typically are court-ordered to perform additional community service. Each case is reviewed weekly by the ISP Team which consists of the judge, the assistant district attorney, the probation officer, defense attorneys, and other service providers. Youth who are successful in the ISP may be returned to standard probation or their legal case may be dismissed. Youth who are not successful may be placed in the custody of the Office of Juvenile Affairs.

**Community Service:**  The Juvenile Probation Office staff assists probation youth in accessing community service opportunities as ordered by the Court. This program focuses on accountability and giving back to the community. The Juvenile Probation Office utilizes the summer months and breaks from school for community service events. Canadian County non-profit organizations or municipalities are contacted and offered opportunities for the probation office and juveniles to complete projects for them. Juveniles are gathered and complete projects such as trash pick-up, grounds maintenance and food distribution.

**Behavior Intervention Program:** The juvenile Probation Office offers a program to parents that have requested an intervention with their child. The focus of this program is to discuss behaviors that are beyond the control of the parent, with both the child and the parent/s. After collecting information from the parents, the probation officer talks with the child to assist in reinforcing the parents' rules and/or concerns. The probation officer thus advises the child of consequences that may take place due to their negative behaviors and in relation to possible court action, should the

6

child continue with negative behaviors. The probation officer will often times help make referrals for juveniles and families though the juvenile is not under supervision.

**Juvenile Probation Office Legal Statistics for FY19-20:**

| | | | |
|---|---|---|---|
| Referrals: | 379 | Restitution Collected: | $3,296.46 |
| Delinquent | 184 | Probation Fees Collected | $145.00 |
| In Need of Supervision (INS) | 195 | GSP Fees: | $245.00 |
| | | IA Fees: | $880.00 |
| Intakes Completed: | 210 | | |
| | | Community Service Hours | 2,467 |
| Deferred Cases: | 56 | | |
| Delinquent/Informal Adjustment | 26 | | |
| INS/ Graduated Sanctions | 30 | | |
| Adjudications: | 80 | | |

95% of Informal Adjustment cases closed successfully
73.3% of Graduated Sanctions cases closed successfully

| | |
|---|---|
| Truancy Officers Investigations: | 503 completed |
| Orientation to Juvenile Justice: | 114 participants |

### *Juvenile Detention Center*

The Canadian County Juvenile Detention Center is a **28-bed** detaining facility. Eighteen of those beds are designated for Canadian County residents and ten are designated for regional use. This program is well structured and emphasizes self-discipline, and self-respect, as well as focus on improving the youth we serve.

**Detention Program:** Canadian County contracts with the Office of Juvenile Affairs (OJA) for ten beds to be used as regional beds for juveniles from across the state. This Year, Canadian County had contracts with 25 counties for utilization of the Detention Center.

The OJA contract stipulates that the state pays 85% of the rate and the sending county pays 15% of the rate. Canadian County pays the entire cost for the 18 Canadian County beds.

During FY19-20, there were a total of 287 **admissions** to Detention (233 from Canadian County and 54 for regional beds). The average length of stay was 3.16 days for Canadian County and 5.71 days for OJA regional beds.

**Sanctions Program:** In this program, 18 beds are now available for only Canadian County to use for either Sanctions or Detention programming. When used for Sanctions programming, the juvenile may receive a short-term sanctions/consequence of three to five days for juveniles when he or she is found to be in violation of court-ordered probation plans. All juveniles admitted to the program are court-ordered. During FY19-20 there were 42 **admissions** to the program. Program participants are assessed with the University of Rhode Island Changes Assessment

7

Scales or URICA test (which evaluates juveniles' readiness for change) and the American Guidance Service Assessment (which identifies juvenile reading and math levels) they are also enrolled in El Reno Public Schools.

### *Drug Screening Program (DSP)*

The Canadian County Children's Justice Center provides free drug screening for children living in Canadian County and for adults in association with a Canadian County juvenile court case. The DSP administer urine test using a 12-panel instant cup with an adulteration strip. The DSP also offer Intercept-Oral swabs which collects saliva. We provide an accurate yet simple way to administer tests, with quick results for detection of twelve substances: Marijuana, Benzodiazepines, Oxycodone, Opiates, Cocaine, Methamphetamines, Amphetamines, Buprenorphine, Barbiturate, PCP, K2, Methadone and other substances if requested. The DSP also has the capability to test for alcohol and performed 4,316 **alcohol breathalyzers** during FY2019-2020

During FY19-20, **drug screenings (to include Nicotine results) administered totaled 6,678** (30% registered positive while 70% registered negative.). Listed below are referral statistics for each agency or program which utilize DSP service;

**Drug Screenings per Referral Source**

| | |
|---|---:|
| Department of Human | 3,780 |
| Canadian County Juvenile Probation Office | 1,158 |
| Canadian County Education Center | 215 |
| Office of Juvenile Affairs | 120 |
| CC Youth & Family Services | 13 |
| Yukon Schools | 38 |
| Mustang Schools | 209 |
| El Reno Schools | 43 |
| Behavioral Health | 121 |
| Parent Referrals | 131 |
| Judge B. Hatfield | 77 |
| Judge Jack McCurdy | 2 |
| Judge Bob Hughey | 184 |
| Judge C. Gass | 21 |
| Judge E Slavtev | 9 |
| Judge K. Strubhar | 88 |
| C & A Courts | 3 |
| Canadian Valley Technology Center | 173 |
| Indian Child Welfare | 248 |
| Supervised Visitation | 9 |
| Comprehensive  Home Base Services | 7 |
| Piedmont Municipal Court | 29 |
| Juveniles Tested while in Detention/Sanctions | *191 |
| *Already added in agency and female/male count | |
| **Total** | **6,678** |

**DSP Demographics**

8

| | |
|---|---|
| # of Urine Specimens Collected | 6,678 |
| # of Positive Drug Screen Results | 2,018 |
| # of Breathalyzers Performed | 4,316 |
| # of Test Kits Given to F.R.A.C. | 300 |
| # of Nicotine Kits Given to F.R.A.C. | 205 |
| # of Confirmations Sent Out | 44 |
| # of ETG/ETOH Sent to Premier Biotech | 199 |
| # of Oral Swabs Sent to Premier Biotech | 27 |
| # of Hair Analysis Test Sent to MedTox | 47 |
| # of K2/Synthetic Marijuana Tests Sent to Premier Biotech | 5 |
| # of Positive In-House K2 Results | 19 |
| # of Positive Nicotine Results | 742 |
| # of Females Tested | 3,403 |
| # of Males Tested | 3,275 |

### *Canadian County Education Center (CCEC)*

CCEC is considered an alternative school that contracts with school districts within Canadian County (SY 2019-2020, 9 school districts).  CCEC provides educational services to students who have not been successful in the regular school setting.  Some students may be serving long-term suspensions.  Others may be at risk of not graduating due to behavioral issues, truancy or lack of adequate credits.  Referrals are made by the student's current school district; however, placement is a voluntary decision of parents/guardians who agree that CCEC is their placement of choice. El Reno Public Schools serves as the Lead Educational Agency (LEA).

CCEC faculty consists of an administrative principal/director, a dean of students, and five highly qualified teachers specializing in English, math, science, social studies and reading. In addition, multiple elective courses are offered and students participate in life skills training and physical education.  Assistance is available from academic tutors, as needed.  Tutors serve students in the core subject areas of math, language arts, science and social studies, as well as reading. As appropriate, computers are made available in each classroom for students to access educational curriculum to supplement learning.  This also allows students to prepare to meet state mandated testing requirements. CCEC is evaluated annually by the Oklahoma State Department of Education.

**Statistics:** *FY 2019-2020*

Student slots available--60

79 total students served
- 80% ---male students
- 20%---female students

9---senior students completed all graduation requirements

Percentages of students per grade level:

9

- 6th grade:     2.5%
- 7th grade:     2.5%
- 8th grade:     15.1%
- 9th grade:     30.3%
- 10th grade:    31.6%
- 11th grade:    8.8%
- 12th grade:    8.8%

## *Behavioral Health Services*

**Behavioral Health Services** provides integrated assessment and treatment services. All services are provided free of charge to the clients. The **Family Recovery Program (FRP)** provides substance abuse assessments, psychological assessments, and group and individual outpatient treatment. FRP services are available to any child who resides in Canadian County and any adult who needs services in conjunction with the treatment or case management of a child's case in Canadian County.

The **Fort Reno Adolescent Center (FRAC)** is a **12-bed program** that provides residential substance abuse treatment for adolescents ages 13-17 years who reside within Canadian County, for adolescents who meet the clinical criteria for the American Society of Addiction Medicine PPC-2R 3.5 level of care. With a targeted length of stay of five months, residents attend a full day of scheduled therapeutic activities including four and one half hours of on-site alternative education provided by El Reno Public Schools.

Therapeutic interventions include cognitive behavioral treatment, behavioral modeling, didactic educational presentations, and family therapy. Additionally, residents receive sober living and vocational skills training and may participate in spiritual activities, peer support activities, and a variety of recreational activities such as indoor and outdoor sports. Field trip opportunities for the residents during this fiscal year included attendance at sporting events, area museums, movies, parks and recreation, and other recreational activities.

Behavioral Health Services is under the direction of a Licensed Alcohol and Drug Counselor-MH. Assessment and treatment staff consist of masters' level clinicians who are licensed or under supervision for licensure. Others may hold the CADC Certification or BH CM II certification for purposes of providing educational/rehabilitation level groups and/or case management services. The FRAC program staff consists of supervisory, direct care, and clerical staff. The Behavioral Health Services program is accredited by the Commission of Accredited Rehabilitation Facilities (CARF) and is certified by the Oklahoma State Department of Mental Health and Substance Abuses Services (ODMHSAS).

**Screenings/Assessments:**

During FY 19-20, the **Family Recovery Program** provided the following services:

Substance Abuse Assessments

10

Adults:  82 out of 122 scheduled appointments (67%)
Adolescents: 66 out of 104 scheduled appointments (64%)
Total Completed: 148 out of 226 scheduled appointments (65%)

| Adult Referral Sources: | | Juvenile Referral Sources: | |
|---|---|---|---|
| DHS | 54 | CCJB | 22 |
| Judge/Ct | 6 | Parent | 9 |
| TANF | 19 | Yukon Schools | 17 |
| Indian CW | 1 | Piedmont | 2 |
| Juvenile Bureau | 1 | Judge/Ct | 8 |
| Mustang | 1 | OJA | 1 |
| | | Mustang | 3 |
| | | CCEC | 2 |
| | | DHS | 2 |

**Outpatient Chemical Dependency Treatment:** (Clients Served)
Adults:        33
Adolescents:  41

| Adult Total Outpatient Discharges: | 17 |
|---|---|
| Completed | 9 (53%) |
| Transferred | 1  (6%) |
| No attendance/Non-Compliance | 7 (41%) |

| Adolescent Total Outpatient Discharges | 32 |
|---|---|
| Completed | 14 (43%) |
| Transferred | 5 (16%) |
| No attendance/Non-Compliance | 12 (38%) |
| Moved | 1  (3%) |

**Outpatient Mental Health Treatment:** (Clients Served)
Adolescent:   42

| MH Adolescent Total Outpatient Discharges | 25 |
|---|---|
| Completed | 1  (4%) |
| Transferred: | 4 (16%) |
| No attendance/Non-Compliance | 20 (80%) |

**Fort Reno Adolescent Center:**

| | |
|---|---|
| Number of Youth Served: | 27 |
| Number of Canadian County Youth Served: | 27 (100%) |
| Total Yearly Discharges: | 23 |
| Reason for Discharge - | |
| Completion of Program | 9 (39%) |

11

| | |
|---|---|
| Transferred to another treatment facility | 0 |
| Discharged by program/behavior | 6 (26%) |
| AWOL | 5 (22%) |
| Left ACA | 2 (9%) |
| Moved | 1 (4%) |

Primary Presenting Problems at Admission:

| | |
|---|---|
| Substance Use Only | 7 (26%) |
| Poly Substance Use | 9 (33%) |
| Substance and Alcohol Use | 11 (41%) |
| Alcohol Use Only | 0 (0%) |
| Nicotine Use | 21 (78%) |

Educational Achievements:
  Residents who passed GED  - 0
  Residents who took the GED - 0
  Residents who graduated high school - 1
  Residents who took the ACT - 0
  Residents who received high school credits - 16
  Residents receiving a semester or more of credit - 16

### *Comprehensive Home Based Services (CHBS)*

The Department of Human Services contracts with Canadian County through NorthCare Mental Health to provide Comprehensive Home Based Services to Child Welfare clients. These in-home services are provided on an individual basis as each family's needs require. Case Managers make home visits for up to a period of nine months in order to assist in preventing children from being removed from the home due to issues of abuse and neglect or to provide reunification services to families in which children have been removed from the home. During this year, the unit was comprised of a supervisor, three full-time Case Managers and an administrative assistant.  Within the 2019-2020 fiscal year, this unit provided services for 97 referrals, which included a total of 192 children.   A breakdown of the cases is as follows.

"Carry Over" cases from the previous fiscal year: 24
(FCS/CB cases, Reunification Cases, and Maintain Permanent Out of Home Placement Cases)
"Family Centered and Community Based Services" cases (no court involvement): 44
"Reunification" cases (court involvement): 40
"Maintain Permanent Placement" cases: 3
"Parent Aid Services" cases: 10

Out of the 97 referrals, 15 referrals were received and withdrawn prior to 28 days of service. Reasons for withdrawn referrals were lack of cooperation by family and/or the referring DHS worker did not schedule the intake staffing within the time frames dictated by the CHBS contract. This contract also allows for families to receive special funding that can be used for a variety of things such as payment of utility or medical bills, the purchase of clothing, school supplies, rent, household supplies, furniture, or supplies needed to make repairs to the home.

During this year, $3,592.11 was spent on special funding for the families receiving CHBS services.

For cases open at least 28 days:
- **91%** of the families met their risk and non-risk related goals
- **86%** of the Family Inventory of Needs Determination (FIND) assessments were completed within 30 days.
- **100%** of families demonstrated adequate or improved parent/child interactions
- **100%** of families were referred to a primary care physician during services
- **100%** of families were assisted with a Sooner Care application or other health insurance
- **29%** of parents were identified as having mental health or substance abuse history
- **100%** of parents with identified mental health or substance abuse history were educated, trained in or referred to substance abuse services
- **29%** of cases were identified as having domestic violence either in the past or present
- **94%** of families with domestic violence identified were educated, trained in or referred to domestic violence services

### *Comprehensive Home Based Services*

**Efficiency:**  For all cases open for at least 90 days, 75% of the Family Inventory of Needs Determination (FIND) assessments will be completed within 30 days of intake.
> **Result:**  89% of the FIND assessments were completed within 30 days of intake.

**Effectiveness:**  For all cases open for at least 180 days, 80% will meet all or most of their risk and non-risk related goals.
> **Result:**  93% of all cases open for at least 180 days met all of most of their risk and non-risk related goals.

**Efficiency:**  For all cases open for at least 180 days, 90% of families will demonstrate adequate or improved parent/child interactions.
> **Result:**  100% of families demonstrated adequate or improved parent/child interactions.

### *Supervised Visitation and Exchange Program*

Canadian County began the Canadian County Supervised Visitation and Exchange Program in July of 2010. The program has provided parents, grandparents, and other family members safe visits with children no longer in the custody of their parents. Children may be in the custody of one biological parent, another family member, or the Department of Human Services. Supervised visits and exchanges may be court ordered due to family issues such as, divorce and custody issues, domestic violence, child abuse, substance abuse, sexual assault, stalking, or the need for parents to have no contact with one another. Supervised visitations and exchanges occur at the Gary E. Miller Canadian County Children's Justice Center in the presence of trained visitation monitors and a deputy sheriff.

13

During the FY19-20 the program served 94 supervised visitation cases and 0 supervised exchanges. 149 children participated in visits with family members. During the course of the year a total of 2,381 hours of visitation were provided in a safe and secure manner. A total of 1,474 visits were conducted.

### *Performance Improvement*

The Gary Miller Children's Juvenile Justice Center is committed to improving the agency and service delivery to our clients, residents, and students. This is a dynamic and continuous process in which feedback on a number of issues including overall feelings of satisfaction and accessibility to services is routinely obtained from individuals and family members receiving services. Additionally, the center obtains feedback from referral sources and community stakeholders regarding how we are meeting the needs of the county and recommendations for additional programming. Ongoing collaboration with other service providers is an essential component of the centers' improvement in overall services.

Our **Outcome Measure System provides** valuable information regarding the **effectiveness** of our services (the quality of care through measuring change over time), the **efficiency** of our services (relationship between resources used and results obtained), **accessibility** to services, and **client satisfaction surveys.** Other components of Performance Improvement are the Annual Center Goals, the Multi-Cultural Committee, the Health and Safety Committee, and the annual "Walk Through" exercise in which center staff play the roles of "clients receiving Behavioral Health Services" and "family members" to experience the process of intake and admission for Behavioral Health Services. "

Information regarding Performance Improvement activities during FY19-20:

**Client Satisfaction Surveys** were completed by a **total of 268 clients and/or family members** receiving services during the fiscal year. When averaging results from quarterly reports, client responses ranged from 2.7 to a 5 on a 5-point scale for each question within each department. A selection of survey statements from clients and/or their family members follows:

**Substance Abuse Assessment**
> When you don't understand something they clarify for you.
> She was very trusting and easy to share with.
> The staff was calm and easy to open up to.
> Everyone made me feel comfortable and I felt no judgement, which I really liked.
> I like that they were flexible to my schedule.

**Probation Office**
> Probation officers were very supportive
> Brought my family back together.
> I learned a lot more about me and others.
> Our family loved our probation officer because she was really involved and helped out family and child a lot and was there when we needed her.

14

Very supportive, non-judgmental rather showing care for the child to help provide options and critical thinking.

**CHBS**

Connor was patient and reassuring when I doubted myself.
The support and respect. CHBS treated us like humans.
Very helpful in every way and very understanding and supportive.
Insight on parenting.
Kierra was very helpful and explained everything very well and was very polite and respectful.

**Ft. Reno Adolescent Center**

I'm thankful for everything the staff and Jackie did to help me stay sober.
Thank you for all your help.
The counseling and coping skills I learned.
That it helped me see how bad I was and helped me get better.
That everything I ever asked for was taken care of.

**Detention**

I learned how to respect my elders.
Everyone here was really nice. Some more than others. I'm sad I have to leave.
I like that I was listened to by staff and judge.
Made me realize I need to grow up.
It helped me a lot with my behavior and my attitude and with others.

**Sanctions**

The staff was helpful. The kitchen made good food.
This program helped me.
Mr. Dunkin is the best detention offier.

**Alternative School**

No statements.

**Orientation to Juvenile Justice**

That whoever I spoke to listened.
This really helped my son get back on track.
The probation officer listened to our issues thoroughly.
The staff are caring and really want to help the kids.
My grandson is doing much better.

**Behavioral Health Treatment**

No statements.

**Supervised Visitation**

No statements.

15

**Drug Screening Program**
No statements.

**Facility Quarterly Surveys** for the fiscal year 2019-2020 were completed by 3 clients or visitors who entered the main reception area of the Center. The results of the Quarterly Surveys revealed an **average positive rating of 5 on a 5-point scale.** Statements made by respondents included:

> Amazing Facility
> Judge if very fair
> Helped me get my life back on track

**Needs Assessments were returned from over 26 referral sources, community stakeholders, and center staff during the 2019-2020 year.** Surveys were completed by referral sources who had previous contact with the Center via Facebook. Respondents were also encouraged to forward the assessment to colleagues and other interested individuals. Of the 26 responses tendered, suggestions for needed county services included transportation, community volunteering programs, community services at the center, ongoing programs for young adults that turn 18 years of age, bullying programs, mentoring programs, broaden counseling programs, later hours for drug testing, grandparent raising grandchildren programs, communication with the public, all day school, quick communication with the departments and parents, better relationship with DHS and parents, summer camps to keep kids out of trouble, scared straight camps, all day school.

**Collaboration:** Working closely with other social service agencies is a key goal for center staff. It is a fact that no one agency can meet the needs of children and their families in Canadian County. It takes concentrated cooperation and a spirit of collaboration to make the juvenile justice system work. The center works closely with many child and family serving entities, including the following:

- Office of Juvenile Affairs
- Department of Human Services
- Oklahoma Department of Mental Health and Substance Abuse Services
- Systems of Care/ Caring for Kids
- Red Rock Behavioral Health Services
- Area Law Enforcement
- Area Schools
- Canadian County Coalition for Children and Families
- Health Department
- Cheyenne-Arapaho Indian Tribe
- CASA
- CART Team
- Sooner Success
- Partnership for a Healthy Canadian County
- Oklahoma Family Counseling Services

16

Positive feedback from our community partners and referral sources regarding services provided by our agency is as follows:

- The Center helped a lot with my behavior
- Staff listens
- Respect & Kindness of the people here
- No Judgement
- Sweet & Patient
- Polite & helpful staff
- The Program Works
- I never want to come back

**Annual Center Goals:**  As a part of the center's performance improvement and strategic planning processes, the Management Team develops annual goals and objectives for the center. These focus on specific programs, developments, and/or processes that will result in improvements in the service provision and overall operation of the center.  The goals and results for FY19-20 are:

Goal One (Long Range-Multiple Project)
To fund and implement storm shelters both detention and non-detention populations, as well as office expansion project.

Objective 1A: Director(s) of CCCJC will monitor Construction Manager reports for storm shelters and office expansion project in an effort to determine quality of services and to meet construction time tables for completion by July 1, 2020 (performance indicator).

Objective 1B: Director(s) of CCCJC will monitor progress of selected construction part on progress of storm shelter project up until completion of said probject by June 30, 2020 (performance indicator).

Goal Two
To increase the availability of behavioral health professionals who are approved to provide co-occurring services within the Canadian County Children's Justice Center.

Objective 2A: Assistant Director of Canadian County Children's Justice Center in conjunction with the Assistant Director of Behavioral Health will develop and implement a behavioral health component with adolescents in detention, which will be
provided by a licensed professional no later than January 13, 2020 (performance indicator).

Objective 2B: Assistant Director of Behavioral Health will provide training for licensed counselors who will provide services to adolescents located in the Canadian County Children's Justice Center's detention center by January 1, 2020 (performance indicator).

Goal Three

17

Associate District Judge and Facility Director(s) in conjunction with center employees will discuss implementation of interventions and new programs that may be possible in relation to delinquents, their behaviors, and the families from which they originate.

Objective 3A: Behavioral Health and Juvenile Probation Office will develop and implement a new bullying program that offers free bullying presentations to educate children, teachers, school administrators, and other stakeholders in the community about the dangers of bullying by September 30, 2019 (performance indicator).

Objective 3B: Coordinator of Outreach and Education will schedule for a Speaker on the Prevention of Child Trafficking, the Dangers of Cellphone Use, Internet Use and Gaming, to further elevate a discussion of the importance of family involvement and education by June 30, 2020 (performance indicator).

Goal Four
Behavioral Health Services will seek CARF re-accreditation/certification for programs currently receiving said status.
Objective 4A: Assistant Director of Behavioral Health will update CARF policy and arrange for staff documentation compliance to occur that support the re-accreditation bid being made by the facility no later than March 21, 2020 (performance indicator).
Objective 4B: Assistant Director of Canadian County Children's Justice Center will complete arrangements as necessary for a CARF re-accreditation site visit to occur by July 1, 2020 (performance indicator).

**Program Outcome Measures and Results:**  Center programs determine outcomes to measure **efficiency** and **effectiveness**. This outcome information is used for program development and enhancement.  Program outcome findings are as follows:

*Juvenile Probation Office -*
**Efficiency:**  At least **80%** of all cases closed during FY19-20 will be closed successfully by the probation office.
**Result:  70.1%** of the cases closed during FY19-20 were closed successfully.

**Effectiveness:**  At least **80%** of juveniles placed on informal adjustment status will achieve dismissal of their case without a further filing of a petition.
**Result: 95%** of juveniles placed on deferred filing status achieved dismissal of their case without a further filing of a petition.

*Canadian County Education Center -*
**Efficiency:**  Reduce the amount of time between the intake process and student's start date.
Goal:  **95%** of students will start within five school days of CCEC receiving intake paperwork.
  1) More than one intake will be scheduled per day when needed.
  2) Student will start the day following intake (deputy will be utilized if needed.)
  3) Student will be given three days to turn in paperwork, before parent is called to pick up
    Student until received.

18

**Result**: Total of 79 students served 4 stared at CCEC after the 5th day following referral.  95% of students referred to CCEC started within five school days.

**Efficiency:** Decrease the number of students who require mandatory after school remediation. Goal: Less than **25%** of student population will be required to attend after school remediation.

      1) Student may be required to attend remediation during P.E. or during 6th period.
      2) Teacher will give student opportunity to complete work at home.
      3) Teacher will notify parent when sending work home.
      4) Teacher will utilize tutor before assigning afterschool remediation.

**Result:**  Total of 79 students served.  12 students were required to attend after school remediation at various times during the school year. That is 15.1% of CCEC students.

### *Comprehensive Home-Based Services -*
**Efficiency:**  For all cases open for at least 90 days, 75% of the FINDs will be completed within 30 days of intake.
**Result: 90%** of the FINDS were completed within 30 days of intake.

**Effectiveness:**  For all cases open for at least 180 days, 80% will meet all or most of their risk and non-risk related goals.
**Result:  86%** of all cases open for at least 180 days met all or most of their
risk                 and non-risk related goals.

**Efficiency:**  For all cases open for at least 180 days, 90% of families will demonstrate adequate or improved parent/child interactions.
**Result:**  100% of families demonstrated adequate or improved parent/child interactions.

### *Behavioral Health----Adult Outpatient and Intensive Outpatient Substance Use Treatment:*
**Efficiency:  100%** of all clients receiving outpatient and IOP services will have a completed Biopsychsocial Assessment and Treatment Plan by the 4th/5[th] visit.
**Result:  100%** of all clients receiving outpatient and/or IOP services had a completed Biopsychsocial Assessment and **100%** of all clients had completed the Treatment Plan by the 4th/5[th] visit.

**Efficiency:  100%** of all clients receiving outpatient and IOP services will have a completed Discharge Summary and Continuing Care Plan within 15 days of discharge.
**Result:  100%** of all clients receiving outpatient and/or IOP services had a completed Discharge Summary and **100%** of all clients had a completed Continuing Care Plan within 15 days of discharge.

**Effectiveness:  80%** of all clients will show an increase of at least 2 points in Global Assessment of Functioning (GAF) score each quarter.
**Result:**
**20%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 1st Qt.

19

**50%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 2nd Qt.
**36%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 3rd Qt.
**38%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 4th Qt.

### *Behavioral Health----Adolescent Substance Use Outpatient Treatment:*

**Efficiency: 100%** of all clients receiving outpatient and IOP services will have a completed Biopsychsocial Assessment and Treatment Plan by the 4th/5th visit.
**Result: 100%** of all clients receiving outpatient and/or IOP services had a completed Biopsychsocial Assessment and **100%** of all clients had completed the Treatment Plan by the 4th/5th visit.

**Efficiency: 100%** of all clients receiving outpatient and IOP services will have a completed Discharge Summary and Continuing Care Plan within 15 days of discharge.
**Result: 100%** of all clients receiving outpatient and/or IOP services had a completed Discharge Summary and **97%** of all clients had a completed Continuing Care Plan within 15 days of discharge.

**Effectiveness: 80%** of all clients will show an increase of at least 2 points in Global Assessment of Functioning (GAF) score each quarter.
**Result: 64%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) for the 1st quarter.
**73%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 2nd quarter
**63%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 3rd quarter.
**27%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 4th quarter.

### *Behavioral Health----Adolescent Mental Health Outpatient Treatment:*

**Efficiency: 100%** of all clients receiving outpatient and IOP services will have a completed Biopsychsocial Assessment and Treatment Plan by the 4th/5th visit.
**Result: 100%** of all clients receiving outpatient and/or IOP services had a completed Biopsychsocial Assessment and **100%** of all clients had completed the Treatment Plan by the 4th/5th visit.

**Efficiency: 100%** of all clients receiving outpatient and IOP services will have a completed Discharge Summary and Continuing Care Plan within 15 days of discharge.
**Result: 100%** of all clients receiving outpatient and/or IOP services had a completed Discharge Summary and **100%** of all clients had a completed Continuing Care Plan within 15 days of discharge.

**Effectiveness: 80%** of all clients will show an increase of at least 2 points in Global Assessment of Functioning (GAF) score each quarter.
**Result: 77%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 1st quarter.

**59%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 2nd quarter.
**86%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 3rd quarter.
**31%** of all clients showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 4th quarter.

### *Behavioral Health——Fort Reno Adolescent Center:*
**Efficiency:** **100%** of all residents will have a completed Biopsychsocial Assessment and Treatment Plan by the 7th/8th day of admission.
**Result: 100%** of residents had a completed Biopsychsocial Assessment by the 7th day of admission and **100%** of residents had completed the Treatment Plan by the 8th day of admission.

**Efficiency: 100%** of all residents will have a completed Discharge Summary and Continuing Care Plan within 15 days of discharge.
**Result: 100%** of residents had a completed Discharge Plan and Continuing Care Plan with 15 days of discharge.

**Effectiveness: 80 %** of residents will show an increase of at least 2 points in Global Assessment of Functioning (GAF) score each quarter.
**Result: 64%** of residents showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 1st quarter.
**55%** of residents showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 2nd quarter.
**56%** of residents showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 3rd quarter.
**25%** of residents showed an increase of at least 2 points in Global Assessment of Functioning (GAF) score for the 4th quarter.

### *Health and Safety*
During FY19-20 the operations department recorded the following activity, including incident reports, and external inspections and internal inspections.

External Inspections:

| | | |
|---|---|---|
| Stampsco (fire alarm) | 12-10-19 | Pass |
| Stampsco (fire ext and vent hood) | 06-24-20 | Pass |
| Dept. of Envir. Quality | 09-04-19 | Pass |
| State Fire Marshall | Pending Request | |
| Central Power Systems -generator | 01-23-20 | Pass |
| Dept. of Labor (boiler) | 12-16-19 | Pass |
| Smith's Detection (x-ray) | Done by Sheriff's Dept. | |

Internal Inspections

| | | |
|---|---|---|
| Bomb Drill | N/A | |
| Van Inspections | 07-11-19 | Pass |
| H/S internal inspection | 11-19-19 | Pass |
| Fire Drill | 11-19-19 | Pass |

21

Tornado Drill            09-06-19      Pass

<u>Incident Reports</u>
Detention/Sanctions
Total Resident Admissions     329
Restraints                  5
AWOL                   0
Total incident reports       58

<u>Incident Reports</u>
**Total Resident Admission:**     **27**
**Restraints (Therapeutic Options):**   **0**
**AWOL:**                **5**
**Total Incident Reports:**      **158**

Staff & Clients in Non-Residential Programs 6
              Total incident reports      222

### Grievance System Annual Review
### July 1, 2019- June 30, 2020

<u>**Sanctions:**</u>
**July-September 2019**
      There were no grievances for Sanctions during the month of July, August, and September. Sanctions had no grievances for the quarter.

**October-December 2019**
      There were no grievances for Sanctions during the month of October, November, and December.  Sanctions had no grievances for the quarter.

**January-March 2020**
      There were no grievances for Sanctions during the months of January, February, and March.  Sanctions had no grievances for the quarter.

**April-June 2020**
      There were no grievances for Sanctions during the month of April, May, and June. Sanctions had no grievances for the quarter.

<u>**Detention:**</u>
**July-September 2019**
Detention reported <u>nine</u> grievances for the month of July. The grievances were filed for rules, and food. The grievances was filed by Canadian county, and OJA residents. All of the grievances

22

were resolved during the month. Detention reports three grievances filed for the month of August. The grievance were filed for other, and rules. The grievances were filed by OJA residents. Detention reported one grievance for the month of September. The grievance was filed for other. The grievances was filed by an OJA resident. The grievance was resolved during the month. Detention had a total of thirteen grievances for the 1st quarter.

**October-December 2019**
Detention reported two grievance for the month of October. The grievances were filed for rules. The grievances was filed by Canadian county, and OJA residents. All of the grievances were resolved during the month. Detention reported one grievance filed for the month of November. The grievance were filed for rules. The grievances were filed by a Juvenile Bureau resident. The grievance were resolved during the month. Detention reported no grievances for the month of December. Detention had a total of three grievances for the 2nd quarter.

**January-March 2020**
Detention reported three grievance for the month of January. The grievances were filed for rules, and policy. The grievances was filed by Canadian county, and OJA residents. All of the grievances were resolved during the month. There were no grievances reported for the month of February in Detention.
In the month of March there were two grievances filed. Both grievances were resolved during the month. The grievances were filed for staff conflict and rules. Detention had a total of five grievances for the 3rd quarter.

**April-June 2020**
Detention reported five grievances filed during the month of March. Four of the given grievances were resolved during the month. All of the grievances were filed for rules. The grievances were filed by OJA residents. There were no grievances reported for the month of April in Detention. There were no grievances reported for the month of May in Detention.
In the month of June there were two grievances filed. Both grievances were resolved during the month. The grievances were filed for food and other. Detention had a total of five grievances with one unresolved for the 4th quarter. Detention reported twenty-six grievances for the year.

**Fort Reno:**
**July-September 2019**
Fort Reno had five grievances for the month of July. All of the grievances were resolved within the month. The grievances were filed by Canadian county Juvenile Bureau residents. The grievances were filed for staff conflict, and rules. In the month of August there were twelve grievances filed. Seven of the grievances were resolved during the month. The grievances were filed for resident, rules, staff conflict, and Kitchen. All of the grievances were filed by Canadian county Juvenile Bureau residents. In the month of September there were seventeen grievances filed. All of the grievances were resolved during the month, plus five grievances from the previous month. The grievances were filed for staff conflict, rules, and resident. All of the grievances were filed by Canadian county Juvenile Bureau residents. Fort Reno had a total of thirty-four grievances for the quarter.

**October-December 2019**
Fort Reno had seven grievances for the month of October. Six of the grievances were resolved within the month. The grievances were filed by Canadian county Juvenile Bureau residents. The

23

grievances were filed for staff conflict, and rules. In the month of November there were <u>fifteen</u> grievances filed. All of the grievances plus one for October were resolved during the month. The grievances were filed for resident, rules, staff conflict, and Kitchen. All of the grievances were filed by Canadian county Juvenile Bureau residents. In the month of December there were <u>twenty-five</u> grievances filed. All of the grievances were resolved during the month, plus five grievances from the previous month. The grievances were filed for staff conflict, rules, and resident. All of the grievances were filed by Canadian county Juvenile Bureau residents. Fort Reno had a total of <u>forty-seven</u> grievances for the quarter.

**January-March 2020**
Fort Reno had <u>nineteen</u> grievances for the month of January. Seventeen of the grievances plus three from the previous month were resolved within the month. Two grievances were pending at the end of the month. The grievances were filed by Canadian county Juvenile Bureau residents. The grievances were filed for staff conflict, and rules. In the month of February there were <u>thirteen</u> grievances filed. Eleven of the grievances plus two for January were resolved during the month. There were two grievances pending at the end of the month. The grievances were filed for resident, rules, staff conflict, and other. Twelve of the grievances were filed by Canadian county Juvenile Bureau residents. One grievance was filed by an Outpatient client. In the month of March there were <u>nine</u> grievances filed. All of the grievances plus two from the previous month were resolved during the month. The grievances were filed for staff conflict, loss of privileges, and shelter. All of the grievances were filed by Canadian county Juvenile Bureau resident. Fort Reno had a total of <u>forty-one</u> grievances for the quarter

**April-June 2020**
Fort Reno had one grievance for the month of April. The grievance was resolved within the month. The grievance was filed by Canadian county Juvenile Bureau resident. It was filed for rules. There were no grievances filed for the month of May. In the month of June, there were <u>six</u> grievances filed. Five of the grievances were resolved during the month. The grievances were filed for rules, and shelter. All of the grievances were filed by Canadian county Juvenile Bureau residents. Fort Reno had a total of <u>seven</u> grievances with one pending for the quarter.

**Fort Reno Grievances:**

**July Grievances:**

**19-40** Resident was playing around with staff and was called a 2 year old. JV/AG
**19-41** Resident was trying to get more butter and was called fat. JV/AG
**19-42** I was wrote a UE for "rolling a blunt" when I was folding a paper. HR/AG
**19-43** Staff denying resident to change the radio station. JV/Staff
**19-44** Staff gave me an EU for trying to do my chore as I was signing a UE. Disrespectful. ZK/RJ

**August Grievances:**

**19-45** I found hair in my food. HR/Kitchen
**19-46** I was falsely written up. HR/Staff
**19-47** I was falsely written up. HR/Staff
**19-48** Resident is being a bad community leader. JV/Residents

24

**19-49** Not being able to lay down on break and staff making up rules. JV/Staff
**19-50** I need my GD med.  Call my dad. TI/Staff
**19-51** Resident smells really bad, like dirty socks and BO.AK/JW


**September Grievances:**

**19-52** CM asked me if I was allowed to sit in CM chair.  She was cussing at me and antagonizing me. AK/MW
**19-53** New counselor called a resident a little kin and said she understood why he is here. JV/Staff
**19-54** Resident acting like a stupid b----. TI/JW
**19-55** They locked me out of my room. TI/Staff
**19-56** Antagonizing resident about giving UE and when I asked for pencil I was denied. JM/Staff
**19-57** Resident always taking 20 minutes in the shower and not getting written up for it. JV/Resident
**19-58** 1st shift staff have been pestering me, annoying me, ignoring me and being completing rude. JW/Staff
**19-59** 1ST shift staff called me crazy cause my religion. JW/Staff'
**19-60** I've been sick because the food I can't eat or I throw up.  I need a doctor. JW/Medical
**19-61** Staff is always threatening resident and making false accusations.  JW/RJ
**19-62** I got wrote up for cleaning my room.  I have diarrhea. JW/Medical
**19-63** Counselor-I don't like how she been treating me.  She been treating me like a kid and she pulled me out of group activity. JM/DW
**19-64** Counselor singled out Jackson and I and said I was closed, that I didn't want to share my feelings. AK/DW
**19-65** I've had my broken arrowhead that to my necklace that my dad got for me. The means everything to me.  Staff took it. JW/Rules

**October Grievances:**
**19.75** Residents must have good hygiene but staff members don't.  JW.JC
**19-76** Staff was mocking me, I mocked him back and got a UE.  CA/JC
**19-77** Staff was sexually bullying me by picking on me. AK/RD
**19-78** Staff accused me of being disrespectful and talking in AA.  CA/Staff
**19-79** Staff tried to give me a UE for laughing.  LR/Staff
**19-80 Unfair** that I got UE for not waking up when I was still asleep and couldn't hear staff. LR/Staff

**October Grievances resolved in November**
**19-81** Staff keeps picking on me.  CA/Staff

**November Grievances:**
**19-82** My personal rights were violated under the permission of a shift supervisor.  He was reading and going thru all of personal mail. AK/MH
**19-83 Staff** told resident to sit at their own table and I was at my table and got a UE. CA/Staff
**19-84** Staff keep calling me a dumb and or special. DM/Staff
**19-85 Most** staff are disrespectful and evil to residents. LR/Staff
**19-86 Staff** and supervisor refuse to feel my water or let me do it. JM
**19-87** Staff saw me cuss and slam down a ping pong paddle but I was mad.

25

**19-88** Getting a UE when other residents didn't for starting it. I fee. Targeted. DK/RW

**19-89** I'm using my accent and their mad, and getting me in trouble for nothing. DM/Staff

**19-90** Staff told me I see what IM working with in a tone that made it seem like he owned me.DK/MH

**19-91** Staff is hello rude and acts and says she wants to fight. DM/KN

**19-92** Staff says he does not care about us. Staff talked to me when I ask him to stop makes me do things. DM/Staff

**19-93** Staff was commenting on the way I smell I felt much disrespected because of it. LR/RJ

**19-94** Staff set her coffee cup next to my water bottle and I accidently knocked her coffee over. KE/RJ

**19-95** Staff manipulated us by gong where she wants to go, and picking the movie she wants us to watch.

**19-96** I got a UE for non-pro-recovery when I wasn't in the conversation.DK


**December Grievances:**

**19-97** Staff gave me UE's after 24 hours and gave me UE's for using a lisp when it wasn't redirected it was the British voice. DK/MH

**19-98** I got a UE for being in a conversation about a dispensary, but when they said stop talking about the subject and I did and still got a UE because they kept talking about it but I didn't. AB

**19-99** 1. I received a UE from Renea and when she wrote down her thoughts on the UE, she pretty much call me an addict, I feel that that was unnecessary and unprofessional. I don't care about getting the UE removed, I just feel that some kind of action would be taken on her part so she doesn't just go call residents addicts. 2. I also got a UE from Russell for "continuing to talk about subject that I was redirected on" but I was not part of the conversation at all, DeShawn was talking to Andreas about how Landon was acting toward Mark on Sunday while Andreas was out on pass, I feel like it's unfair for me to be penalized for someone else's immature actions, I request that this UE be removed, I work hard to do good. JP/RJ/RW

**19-100** That I got a UE when I listened to music while doing my work in class, but I didn't know I couldn't. AB

**19-101** That a staff member (Renea) said I was snapping my fingers on a UE when I never did that. AB/RJ

**19-102** Rebecca wrote me a false UE saying I was talking across tables when I was talking and laughing about the conversation that was at my table. AB/RD

**19-103** Rena wrote me up yesterday for "having an attitude." This morning she has been being disrespectful and rude to me and I haven't said or done anything. She told me "Do you have a problem?" "Or are you the problem?" AK/RJ

**19-104** Renea refused to let me use the restroom and got a UE for it. DK/RJ

**19-105** Being redirected and not doing and still got a UE from Renea. DK/RJ

**19-106** Rebecca wrote me a false UE saying I was talking across tables, when I was just laughing at the conversation we were having at my table and the people at the other table overheard our conversation and started laughing, staff said we were redirected but no redirection was given. JP/RD

**19-107** Got a UE for whispering which I wasn't and Kelli refused to let me see it & let me sign it. DK/KN

**19-108** Staff accusing me of whispering because I had my back turned she didn't see me talk or hear say anything. She just assumed stuff without really knowing. CA

**19-109** Tonya wrote a UE for "farting on unit" when I did not fart at all. JP

26

**19-110** Russell wrote me a UE that never happened because I wasn't even sitting at the table he said I was at. And I think I know what he thinks I said but it wasn't me that said. DK/RW

**19-111** At the Thunder game, Krysti, Jennifer, Natalie and I were in the bathroom. We were all done and we started to walk out to David and the boys. When we got there, David asked where everyone was. I looked behind me and they weren't there. They stayed behind outside the bathroom. I didn't know this. David gave me a UE for not following staff direction. JA/DT

**19-112** Renea wrote me a UE for sleeping in my room during movie time when I wasn't. She just wrote me a UE because I looked like I was sleeping and she never even bothered to see if I was awake, Jeffrey did and I was awake. JP/RJ

**19-113** That I got a UE for air cheering cool-aid with Jaden about peanut butter cookies. (because we liked peanut butter cookies). AB

**19-114** Russell wrote me a UE stating that I said "I've woke up to my girlfriend fully naked on the floor" and it was completely false, I said "I woke up to my girlfriend making me breakfast in the morning" and he wrote something completely different on the UE. JP/RW

**19-115** Mark wrote me a UE for "emulating cheers" but we never made contact and we air cheered to the fact that we were the only ones who liked the peanut butter cookies. He said it was non-pro-recovery but I don't feel it was non pro recovery. And neither of us were redirected in any way. Mark always writes UE's with no warning or redirection. JP/MH

**19-116** That I got a UE for "whispering in the gym" but a resident asked me what I got searched and a UE for it and I said I couldn't talk about it and I got a UE for it. AB

**19-117** I got a UE about talking disrespectful about females but that never happened. AB

**19-118** That Mark took my letter and looked at it, it had a inappropriate drawing from a friend. And he took it and said it needed approval, when you are only supposed to search it not look at it. AB/MH

**19-119** Staff member Renea always comes into work with negativity towards residents. So I said no one cares about negativity were in here to be positive. I feel targeted and bullied cause I'm almost out of here. JW/RJ

**19-120** Staff Jeffrey yanked etch-a-sketch from my hand at 9:02 pm saying I had to put it up because it was news time, when I told him it wasn't a rule he said "I don't give a damn" JP/JC

**19-121** That I was eating candy and Jeffrey took it out of my mouth and it got on over my clothes and down my nose so I said you got me f'ed up. AB/JC

**January Grievances:**

**19-222** I got a UE for having trash in my trash can. JW/Staff

**19-123** Staff wrote me a UE for having rash in trashcan. JM/Staff

**19-124** Staff wrote me a UE for talking in hallway when it was the resident behind me. JP/Staff

**20-1** I feel like staff is targeting me. DK/Staff

**20-2** Staff wrote me a UE for not cleaning my room which I did.

**20-3** Staff wrote me a false UE. DK/Staff

**20-4** Staff wrote me a UE for being on the floor during serving time. DK/Staff

**20-5** Staff wrote me a UE that was false. JA/Staff

**20-6** Staff is writing false UE'S to every resident. JP/Staff

**20-7** Staff wrote me a UE for dancing on unit. JP/Staff

**20-8** I got a UE from staff for calling Director a liar. JP/Staff

**20-9** Staff wrote me a UE for basking a resident when I wasn't a part of the conversation. JP/Staff

**20-10** Staff got mad because I was dribbling the lass and she couldn't hear. DK/Staff

**20-11** Staff wrote me a UE because I accidently stepped on the back of a residents shoes. JA/Staff

27

**20-12** Staff wrote me a UE for arguing with staff but she was string to force us to watch a movie JP/Staff
**20-13** Staff said I said on a UE I said can I get my f------ tums.  DK/Staff
**20-14** I got a UE for farting out loud in my room during AA. JP/Staff

**February Grievances**
**20-15** Staff said I huff sharpies and said my upper lip stinks. KK/Staff
**20-16** We have to line up in order. AB/Staff
**20-17** Staff gave me a UE guns lingering. JP/Staff
**20-18** They won't let me call my PO. MJ/Staff
**20-19** Staff member said something about a hoe and we aren't allowed to say. MJ/Staff
**20-20** For me to be heard and cameras to be checked on who really is putting food into the books. MJ/Staff
**20-21** Staff member falsifying accusations on me. MJ/Staff
**20-22** Staff member not allowing me to speak with shift supervisor.  MJ/Staff
**20-23** They gave me a UE for wearing another resident's shirt. MJ/Staff
**20-24** Staff seem sexist from girls and boys. MC/Staff
**20-25** The girls shouldn't get sent off to the blue side. MC/Staff
**20-26** 22nd shift is sexist. AT/Staff

Other:
**20-27** DSP is not reliable for UA'S. LR/Staff
**March Grievances:**
**20-28** At 2:24 pm no one was on the floor with us. Residents/staff
**20-29** staff took my Saturday movie away. JP/Staff
**20-30** Staff is trying to give me a UE for calling him Mr. MJ/Staff
**20-31** I got a UE for slouching. MJ/Staff
**20-32** I got a UE for slouching. .AB/Staff
**20-33** Got a couple of UE's I believe that I shouldn't have gotten. MJ/Staff
**20-34** got a UE for sitting in the middle of my couch and supposedly spreading my legs to wide whenever I was just sitting normally. MJ/Staff
**20-35** All of my sap for my clothes are gone. AT/Staff
**20-36** The right shower does not have any hot water. AT/Staff
**20-37** Saying I was mocking her whenever I wasn't. MJ/Staff
**20-38** Staff asked me if I wanted some move candy and did not give me any. MJ/Staff

**April Grievances:**
**20:39** Got kicked out of group for no reason and staff called me gay.  MJ/RJ

**May Grievances:**
**None**

**June Grievances:**
**20:40** 3rd Shift won't leave the fan on unit, so it won't keep it from getting hot. MJ/Staff
**20:41** I got a UE for calling staff crazy, whenever all I said, was "that he was acting a little crazy today
**20:42** I got a UE for sleeping when I wasn't  sleeping, and this morning they woke Asher up later than they woke me up. MJ/Staff

28

**20:43** The unit is way too hot, and how hot it is in my room.  I am sweating on unit. MJ/Shelter
**20:44** The unit is way too hot. MJ/Shelter

**Description/Causes:**  Filed for staff conflict, food, Shelter, and rules.

**Trends:**
Staff and residents continue to work on stability, communication and follow the rules.  Effective communication continues to be an obstacle between staff, and residents.  Administration and Management will continue to work with staff on communication.  Staff will have on-going training in communication and conflict resolution. Administration and Management will continue to train staff on working in an ethical manner with residents.

**Actions for Improvement:**
Management and Administration will continue to train staff and new employees on working relations with residents.  Communication is an essential area when working in a residential setting.   Residents have to adjust to a new environment and changing old behaviors. Staff will continue to assist them in an encouraging direction.  New employees will continue to learn the rules of the program, and must maintain consistency.

**Results of Performance Improvement Plans:**
Continued Hands on training working on the floor.

**Necessary Education and Training of Staff:**
New Employees will participate in a 2 step Orientation process, with the Facility and Fort Reno. Staff will complete Therapeutic Options, CPR 1st Aid, Ethics, MAT, Van driving, continuous In-service training, communication, documentation, and boundaries of all staff.

**Prevention of Recurrence:**
Gary Miller Justice Center is a non-smoking facility and employees must adhere to policies and procedures to remain employees.  Smoking cessation is available to employees.

**Internal and External Reporting:**
Staff will continue to follow chain of command and report incidents to supervisors and administration.  Staff will continue to document the actual event that occurred on shifts. Incidents were reported internally.  All external was reported to the proper authorities.

### *Administration*

**Human Resources:**  The Human Resources Department is the center point for recruitment, hiring, retention, new employee orientation, employee relations, performance management, termination, workers' compensation, employment policies, FMLA, employee disciplinary matters, employee records and related issues.  Highlights during FY19-20 include:

- Successful recruitment of qualified employees.
- Improve Staff Training opportunities
- Streamline Service including timekeeping system (Kronos)

29

**Multicultural Committee:**  Throughout the year the Multi-Cultural Committee sponsors a variety of different cultural activities for the Canadian County Children's Justice Center.  The Committee has also purchased flowers when an employee loses a loved one, help families during the holiday, and sponsor Annual Employee Picnic and the Annual Multi-Cultural Christmas Party. The following are actual projects the committee completed during the past year.

- July, 2019 –Employee Luncheon Hot Dogs
- August, 2019 –Employee Spaghetti Luncheon
- August, 2019 –Flowers to Grieving Employee
- September, 2019 –Recovery Walk $100
- September, 2019 –Chili Cook-Off
- October, 2019 –Halloween Costume Contest
- October, 2019- Employee Picnic
- November, 2019 Donation to Employee in Need (home burned)
- December, 2019-Annual Employee Christmas Party
- December, 2019- Food Drive
- January, 2020- Lunch & Learn Spa

**Fiscal Management:**  The center is a department of Canadian County and as such all fiscal operations are in accordance with all applicable state statutes and county policies and procedures. The center's financial records are audited annually by the Oklahoma State Auditor's Office.  As per county requirements, the center attempts to develop a "temporary" budget by June 19th for the upcoming fiscal year and a "final" budget by July 1. The budget is prepared based on the projection of 1) revenues generated from the one-third cent county sales tax and from grants and contracts, and 2) expenditures for the operation of the center's programs and facility. The FY19-20 Budget was as follows:

### FY 2019-2020 Budget

| | |
|---|---|
| **FY19 Carryforward** | $  1,041,553.95 |
| **Anticipated Revenues:** | |
| **Canadian County Sales Tax Revenue ($599.046.54 x 12)** | $  7,188,558.47 |
| **Contract Revenue** | $     872,957.00 |
| **TOTAL FUNDS AVAILABLE:** | $  9,103,069.42 |
| **Anticipated Expenditures:** | |
| **Personal Services** | $  6,165,710.89 |
| **Part Time Help** | $       92,989.12 |
| **Travel Expenses** | $       80,085.83 |
| **Education (CCEC)** | $     668,000.00 |
| **Maintenance & Operations** | $  1,961,799.58 |
| **Capital Acquisitions** | $     134,484.00 |
| **TOTAL EXPENDITURES OF FUNDS:** | $  9,103,069.42 |

30

# Gary E. Miller Canadian County
## Children's Justice Center

## Annual Report

### July 1, 2020 – June 30, 2021

### Gary E. Miller Canadian County Children's Justice Center
### 7905 East Highway 66
### El Reno, Oklahoma 73036

### *Mission Statement*

*The Gary E. Miller Canadian County Children's Justice Center exists to serve the children and families of Canadian County, Oklahoma with respect, dignity, fairness, and compassion. With services to Canadian County as our foundation, we are driven by the motivation to enhance the quality of life for children and their families.  In order to fulfill our mission, the Gary E. Miller Canadian County Children's Justice Center provides a variety of services including assessment, prevention, education, probation, treatment, independent living services, home based services, and detention.*

### *Organization and Leadership*

The Gary E. Miller Canadian County Children's Justice Center is a Department under the fiscal umbrella of Canadian County. All personnel are employees of the county and the Children's Justice Center's fiscal matters fall under the County Purchasing Act in the Oklahoma Statute. Canadian County has three elected County Commissioners who are responsible for these operations.

> Dave Anderson---Commissioner for District 2
> Marc Hader---Commissioner for District 1
> Jack Stewart---Commissioner for District 3

Program and Statutory Responsibility falls under the purview of the Associate District Judge who handles all Juvenile Dockets. Since September 2008, the Honorable Bob Hughey has served as the Associate District Judge for Canadian County. The Center is supported by a 1/3 cent county sales tax and revenues generated from program contracts and grants. This sales tax is dedicated to the juvenile justice system for the construction, maintenance, and programming of the services at the center.

2

## *Management Team*

The Associate District Judge and the Facility Director designates managerial and administrative staff to participate in the Management Team. This team meets at least once per month to plan programs, address issues of concern, to be advised of new developments in service delivery and needs, and to discuss other issues as needed. Management team members then communicate this information to staff within their program of responsibility. Members include:

Melanie Johnson, Facility Director
Cedric Mills, Assistant Facility Director
D'Shea Brothers, Executive Assistant
Angel Colley, Director of Operations
Pam Owens, Accountant
Eliza Botone, Juvenile Probation Director
LaTanya Freeman, Detention Director
Ronnie Warrior, Assistant Detention Director
Abby Wright, Assistant Detention Director
Kim White, Director of Behavioral Health Services
Michael Dunn, Group Home Director
Jackie Richards, Assistant Group Home Director
Michelle Wilson, Comprehensive Home-Based Services Supervisor
Neil Womack, Director of Student Services
Chris Etheredge, Community Education and Resource Coordinator
Erin Barton, Supervised Visitation and Exchange Program
Misty Schweitzer, Human Resource Manager
Brandi Smith, Drug Screen Program Supervisor
Krystal Rose, Quality Assurance

## *Citizens Advisory Committee*

The Citizens Advisory Committee was created in 2004. This committee serves "to aid in the more effective administration of the statutes relating to juveniles and for the purposes of counsel and advice". Committee members are appointed by the Associate District Judge and serve without pay for a period of four years and until their successor is appointed. The Center's Citizen Advisory Committee members during FY20-21 are:

| | |
|---|---|
| John Bickerstaff | Judge Bob Hughey |
| Phil Carson | Nedra Funk |
| Sandra Bohannon | Brian Grider |
| Jennifer King | Gary Miller |
| Sara Myers | Linda Ramey |
| Charles Schwarz | Brooke Robertson |
| Jack Stewart | Cedric Mills |
| Cleve Wheeler | Charles Bradley |
| Jeanne Hobson | Erin Jones-Slavtev |
| Melanie Johnson | |

3

PURSUANT TO THE LEGAL NOTICE AS IS REQUIRED BY THE OKLAHOMA OPEN MEETING ACT INCLUDING THE POSTING OF NOTICE AND AGENDA, THE BOARD OF COUNTY COMMISSIONERS OF CANADIAN COUNTY, STATE OF OKLAHOMA, MET IN REGULAR SESSION AT THE CANADIAN COUNTY COURTHOUSE, 301 NORTH CHOCTAW STREET, EL RENO, OKLAHOMA AT _9:00_ O'CLOCK _A_.M. ON THE _28th_ DAY OF _May_ 1996.

PRESENT: _Brandly, Wallace, Young_

ABSENT: _None_

RECEIVED

MAY 2 9 1996

CANADIAN COUNTY
ELECTION BOARD

THEREUPON the Chairman introduced a Resolution which was read in full by the Clerk and upon motion by Commissioner _Brandly_, seconded by Commissioner _Young_, said Resolution was adopted by the following vote:

AYE: _Brandly, Wallace, Young_

NAY: _None_

Said Resolution was thereupon signed by the Chairman, attested by the County Clerk of Canadian County, sealed with the seal of said County, and is as follows:

RESOLUTION NO. _9620_

A RESOLUTION PROVIDING FOR FUNDS FOR CANADIAN COUNTY, OKLAHOMA; AUTHORIZING THE CALLING OF A SALES TAX ELECTION LEVYING A .35 OF ONE CENT SALES TAX ON THE GROSS RECEIPTS OR PROCEEDS ON CERTAIN SALES FOR AN UNLIMITED PERIOD, SUCH TAX TO BE USED FOR CONSTRUCTION, FINANCING AND EQUIPPING OF A JUVENILE DELINQUENTS DETENTION FACILITY AND JUVENILE JUSTICE FACILITIES IN CANADIAN COUNTY, INCLUDING DESIGN, CONSTRUCTION, EXPENSES, OPERATIONS, EQUIPMENT AND FURNISHINGS; FIXING AN EFFECTIVE DATE; MAKING PROVISIONS SEPARABLE; AND DECLARING AN EMERGENCY.

WHEREAS, the Board of County Commissioners of Canadian County, Oklahoma have determined that it is necessary and beneficial to the citizens of Canadian County to construct and equip a Juvenile Delinquents Detention Facility and Juvenile Justice Facilities (herein the "Facilities") in Canadian County; and

WHEREAS, the Board of County Commissioners of Canadian County, Oklahoma have determined that it is necessary to provide financing for such Project under certain conditions hereinafter described.

NOW, THEREFORE, BE IT RESOLVED by the Board of County Commissioner of Canadian County, Oklahoma:

SECTION 1.            Citation.

This Resolution constitutes, shall be known and may be cited as the "Canadian County, Oklahoma, Sales Tax Resolution."

1

SECTION 2.        Definitions.

The definitions of words, terms and phrases contained in the Oklahoma Sales Tax Code are hereby adopted by reference and made a part of this Resolution. (68 O.S. 1991, as amended, Section 1352.)

SECTION 3.    Effective Date; Reduction Date; Termination Date.

This Resolution shall become effective immediately and the imposition of said sales tax shall be effective November 1, 1996, subject to the approval of a majority of the registered voters of Canadian County, Oklahoma, voting on the same on August 27, 1996, in the manner prescribed by Oklahoma Statutes. The .35 of one cent sales tax shall be unlimited in duration.

SECTION 4.    Purpose of Revenues.

(1)      It is hereby declared to be the purpose of this Sales Tax Resolution to provide for a county sales tax of .35 of one cent. Such revenues shall be utilized for design, construction, financing, operations, equipment and furnishing of the Facilities to be located in Canadian County.

SECTION 5.    Restrictions on Use of Facilities.

The abovedescribed Project to be financed with such Sales Tax is subject to certain restrictions, as follows:

(1)      The Project is to be implemented for the development of the Facilities approved by the County Commissioners;

(2)      The Facilities are to be owned by the Canadian County Public Facilities Authority, subject to direction of the Canadian County Commissioners to the Trustees of the Canadian County Public Facilities Authority.

SECTION 6.    Tax Rate; Sales Subject to Tax; Exemptions.

There is hereby levied an excise tax of .35 of one cent upon the gross proceeds or gross receipts derived from all sales taxable under the Sales Tax Law of Oklahoma, including but not exclusive of the following:

1.      Tangible personal property; except newspapers and periodicals

2.      Natural or artificial gas, electricity, ice, steam or any other utility or public service except water, sewage and refuse;

3.      Transportation for hire of persons by common carriers, including railroads (both steam and electric), motor transportation companies, taxicab companies, pullman car companies, airlines and all other means of transportation for hire (excluding those specificallly exempted);

4.      Service by telephone and telegraph companies to subscribers or users, including transmission of messages, whether local or long distance; this shall include all services and rental changes having any connection with the transmission of any message;

2

5. Printing or printed matter of all types, kinds and characters except for services of printing or over-printing;

6. Service of furnishing rooms or accommodations by hotels, apartment hotels, public rooming house, public lodging houses, tourist camps.

7. Service of furnishing storage or parking privileges by auto hotels and parking lots;

8. Computer hardware, software, or programs, including gross receipts from the licensing of software programs;

9. Food, confections and all drinks sold or dispensed by hotels, restaurants or other dispensers, and sold for immediate consumption upon the premises, or delivered or carried away from the premises for consumption elsewhere;

10. Advertising of all kinds, types and characters, including any and all devices used for advertising purposes and the servicing of any advertising devices, except as provided elsewhere in this Resolution;

11. Dues or fees to clubs, and the sale of tickets or admission to places of amusement, to athletic, entertainment or recreational events, or dues or fees for the privilege of having access to or use of amusement, entertainment, athletic or recreational facilities (including free or complimentary passes, tickets, dues or fees which are hereby declared to have value equivalent to the sale price of tickets, passes, admissions, fees or dues of like kind or character;

12. Charges made for the privilege of entering or engaging in any kind of activity, when no admission is charged spectators, such as tennis, racquetball or handball courts;

13. Charges made for the privilege of using items for amusement, sports, entertainment or recreational activity such as trampolines or golf carts;

14. The rental of equipment for amusement, sports, entertainment or other recreational activities, such as bowling shoes, skates, golf carts, or other sports and athletic equipment;

15. The gross receipts from sales through any vending machine, without any deduction for rental to locate the vending machine on the premises of a person who is not the owner or any other deductions therefrom;

16. Gross receipts or gross proceeds from the rental or lease of tangible personal property, including rental or lease or personal property when the rental or lease agreement requires the vendor to launder, clean, repair or otherwise service the rented or lease property on a regular basis, without any deduction for the cost of the service rendered; provided, if the rental or lease charge is based on the retail value of the property at the time of making the rental or lease agreement and the expected life of the property, and the rental or lease charge is separately stated from the services cost in the statement, bill or invoice delivered to the consumer, the cost of services rendered shall be deducted from the gross receipts or gross proceeds;

17. Flowers, plants, shrubs, trees and other floral items, whether or not same was produced by the vendor, sold by persons engaged in florist or nursery business in this

3

State, including all orders taken by an Oklahoma business for delivery in another State; provided, all orders taken outside this State for delivery within this State shall not be subject to the tax levied by this Resolution;

18. Tangible personal property sold to persons, peddlers, solicitors or other salesmen, for resale where there is likelihood that this State will lose tax revenue due to the difficulty of enforcing this Resolution because of:

    a.    The operation of this business;

    b.    The nature of the business;

    c.    The turnover of independent contractors;

    d.    The lack of place of business in which to display a permit or keep records;

    e.    Lack of adequate records;

    f.    The persons are minors or transients;

    g.    The persons are engaged in service businesses; or

    h.    Any other reasonable reason;

19. For the purpose of this Resolution, sales of service and tangible personal property made for the purpose of developing real estate, even though such real estate is intended for resale as real property, are hereby declared to be sales to consumers or users; sales of service and tangible to personal property, including materials, supplies and equipment made to contractors who use the same in the performance of any contract, are hereby declared to be sale to consumers or users and not sales for resale; sales of tangible personal property to persons who are primarily engaged in selling their services shall be deemed sales to consumers or users and, therefore, taxable; sales of tangible personal property to peddlers, solicitors and other salesmen who do not have established places of business, shall be deemed to be sales to consumers or users, and therefore, taxable.

SECTION 7.        Tax Collector Defined.

    The term "Tax Collector" as used herein means the Department of the County Government or the official agency of the State duly designated according to Law, or Contract authorized by Law, to administer the collection of the tax herein levied.

SECTION 8.        Classification of Taxpayers.

    For the purpose of this Resolution, the classification of taxpayers hereunder shall be as prescribed by State Statutes for purposes of the Oklahoma Sales Tax Code.

4

SECTION 9.        Subsisting State Permits.

All valid and subsisting permits to do business issued by the Oklahoma Tax Commission pursuant to the Oklahoma Sales Tax Code are, for the purpose of this Resolution, hereby ratified, confirmed and adopted in lieu of any requirement for an additional governmental permit for the same purpose.

SECTION 10.   Exemptions.

There is hereby specifically exempted from the tax levied by this Resolution the gross receipts or gross proceeds exempted from the Sales Tax Law of Oklahoma, inclusive, but not exclusive of and derived from (which may be changed from time to time by state statutes), the:

1.    Sale of cigarettes and tobacco products taxed by State Statutes;

2.    Sale of raw products from the farm, orchard or garden where such sale is made by the producer of such raw products directly to the consumer or user; gross receipts or gross proceeds derived from the sale of livestock, poultry products and dairy products by the producers; exemptions granted by this Subsection shall not apply when such articles are sold, even though by the producer thereof, at or from an "established business place" not on a farm; neither shall this exemption apply unless said articles are produced or grown within the State of Oklahoma; the provisions of this Subsection are intended to exempt the sale of livestock producers of livestock sold at special livestock sales; the provisions of this Subsection are intended to exempt the sale of dairy products when sold by a dairyman or farmer who owns all of the cows from which the dairy products he sells are produced; the provisions of this Subsection shall not be construed to exempt sales of dairy products by any other business; the provisions of this Subsection shall not be construed to exempt sales by florists, nurserymen and chicken hatcheries;

3.    Dues paid to fraternal, religious, civic, charitable or educational societies or organizations by regular members thereof, provided such societies or organizations operate under what is commonly termed the lodge plan or system and do not operate for a profit which inures to the benefit of any individual member or members thereof to the exclusion of other members;

4.    Sale of tangible personal property or services to or by churches, except where such organizations may be engaged in business for profit or savings, competing with other persons engaged in the same or similar business;

5.    Gross receipts and gross proceeds deriving from the transportation of school children to and from schools and high schools in motor or other vehicles;

6.    Transportation of persons where the fare of each person does not exceed one dollar ($1.00), or local transportation of persons within the corporate limits of cities and towns, except by taxicabs;

7.    Sales of food in public, common, high school or college cafeterias and lunch rooms operated primarily for teachers and pupils, but not operated primarily for the public or for profit;

5

8. Sales to the United States Government, State of Oklahoma or any of its political subdivisions;

9. Sales of gasoline or motor fuel on which the Motor Fuel Tax, Gasoline Excise Tax or Special Fuels Tax has been paid to the State of Oklahoma;

10. Sales of crude petroleum or natural or casinghead gas and other products subject to the Gross Production Tax under the provisions of the laws of the State of Oklahoma; this exemption shall not apply when such products are sold to a consumer or user for consumption or use, except when used for injection into the earth for the purpose of promoting or facilitating the production of oil or gas;

11. Sales of motor vehicles, attached optional equipment and accessories on which the Oklahoma Motor Vehicles Excise Tax has been paid;

12. Sales by county, district and State fairs;

13. Sales of advertising space in newspapers, periodicals and billboards advertising services, and sales of time for radio and television broadcasts of advertising;

14. Sales for resale to persons regularly engaged in the business of reselling articles purchased, whether within or without the State; provided that such sales to residents of this State are made to persons to whom sales tax permits have been issued by the Oklahoma Tax Commission as provided by law; this exemption shall not apply to the sales of articles made to persons holding permits when such persons purchase items for their use and which they are not regularly engaged in the business of reselling; neither shall this exemption apply to sales of tangible personal property to peddlers, solicitors and other salesmen who do not have sales tax permits or established places of business;

15. Goods, wares, merchandise and property sold for use in manufacturing, compounding, processing, assembling or preparing for sale shall be classified as having been sold for the purpose of resale or the subject matter of resale, only in the event:

    a. Such goods, wares, merchandise or property are purchased for the purpose of being manufactured into a finished article and if it becomes a recognizable and integral part of the manufactured, compounded, processed, assembled or prepared product; or

    b. If it is consumed in the process of manufacturing, compounding, processing, assembling or preparing products for resale.

16. Sales of machinery and equipment purchased and used by persons establishing new manufacturing or processing plants already established in Oklahoma; provided this exemption shall not apply unless such machinery and equipment is incorporated into and directly used in the process of manufacturing property subject to taxation hereunder; the term "manufacturing plants" shall mean those establishments primarily engaged in manufacturing or processing operations and generally recognized as such;

6

17. Sale of an interest in tangible personal property to a partner or other persons who, after such sale, owns a joint interest in such tangible personal property where the Oklahoma Sales or Use Tax has previously been paid on such tangible personal property;

18. Sales of containers shall be exempt when sold to a person regularly engaged in the business of reselling empty or filled containers, or when he purchases such containers for the purpose of packaging raw products or farm, garden or orchard for resale to the consumer or processor; provided this exemption shall not apply to the sale of containers used more than once and which are ordinarily known as returnable containers, unless a tax under this Resolution is collected and paid to the tax collector with respect to each and every transfer by such person of title or possession of such returnable container, if made to any consumer or user within this State; nor shall it apply to the sale of labels or other materials delivered along with items sold, but which are not necessary or absolutely essential to the sale of the sold merchandise;

19. Exemptions of poultry, livestock feed and farm machinery, as prescribed by the State Sales Tax Code, shall be equally applicable as exemptions from the tax herein levied;

20. Sales of agricultural fertilizer to persons regularly engaged for profit in the business of farming and/or ranching, which are exempt from State Sales Taxes, shall likewise be exempt from the County sales tax herein levied;

21. Sales of agricultural fertilizer to any person engaged in the business of supplying such materials on a contract or custom basis to land owned or leased and operated by persons regularly engaged, for profit, in the business of farming and/or ranching;

22. Sales of agriculture seed or plants to any person regularly engaged, for profit, in the business of farming and/or ranching; this Subsection shall not be construed as exempting from sales tax seed which is packaged and sold for use in noncommercial flower and vegetable gardens;

23. Sales of agriculture chemical pesticides to any person regularly engaged, for profit, in the business of farming and/or ranching; for the purposes of this Resolution, agricultural chemical pesticides shall include any substance or mixture of substances intended for preventing, destroying, repelling or mitigating any insect, snail, slug, rodent, bird, nematode, fungus, weed or any other form o terrestrial or aquatic plant or animal life or virus, bacteria or other microorganisms on or in living man, or any substance or mixture of substances intended for use as a plant regulator, defoliant or desiccant;

24. In addition to other transactions exempt from the sales tax levied under Section 1358 of the Oklahoma Sales Tax Code, there shall also be exempt from such tax the gross proceeds from the sale of farm machinery and repair parts thereto, to be used directly on a farm or ranch in the production, cultivation, planting, sowing, harvesting, processing, spraying, preservation or irrigation of any livestock, poultry, agriculture or dairy products produced from such lands;

25. Sales of tangible personal property or services to the Council Organizations or similar State supervisory organizations of the Boy Scouts of America, the Girl Scouts of the U.S.A. and the Campfire Girls shall be exempt from sales tax.

7

26.    In addition to other transactions exempt from the Sales Tax under the Oklahoma Sales Tax Code, there shall also be exempt from such tax the gross proceeds from the sale of baby chicks, turkey poults and starter pullets used in the commercial production of chickens, turkeys and eggs; provided that the purchaser certifies in writing on the copy of the invoice or sales ticket to be retained by the seller that the pullets will be used primarily for egg production.

**SECTION 11.** **Other Exempt Transfers.**

Also, there is hereby specifically exempted from the tax herein levied, the transfer of tangible personal property exempted from the Oklahoma Sales Tax Law inclusive, but not exclusive, (which may be changed from time to time by state statutes), of the following:

1.    From one (1) corporation to another corporation, pursuant to a reorganization; as used in this Subsection, the term "reorganization" means:

    a.    A statutory merger or consolidation; or

    b.    The acquisition by a corporation of substantially all of the properties of another corporation, when the consideration is solely all or a part of the voting stock of the acquiring corporation, or of its parent or subsidiary corporation;

2.    In connection with the winding up, dissolution or liquidation of a corporation only when there is a distribution in kind to the shareholders of the property of such corporation;

3.    To a corporation for the purpose of organization of such corporation where the former owners of the property transferred are, immediately after the transfer, in control of the corporation, and the stock or securities received by each is substantially in proportion to this interest in the property prior to the transfer;

4.    To a partnership in the organization of such partnership if the former owners of the property transferred are, immediately after the transfer, members of such partnership, and the interest in the partnership received by each is substantially in proportion to his interest in the property prior to the transfer; and

5.    From a partnership to the members thereof when made in kind in the dissolution of such partnership.

**SECTION 12.** **Tax Due When; Returns; Records.**

The tax levied hereunder shall be due and payable at the time and in the manner and form prescribed for payment of the State Sales Tax under the Sales Tax Law of the State of Oklahoma.

**SECTION 13.** **Payment of Tax; Brackets.**

1.    The tax herein levied shall be paid to the tax collector at the time and in the manner and form provided for payment of the State Sales Tax under the Sales Tax Law of Oklahoma.

2.    The bracket system for the collection of the County sales tax by the tax collector shall be the same as hereafter adopted by the agreement of said County.

8

**SECTION 14.   Tax Constitutes Debt.**

Such taxes, penalty or interest due hereunder shall at all times constitute a prior, superior and paramount claim as against the claims of unsecured creditors, and may be collected by suit as any other debt.

**SECTION 15.   Vendor's Duty to Collect Tax.**

1.   The tax levied hereunder shall be paid by the consumer or user to the vendor and it shall be the duty of each and every vendor in this County to collect from the consumer or user, the full amount of the tax levied by this Resolution, or an amount equal as nearly as possible or practicable to the average equivalent thereof.

2.   Vendors shall add the tax imposed hereunder or the average equivalent thereof, to the sales price or charge, and, when added, such tax shall constitute a part of such price or charge, shall be a debt from the consumer or user to the vendor until paid and shall be recoverable by law in the same manner as other debts.

3.   A vendor, who willfully or intentionally fails, neglects or refuses to collect the full amount of the tax levied by this Resolution or willfully or intentionally fails, neglects or refuses to comply with the provisions or remits or rebates to a consumer or user, either directly or indirectly and by whatsoever means, all or any part of the tax levied, or makes in any form or advertising (verbally or otherwise) any statement which infers that he is absorbing the tax, or paying the tax for the consumer or user by an adjustment of prices, at a price including the tax or in any manner whatsoever, shall be deemed guilty of an offense and, upon conviction thereof, shall be fined not more than five hundred dollars ($500.00).

**SECTION 16.   Returns and Remittances; Discounts.**

Returns and remittances of the tax herein levied and collected shall be made to the tax collector at the time and in the manner, form and amount as prescribed for returns and remittances by the State Sales Tax Code; remittances of tax collected hereunder shall be subject to the same discount as may be allowed by said Code for collection of State Sales Tax.

**SECTION 17.   Interest and Penalties; Delinquency.**

Section 217 of Title 68, O.S. 1991, as amended, is hereby adopted and made a part of this Resolution, and interest and penalties at the rates and in the amounts as therein specified are hereby levied and shall be applicable in cases of delinquency in reporting and paying the tax levied by this Resolution. The failure or refusal of any taxpayer to make or transmit the reports and remittances of tax in the time and manner required by this Resolution shall cause such tax to be delinquent. No deduction from tax shall be allowed if any such report or payment of tax is delinquent.

**SECTION 18.   Waiver of Interest and Penalties.**

The interest, penalty or any portion thereof, accruing by reason of a taxpayer's failure to pay the County tax herein levied, may be waived or remitted in the same manner as provided for said waiver or remittance, as applied in the administration of the State Sales Tax provided in Title 68, O.S. 1991, as amended, Section 220; to accomplish the purposes of this Section, the applicable provisions of said Section 220 are hereby adopted by reference and made a part of this Resolution.

9

SECTION 19.  Erroneous Payment; Claim for Refund.

Refund of erroneous payment of the County Sales Tax herein levied may be made to any taxpayer making such erroneous payment, in the same manner and procedure, and under the same limitations of time, as provided for administration of the State Sales Tax as set forth in Title 68, O.S. 1991, as amended, Section 227 and, to accomplish the purposes of this Section, the applicable provisions of said Section 227 are hereby adopted by reference and made a part of this Resolution.

SECTION 20.  Fraudulent Returns.

In addition to all civil penalties provided by this Resolution, the willful failure or refusal of any taxpayer to make reports and remittances herein required, or the making of any false and fraudulent report for the purpose of avoiding or escaping payment of any tax, or portion thereof, rightfully due under this Resolution, shall be an offense and, upon conviction thereof, the offending taxpayer shall be subject to a fine of not more than one thousand dollars ($1,000.00).

SECTION 21.  Records Confidential.

The confidential and privileged nature of the records and files concerning the administration of the County sales tax is legislatively recognized and declared, and to protect the same, the provisions of Title 60, O.S. 1991, as amended, Section 205 of the State Sales Tax Code and each Subsection thereof, are hereby adopted by reference and made fully effective and applicable to administration of the County Sales Tax as if set forth herein in full.

SECTION 22.  Amendments.

The people of Canadian County, Oklahoma, by their approval of this Resolution at the election hereinabove provided, have authorized the Board of County Commissioners, by Resolution duly enacted, to make such administrative and technical changes or additions in the method and manner of administration and enforcement of this Resolution as may be necessary or proper for efficiency and fairness; provided that the rate of the tax herein provided shall not be changed without approval of the qualified electors of the County as provided by Law.

SECTION 23.  Provisions Cumulative.

The provisions hereof shall be cumulative and in addition to any and all other taxing provisions of County Laws.

SECTION 24.  Provisions Severable.

The provisions hereof are hereby declared to be severable, and if any Section, paragraph, sentence or clause of this Resolution is for any reason held invalid or inoperative by any court of competent jurisdiction, such decision shall not affect any other Section, paragraph, sentence or clause hereof.

SECTION 25.  Emergency.

Whereas it being immediately necessary for the preservation of the peace, health and safety of the residents of Canadian County, Oklahoma, that the provisions of this Resolution be put into full force and effect immediately, an emergency is hereby declared to exist, by reason whereof this Resolution shall take effect and be in full force from and after its passage and publication, as provided by law.

10

PASSED, APPROVED AND ADOPTED THIS 28ᵗʰ DAY OF May , 1996.

Chairman,
Board of County Commissioners
Canadian County, Oklahoma

ATTEST:

County Clerk

(SEAL)

11

STATE OF OKLAHOMA          )
                          )SS
COUNTY OF CANADIAN         )

I, the undersigned, the duly qualified and acting County Clerk of the County of Canadian, State of Oklahoma, hereby certify that the above and foregoing is a true, correct and complete copy of the Resolution duly adopted by the Board of County Commissioners of Canadian County and of the proceedings of the Board of County Commissioners in the adoption of said Resolution on the date therein set out as shown by the records of my office.

I further certify that in conformity with Title 25 Oklahoma Statutes 1991, Sections 301-314, inclusive, as amended (the Oklahoma Open Meeting Act), I received notice of the meeting as required by law, and I did, or caused to be done, the following acts:

A.  At least twenty-four (24) hours prior to said meeting (excluding Saturdays, Sundays and legal holidays declared by the State of Oklahoma), display public notice of said meeting in prominent public view at the principal office of the County Commissioners and at the location of said meeting, such notice setting forth thereon the date, time, place and agenda for said meeting; and

B.  That the minutes of the meeting reflect the time and manner of such notice of the meeting required by the Oklahoma Open Meeting Act.

WITNESS my hand and seal of said County this 28th day of May, 1996.

_____
County Clerk

(SEAL)

12

RECEIVED

RESOLUTION NO. _96 - 21_

MAY 2 9 1996

CANADIAN COUNTY
ELECTION BOARD

A RESOLUTION AUTHORIZING THE CALLING AND HOLDING OF AN ELECTION IN CANADIAN COUNTY, STATE OF OKLAHOMA, FOR THE PURPOSE OF SUBMITTING TO THE QUALIFIED ELECTORS OF SAID COUNTY THE QUESTION OF APPROVING RESOLUTION NO. _96 - 21_ OF SAID COUNTY, LEVYING A .35 of ONE CENT COUNTY SALES TAX FOR AN UNLIMITED PERIOD, AND DECLARING AN EMERGENCY.

WHEREAS, pursuant to authority of Title 68, Oklahoma Statutes 1991, as amended, Sections 1370-1372, inclusive, the Board of Commissioners of Canadian County, Oklahoma, has adopted Resolution No. **96 - 20** of said Canadian County, Oklahoma, in relation to levying a County Sales Tax, on certain sales, of .35 of one cent, as therein provided, and the proposition as to whether or not said Resolution should be approved must be submitted to the qualified electors of the Canadian County, Oklahoma, under the provisions of said Statutes;

NOW, THEREFORE, BE IT RESOLVED by the Board of Commissioners of Canadian County, State of Oklahoma:

SECTION 1.          That the Chairman of the Board of Commissioners of Canadian County, Oklahoma, be and he is hereby authorized and directed to call a special election to be held in said County on the 27th day of August, 1996, for the purpose of submitting to the qualified electors thereof the following proposition:

PROPOSITION

SHALL RESOLUTION NO. _96 - 21_ OF CANADIAN COUNTY, OKLAHOMA, ENTITLED:

A RESOLUTION PROVIDING FOR FUNDS FOR CANADIAN COUNTY, OKLAHOMA; LEVYING A .35 OF ONE CENT SALES TAX ON THE GROSS RECEIPTS OR PROCEEDS ON CERTAIN SALES FOR AN UNLIMITED PERIOD, SUCH TAX TO BE USED FOR FINANCING, CONSTRUCTION AND EQUIPPING OF A JUVENILE DELINQUENTS DETENTION FACILITY AND JUVENILE JUSTICE FACILITIES IN CANADIAN COUNTY, INCLUDING DESIGN, CONSTRUCTION, EXPENSES, OPERATIONS, EQUIPMENT AND FURNISHINGS; FIXING AN EFFECTIVE DATE; MAKING PROVISIONS SEPARABLE; AND DECLARING AN EMERGENCY.

BE APPROVED?

SECTION 2.          That such call for said election be by proclamation, signed by the Chairman of the Board of Canadian County Commissioners, and attested by the County Clerk, setting forth the proposition to be voted upon, the number and location of the polling places, the hours of opening and closing the polls and the names of the officers who shall conduct said election; that the ballot shall set forth the proposition to be voted upon substantially as set out in Section 1 hereof; and that the returns of said election shall be made to and canvassed by the County Election Board.

SECTION 3.          That by reason of said County being without adequate funds with which to furnish required public services, it is deemed and declared necessary for the preservation of the public peace, health and safety, that said election be held without delay, and to that end that this Resolution shall become operative immediately; an emergency is hereby declared to exist whereby this Resolution shall be in full force and effect immediately from and after its passage and approval.



PASSED, APPROVED AND ...DOPTED this 28th day of May 1996.

ATTEST:

Chairman,
Board of County Commissioners
Canadian County, Oklahoma

County Clerk

(SEAL)

# AFFIDAVIT

1.  My name is Misty Schweitzer.

2.  I am over the age of 18 years old. I am of sound mind and capable of making this Affidavit. The information herein is true and correct and sworn under penalty of perjury.

3.  The facts stated in this Affidavit are within my personal knowledge based upon my own personal experiences and/or those experiences reported to me in my official capacity as the Human Resource Manager at the Gary E. Miller Canadian County Children's Justice Center (CCCJC).

4.  I have never been charged with or convicted of a felony or crime involving dishonesty or moral turpitude.

5.  I was employed by Canadian County at the CCCJC from October 12, 2020, through March 25, 2021.

6.  I was employed as the Human Resource Manager for the CCCJC and considered part of the CCCJC management, but I was not a part of the final decision-making team in management. I did not have independent decision-making authority, all my management decisions had to be approved by Melanie Johnson, Cedric Mills, Judge Hughey and/or NaCole Majors.

7.  I am studying to obtain my degree in Bachelor of Science Business Administration, Human Resources Management

8.  I have worked in Human Resources for 15-16 years.

9.  I have never previously been terminated from a position before.

10. I was terminated on March 25, 2021, by NaCole Majors and Melanie Johnson. Prior to my termination I had only positive reviews and suffered no discipline.

11. I believe my termination was based upon discrimination and illegal conduct which is consistent with other illegal conduct I have observed as the Human Resources Manager.

12. While employed as the Human Resource Manager I have seen a pattern and practice of discriminatory discipline, hiring, and firing practices at the CCCJC.

13. Allegations against disfavored employees are trumped up and used as a pretext to terminate when the employees will not quit due to a hostile work environment. When individuals make complaints against favored employees, the allegations are

minimized, and write ups are put off and no discipline is imposed. Employee discipline is applied inconsistently and used as a weapon against those that Management dislikes.

14. I have also observed multiple violations of state law in regard to spending of County funds.

15. All hiring and firing practices are sanctioned and approved by Judge Bob Hughey, Director Melanie Johnson, Assistant Director Cedric Mills and County Human Resource Manager NaCole Majors.

16. Judge Hughey requires that Johnson and Mills consult with him prior to making decisions with regard to the hiring and firing of employees. Hughey is actively involved in the process of determining who is employed at the CCCJC. However, he also engages in willful blindness with regard to the illegal and inappropriate conduct of Johnson and Mills unless he is forced to deal with the situation because another elected official becomes involved.

17. The improper expenditures of county funds were sanctioned and approved by Judge Bob Hughey, Director Melanie Johnson, Assistant Director Cedric Mills and County Human Resource Manager NaCole Majors.

18. The Management Team at the CCCJC consisted of Judge Bob Hughey, Director Melanie Johnson, and Assistant Director Cedric Mills.

19. I was included in multiple high level management meetings including meetings with the commissioners and attorneys for the county relating to this lawsuit and in relation to actions taken against current and former employees of the CCCJC.

20. Throughout my employment with the CCCJC, I observed practices that I believe were illegal, discriminatory, and retaliatory. In my role as the Human Resources Manager, I attempted to advise management (Hughey, Johnson, Mills, and Majors) that they could not engage in certain discriminatory behavior and that it violated state and federal employment laws. My advice was ignored. I was instructed to violate the law and to take actions I believe were retaliatory and improper. I was instructed to do things that I believe were wrong and not to ask questions about it. I was told to agree with whatever Ms. Johnson or Mr. Mills told me to do regardless of whether I actually agreed to do it or not otherwise I would lose my job.

21. Management at the CCCJC did not want to accommodate individuals with disabilities, they engaged in discriminatory practices towards employees that they did not like, and they actively engaged in behaviors that in my opinion were designed to make employees quit.

22. I believe I was terminated because:

    a. I would not agree to comply with the discriminatory practices of the CCCJC or engage in illegal conduct,

    b. I reported violations of state and federal law in regard to employment practices and spending practices.

    c. I refused to send an email at the direction of Melanie Johnson to all CCCJC employees advising them that they could not participate in religious activities or engage in bible study on CCCJC property.

    d. I asked for accommodations under the Americans with Disabilities Act, the Rehabilitation Act, and the Oklahoma Anti-Discrimination Act; and

    e. I was a witness to their pattern and practice of illegal conduct that was occurring at the CCCJC, and Management did not want me as a witness at any unemployment hearings or in this lawsuit because I would substantiate the allegations of the Plaintiffs.

23. I have a diagnosis of undifferentiated connective tissue disease, fibromyalgia, chronic migraines, and polyarthritis. I asked for accommodation related to my disability in November 2021. On March 24, 2022, I had an appointment with my doctor to obtain further orders and information for my accommodations. When I returned to work on March 25, 2022, I was terminated without cause or explanation.

24. The pattern and practice of favoritism and discrimination in the employment practices at the CCCJC was evident very early in my employment with the CCCJC.

25. I attempted to remedy this behavior by addressing it with Management at the CCCJC and County level, but it was clear that Management at the CCCJC did not care about complying with the law.

26. I have filed a discrimination claim on my own behalf with the EEOC and have retained counsel to pursue a case against the Defendants.

27. The broad categories of improper conduct I observed included preferential treatment of D'Shea Brothers; preferential treatment of management favored employees of the CCCJC and discriminatory conduct against disfavored employees of the CCCJC; retaliatory treatment of the lawsuit employees and their associates who are or were employed with the CCCJC; failure to follow safety protocols and policies jeopardizing safety of the children; and failure to comply with laws regarding the expenditures of funds.

28. Time periods relevant to this affidavit are as follows:

   a. Ronda Moss was terminated in October 2019.

   b. Dan Kern was terminated in November 2019.

   c. Melissa McClain was effectively demoted in October 2019 and had job duties taken away from her over time in Human Resources until she was moved to Supervised Visitation in December 2020. McClain went on FMLA leave in March 2021. McClain's employment ended in the summer of 2021.

   d. D'Shea Brother's employment began in November 2019.

   e. Melanie Johnson's employment began in August 2020.

   f. Robert Fletcher was terminated in October 2020.

   g. Cassie Goodfellow reports violations in December 2020 and was terminated in January 2021.

   h. Erin Barton went on FMLA leave in March 2021 for self-care. Barton's employment ended in the summer of 2021.

   i. Donna Wehmuller's employment ended in May of 2021.

   j. Paul Hardaway's employment ended in the summer of 2021.

   k. Jerry Koester was written up in the fall of 2021.

   l. Jerry Koester retired in January 2022.

   m. Rachel Theron was terminated on March 24, 2022.

   n. I was terminated March 25, 2022.

**Preferential Treatment to D'Shea Brothers:**

29. Facility Director Melanie Johnson and Executive Assistant D'Shea Brothers had a personal relationship that impacted business and how employees were treated. Ms. Johnson noticeably favored Ms. Brothers and Ms. Brothers felt that the rules did not apply to her. Ms. Brothers was treated more favorably to other employees and if Ms. Brothers did not like an individual or if they complained about her, Ms. Johnson took Ms. Brothers side over the side of the complaining party.

30. Shortly after my employment began, Ms. Brothers told me that Ms. Johnson wanted her to have the Human Resources position. NaCole Majors confirmed that Ms.

Johnson wanted Ms. Brothers to move into this position but that she as the main Human Resources Manager would not allow it because Ms. Brothers lacked the qualifications for the job. Therefore, Ms. Johnson slowly took job responsibilities away from HR Generalist Melissa McClain and reassigned the job duties to Ms. Brothers.

31. Ms. Brothers would actively attempt to interfere with the performance of my job duties, and I had to repeatedly tell her to stop and reported this conduct to Ms. Johnson who took no action to stop it and protected Ms. Brothers from discipline.

32. Ms. Brothers job description was modified, and she set herself up as the person to receive the background checks from the State of Oklahoma for new hires. This was previously under the purview of Ms. McClain and is one of the examples of duties being taken away from Ms. McClain.

33. Ms. Brothers acting as an agent of CCCJC told employee Miriam Reynolds that she could not socialize with Melissa McClain and Robert Fletcher because they had lawsuits against the CCCJC.

34. Ms. Brothers routinely exceeded the authority of her job description and did not follow policy and procedure. Numerous employees complained about Ms. Brothers conduct but no action was taken against her by Management.

35. Ms. Brothers was given keys to the HR Office and was discovered riffling through papers and searching for information she was not entitled to review or access. I have found my files ransacked. No discipline was instituted against her for this violation of policy. I have since learned that the alleged reason for my termination is the "forgery" of documents. I have not signed any document improperly. I believe if a document has been signed improperly with my name, such signature was made by D'Shea Brothers in an attempt to cover her illegal conduct or to get me fired.

36. In January 2022, I tested positive for covid. Ms. Brothers, who was my subordinate, stated that she needed to re-evaluate my available days that I could take off. She then began to harass me about getting tested or wanting to be updated on my doctors visit on January 12th. Ms. Brothers did not follow proper HR procedures for inquiring about my medical condition or my leave.

37. She proceeded to tell me that I might fall below zero on my accrued time off. As per policy, I immediately requested donated leave and cc'd NaCole Majors on the email request for donated leave. Ms. Brothers did not send out my email requesting donated leave therefore NaCole was required to do so. I had several employees that offered time to me, however, Ms. Brothers still put me on leave without pay and on an hourly status. This is similar to how Ms. McClain's request for donated leave was treated.

If management did not want you to have donated leave from other employees, they would interfere with allowing employees to donate time.

38. While I was out on FMLA leave Ms. Brothers continued to harass me, demanding a negative test or a release date to come back to work due to my Covid. During this text I was at the hospital. I let her know that I did not have a return date as I was still sick and that I had a release to come back to work regarding the covid the date that I tested positive in accordance with medical guidelines.

39. Rachel Theron was hired on as the CCCJC Accountant in the fall of 2021.

40. D'Shea Brothers was not qualified to hold this position, but she wanted to insert herself into the management of the funds of the center. Overtime Ms. Brothers took over payroll operations at the center and management of the petty cash funds. She did not have the qualifications to manage payroll or petty cash. Johnson allowed Ms. Brothers to insert herself into this role despite her lack of experience and qualifications.

41. Brothers' behavior resulted in an employee's OPERS contributions being calculated improperly and causing significant problems for the employee. No discipline was instigated for her behavior, and she was allowed to continue in this position.

42. Additionally, Ms. Brothers interference with accounting activities caused there to be discrepancies in the petty cash at the CCCJC. Ms. Brothers was also purchasing items without following proper protocols. She was not disciplined for this behavior.

43. In January 2022, Accountant Rachel Theron submitted a discrimination and retaliation complaint, as well as a hostile work environment complaint to NaCole Majors about Ms. Brothers and Ms. Johnson. Ms. Majors performed a cursory investigation and questioned several people including myself. The questions asked were very odd and indicated that it was not a serious investigation.

44. Ms. Theron demanded that action be taken against Ms. Johnson and Ms. Brothers, but they were never disciplined, and in my opinion, a proper investigation was not performed.

45. I advised Ms. Majors in January 2022, that I believed Ms. Johnson was trying to find a way to terminate me and that Ms. Brothers was participating in the conduct. I also advised Ms. Majors that there was demonstrated favoritism and unethical behavior in violation of state and federal law at the CCCJC.

46. I also believe that Ms. Johnson and Ms. Brothers were trying to find a way to terminate Ms. Theron and other employees who complained.

47. I later learned that as I was disclosing this information to Ms. Majors, she was sending it immediately to Ms. Johnson. There was no confidentiality in my reporting, and this violates standard HR policies and procedures for investigations.

48. When Ms. Majors delivered the results of her investigation to Ms. Theron, Majors offered to allow someone else to conduct an investigation into her allegations. Ms. Theron requested the independent investigation; however, Ms. Majors then ignored the request for an independent investigation and instead told Ms. Theron that her allegations were unfounded. Ms. Majors did advise that she believed there was improper conduct happening at the CCCJC but not the conduct Ms. Theron complained about.

49. When no action was taken against Ms. Johnson or Ms. Brothers based on Ms. Theron's reports, she filed a charge of discrimination with the EEOC.

50. After Ms. Theron's report of improper conduct against Ms. Brothers, she began to retaliate against Ms. Theron and employee Brooklyn Ellison who also works in accounting.

51. Ms. Ellison then made a claim of retaliation against Ms. Brothers and met with Majors and Johnson about her complaints. Ms. Johnson advised her that "Rachel's days are numbered."

52. After Ms. Ellison complained her workstation was moved so that she sat right next to Ms. Brothers in an effort to force her to quit.

53. The day before I was terminated, CCCJC accountant Rachel Theron was also terminated.

54. The CCCJC received notice of Ms. Theron's charge filed with the EEOC a few weeks prior to her termination. Management knew that she had filed an EEOC charge when she was terminated.

55. Ms. Theron was fired the same day she requested the documents which would prove that the CCCJC, and in particular, that Melanie Johnson and D'Shea Brothers are not complying with the county spending act.

56. I believe Ms. Theron's termination was retaliatory for reporting discrimination, retaliation, and other illegal conduct occurring at the CCCJC including the failure to comply with the county spending act.

57. Multiple other employees complained about Ms. Brothers and no action was taken against her.

58. In August 2021, CCCJC Account Pam Owens decided to retire due to her disability, her family's needs, and the conduct of D'Shea Brothers. Pam Owens stated that D'Shea was making rude comments to her and questioning her regarding her ability to do stuff and why she must keep it "old school." Ms. Brothers comments constitute age discrimination, but nothing was done to her over this conduct.

59. Rachel Theron replaced Ms. Owens upon retirement.

60. In June 2021, CCCJC Employee Deborah White made a complaint against D'Shea Brothers for calling her "Hun." I documented this and wrote Ms. Brothers up but there was no discipline.

61. In August 2021 Deborah White was then terminated for "not getting along with others" after making the complaint against D'Shea Brothers treatment of her and her discriminatory behavior. Nothing was done to address Brother's conduct.

62. Due to an issue about religion being in Rachel Theron's initial filing and complaint, Melanie Johnson came to me wanting to ban bible study and anything else religious in nature from the CCCJC. Melanie wanted me to send out an email stating this. I could not in good faith do it when 98% of the building was religious and that included Judge Hughey who used to hold daily morning prayer. NaCole also stated that she would not touch it.

63. In February 2022, more complaints were made against D'Shea Brothers. Judge Hughey and County Clerk Sherry Murray brought the issues to the attention of Ms. Majors. I believe that Judge Hughey only took any action because the complaint involved employees from the offices of other elected county officials.

64. Ms. Majors told Ms. Johnson that it was finally time to write up Ms. Brothers due to the number of previous complaints. Any other employee would have been written up before this and likely fired.

65. The complaints were made by Ebelyn Spencer who works in the Assistant District Attorney's office and from Court Clerk Dani Stewart. The complaints related to the way Ms. Brothers treats people and inserts herself into matters that do not involve her.

66. I wrote up the counseling and presented it to Ms. Brothers and explained why she was receiving it. She tapped the paper, shook her head, and said, "uh I'm not signing this, I do not agree." I told her that was her right, but I always tell everyone to place their statement on it. Ms. Brothers wrote that I would have her statement within 24 hours. She then made a copy and went to Ms. Johnson's office to complain. At the top of the copy that I received back; Ms. Johnson had written the word "retaliatory?" "Too harsh" and told me to remove the customary wording "up to and including

termination." Ms. Johnson also wanted me to change these words which are used out of the county employee handbook. This was completely different than the treatment shown to any other employee at the CCCJC.

67. Ms. Brothers repeatedly violated the law and CCCJC policy and was not disciplined. Finally, when enough people complained she was written up but the write up was not even at the same level of other employees. Ms. Johnson and management clearly favor individuals and do not follow the law in regard to employee discipline.

**Retaliatory Treatment of the Lawsuit Plaintiffs and Their Associates:**

68. From the beginning of my employment with the CCCJC it was made very clear that the Management Team wanted to get rid of (i.e. fire or force out) anyone associated with the lawsuit filed against the CCCJC relating to the termination of Ronda Moss and the complaints against Judge Hughey and Dan Kern and others by Moss, McClain, Fletcher, Barton, and Wehmuller. I found this behavior very concerning and expressed that it was improper.

69. Comments were regularly made by Mills, Johnson, Brothers, Hughey and others about individuals who were employed with the CCCJC feeding information to the Plaintiffs in the lawsuit. Management looked for any reason to act against Melissa McClain, Erin Barton, Robert Fletcher, and Donna Wehmuller, the Plaintiffs who remained employed at the CCCJC but who asserted claims with the EEOC.

70. Additionally, Management looked for every opportunity to act against Jerry Koester, Angel Colley, Cassie Goodfellow, and Paul Hardaway, individuals who did not file EEOC claims against the county, but who acted as witnesses, supported the Plaintiffs, and/or remained friendly with them after they left.

71. Management believed that Koester, Colley, Goodfellow and Hardaway were feeding information to the Plaintiffs and they wanted them fired.

72. In January 2021, Ms. Johnson came to me asking questions about Cassie Goodfellow. Ms. Johnson did not want to allow Goodfellow to take off a day of work for the anniversary of her mother's death. I advised that so long as she had the time off and her supervisor approved the day off, we could not deny her the time off. Ms. Johnson did not like this response. I believe she wanted to deny the day of to be retaliatory and mean.

73. Ms. Johnson trumped up allegations against Ms. Goodfellow as a basis to terminate her. Ms. Johnson alleged that Ms. Goodfellow said something about not wanting to risk her life due to covid exposure and she understood that if others had lived their lives already and did not see it as much of a risk. Ms. Johnson claimed that this was age discrimination and had me fire her for it. However, Ms. Johnson engaged in

similar behavior in regard to her privilege walk and talking about unvaccinated people clogging up the hospitals. Ms. Johnson selectively claimed discrimination when it suited her purpose.

74. Ms. Goodfellow was terminated in January 2021. I was told to agree with the decision made by NaCole Majors, Melanie Johnson and Judge Hughey to terminate Ms. Goodfellow. Mr. Mills stated her termination "wasn't a huge loss as they wanted to replace her due to her relationship with others in the lawsuit."

75. Majors, Hughey, Mills, and Johnson terminated Goodfellow because they believed she was gathering information for and acting as a witness for the Plaintiffs in this lawsuit. It is a violation of state and federal law to take action against an employee for acting as a witness in a EEOC proceeding.

76. Immediately after Goodfellow was terminated D'Shea Brother's reached out to United Systems, who is the company that provides offsite computer data storage, to retrieve her a new password so that she could enter Cassie's emails. Brothers then began to dig through the emails and the office Goodfellow was occupying. To my knowledge, nothing was found that Cassie had given anything to the former employees.

77. In March 2021, Erin Barton and Mellissa McClain requested leave under the Family and Medical Leave Act. The Management Team was glad to see them leave. I was instructed to make their leave as difficult as possible by Melanie Johnson and Cedric Mills.

78. In late June 2021, I was instructed by Melanie Johnson to post Erin Barton and Melissa McClain's positions as open while they were on FMLA leave. When an employee is out on FMLA leave, when they return, they must be returned to their same job or an equivalent job. Ms. Johnson did not want them to return to their jobs, so she wanted me to try to fill them before they returned. I advised her that this was not proper, and she told me to do it anyway.

79. I sent a letter to Ms. Barton and Ms. McClain regarding their return to work. I spoke with Ms. McClain about her return to work and I told her the job was posted because I was instructed to post it and I did not agree with it.

80. Ms. McClain and Ms. Barton both requested that they be allowed to move from FMLA leave to a short term leave under the Americans with Disabilities Act while they went to the doctor to get the list of accommodations needed to return work.

81. Ms. McClain was returning to work with a high-risk pregnancy and required accommodations. She asked for a short period of time off under the ADA to go to the doctor to get her accommodations.

82. Ms. Barton was off for self-care. She likewise requested additional time to go to the doctor to get specific instructions for accommodations on return to work.

83. I advised Ms. Johnson and Ms. Majors about their request for ADA leave. I was told to deny their request for ADA leave and put them on unprotected unpaid leave. This was designed to force them to quit or return to work in a job that was not the same or substantially the same as their jobs when they left.

84. Ms. Barton and Ms. McClain asked for donated leave at the time to return to work. Ms. McClain has a high-risk pregnancy, but Ms. Johnson and Ms. Majors did not allow me to solicit donated leave for Ms. McClain and Ms. Barton in the same way I was allowed to solicit donated leave for other employees. This is a violation of CCCJC policies and procedures.

85. I was not allowed to engage in the interactive process with Ms. McClain and Ms. Barton about their requested leave. I was told to deny the request for ADA leave. I did not agree with this determination but did as I was told. I believe that Management including Johnson, Hughey, Mills, and Majors were trying to make McClain and Barton quit or force them into a position that was not equivalent to make them leave.

86. I was instructed to keep McClain and Barton as employees of the CCCJC even though we had posted their jobs as open, the jobs offered to them upon returning were not substantially equal to their previous jobs in supervised visitation and we had received notice through their attorney that they were considered constructively discharged.

87. Ms. McClain made multiple calls to the CCCJC trying to verify certain information needed to apply for social security benefits for her daughter, but I was instructed to maintain that she was still employed with the CCCJC even though it would interfere with her obtaining benefits for her daughter who has seizures.

88. In August 2021, I learned that McClain and Barton applied for unemployment benefits. I was told to contest their benefit application. Both were awarded benefits based upon their constructive discharge for a hostile work environment. When they were awarded benefits, I was instructed to appeal the claim. I did not agree with contesting the award of benefits or appealing the award, but I did as I was told.

89. There was no misconduct on the part of McClain or Barton causing their employment to end. They were forced out through a hostile work environment.

90. As all of this was happening, Cedric Mills stated "the trash takes itself out" in reference to Barton, McClain, Wehmuller and Hardaway leaving the CCCJC because they could not take the bad treatment anymore.

91. This further substantiated my belief that Management was intentionally creating a hostile work environment to force them to quit.

92. Mr. Mills also stated that he believed Angel Colley was providing information to the individuals suing himself, the other members of management and the County. Ms. Colley is one of the original employees who filed complaints against Dan Kern, the former Facility Director. Ms. Colley made a complaint to Ronda Moss who provided it to Judge Hughey. No one acted on the complaints made about Kern. Colley did not file an EEOC complaint, so no direct action was taken against her, but Management believed she provided the Plaintiffs information and watched her closely.

93. NaCole Majors asked if I knew anything about Ms. Colley providing the Plaintiffs with information. I told her that I did not. I believe the allegations against Ms. Colley and my questioning was further evidence of their desire to terminate or force out anyone who might help or be supportive of the Plaintiffs in this suit.

94. In the fall of 2021, Management targeted Courtroom Deputy Jerry Koester for their suspicion of him helping the Plaintiffs. Mr. Koester was a long-time CCCJC employee, friend of the judge, and former Chief of Police. I was instructed to write up Mr. Koester for allegedly selling a firearm in the CCCJC parking lot to a former employee Robert Fletcher. No one actually saw Mr. Koester engage in the behavior and the write up stated that "it was presumed" that this conduct took place. Mr. Fletcher is one of the employees in this lawsuit. Mr. Koester denied that he did anything improper or had a gun in his possession on CCCJC property.

95. I did not agree with the write up but followed the directions of Ms. Johnson. I informed Mr. Koester of his rights regarding the write up and he refused to sign it because he did not agree to it and denied engaging in the behavior.

96. Ms. Johnson became very mad at Mr. Koester's refusal to sign the write up. She took the write up to Judge Hughey and told him to make Koester sign it.

97. Mr. Koester signed the write up under duress after being forced to by Judge Hughey.

98. Mr. Koester felt that he was being set up to be fired by Ms. Johnson and Judge Hughey.

99. This conduct violates county policy and procedure and is unethical and illegal.

100.    Mr. Koester decided to retire as a result of the way he was treated by Johnson and Hughey.

101.    I believe the allegations against Mr. Koester were trumped up because of his friendship with the Plaintiffs in this suit.

102.     Individuals who filed the complaints against Kern, who filed EEOC complaints and/or the lawsuit, and those who maintained friendships with them were retaliated against during my employment with the CCCJC. They were targeted by management, written up for conduct which other employees were not written up for and not provided accommodations given to others. Management looked for minute violations as a pretext to write them up or discipline when they overlooked overt violations of policy and the law in employees who were not complaining of violations.

103.     As a result, the only individual left at the CCCJC who has not quit or been fired is Angel Colley. However, I believe that they are looking for a basis to terminate Ms. Colley based on their belief that she is providing Plaintiffs information for this suit.

104.     Additionally, Mariam Reynolds, who was the Group Home Manager when Mr. Kern was Facility Director, told me that Mr. Kern promised to make her an Assistant Director. During that time, the Assistant Director position to which Mr. Kern referred, was occupied by Ronda Moss. This would indicate that Mr. Kern targeted Ms. Moss to force her to quit and when she did not, he terminated her so he could give the position to Ms. Reynolds.

105.     There were allegations made by Management that Ms. Moss forged documents, but I found no evidence of forged documents in the CCCJC files or that the CCCJC HR files were improperly maintained by Ms. Moss or Ms. McClain prior to my employment.

106.     Management has now also accused me of forging documents in response to my application for unemployment. The OESC found that there was no evidence I engaged in wrongdoing.

107.     I did not execute any document without authority to do so or without being told to do so by management. However, Ms. Johnson and Mr. Mills routinely had me back date and change documents.

108.     I believe that Ms. Brothers did falsify documents but that it was done with the knowledge and approval of Ms. Johnson and Mr. Mills.

**Preferential Treatment of Other Employees:**

109.     In the fall of 2021, Ms. Johnson and Ms. Brothers were emailing back and forth regarding a long-time employee (Leslie Johnson) that had been terminated before I was hired at the CCCJC. The cause of her termination had to do with her failing a drug screen even though she has a cannabis card. This email string went out CCCJC wide. A CCCJC employee contacted Ms. Johnson and/or Ms. Brothers and

advised them of their breach of employee confidentiality. Ms. Brothers contacted United Systems and had them retract the email. Ms. Johnson brought a letter stating that she broke confidentially with Brandi's and D'Shea's signature on it. Ms. Johnson was not disciplined for her breach of employee confidentiality which could have exposed the CCCJC for liability. Neither was Ms. Brothers.

110.    During a Leadership/Management meeting in the fall of 2021, Ms. Johnson spoke about covid numbers and how the "uneducated and unvaccinated" people are filling up the hospitals and dying. Drug Screening Supervisor, Brandi Smith, made a complaint about this comment being discriminatory. No action was taken against Ms. Johnson. This comment is similar to the comment that Ms. Goodfellow made that Ms. Johnson used to justify her termination.

111.    In October 2021, Mr. Mills received a phone call from an employee who was upset over her sick time. After speaking with the employee, Mr. Mills hung up the phone and told me "You never give them a direct answer and never send anything in an email that they can use against you later." This is the kind of attitude that Mr. Mills displayed at work. He has a reputation among the employees for being lazy and noncommittal and will pawn his work and responsibilities off on other people.

112.    In November 2021, Mr. Mills, who is a Black man, was on the phone and told the individual whom he was speaking to in reference to the county deputies that are assigned to the CCCJC, that "these white boys work for me." A deputy complained about the comment. No action was taken against Mr. Mills.

113.    In December 2021 temporary employee Jeffrey Moorhouse made a complaint against Cedric Mills regarding a hostile work environment. Mr. Moorhouse is not from the United States. Mr. Moorhouse complained that Mr. Mills was discriminatory and spoke to him in a belittling and condescending manner. Mr. Moorhouse complained to his direct supervisor Angel Colley. Ms. Colley reported the complaint to me and Ms. Johnson. Ms. Johnson "investigated" by speaking to Mr. Mills who denied making any of the statements that were complained about. Ms. Majors was not notified of the complaint and did not investigate. After speaking with Mr. Mills, Ms. Johnson told me in reference to Mr. Morehouse "do we really want someone like that working here?"

114.    Mr. Moorhouse was attempting to be hired on as a permanent employee at the time of my termination. Ms. Johnson actively interfered with my attempts to hire him as a permeant employee and tried to impose job requirements that never existed for the position to prevent him from being hired.

115.    Once Mr. Moorhouse's time had rolled over from the temporary agency, Ms. Colley wanted to hire him full time because he was a good worker. We started the process. Mr. Moorhouse began to ask questions about his employment. One of the

questions he asked was about the background check. I told him it depended on the position. After Mr. Moorhouse left the room, Mr. Mills stated, "that makes me wonder if he has something to hide back in his own county?" I told Mr. Mills no it is just inquisitive, and he had an issue working around felons before at other places with Express Personnel.

116.     In March 2022, Mr. Moorhouse had provided all of the necessary documents to be hired, after jumping through hoops to gather them for me. However, Ms. Johnson was still questioning the validity of his documents and making active efforts to avoid hiring him. Ms. Johnson and Mr. Mills gave Mr. Moorhouse until April 15th to either provide proof or provide a GED for his position or he would no longer be an applicant for our job or a temporary worker at our CCCJC. It is my understanding that the CCCJC had never previously required a janitorial employee to provide proof of a GED or high school diploma. I believe this requirement was imposed to prohibit Mr. Moorhouse, a non-US citizen who had complained about Mr. Mills from working at the CCCJC.

117.     In July 2021, Cedric Mills rented a U-Haul trailer that was rented for Camp Hope. When the CCCJC was done using the U-Haul, Cedric Mills drove it to his home for personal use. The County paid for this rental period. Mr. Mills then drove the vehicle from his home to return without ensuring that the trailer was properly secured. The U-Haul trailer detached from his vehicle and hit another car while he was driving. The detached U-Haul trailer caused damage to the vehicle it hit. The CCCJC was financially liable for Mills negligent conduct in regard to the U-Haul. Additionally, the U-Haul was not incumbered properly before picking it up. Mills was never written up or disciplined for his conduct which violated CCCJC policy.

118.     On multiple occasions, I reported to Ms. Johnson and Ms. Majors concerns regarding inappropriate sexual behavior by Michael Dunn, the Group Home Manager. The conduct constituted sexual harassment, gender discrimination, and favoritism of male employees over female employees. Mr. Dunn made comments during an interview he conducted with me and Assistant Group Home Manager, Jackie Richards, regarding the number of women and estrogen in the CCCJC. Once while he was in Ms. Ellison's office, he asked her if he "leaked" in her chair when he got up because there was a wet spot. This made her very uncomfortable. He also favored male employees over female employees and treated the female employees differently. There was never an investigation into Mr. Dunn's conduct and his conduct violates center policy on gender discrimination and sexual harassment.

119.     Throughout my employment with the CCCJC I repeatedly reported improper and illegal conduct and procedures to Judge Hughey, Melanie Johnson, Cedric Mills and NaCole Majors. Nothing was done about it. When Johnson and Mills started retaliating against me, I reported the conduct to Majors only. Majors took no action to protect me or investigate and I was still fired.

120.     I was also discriminated against for having a protected disability. I have an accommodation letter that states I can use sick leave and/or any other leave or non-leave that is approved for my medical needs due to my disabilities that are covered by ADA. A copy of this was given to Cedric Mills and I also placed a copy in my medical file.

121.     I was denied the right to use sick time on March 24, 2022, a day that I took off to go to the doctor and my daughter's track meet. I had this time approved. On March 23, 2022, I was approved to use sick time for this day off.

122.     When I returned on March 25, 2022, I was terminated. On April 20, 2021, I received my final calculation of time owed sheet and realized that sick time was not applied to the first part of the morning like I had asked. I then requested my March timesheets from D'Shea Brothers via email, on April 20th in which she replied received. I requested a second time on April 21st in which I finally received my times cards an estimated 5:17 PM which shows the use of 7.37 hrs of comp time being used and .63 hrs of annual time being used instead of my sick time that my final calculated time shows available ( I only requested 3 hours of sick this day) per a phone call I received from Brooklyn Ellison the date I was let go 3/25/2022, Cedric Mills told D'Shea to give me a full day of sick leave. Ms. Ellison told me that D'Shea said she was not going to do that because I was talking about that morning about Caydance at the track meet. Which I was. This goes against my ADA accommodations and affects once again my pay as well as one more retaliation against me.

123.     There is a demonstrated pattern and practice at the CCCJC to ignore bad conduct of people they like and discriminate against those whom management does not like. Management will suborn illegal behavior if it suits its needs and then will fire those who seek legal protections.

124.     Judge Hughey claimed to be involved in all decisions regarding the hiring and firing of people, but he took no action to ensure that Melanie Johnson or Cedric Mills were following the law and not engaging in discriminatory conduct.

**Failure to Follow County Purchasing Act Guidelines:**

125.     Because the CCCJC is a division of County government it must comply with the County Purchasing Act. The CCCJC routinely failed to comply with the law and several people complained about these violations including Cassie Goodfellow and Rachel Theron. Both were fired.

126.     Some examples of the violations of the County Purchasing Act that I discovered and reported included:

a. During the annual Thanksgiving luncheon in November 2020, Melanie Johnson turned the event into a training opportunity. Melanie used a "privilege walk" as the training. This upset several employees who came to me about it. The "privilege walk" is where any employee who is not considered a minority must take steps forward based on their race, education, and other "privileges" they receive. The result is all of those who are considered a minority are left standing at the back. Its purpose is to demonstrate 'white privilege." Many employees felt that this was discriminatory. The privilege walk was the only training, and it was done as a cover to pay for lunch for the employees. Also, during the annual Thanksgiving luncheon in November 2021, the supplying vendor was not properly put into place. Funds were not incumbered properly. Decorations were bought using Walmart and Hobby Lobby cards. When I reported this to Mr. Mills, he said it will be okay since it was on the card it will fly under the radar.

b. In the fall of 2021, Community Education & Resources employee, Caitlin began buying employees items such as balloons, balloon string, balloon air tanks and birthday and anniversary cards, candy, and bags to place candy in as gifts. This is an improper use of County funds.

c. In December 2021, a Cricut machine that is being used for CCCJC's use was purchased with the CCCJC's funds.

d. Beginning in January 2021, Ms. Johnson and Mr. Mills put Ms. Brothers in charge of hiring employees for Camp Hope. Monies spent on Camp Hope came from the CCCJC budget. Materials were bought with the Amazon Card and the Walmart Card. Checks were given to Camp Hope volunteers, and it was discussed to pay them approximately $400.00 this year. D'Shea Brothers, Kayli Swigert and Michelle Wilson are getting paid stipends for working on Camp Hope things using county money.

e. CCCJC bills were not being paid due to the funds not being incumbered correctly. The Walmart and Hobby Lobby cards were cut off.

f. The CCCJC used the Multicultural Committee as a way to raise funds for employee lunches and events that were not supposed to be purchased with county funds. Items sold through this committee were supposed to be donated by the employees or community. The Committee sold salads at lunch to raise money. However, the supplies for the salads were purchased out of CCCJC funds and/or taken from the CCCJC's kitchen. They used containers, eggs, salad dressing, eating utensils, and napkins paid for by the CCCJC out of county funds. The funds made from the sales were then deposited into the multicultural committee accounts and the county was not repaid. When

confronted, Mr. Mills and Ms. Johnson stated that it would not be noticed that they were using county funds improperly.

g.  In December 2021, I reported to the Canadian County Administrative office that there was to be a Christmas party using county founds. D'Shea was in her office trying to figure out how to create a purchase order after the fact that would cover the fact that it was a party and that we were receiving catering. I called and reported this to NaCole Majors (who was my point of contact) regarding the party. When the purchase order was received by the administrative office, County Clerk, Sherry Murry called D'Shea and asked about it. Ms. Johnson did a quick two-minute speech and then played a 4-minute video and called it a training. Cupcakes and cheesecake were bought through the CCCJC kitchen funds; gift cards were bought as well from what I have been told. Ms. Johnson instructed Caitlin to buy these for gifts and awards.

h.  Cedric Mills received a raise last year and received his annual raise of 4%. His evaluation also states he always comes in on weekends and completes all tasks. This is not true. He has asked me to complete his work numerous times. This last time it was a compliance report. There is an email from Quality Assurance employee, Krystal Rose as well as a phone call I received that states Mr. Mills is to complete this report. There are emails from Mr. Mills telling me I needed to complete this report

i.   D'Shea Brothers was approved for a $1500 stipend to create Purchase Orders and for phone calls in relation to Camp Hope. This is what she is already paid for.

j.   I was required by Ms. Johnson to give all of the employees' addresses to Caitlin, (the Community Education employee), to mail out Christmas cards to the CCCJC employees, and cards to the County Administrative office. County funds were used to do this.

k.  The retirement party that was held for Deputy Jerry Koester was provided using county funds.

l.   Activity was going on to remove Judge Gary E Miller's name from all items. I saw logos being made by Chris Etheredge without Judge Miller's name on them. These were sent to the printers. T-Shirts and letterhead were being designed without Judge Miller's name on them. County funds were being expended for this purpose and it is a violation of the County purchasing Act.

127.    Every time I complained about violations of the law in regard to spending Ms. Johnson and/or Mr. Mills stated that it was ok, and they would never be caught,

or they would make up fake documents to cover their behavior.  I find this conduct to be unethical and did not condone it. I made it clear that I did not condone their behavior and I believe this contributed to the decision to terminate me.

## Failure to Follow Safety Protocols and Policies Jeopardizing Children at the Facility

128.     In January 2022, a juvenile female who was in the CCCJC detention facility, made allegations that she had become impregnated by a detention officer, and she filed a grievance about it.

129.     There was never a proper investigation into the allegations made by the young lady.

130.     The detention officer was allowed to return to work without being properly cleared. Ms. Johnson stated, "he would never do something like that."

131.     It has been reported multiple times that Group Home Manager, Michael Dunn, allows the female residents to go without bras and, allows them to hug each other, allows the females to get into bed with each other and go into each other's rooms. It has been reported that residents have hickeys from other residents. This violates CARF accreditation standards, and the conduct should have been reported to the appropriate state agencies.

132.     When I attempted to speak with Mr. Dunn about these things, he told me that he had bigger things to worry about. It is also reported by staff that Michael favors male staff over female staff, does not respond well to females in authoritative roles, and has allowed a female staff to be bullied.

133.     Michael Dunn was told by Ms. Johnson, Assistant Behavioral Health Director, Kim White, and Assistant Group Home Manager, Jackie Richards, not to allow Renea Johnson to be the Medication person on her shift. Ms. Richards reminded him again, when Dunn called stating there was not another person on the shift to do it (he is trained to do it). Mr. Dunn still had Renea do the medication counts and it was incorrect. This violates policies and procedures of the facility and places the children in danger. When this was reported to me there was only Renea's name as the Medication Aide. When Ms. Johnson requested to see the medication log, Michael Dunn had added his name to cover the wrongdoing. No discipline was made for this violation.

134.     Fentanyl was brought into the group home by a resident and was not properly reported or investigated as is required.

135.     Failure to report is a violation of the law and CCCJC policies and procedures.

136.     These are examples of multiple policy and procedures that are being violated and overlooked in favor of preferred employees. The allegations of drugs being brought into the group home made against Mr. Dunn are the same kinds of allegations, that were false and fabricated by Mr. Kern with Judge Hughey's knowledge, that were made against Ms. Moss as justification for terminating her after she reported harassment, inappropriate actions towards students and other wrongdoing.

FURTHER AFFIANT SAYETH NAUGHT

MISTY SCHWEITZER

05/12/2022
Yukon OK            Date

STATE OF OKLAHOMA

COUNTY OF CANADIAN


SUBSCRIBED AND SWORN TO BEFORE ME, on ___5·12·22___

the __12__ day of __May__, 2022 by MISTY SCHWEITZER


Signature_____

NOTARY PUBLIC

My Commission expires: ___8/24/22___                    (Seal)

SONIA MENHUSEN
NOTARY
# 18008511
EXP. 08/24/22
PUBLIC
STATE OF OKLAHOMA

**Oklahoma Gazette**                    Search

---

NEWS » METRO                              SEPTEMBER 24, 2014

# Canadian County Children's Justice Center offers a unique collection of resources that appears to have a major impact on the decrease in adult crimes.

BY BEN FELDER

click to enlarge



Lauren Hamilton

Juvinile inmates dance to a work out video at Canadian County Children's Justice Center in El Reno, Oklahoma. Photo by Lauren Hamilton

Bill Alexander believes the teenagers who spend time locked up at the Gary E. Miller Canadian County Children's Justice Center are lucky.

Luck isn't an obvious description when you see teenagers in bright yellow jumpsuits spending hours in a stuffy classroom, having to ask permission to scratch their head or being confined to a jail cell at night.

"I tell them, 'You are lucky because you got to see is what it's like to lose your freedom,'" said Alexander, the facility director. "They get a chance to realize being on the outside offers lots of freedoms you didn't even realize you had."

Ex. 20 Gazette Article.pdf
Page 1 of 4

Built in 1999, the justice center in El Reno is a unique facility that offers every

## Oklahoma Gazette

Search

office of juvenile affairs and probation officers. There is also a free drug and alcohol rehabilitation center for residents of Canadian County and an alternative school for students kicked out of their home district.

Built and operated from a 35-cent voter-approved county sales tax, the only county sales tax in Canadian County, the facility is one of the only in Oklahoma to offer such a comprehensive center for children and their families. Fifteen years after opening the center, Canadian County has seen its misdemeanors cut in half, despite being one of the fastest growing counties in the nation over the past decade. The number of adult felonies has also remained virtually unchanged, a fact Alexander believes is tied to the success of the center.

One of the unique advantages the center has is its ability to work with kids before they are already stuck in the justice system.

"We have parents who come in and say, 'Can you help me with my kid? He is out of control,'" Alexander said. "In many counties in the state, they can't do anything about it."

That's because the justice system only gets involved following an arrest, which might be too late for many teens. However, in Canadian County, parents can request that their child be placed on probation before there is an arrest.

"Once they do that, the court has some teeth," Alexander said.

click to enlarge



Bill Alexander, facility director for Canadian Country Children's Justice Center in El Reno, Oklahoma. Photo By Lauren Hamilton.

Obeying the rules of parents and school officials is criteria for the probation, a violation of which allows the county judge to step in and order the child into a three- to five-day sanctions program.

"You can't lock a kid up in a juvenile detention center unless they commit a

## Oklahoma Gazette     Search

know that they have to do what people in authority tell them."

One wing of the justice center houses juveniles who have been arrested and are awaiting sentencing. Another wing is for those in the sanctions program, which functions like a jail facility.

However, locking up kids isn't the only function of the center. There is an outpatient and residential behavioral health service program, a 24–bed residential substance abuse program and a drug screening program parents can confidentially use at any time.

"One of the advantages that I see here is having so many different services under one roof," said Eva Massey–Hottle, a councilor at the justice center.

Massey–Hottle has worked at the center for 10 years, but before that, she had been with other juvenile programs. In her experience, the Canadian County facility is like none other across the state.

"I can tell you in this agency, everyone seems to be going in the same direction," Massey–Hottle said. "You get so much better results because we have all the services here and we are not running into that conflict between agencies."

click to enlarge



Lauren Hamilton

Judge Bob Hughey of Canadian County.

The justice center offers a holistic approach that families can turn to when hope is on short supply. Christine Ethridge was a single mother, and her son, Matt, was running into problems.

"He started hanging out with the wrong crowd," she said. "I didn't know what to do, but the center was a huge help."

Matt had gotten in trouble at school after being found with a gun and was

## Oklahoma Gazette

Search

when you have a troubled teen and you are a single parent, you feel all alone, Ethridge said.

Matt began to turn his life around, thanks in part to the center, and Ethridge said she began to see a bright future for her son. Matt died in a car accident at the age of 16, but Ethridge said it was a blessing to see her son on the right track before he passed away.

"I used to joke that if your kid ever got in trouble, you want it to be in Canadian County," Ethridge said. "They gave me hope."

As Alexander walked through the detention center, he stepped inside a classroom where a dozen teenagers in the sanctions program were in the middle of a daylong class. He instructed them to look up from their textbooks and asked what the most important lesson to learn at the center was.

Various answers were offered, including respecting adults, taking responsibility for one's actions and following the rules.

"All those things are good. I hope you do learn them," Alexander said. "But what I want you to learn more than anything is this is what it's like to lose your freedom."

Print headline: Youth in reform: Canadian County Children's Justice Center offers a lot under one roof.

| Like 0 | Share | Tweet | Save | Email | Favorite | Share |

T







| From: | Bill Sharp |
| Sent: | Tuesday, June 13, 2017 5:37 PM |
| To: | CCJC Employees |
| Subject: | Press Release from the Canadian County Commissioner's Office |

On June 7, 2017, the Board of County Commissioners received notice that a charge of discrimination had been filed by a former juvenile center employee with the Equal Employment Opportunity Commission. The Board takes allegations of this nature very seriously. In response to this notice, and in light of the Board's concerns related to the workplace environment at the juvenile center, the Board has temporarily suspended the job duties of the Justice Center Co-Facility Director, Bill Alexander, while an independent investigation into this matter is conducted. An investigation of this type implies no conclusion of guilt or innocence.

Bill Sharp, Ph.D.
Facility Co-Director and Director of Behavioral Health
The Gary E. Miller - Canadian County
Children's Justice Center
7905 East Highway 66
El Reno, OK 73036
(405) 262-0202

**Ronda Moss**

| | |
|---|---|
| **From:** | Ronda Moss |
| **Sent:** | Friday, December 21, 2018 11:49 AM |
| **To:** | Bob Hughey |
| **Subject:** | Regarding incident (further) |
| **Importance:** | High |

Judge;

I apologize to be sending more information; I have had a lot of meetings the past few days and have not had a lot of time to complete information for my complaint against Cedric. I would like to include job interference because of his refusal to leave my office when I repeatedly asked him to and after repeatedly letting him know that I needed to talk to Ms. Conant and Melissa, who were standing in the hallway waiting to enter my office.  HR personnel are required to do what is called engaging in the interactive process with an employee whose condition is covered under ADA, which I was attempting to do with Ms. Conant (her condition is covered under ADA.)  This process includes the possible need for an accommodation which can include accommodations on the job, as you know, as well as needing time off and the use of FMLA.  I would like this included because I am including this as documentation in case, in the future, anything comes up about the possibility of ADA or FMLA interference is called into question.  (Ms. Conant's counselor, whom I spoke with on the phone, verified that she had advised Ms. Conant to go to her HR representatives and discuss possibly using FMLA.)

Once Ms. Conant was allowed to come into my office, I did discuss her options in using FMLA.  Ms. Conant is worried about taking off work, even using FMLA, because she told Melissa and I, she is afraid of losing her job, making her co-workers and LaTanya mad at her.  No matter how many times me and Melissa reiterate to her that her job is not in jeopardy and that is what FMLA is for, she is fearful.  She expressed that she has been returning to work before her doctor wants her to release her for these concerns.  She states that she "talks her doctor into" letting her return to work.  This is concerning because if she keeps returning to work before she should, she may continue having the same issues.

Also, I learned that LaTanya had entered Melissa's office with Ms. Conant present and said that Ms. Conant needed to return to the floor.  This is totally unacceptable and would most likely constitute interference by Ms. Conant's manager.

I am keeping this documentation for future reference in case the facility becomes negatively involved and it is noted that neither Melissa nor I interfered with the above mentioned processes, however, that Cedric and LaTanya both did.

*Ronda Moss*
*Assistant Facility Director*
*Human Resources Director*
*Gary E. Miller Canadian County Children's Justice Center*
*www.childrensjusticecenterok.org*
*Phone: 405-264-5509*

1

**EXHIBIT 4**

Walked by students & staff at CCEC
(after the student exposure incident)
and said "keep it in your pants"
- Paul Hardaway

~~Pau~~ Refering to staff, monica Hofer,
told Erin that she needed to
"help him get Monica away
from her husband".
- Erin

Told employees that he got a new
toilet and his (parts)(pinuts) will all fit
in it
- michelle W.
- Erin

In a meeting, said "glad your puss
is here
- Katelynn
- Chris

Uses words (geriatric, etc.) when talking
about older employees and having older
people. Asks how old new employees
to be hired are.

Uses profanity a lot, including "F-word"

Calls people out in meetings and puts managers on the spot by telling them to conduct the meeting without telling them before hand or telling them what the meeting is about. Then makes fun of them.

Makes fun of staff/managers during meeting in front of others. Made fun of Kim White when she asked a question by putting his glasses on crooked and talking "like a doofus."
- Doni
  all management staff

Most every conversation including meetings some form of inappropriate behavior, profanity or sexual nature is displayed.

male student at CCEC exposed himself.
Dan tells employees around the building
that a student is "swinging his meat
around"
— Cedric
— Ronda
— Chris

Refers to kids with special needs as
"the kids who wear helmets" "riding
the special bus" "the window-lickers"
while talking in a "retarded" voice
& using crippled up hand gestures.
— Cedric
— Ronda
— Ebbie
— Dani Stuart

During: Told that he had played a joke on his
meeting, sister and called her work and asked
her to page a person named "Vulva Hymen"
Repeated this several times.
— Latanya
— Krystal
— Cedric
— Angel
— Ronda

Spoke with Paul Hardaway due to hearing he was upset about something that happen with Mr. Kern. Speaking with Mr. Hardaway he stated that Mr. Kern came up behind him in the common area during meal time with the students, and made the statement "Keeping in their pants today". This was in reference to a young man at CCEC exposing himself out in the open. I asked Mr. Hardaway does he think that the kids could hear what was said, he stated "could have".

Ronda reported to me that in front of staff (Chris, Cedric and herself) that Mr. Kern made comments in reference you the young man that exposed himself, that we have a kid at the school "swinging his meat around"

**09-23-19** Ronda came to me and reported that Erin Barton (supervisor over SVP) and her were conversing an Erin told her Mr. Kern came to her and made the comment she (Erin) needed to help him get Monica (employee in SVP) away from her husband.

During the first bullying meeting Mr. Kern made comment "Glad your puss is here".

When Deborah White was hired myself, Ronda, and Mr. Kern were speaking about having a new lead therapist. Mr. Kern responded with "how old is this lady".

**08-30-19** Angel came and reported to me that she was getting a drink of water from the kitchen and she overheard Mr. Kern saying that he was playing a joke on his sister and had her call out over the intercom "Vulva Hymen you have a phone call. Dani Stewart also told me that she heard him say it loud enough where she could hear him, she commented "I wear headphones, my fan and my music were on and I still heard him".

**09-24-19** While speaking with Mrs. Stewart she made comment that he makes fun of special needs people, and one day he was walking by her and she turned around an caught him making a gross expression on his face towards her.

**07-24-19** During the Management meeting there was a discussion by Mr. Kern about going to something different than CARF and Kim White was surprised by that she started asking questions and Mr. Kern started laughing at her took his glasses and placed them crooked on his face making fun of how Mrs. White looked when he made the comment.

**08-02-19 and 08-07-19** I Melissa McClain went and asked Mr. Kern to speak with him that it was brought to my attention that there are some staff that don't feel supported by him (Doni, Kim) that they are being set up to fail.

**08-22-19** Ronda Moss came to my office and just wanted to let me know that she was going to Mr. Kern again about how she feels during meeting and his making fun of her calling her (Gestapo) and allowing other staff members to speak to her during those meetings (LaTanya Freeman).

**09-18-19** Cassie Goodfellow came to me stating that she feels like Mr. Kern does not like her and is afraid of losing her job. She stated that she was preparing payroll to go downtown and needed Mr. Kern's signature however he was talking to others. She finally was able to give it to him and made her rushed to be able to get it downtown she went back over to get it from him and he had given it to

another employee. She stated she had just gotten in trouble about discussing payroll with staff and he handed the very thing to a staff member. Payroll is very sensitive document it has all employee's salary and wages on it.

**09-20-19** I spoke with Derika about something that I heard. I went to her and stated I am not one to listen to gossip so I wanted to know if this was true. I asked her if she was upset about anything that may have taken place and that is when she told me that she was not really upset but her feeling were hurt and she was made. She stated Mr. Kern came to and told her a staff member came into a meeting that himself and Mr. Mills were having and out load said she was mad that Derika got a raise and was going to have a "boob Job" with it. This comment not only made her mad but upset her that people knew about it. Mr. Kern in my professional opinion should have never had that conversation with Derika or to go as far as telling her whom the staff was.

I do not remember the date to be exact however I know that When Mr. Kern first started that I went to him personally and told him people are not happy with the language that he is displaying I stated to him "you are a little rough around the edges with your language. He said "what do you mean by that", I told him his cussing the language he displays in meetings.

**09-11-19** Angel came to me and told me that Mr. Kern came to her and asked her "Did Bill really have an affair with your sister in law", she stated back "no" and he was mistaken. He went on to say "you know it was presumed by a few staff that you also had an affair with Bill". She shut him down there and said "absolutely not". That Bill text her and she saw where the text were going she stopped responding.

Right after Mr. Kern started there was an incident that had come up and I told him I was just doing my job and wanted to be treated with respect he said that a certain staff member just does not like me that she had gone to him and said she didn't like Melissa because I did not defend Bill Alexander and through him under the bus. I told him right there I did not do anything like that I never spoke to or about Bill to anyone that I could only speak on my professional relationship with Bill Alexander and he didn't say or do anything inappropriate to me. However I do feel like Mr. Kern going around telling staff what others have said makes for a hostile work environment.



**Marc Hader**
+14054749558

Wednesday, October 9, 2019

Hi Mark, it's Donna Wehmuller.
Are you by chance available
to talk this afternoon? If not,
are you planning on coming
tomorrow evening to the
picnic?

2:36 PM

M   Yes, I am availabl e this
afternoon if you would like to
meet. And yes I do have the
picnic on my schedule. But, I
have three events all going on
at that same time tomorrow.

Where is a good place for me to
meet you? I can come right now,
or I can do so later.   3:17 PM

Are you at your district office?

3:21 PM

M   I'm glad you felt like you could
reach out to me. I spoke with
NaCole.

What imo is the picnic? I'm
afraid I have two other events

Ex. 25 Wehmuller Text with Hader.pdf
Page 1 of

Enter message

Special Feature: Our PGA Championship Coverage                    ✕

Watch Our Special: Southern Hills, The PGA Returns                ✕

Need to Know: Oklahoma Lake Levels                                ✕



MENU

LIVE
@4PM

☀ 90°

By: Grant Hermes



New allegations have surfaced against the director of an El Reno juvenile detention center and school alleging sexual harassment, retaliation and inappropriate behavior toward or around minors.

According to documents obtained by News 9, multiple employees at the Canadian County Children's Justice Center have complained about Director Dan Kern's behavior. In one alleged instance, Kern was heard calling the students at the center "jack***" and little s***-heads." In another alleged incident, after a student had exposed himself at the school, Kern said in front of students and a school official "Where is that swinging d***?"

In another troubling alleged instance in front of a school official, Kern promised a 13-year-old student he'd take her to see her father in prison asking about her relationship with her father. After the student was dismissed Kern told an official "She's a cute girl and she's got a cute butt."

The sources behind the documents asked not to be named, one of them saying in a text message any alleged retaliation was "something political and we don't even realize how high."

Schooling for students at the center is overseen by El Reno Public Schools. According to the source, both the ERPS Superintendent and a principal were notified. The Superintendent asked to stay updated, and the principal called the source sounding "horrified".

Multiple Canadian county officials have been notified of Kern's alleged behavior including two commissioners Marc Hader and David Anderson, and Judge Bob Hughey who hired Kern last March. To the sources' knowledge, no real investigation was ever conducted, and Kern remains on the job.

Hader said he was unaware of any specific allegations but did know about recent firings at the center. Mr. Anderson did not return our message.

News 9 attempted to interview Mr. Kern at the center but was told he was unavailable to talk.

According to another source who was in the building at the time, Mr. Kern told deputies at the door to stop the reporter and photographer from entering the building, which would have been illegal because the center is a public building.

Attempts were made to set up an appointment with Mr. Kern's office, but the attempts were not returned as of Monday morning.

","published":"2019-10-28T14:17:40.000Z","updated":"2019-10-28T14:14:55.000Z","summary":"New allegations have surfaced against the director of an El Reno juvenile detention center and school alleging sexual harassment, retaliation and inappropriate behavior toward or around minors. According to documents obtained by News 9, multiple employees","affiliate": {"_id":"5cc353fe1c9d440000d3b70f","callSign":"kwtv","origin":"https://www.news9.com"},"contentClass":"news","createdAt":"2020-01-31T18:14:00.471Z","updatedAt":"2022-03-30T20:15:45.125Z","__v":4,"show":true,"link":"/story/5e346e68527dcf49dad6e11b/harassment-inappropriate-behavior-alleged-at-el-reno-detention-center","hasSchedule":false,"id":"5e346e68527dcf49dad6e11b"};

SPONSORED CONTENT

Edmond, Oklahoma Launches New Policy For Cars Used Less Than 49 Miles/Day ☐
BY COMPARISONS.ORG



Special Feature: Our PGA Championship Coverage   ✖

Watch Our Special: Southern Hills, The PGA Returns   ✖

Need to Know: Oklahoma Lake Levels   ✖



MENU

☀ 90°

Wednesday, November 6th 2019, 7:31 pm
By: Dana Hertneky

A former employee of the Canadian County Children's Justice Center said not only was she sexually harassed, but she was fired when she reported it. The retaliation is the latest in a list of disturbing allegations at the center.

That former employee and another woman, both who worked in human resources for the center, have notified Canadian County that they have retained an attorney and plan to eventually file a lawsuit claiming retaliation for making reports about the center's director.

Dan Kern is the Canadian County Children's Justice Center's current director despite, according to the women's attorney, between five and eight employees, both men and women, making serious claims about him.

### *Read Related Story: Canadian Co. Officials Respond To Allegations of Misconduct At Juvenile Center*

"There were a lot of inappropriate and sexualized statements that were made by Mr. Kern, the use of derogatory, vulgar, pejorative terms about women in general," said Rachel Bussett the attorney representing both of the women.

Ronda Moss, the former facilities director, said she made complaints of harassment, age discrimination and retaliation four different times between September 24 and October 7 on behalf of herself and others. Shortly after that on October 17, she was fired.

"I was not given a reason why still to this day I don't know why," said Moss.

In a letter to Canadian County commissioners Moss's attorney Bussett said another employee Melissa McClain made similar claims and was demoted also on October 17.

Both women said they notified Judge Bob Hughey, who oversees the center and makes all the hiring and firing decisions.

Moss said no action was taken against Kern and when she was fired, the county's HR director was not aware of the complaints.

"She said that she's just the messenger, and I went on to ask her about the status of the complaints against the center that should have gone to her, and she said she didn't know anything about that," said Moss.

News 9 spoke on the phone with County Commissioner David Anderson, who said they are taking these allegations seriously and are in the process of conducting an internal investigation into misconduct of the facilities director.

Anderson said he has reviewed the letter from Bussett, and these latest claims will be a part of that investigation.

","published":"2019-11-07T01:31:37.000Z","updated":"2019-11-07T01:35:46.000Z","summary":"A former employee of the Canadian County Children's Justice Center said not only was she sexually harassed, but she was fired when she reported it. The retaliation is the latest in a list of disturbing allegations at the center. That former employee and a","affiliate":
{"_id":"5cc353fe1c9d440000d3b70f","callSign":"kwtv","origin":"https://www.news9.com"},"contentClass":"news","createdAt":"2020-01-31T18:11:14.899Z","updatedAt":"2022-03-30T20:14:43.250Z","__v":4,"show":true,"link":"/story/5e346dc2527dcf49dad6dc81/2-women-claim-they-were-fired-for-reporting-sexual-harassment-against-canadian-co-juvenile-center-director","hasSchedule":false,"id":"5e346dc2527dcf49dad6dc81"};

Special Feature: Our PGA Championship Coverage ✖

Watch Our Special: Southern Hills, The PGA Returns ✖

Need to Know: Oklahoma Lake Levels ✖

MENU  LIVE @4AM

 80°

# Canadian Co. Judge Defends Detention Center Dir. At Heart Of Controversy

Friday, November 15th 2019, 8:08 am
By: Grant Hermes



EL RENO JUDGE RESPONDS TO MISCONDUCT COMPLAINTS

 

The judge who oversees an El Reno juvenile detention center defended the center's director who is at the heart of an ongoing misconduct investigation.

In a recent guest article in the El Reno Tribune, Canadian County Judge Bob Hughey, charged with running the El Reno Children's Justice Center, confirmed Director Dan Kern was a high-level official at the notorious and now closed Walnut Grove detention facility in Mississippi.

According to a 2012 DOJ investigation, federal investigators found "sexual misconduct that was among the worst that [investigators had] seen in any facility anywhere in the nation" at Walnut Grove. Previously, News 9 was able to link but not definitively prove Kern worked at the facility.

Kern was later named in a lawsuit filed against the Mississippi center as the Deputy Director. But, In his article Hughey said linking Kern to the widespread misconduct and alleged criminality was "off base."

"There was no reason for this lawsuit to raise any red flags related to the employment of Dan Kern. Kern was recognized as an expert, with the knowledge and experience to correct the problems of Walnut Grove," Hughey wrote.

However, the problems at Walnut Grove persisted and the center was closed in 2015. Kern was later dismissed from the lawsuit.

Kern has been accused by current and former staff members of harassment, retaliation and using sexual language about students at the center. Two former employees are now suing, saying they were wrongfully fired.

"I was not given a reason why. Still to this day I don't know why," former center employee Ronda Moss said about her firing.

According to one source, who has asked to remain anonymous, the alleged retaliation has continued by sequestering employees who made complaints in their offices and subjecting them to surprise drug tests, something the source said was out of the ordinary.

Kern remains on the job, despite the allegations and a county investigation. Repeated attempts to reach Kern have been made but have gone unanswered.

## Read Related: Canadian Co. Officials Respond To Allegations Of Misconduct At Juvenile Center

","published":"2019-11-15T14:08:47.000Z","updated":"2019-11-15T23:59:20.000Z","summary":"The judge who oversees an El Reno juvenile detention center defended the center's director who is at the heart of an ongoing misconduct investigation. In a recent guest article in the El Reno Tribune, Canadian County Judge Bob Hughey, charged with r","affiliate": {"_id":"5cc353fe1c9d440000d3b70f","callSign":"kwtv","origin":"https://www.news9.com"},"contentClass":"news","createdAt":"2020-01-31T18:08:58.685Z","updatedAt":"2022-03-30T20:13:55.554Z","__v":3,"show":true,"link":"/story/5e346d3a527dcf49dad6d8c5/canadian-co-judge-defends-detention-center-dir-at-heart-of-controversy","hasSchedule":false,"id":"5e346d3a527dcf49dad6d8c5"};

SPONSORED CONTENT

How Dogs Cry For Help: 3 Warning Signs Your Dog Is Crying For Help 🗗

**BY DOGFOODDISCOVERY.COM**



# EXHIBIT 11

In regards to inappropriate remarks I have made since the onset of my employment with the Canadian County Children's Justice Center, I can honestly say, without hesitation, that I had absolutely no intention of ever making anyone feel uncomfortable, but nonetheless, those comments made were unbecoming of my position and not appropriate for the workplace.

I value the leadership opportunity that has been granted to me with my employment at the Justice Center. With this opportunity, I understand the responsibilities I must uphold to the Center, the Board of Commissioners, and to the tax payers of Canadian County.

I wrongfully errored in sharing stories and making comments that are not workplace appropriate. I take full responsibility for my behavior, and I have since made the necessary adjustments so that my words and actions remain above reproach, and so that my leadership standards reflect those of which I would expect of any other employee within the agency.

With my longstanding professional experiences, I know that rumors (even those which are fabricated) are usually harmless to your career and that the best course of action in responding to rumors is to let them 'run their course'.

To my professional detriment, and admitted naivety, I coincidentally made the unbecoming and unprofessional remarks at a transitional time in the agency when professional scrutiny and accompanied embellishment were at a peak. The toxicity level at the Canadian County Children's Justice Center, resulting from gossip and rumors spread throughout the agency, is at a level of which I have never experienced.

It seems as if rumors and accusations which have been formed against me have been created by someone who is seeking to retaliate against historical administrative appointments and context within the agency, all of which was beyond my knowledge and control at the onset of my employment.

Since the onset of my role as Facility Director at the Justice Center, I have since learned (due to an ongoing series of unfortunate leadership decisions) of how a former Assistant Facility Director reacted poorly to not being hired as the agency's Facility Director (again, something which was outside the realm of my decision-making). This individual worked adversely against my initiatives and general enhancements to workplace processes by creating backchannels of unregulated information which was toxic. This same individual has proven adept at identifying people that could be manipulated to assist in the said retaliation. Again, to my detriment, because of unbecoming comments I had made, I unknowingly made myself an 'easy target' for this individual's scorned purpose.

The gossip and rumor mill is a formidable foe at the Canadian County Children's Justice Center, one of which I will make certain is addressed through improved lines of communication, continued transparency, and accountability to expectations. I will continuously seek assurance in hiring quality personnel for key positions, mandating policy governing workplace gossip, and defining leadership behavior that is above questioning.

*"In the long run, we shape our lives, and we shape ourselves. The process never ends until we die. And the choices we make are ultimately our own responsibility".  Eleanor Roosevelt*



**Canadian County**
**Payroll**

**Employee Status Change**

Name: _Daniel Kern_          Employee # _90353_

Change of Address:   (For Part-Time Employees Only)

Old Address: _____

New Address: _____

~ Full-Time Employees Must Complete the OPERS Change of Address Form ~

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Change of Salary/Account: Old _____   New _____   Effective _____

Change of Accrued Vacation Time:

Anniversary Date: _____   Old Rate _____   New Rate _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Sick Leave without Pay:   Begin_____   Return_____

Leave without Pay:   Begin_____   Return_____

FMLA:   Begin_____   Return_____

Military Leave:   Begin_____   Return_____

Workers' Comp.:   Begin_____   Return_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Termination Date: _11/22/2019_

Was employee involuntarily terminated?   Yes _X_   No ____

Was employee terminated for gross misconduct?   Yes ____   No _X_   Dist. Atty. _____

Was employee called to military duty?   Yes ____   No _X_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Other notes: _Employee's last day of employment is 11/22/2019._

Authorized by: _Pamela Owens_          Date: _11/22/2019_

Title: _Accountant_

201 N. Choctaw Avenue, El Reno, OK  73036
405.295.6179 ~ Fax 405.295.1599
www.canadiancounty.org

Ex 30 Kern Discipline.pdf
Page 1 of 4



**Canadian County**
Payroll

**Employee Status Change**

Name: _Daniel Kern_                          Employee # _90353_

Change of Address:   (For Part-Time Employees Only)

Old Address: _____

New Address: _____

*~ Full-Time Employees Must Complete the OPERS Change of Address Form ~*

Change of Salary/Account:  Old _____   New _____   Effective _____

Change of Accrued Vacation Time:

Anniversary Date: _____   Old Rate _____   New Rate _____

| | | |
|---|---|---|
| Sick Leave without Pay: | Begin _____ | Return _____ |
| Leave without Pay: | Begin _11/18/19_ | Return _Unknown_ |
| FMLA: | Begin _____ | Return _____ |
| Military Leave: | Begin _____ | Return _____ |
| Workers' Comp.: | Begin _____ | Return _____ |

Termination Date: _____

Was employee involuntarily terminated?        Yes _____   No _____

Was employee terminated for gross misconduct?   Yes _____   No _____   Dist. Atty. _____

Was employee called to military duty?        Yes _____   No _____

Other notes: _____

Authorized by: _Pam Owens_                    Date: _11/18/19_

Title: _Accountant_

201 N. Choctaw Avenue, El Reno, OK  73036
405.295.6179 ~ Fax 405.295.1599
www.canadiancounty.org

Ex 30 Kern Discipline.pdf
Page 2 of 4

# Discipline: Disciplinary/ Counseling Report

Name: Dan Kern          Office/Dept.: CCCJC          Date: 11/18/2019

Date of Occurrence: 11/13/2019     Time: 9:30 Approximately     Location: CCCJC

## ACTION TAKEN:

☐    Coaching      ☐    Verbal Warning      ☐    Written Warning
☐    Final Warning      ☐    Termination      ☑    Suspension without pay

(Depending on the nature of the offense, the county reserves the right to skip any steps at its discretion)

## DESCRIPTION OF ISSUE:

☐    Attendance      ☑    Conduct      ☐    Safety Violation
☐    Policy/ Procedure Violation    ☐    Unsatisfactory job performance    ☐    Other:

## EXPLANATION:

## GOALS/CORRECTIVE BEHAVIOR:

Should your record continue to be unacceptable in the above area(s), the county will find it necessary to take the following disciplinary action (or more depending on the situation):

| ☑ | Written Warning | ☑ | Final Warning: |
|---|-----------------|---|----------------|
| ☑ | Termination | ☑ | Other: |

## EMPLOYEE COMMENTS:

Employee: _Dan Ken_____  Date: _11/18/2019_

Chairman: _David Anderson_____  Date: _11-18-19_

Manager: _Bo Huff_____  Date: _11-18-19_

Human Resources: _____  Date: _11-18-19_

Special Feature: Our PGA Championship Coverage                    ✕

Watch Our Special: Southern Hills, The PGA Returns                ✕

Need to Know: Oklahoma Lake Levels                               ✕

MENU                                    LIVE
                                        @4AM                      ☀ 80°

# Director Of Canadian Co. Center Fired Amid Misconduct Investigation

Monday, November 25th 2019, 9:22 am
By: Grant Hermes



 

In a surprising about face, the
Center in El Reno announced
placed on paid leave.

This began several weeks ago after sources came forward and said Kern had allegedly
been harassing employees and was engaging in lewd behavior around students at the
center.

Kern was under investigation by the county after News 9 began reporting on the allega-
tions against Kern.

Up until last week, the Judge in charge of the center, Judge Bob Hughey, supported Kern
throughout multiple News 9 stories about his alleged misconduct. Hughey even called
some of the reporting misguided.

In an email, Hughey did not release any details about what led to his new stance on Kern's
alleged behavior.

"I just wanted to let everyone know that Dan Kern is no longer employed at the Children's
Justice Center," Hughey wrote.

Hughey also said in his email the search for a replacement started immediately. Repeated
requests to talk to both Kern and Hughey have either been denied or gone unanswered.

","published":"2019-11-25T15:22:00.000Z","updated":"2019-11-25T15:21:59.000Z","summary":"In a
surprising about face, the Judge in charge of the Canadian County Children's Justice Center in El
Reno announced director Dan Kern is no longer with the center after being placed on paid leave. This
began several weeks ago after sources came fo","affiliate":
{"_id":"5cc353fe1c9d440000d3b70f","callSign":"kwtv","origin":"https://www.news9.com"},"contentClas
s":"news","createdAt":"2020-01-31T18:06:51.522Z","updatedAt":"2022-03-
30T20:11:03.755Z","__v":2,"show":true,"link":"/story/5e346cbb527dcf49dad6d527/director-of-cana-
dian-co-center-fired-amid-misconduct-
investigation","hasSchedule":false,"id":"5e346cbb527dcf49dad6d527"};

SPONSORED CONTENT

22 Yukon Progress.pdf
Page 1 of 2



# YUKON PROGRESS

*Home of Jim Meadows*

| USPS 498-400 | Yukon's Best Choice for Community News & Sports. | $1 DOLLAR |
|---|---|---|
| Volume: 116 | Issue: 028 | Saturday, June 17, 2017 | 5 Sections | 80 Pages |

# Director suspended

## Sexual texts, harassment focus of pending investigation



**Jack Stewart**
**County Commissioner**

By Tim Farley
*News Editor*

Canadian County's Juvenile Justice Center Co-Facility Director Bill Alexander has been temporarily suspended from his duties pending the outcome of an investigation that involves alleged sexual texts he sent to a female co-worker.

A statement from the Canadian County Commissioner's Office stated that on June 7 the Board of County Commission-

"In response to this notice, and in light of the Board's concerns related to the workplace environment at the juvenile center, the Board has temporarily suspended the job duties of the Justice Center Co-Facility Director, Bill Alexander while an independent investigation into this matter is conducted."

*County Commissioners' statement*

ers were notified that a former juvenile center employee filed a discrimination charge against Alexander with the Equal Employment Opportunity Commission.

"In response to this notice, and in light of the Board's concerns related to the workplace environment at the juvenile center, the Board has temporarily suspended the job duties of the Justice Center Co-Facility Director, Bill Alexander while an independent investigation into this matter is conducted. An investigation of this type should be considered routine in such cases," the statement reads

**See Suspend, Pg. 2A**



**Marc Hader**
**County Commissioner**

**See Molest, Page 2A**

## Frisco Road project draws objections from Yukon woman

### Highway 4 should have priority, Walters says

By Tim Farley
*News Editor*

Longtime Yukon resident Amy Walters isn't a fan of the Frisco Road-Interstate 40 interchange that will be built within the next few years.

Instead, Walters wants the State Highway 4 project started and finished before any more state funds are spent on the Frisco Road interchange. She made her feelings known Tuesday during a public hearing that centered on the Frisco Road project.

"I think it's wrong to

put economic development over public safety," she said. "They need to put every dollar into Highway 4 so we can take care of public safety. Right now, it's a death trap and parents don't want their children riding on school buses that take that route."

Yukon city officials expect a giant indoor-outdoor water park, a hotel and other retail businesses will locate north of the interchange before and after its constructed. The cost of the interchange is estimated at $17 million, according to Brian Taylor, division engineer for the Oklahoma Department of Transportation.

Taylor countered that Highway 4 and the Frisco Road interchange are priority projects for ODOT.

"It's hard to say Frisco

**See Road, Page 2A**



The yellow circle shows the Frisco Road-Interstate 40 interchange that will be built within the next three years, state transportation officials said Tuesday. The red lines indicate utilities.

## Yukon man booked on porn charge

A Yukon man was arrested for trading child pornography and conspiring to sexually molest a newborn baby, according to the Canadian County Sheriff's Department

Daniel Thomas J. Def-

fner, 39 of Yukon, was arrested Friday, June 9 by investigators with Canadian County Sheriff's Office

Detectives with the Midwest City Police Department contacted Cana-

dian County investigators on June 8 with evidence they collected from Deffner's Facebook account. The conversation implicated him in child exploitation and distribution of child pornography in Ca-

nadian County.

Deffner's Facebook dialogue showed he was communicating with a pregnant woman living in Midwest City's jurisdic-

**See Molest, Page 3A**



www.YukonProgress.com

**$1.00**

For home delivery call: (405) 373-1616

USPS 498-400



# Crosslands
## A & A Rent-All And Sales Co.

Contact Jerry Jansen at (405) 354-4808
for all your equipment rental needs.

EQUIPMENT RENTALS • RESTROOM RENTALS • SALES • PARTY RENTALS • 305 S. RANCHWOOD BLVD • YUKON, OK • CROSSLANDRENTALS.COM



Mon: 7:00 AM-5:00 PM | Tue: 7:30 AM-5:00 PM | Wed: 7:30 AM-5:00 PM
Thu: 7:30 AM-5:00 PM | Fri: 7:30 AM-5:00 PM | Sat: 8:00 AM-1:00 PM
Closed Sundays

# Suspend

From Page 1A

Two sources confirmed Alexander reportedly sent sexual texts to a justice center employee asking if she was a swinger and the sexual positions she prefers. The sources said the woman who received the texts did not file a complaint for fear of losing her job. However, copies of the texts were sent to Canadian County Assistant District Attorney Paul Hesse. Hesse was recently appointed as a district judge for Canadian County by Gov. Mary Fallin.

Hesse said he could not comment on the texts.

Sources told the newspaper Alexander allegedly drove to Dallas when he was involved in a swingers' circle. Swinging, also known as wife swapping or partner swapping, is a non-monogamous behavior in which single people and partners in a committed relationship engage in sexual activities with others as a recreational or social activity.

Reports also surfaced Tuesday that the commissioners overstepped their legal authority by suspending Alexander. Sources told the newspaper Alexander works under Associate District Judge Bob Hughey, who was out of town this week, and only Hughey has the power to suspend Alexander, according to state law. Hughey is responsible for the juvenile center docket.

**State law states that juvenile center directors such as Alexander "serve at the will and discretion of the judge responsible for the juvenile docket." The law also reads, "The director shall perform the duty or duties of directions and implementations of county juvenile facilities and services as prescribed and directed by the board of county commissioners."**



**Paul Hesse**
**Asst. District Attorney**

State law states that juvenile center directors such as Alexander "serve at the will and discretion of the judge responsible for the juvenile docket." The law also reads, "The director shall perform the duty or duties of directions and implementations of county juvenile facilities and services as prescribed and directed by the board of county commissioners."

However, commissioners are not allowed by state law to hire or fire juvenile center directors.

County Commissioners Marc Hader and Jack Stewart confirmed Tuesday night that the county intends to hire an outside firm to investigate the allegations against Alexander. Both commissioners also said they believe they were within their power to suspend Alexander.

As part of the allegations against Alexander, a second woman reportedly has filed a complaint with the U.S. Equal Employment Opportunity Commission after she was harassed and fired. Hader and Stewart said they could not comment on the EEOC complaint.

# Road

From Page 1A

Road is taking priority when my first project (on the board) is Highway 4. They are both priority projects for us," he said.

Over the years, numerous accidents involving injuries and fatalities have occurred on Highway 4 between Yukon and Northwest Expressway (Highway 3). Most of the accidents occur at curves in the road near the Britton and Hefner intersections.

Walters was reassured by Yukon City Manager Jim Crosby that Highway 4 is not being ignored. A contract and plans have been approved and city officials are currently in negotiations to buy required easements. Crosby told Walters and the rest of the people at the public hearing that bonds are being sold to finance the city's part of the project, which will be constructed in partnership with ODOT and Oklahoma City.

The roadway will be realigned to the west and three current bridges will be removed and one 1,500-foot bridge will be built. The other two phases of Highway 4 will be from Highway 66 to Wilshire Road and from Wilshire Road to Highway 3.

"It's not happening fast enough," Walters said.

ODOT officials countered that a $44,000 traffic control improvement project was approved in April, the project will require



**Jim Crosby**
**City Manager**

the installation of flashing LED warning signs at the Britton Road intersection to give better warning to motorists. Flashing LED stop signs also will be installed and the signs will be much larger and more visible than the existing stop signs.

The safety project will be funded with federal safety money.

In the meantime, ODOT has been with Oklahoma City to advance an $11 million reconstruction project on Highway 4 from Wilshire Avenue to State Highway 3, which is tentatively set for federal fiscal year 2022. Utility relocation is set for fiscal year 2019.

**Frisco Road I-40**

The main purpose of Tuesday's public hearing received little feedback from the citizens who attended. However, Diane Abernathy, senior environmental project man-

ager for Triad Design Group, told the audience traffic on Garth Brooks Boulevard would increase by 80 percent in 2040 without the Frisco Road project.

The new interchange will improve traffic flow at the Cimerron interchange, Highway 66 and NW 10th Street, she said.

"We want to accommodate future traffic in a safe and efficient manner," Abernathy said.

When deciding on the preferred interchange plan, Abernathy and other ODOT officials examined natural resources, endangered habitats, historic properties, oil and gas wells, tribal properties, commercial facilities and existing businesses and residences.

A noise assessment determined interchange traffic would impact two homes and one commercial facility in the area. However, Abernathy said the cost for two noise walls would be "unreasonable." One homes is located due west of the project and another home and business is south of the proposed interchange.

ODOT's eight-year construction plan provides for right-of-way and utility relocation to occur in 2018 and 2019 and for construction to begin in 2020.

ODOT will accept public input through July 5.

## Service You Can Count On



**Yanda & Son Funeral Home** is a caring business which treats each individual with the utmost respect and professionalism. Since 1959 the Yanda family has been serving the Yukon and surrounding area faithfully and lovingly. We offer a wide range of services and accept the transfer of pre-arrangements from another funeral home.

**From Your Friends At**

# Yanda & Son
**Funeral Home and Cremation Services, Inc.**

*"Dedicated to the Dignity of Life"*

**1500 W. Vandament • 350-7101**
**www.yandafuneral.com**



**LIMITED TIME!**

**One Low Rate on New & Used Auto Loans**

**2.99%** APR

Lock in this low rate today!

**Call or prequalify online!**
**354-5281 | www.ynbok.com**

**YNB**

*The Bank That Makes Things Happen*

FDIC

**The New York Times** | https://www.nytimes.com/2016/09/16/us/mississippi-closes-private-prison-walnut-grove.html

# Privately Run Mississippi Prison, Called a Scene of Horror, Is Shut Down

**By Timothy Williams**

Sept. 15, 2016

A privately operated Mississippi prison that a federal judge once concluded was effectively run by gangs in collusion with corrupt prison guards, closed Thursday, its prisoners transferred to other state facilities, officials said.

Conditions at the prison, the Walnut Grove Correctional Facility, were deemed so substandard by Judge Carlton Reeves of Federal District Court, that he wrote in a 2012 settlement order that it "paints a picture of such horror as should be unrealized anywhere in the civilized world."

The move to shutter Walnut Grove, in Leake County, comes one month after the Justice Department announced that it would phase out its use of private prisons to house federal inmates after concluding that such facilities are more dangerous and less effective than prisons run by the government.

But the Obama administration decision does not affect states, which have increasingly come to rely on private firms to manage prison populations, including Mississippi.

While states say they enter arrangements with for-profit prison contractors to save money, some studies have cast doubt on whether private prisons are actually less expensive for taxpayers.

On Thursday, Walnut Grove's demise was celebrated by prison rights organizations and civil liberties groups.

"Good riddance to Walnut Grove, a cesspool sponsored by Mississippians' tax dollars," said Jody Owens, managing attorney with the Southern Poverty Law Center.

Walnut Grove was run by Management and Training Corp., a Utah-based company that is among the nation's largest private prison contractors.

The Mississippi Department of Corrections said in June that it had decided to shutter Walnut Grove not because of the often-unrestrained violence at the facility, but for budget cuts. Grace Simmons Fisher, a corrections department spokeswoman, declined to comment on Thursday.

Issa Arnita, a spokesman for the private prison contractor, said on Thursday in a statement that Management and Training Corporation had "made tremendous improvements to overall operations" at Walnut Grove since it took over management in 2012.

But the 1,260-bed facility had been operating since 2012 under a federal consent decree for violating prisoners' constitutional rights, and in 2014, Walnut Grove was the scene of two major riots.

Last year, Judge Reeves extended federal oversight of the prison because of continuing constitutional violations.

Conditions in a number of Mississippi's correctional facilities have been denounced by prison overhaul advocates or enjoined by the federal authorities for violating inmates' constitutional rights, but Walnut Grove was cited as a particularly brutal, often lawless place.

A 2012 Justice Department report found that rape of younger inmates by older prisoners was relatively common, and that guards habitually denied some prisoners access to medical care, while smuggling in weapons and drugs and having sexual relationships with others.

"The sexual misconduct we found was among the worst that we have seen in any facility anywhere in the nation," the report said.

Some of the guards, the report said, were themselves members of the gangs, including at least one prison supervisor who let prisoners out of their cells to assault unsuspecting rivals.

Organized gladiator-style fights between prisoners and encouraged by guards were also a frequent occurrence, with guards betting on the outcomes, according to the report.

Mr. Owens, of the Southern Poverty Law Center, said that on one visit to Walnut Grove, the odor of marijuana hung so heavily in the air that he worried he would get a contact high.

"It was like walking out of a club and your clothes smell like smoke," he said.

Even after juveniles were removed from the facility, violence continued.

At the same time, the neighboring town of Walnut Grove, population 1,900, boomed from prison revenue and employment. The town lobbied to be the site of a prison after one of its major employers, a glove factory, was closed.

As an example of the close ties between the prison and the town, Walnut Grove's mayor, William Grady Sims, served for a time as the prison's warden.

In 2009, Mr. Sims drove a female inmate to a motel room where they had sex. He later told the woman to lie to investigators about it. Mr. Sims was convicted and sentenced to seven months in a federal prison.

Special Feature: Visit Our 'Summer Adventures' Page ✕

Need to Know: Oklahoma Lake Levels ✕

MENU  LIVE @4:30AM

 77°

# Canadian Co. Officials Respond To Allegations Of Misconduct At Juvenile Center

Tuesday, November 5th 2019, 8:42 am
By: Grant Hermes



Canadian County officials are breaking their silence about allegations of misconduct made against the director of an El Reno juvenile detention.

In a Facebook post on the Center's official page, an unnamed author said they're taking allegations against Director Dan Kern seriously.

"Because this involves personnel issues, we cannot disclose information about the particulars of these allegations," the post reads.

Early last week, nearly a half dozen sources told News 9 Kern cursed and used sexual language around and about students. Those same sources asked to remain anonymous, afraid of being harassed or retaliated against.

The post appeared to be in response to those sources coming forward and News 9's stories. It says county officials were "not notified" of the allegations and an investigation into Kern had been "delayed by the withholding of information."

But according to one of the sources, Canadian County Judge Bob Hughey, who oversees the center, was notified in a typed and signed letter. The post does not go into detail about what kind of information had been withheld.

There are also new details about Kern's past.  According to the sources and a 2012 Department of Justice investigation code named Mississippi Hustle, Kern served as deputy warden of the Walnut Grove juvenile facility in Mississippi, where investigators found wide spread use of excessive force, indifference to harm and suicide risks and "sexual misconduct that was among the worst that [investigators had] seen in any facility anywhere in the nation." The center was shut down several years later.

News 9 has not been able to independently confirm Kern worked at Walnut Grove, although online records show Kern living in the area at the time and in other states where Kern is known to have worked.

County officials say the County Human Resources Manager NaCole Majors will be conducting the investigation at the center. The process in this investigation differs from the investigation into harassment allegations made against the previous co-director. In that case, the county hired a Tulsa-based investigative firm to look into the allegations. The co-director was later fired from his position, although was never sued by the woman making the allegation after an EEOC investigation.

Repeated attempts to reach Kern for comment have gone unanswered.

","published":"2019-11-05T14:42:52.000Z","updated":"2019-11-05T14:42:38.000Z","summary":"Canadian County officials are breaking their silence about allegations of misconduct made against the director of an El Reno juvenile detention. In a Facebook post on the Center's official page, an unnamed author said they're taking allegations against Di","affiliate":{"_id":"5cc353fe1c9d440000d3b70f","callSign":"kwtv","origin":"https://www.news9.com"},"contentClass":"news","createdAt":"2020-01-31T18:11:46.053Z","updatedAt":"2022-03-30T20:14:55.261Z","__v":2,"show":true,"link":"/story/5e346de2527dcf49dad6dd76/canadian-co-officials-respond-to-allegations-of-misconduct-at-juvenile-center","hasSchedule":false,"id":"5e346de2527dcf49dad6dd76"};

SPONSORED CONTENT



Exciting new updates. Same great nutrition. ⬈
By Hill's Vet